Edward J. Dauber, Esq.
Linda G. Harvey, Esq.
GREENBERG DAUBER EPSTEIN & TUCKER
A Professional Corporation
1 Gateway Center
Suite 600
Newark, New Jersey 07102
Telephone No. (973) 643-3700
*Attorneys for Plaintiffs Avi Avraham Zinger and*
*American Quality Products Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AVI AVRAHAM ZINGER,**<br><br>*and*<br><br>**AMERICAN QUALITY PRODUCTS LTD.,**<br><br>              *Plaintiffs*<br><br>      *v.*<br><br>**BEN & JERRY'S HOMEMADE, INC.**<br><br>*and*<br><br>**UNILEVER UNITED STATES, INC.**<br><br>*and*<br><br>**CONOPCO, INC.,**<br><br>            *Defendants* | Civil Case No.: 22-<br><br><br>**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES**<br><br>**JURY TRIAL REQUESTED** |

1

## INTRODUCTION

This is an action to declare unlawful and prohibit the termination of a license agreement (the "Agreement") under which the Plaintiffs, Avi Avraham Zinger ("Avi") and his companies, American Quality Products Ltd. and its predecessors ("AQP"), have manufactured and distributed Ben & Jerry's ice cream products in Israel for the past 34 years. The only reason defendants Ben & Jerry's Homemade, Inc. ("B&J") and Unilever[1] ended the Agreement was Plaintiffs' refusal to comply with their unlawful demand that Plaintiffs violate Israeli law by boycotting parts of Israel. The demand was in and of itself a violation by Defendants of Israeli law, U.S. anti-boycott policy, and the laws and policies of the States of New Jersey, New York, and many other states. Defendants' unlawful demand also violated terms of the Agreement itself as well as the Consent Decree required by the Israeli Government Competition Authority ("ICA") as a condition of its approval of the merger between B&J and Unilever.

Defendants caused immediate harm to Plaintiffs' business operation and reputation when Defendants announced their intent to terminate the parties' 34-year relationship as of the end of December 2022. That harm accelerated and intensified when Unilever announced on February 10, 2022 that it is planning a "new arrangement" for Ben & Jerry's ice cream in Israel. Plaintiffs' competitors (which include another Israeli ice cream company owned by Unilever) are taking advantage of the situation to push Plaintiffs out of the marketplace. Competitors are poaching Plaintiffs' employees and pressuring supermarket chains to relinquish to them a portion of

---

[1] The Unilever defendants in this case are Unilever United States, Inc. ("Unilever USA") and Conopco, Inc. (collectively, for purposes of this litigation, "Unilever"). These are the U.S. branches of the global Unilever entity (Unilever PLC, a British company), whose predecessor (Unilever NV, a Netherlands company) signed the License Agreement. Only the U.S. branches were and are actively involved in the conduct at issue in this case. We refer to the Unilever entities and B&J together as "Defendants."

Plaintiffs' freezer space. In addition, the uncertainty created by Defendants regarding AQP's future viability has made it impossible for Plaintiffs to hire necessary managerial staff or to properly determine and order necessary ingredients and equipment. Plaintiffs' market share had been steadily increasing for years. As a direct consequence of Defendants' unlawful action, Plaintiffs' sales have dropped precipitously. To prevent irreparable harm to Plaintiffs' business and reputation, this action seeks immediate declaratory and injunctive relief to maintain the status quo and enable Plaintiffs to continue manufacturing and distributing Ben & Jerry's products. Plaintiffs ultimately seek a jury trial and damages.

In 1987, Avi, an Israeli citizen, became the first and only licensee of defendant B&J. He built his business from scratch, starting with a single ice cream parlor or "scoop shop." His company, which today employs a diverse workforce of 169 people, including new immigrants, African refugees, and people with disabilities, manufactures and distributes Ben & Jerry's ice cream to supermarket chains and mini-markets throughout Israel, including in the areas acquired by Israel in 1967 (the "Areas," aka the "disputed" or "occupied" territories) and operates two scoop shops.

Avi's license arrangement remained in place following B&J's merger with corporate giant Unilever in 2000. In 2004, AQP, B&J, and Unilever signed an Agreement (the operative one in this case) granting AQP a license *inter alia* to manufacture, distribute, and sell Ben & Jerry's ice cream throughout the territory defined in earlier agreements (and the 2004 agreement) between AQP and B&J—namely, the State of Israel, including the Areas, where many Palestinians reside.

The relationship among the parties continued successfully for many years. Avi's company expanded, became part of Unilever's supply chain, and began providing Ben & Jerry's ice cream products also to Europe. Avi and his company consistently developed and supported programs to

assist disadvantaged groups and to foster Israeli-Palestinian cooperation in alignment with B&J's—and Avi's own—social mission.

Approximately ten years ago, Unilever's B&J subsidiary became the target of the Boycott, Divestment & Sanctions ("BDS") Movement, which is hostile to the State of Israel. BDS proponents demanded that B&J stop selling its ice cream in Israel, including in the Areas.

Defendants repeatedly promised Avi they would extend his company's Agreement, which currently goes to December 31, 2022, as they had without question for decades. At the same time, Defendants pressured Plaintiffs to accommodate BDS by ending sales and distribution of Ben & Jerry's ice cream in the Areas, even though Defendants knew that this demand violated Israeli law, the laws of various states (including New Jersey and New York), U.S. policy, and a Consent Decree issued by the Israeli Government as a condition of approval of the Unilever–B&J's merger. The demand also breached numerous terms of the Agreement itself, including provisions that define AQP's Territory to include the Areas, require AQP to maximize sales in the Territory, and prohibit the violation of "all applicable national or local laws and regulations," as well as U.S. export laws.

BDS pressure mounted in the spring of 2021. In July 2021, contrary to the assurances Defendants had made to Avi that Plaintiffs' contract would be renewed, Defendants abruptly announced they would be terminating AQP's License, ending a mutually successful 34-year business relationship between Plaintiffs and B&J. The *only* reason for non-renewal was Plaintiffs' refusal to carry out Defendants' unlawful demand. A party to a contract, especially the one with outsized bargaining power, cannot lawfully or in good faith coerce the weaker party into violating the law as a condition of maintaining the contract. Defendants are liable for wrongful termination, for breach of the License Agreement, for breach of the implied covenant of good faith and fair

dealing, and for false light invasion of Plaintiff's privacy, as set forth below. Plaintiffs also seek immediate injunctive relief barring Defendants from terminating or non-renewing the business relationship and maintaining the status quo pending the outcome of the litigation on the merits.

## THE PARTIES

1. Plaintiff Avi Avraham Zinger ("Avi") is an Israeli citizen who resides permanently and is domiciled in Israel. In 1987, defendant Ben & Jerry's Homemade, Inc., granted Avi an exclusive license to manufacture and sell its ice cream products in Israel, including in the Areas. Avi, through his companies, remains the only Ben & Jerry's licensee to this day, in Israel or elsewhere.

2. Plaintiff American Quality Products Ltd. ("AQP") is the Israeli corporation through which Avi now operates his license. Avi is AQP's sole ultimate beneficial owner through an intermediate holding company.

3. Defendant Ben & Jerry's Homemade, Inc. ("B&J") is a Vermont corporation with principal executive offices in Burlington, Vermont. The company was formed by its original owners, Ben Cohen ("Ben") and Jerry Greenfield ("Jerry"), to manufacture, distribute, and sell quality ice cream. In 2000, the Unilever Group acquired 100% of B&J through a merger in which B&J became the wholly-owned subsidiary of Defendant Unilever United States, Inc.

4. Defendant Unilever United States, Inc. ("Unilever USA") is a Delaware corporation having its principal executive office in Englewood Cliffs, New Jersey. It is a wholly-owned subsidiary of Defendant Conopco, Inc.

5. Defendant Conopco, Inc. ("Conopco") is a New York corporation having its principal executive offices in Englewood Cliffs, New Jersey. AQP remits its royalty payments

directly to Conopco. Unilever USA and Conopco are referred to in this Complaint collectively as Unilever USA.

6. The Unilever Group's portfolio of consumer products includes more than a dozen global brands, including Hellmann's mayonnaise, Knorr soup, Lipton tea, Axe deodorant and Dove soap products. Unilever's consumer goods are sold in more than 190 countries, including Israel. Its largest market is the United States.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1332(a)(2), because the amount in dispute is over $75,000 exclusive of interest and costs, and because the dispute is between (a) citizens of a foreign state who are not admitted for permanent residence in the United States and (b) citizens of States in the United States.

8. This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and to issue preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure ("FRCP").

9. This Court may assert personal jurisdiction over all the Defendants pursuant to FRCP Rule 4(h) and N.J. Court Rule 4:4-4.

10. Venue is proper under 28 U.S.C. § 1391(b)(3) because one or more of the Defendants is subject to this Court's personal jurisdiction.

## FACTUAL BACKGROUND

**A.  Avi Enters into an Agreement With B&J To Develop an Ice Cream Business in Israel.**

11. In or around 1984, Avi learned about a fledgling ice cream business in Vermont started by Ben and Jerry. Avi was impressed by the quality of Ben & Jerry's ice cream and

concluded there was a potential market for Ben & Jerry's ice cream in Israel, which had no so such quality ice cream then. At the time B&J was relatively unknown in the United States and had no international market presence.

12. On information and belief, in the 1980s and 1990s, Strauss Ice Cream Ltd. ("Strauss"), an Israeli corporation, held well over 50% of the Israeli ice cream market. Strauss was later acquired by Unilever, which currently distributes Strauss ice cream throughout Israel, including in the Areas.

13. In or around 1985 or 1986, Avi arranged to meet Ben at his home in Vermont. Avi explained his desire to bring Ben & Jerry's ice cream to Israel and Ben agreed.

14. In 1987, B&J entered into an agreement with Avi and a predecessor to AQP, licensing the right to manufacture and sell Ben & Jerry's ice cream products within Israel, including the Areas.

15. In 1987, Avi began building his ice cream business from scratch. He travelled to Vermont to learn how to make ice cream, where the ingredients were sourced, and how to comply with B&J's policies. Avi identified a factory in Israel and arranged to rent it part-time. It took more than a year before Avi was able to open his first Ben & Jerry's scoop shop in Tel Aviv. It was an instant success. Over the years, Avi opened 15 more scoop shops.

16. In the early 1990s, Avi expanded his business beyond the scoop shops and began distributing Ben & Jerry's ice cream to supermarkets, convenience stores, hotels and restaurants throughout Israel, including the Areas.

17. In 1998, B&J and an AQP predecessor signed a new agreement which contemplated expanding Avi's business to include Cyprus, Greece, and Turkey, in addition to Israel.

18. In 1999, B&J purchased a 60% interest in Avi's business.

## B. B&J Merges with Unilever and the Two Companies Sign a Consent Decree with Israel's Antitrust Authority.

19. In May 2000, B&J agreed to merge with the Unilever Group, then headed by Unilever N.V. Merger negotiations were managed and coordinated primarily by Unilever USA on behalf of the Unilever Group. Unilever was then, as now, the world's largest manufacturer of ice cream. Not only did the Unilever Group have a controlling interest in Strauss, which was the dominant ice cream company in Israel, but it also controlled many of the major U.S. ice cream brands like Popsicle, Klondike, Breyers, Good Humor, and Magnum.

20. The merger raised serious antitrust issues in Israel because Unilever controlled Strauss, which had the largest share of the Israeli ice cream market, in excess of 50%.

21. Israel's Restrictive Trade Practices Authority, the government agency responsible for overseeing antitrust issues in Israel (now known as the Israel Competition Authority or ICA), agreed to the Unilever-B&J merger subject to B&J's relinquishing its 60% interest in Avi's business, which it did in 2001, and to Unilever and B&J's agreeing to strict conditions ultimately set forth in a 2001 Consent Decree.

22. The Consent Decree, *inter alia*, prohibited B&J and Unilever from "narrow[ing] the scope of the license" issued to Plaintiffs or "degrad[ing] the terms" of the license without first notifying and receiving the approval of the ICA.

23. It further provided that full management separation had to be maintained between Unilever and AQP. The Consent Decree directed that "Unilever and/or B&J shall have no involvement with [AQP]'s decisions regarding conditions of contracting with retailers, the scope and timing of such contracts and the opening of retail stores for the

sale of ice cream, the locations thereof and prices at which Ben & Jerry's products will be sold in such stores." Unilever and B&J were prohibited from contacting AQP directly or indirectly concerning these matters. The Consent Decree prohibited B&J, Unilever, and Strauss Ice Cream from taking any action that might "interfere with the activities of [AQP] in the field of frozen desserts generally and, particularly in the distribution and marketing of Ben & Jerry's products."

24. Unilever and B&J agreed to the conditions, and the merger went forward.

25. Contemporaneously with the Consent Decree, on December 17/18, 2001, B&J and Avi signed an Outline of Terms detailing how Avi would wind up the company in which B&J had a 60% interest and convey the license, inventory, and all assets to AQP. The Outline of Terms also set forth the principal terms of the parties' future License Agreement, including how Avi would be granted "Exclusivity in Israel as to B&J Products, including the 'occupied territories' under sole Israeli control." [Outline of Terms, §20(a)]. The latter provision reaffirmed the parties' longstanding understanding of the geographic scope of Avi's license, namely that it included all of Israel, including the Areas.

26. At the time of the merger, Unilever agreed that B&J's newly formed Board would retain the right to "oversee" the "historical social mission of the Company," defined as including: "a commitment to purchase 'fair trade' products, ... to open scoop shops in ... partnership with non-profit organizations, ... to use unbleached paper ... and ... to purchase, if commercially feasible, a portion of its ingredients from not-for-profit suppliers and suppliers from economically disadvantaged groups and to [assist] such suppliers."

27. Unilever maintained primary responsibility for financial and operational aspects of B&J, and it ultimately made the decision to boycott the Areas.

C. **Unilever, B&J, and AQP Enter into a License Agreement in 2004.**

28. In 2004, B&J, Unilever, and AQP signed a License Agreement (the "Agreement") authorizing AQP to manufacture, sell and distribute Ben & Jerry's ice cream products in the "Territory" defined, consistent with the earlier license agreements and the 2001 Outline of Terms, as "The State of Israel, including the 'occupied territories' under sole Israeli control." The Agreement expressly granted AQP the right to distribute Ben & Jerry's ice cream products through supermarkets, grocery stores, convenience stores, contract food service accounts and other food outlets. [L.A., *Definitions,* "Wholesale Distribution/Wholesale Distribution Channel"]

29. Specifically, the Agreement gives AQP an "exclusive, non-transferable and personal license" and the rights to offer, sell, and distribute Ben & Jerry's ice cream, to subcontract the manufacture of Ben & Jerry's ice cream, to construct, open, own, and operate retail shops, to use Ben & Jerry's proprietary marks, and to promote the products in Israel including the Areas. The Agreement requires AQP to "use best efforts to (1) maximize the sale of the Property Products in the Territory and (2) promote the Wholesale Distribution thereof…" [LA §25.1]

30. AQP agreed to pay a 3 percent royalty of the "gross turnover," in U.S. dollars, to B&J during the renewal term. [LA §§12.1, 12.4]

31. The parties agreed that AQP "shall comply, and shall use its best efforts to ensure that it…comply with **all applicable national or local laws and regulations** in performing

its duties hereunder and in any of its dealings with respect to the Products..." [LA §15.20, emphasis added]

32. With respect to U.S. export control laws, the agreement states:

> [AQP] agrees that it shall not act or omit to act in any way that would violate any of the export control laws or regulations of the U.S. and no party shall be required hereunder to act or omit to act in any way that it believes in good faith would violate any such law or regulation.  [LA §15.24]

33. The parties further agreed that it would be an immediate event of default—not subject to any opportunity to cure—for AQP to take any "action or inaction...[that] results in the loss of the right or forfeiture of the right, to do or transact business in the Territory." [LA §23.2.4]

## D. Plaintiffs Expand Their Business.

34. Between 2000 and 2005, Avi closed most of his scoop shops and focused his business primarily on manufacturing and distribution. A surge in terrorist attacks in Israel, including suicide bombings that targeted locations popular with young Israelis, made Avi concerned for the safety of his scoop shop employees and patrons. He chose instead to make Ben & Jerry's ice cream available throughout Israel and the Areas by distributing to supermarkets and gas station mini-markets throughout the region. AQP also became part of Unilever's supply chain and began providing Ben & Jerry's products manufactured in Israel to Europe.

35. In 2010, pursuant to Defendants' direction and guidance, Avi , undertook substantial financial commitments at great personal risk to enable AQP to move to a new larger

factory in Be'er Tuvia near Kiryat Malachi, in southern Israel, to meet Unilever's anticipated supply-chain demands.

### E. Plaintiffs Actively Promote Social Justice Causes.

36. Avi and AQP have, over many years, initiated and supported projects that promote coexistence between Israelis and Palestinians and provide educational and occupational opportunities to disadvantaged communities, including Palestinians. Plaintiffs also elected to use Fairtrade Certified Ingredients, at significant additional cost to their business.

37. Avi's social mission projects include support for:

- The Middle East Entrepreneurs of Tomorrow ("MEET") - a program conducted together with the Massachusetts Institute of Technology to educate Israeli and Palestinian high-school student entrepreneurs and teach them computer sciences, entrepreneurship, and innovative leadership skills over a three-year period. When the U.S. government halted aid payments that MEET relied upon, jeopardizing the program's viability, Avi arranged for B&J to donate $100,000 to MEET to ensure the program's continuity. In addition to funding, Avi developed programming for MEET using his B&J's business as a case study. Avi and his business became a highlight of the MEET program. His participation came to an abrupt end in July 2021, however, when Defendants announced they were terminating the Agreement. MEET rescinded its invitation, explaining they feared that Avi's participation would lead Palestinians to boycott the program.

- "Seeds of Peace" – an organization that promotes co-existence between Israeli and Palestinian students.

- The Global Learning and Observations to Benefit the Environment ("GLOBE") Program - a worldwide, hands-on, primary and secondary school-based science and education program sponsored by the U.S. Government and NASA that works with Israeli Arab and Jewish children.

- Kids4Peace – a global movement of Jewish, Christian, and Muslim youth dedicated to ending conflict and inspiring hope in divided societies around the world. Kids4Peace operates five international summer camps and a six-year, year-round program for Palestinian, Israeli and North American youth.

- Jordan River Village – an overnight camp and retreat center in the Middle East where children living with serious illnesses of all ethnic and religious backgrounds (including Jewish Israelis, Israeli Arabs, and Palestinians) participate together.

- The Ethiopian National Project ("ENP") - an organization that assists Ethiopian-Israeli youth and community in Israel. Avi contacted and coordinated with the Bob Marley family's One Love Foundation to bring to Israel the Ben & Jerry's ice cream flavor that honored the late Reggae singer, and to set up a program which donated part of the sales to empower the Ethiopian community while raising awareness, raising more funds and recruiting new volunteers to the project. With the donations Avi developed a traditional Ethiopian community garden initiative that unified the Ethiopian community by ameliorating the rift that had developed between older Ethiopian refugees (who had little formal education and found it difficult to acclimate to Israel's modern society) and their children and grandchildren. The gardens enabled multiple generations of Ethiopians to plant and harvest together while learning Ethiopian traditions and beautified the area around the community

13

center. Avi contacted Bob Marley's son, Ziggy Marley, who was preforming in Israel and arranged for members of ENP's School Performance and Community Empowerment Program to attend the concert and meet the performer. For many of the student attendees, this was a very inspiring experience as well as the first concert they had ever attended.

- "Fruits of Peace" – a project initiated by Avi to strengthen economic cooperation between Israelis and Palestinians by developing new Ben & Jerry's ice cream flavors using ingredients sourced from Palestinian farmers in the Areas. Avi worked with USAID, and non-profit peace organizations to identify and connect with Palestinian farmers. He developed a "Fruits of Peace" ice cream flavor ("Creamy Fig Ice Cream with Dates") and had artists design the packaging. The Palestinian partners then abruptly stopped communicating with him, apparently due to BDS anti-normalization pressure. As a result, the "Fruits of Peace" project shut down.

38. Defendants consistently and enthusiastically embraced and boasted about Plaintiffs' many social mission projects.

## F. The Boycott, Divestment, and Sanctions Movement ("BDS") Pressures B&J To Boycott Israel.

39. In or about 2011, B&J became a target of the BDS Movement, which promotes boycotts, economic sanctions, and divestments aimed at the eventual elimination of Israel.

40. B&J began receiving letters from Vermonters for A Just Peace in Palestine ("VTJP"), a BDS group, demanding that B&J stop selling ice cream in Israel, based on allegations that B&J was selling ice cream in "illegal Jewish-only settlements" in the Areas. VTJP failed to mention that Ben & Jerry's was also being sold in Palestinian cities, villages,

and communities throughout the Areas. In addition, many Palestinians shop at the supermarkets and mini-markets to which Plaintiffs distribute Ben & Jerry's ice cream in the Areas. Plaintiffs do, and always have, distributed Ben & Jerry's ice cream to all people in the Areas and all over Israel.

41. Plaintiffs have never limited sales of Ben & Jerry's ice cream to "Jewish-only settlements." Nor could they lawfully do so. Israel's non-discrimination laws prohibit discrimination in the furnishing of a product or public service on the basis of many categories, including, race, religion, nationality, place of origin, gender, sexual orientation, age, and **residence**. Pursuant to this law, an Israeli company like AQP may not refuse to provide its product to customers residing in the Areas, regardless of their religion, ethnicity, national origin, gender, race etc. Israel's anti-boycott law also prohibits any person from knowingly calling for a boycott against the State of Israel or any area under its control (*i.e.*, the Areas).

## G. Defendants Renew the License Agreement, and, after Visiting Israel and Witnessing Plaintiffs' Operation Firsthand, B&J Executives Defend Plaintiffs in the Face of BDS Attacks.

42. In 2013, the Agreement was renewed for the first of two successive five-year terms. The first term ran from 2013 – 2018. The second term began in 2018 and continues through December 31, 2022.

43. In March 2014, Jostein Solheim, the then-CEO of B&J (who had been placed as CEO by Unilever USA), and the members of B&J's independent Board of Directors ("the Board") visited Israel and witnessed firsthand Plaintiffs' business operation and involvement in social mission projects.

44. Also in March 2014, VTJP sent a letter to Solheim urging B&J to end its business relationship with its Israel "franchise." In a letter dated April 8, 2014, Solheim (who had just returned from visiting Plaintiffs in Israel) advised VTJP that "our Licensee in Israel operates his business in alignment with Ben & Jerry's Mission and Values," which included "promotion of peace through understanding." Writing to another BDS supporter, Solheim cited the social-justice efforts that Avi was spearheading to demonstrate that "we . . . support peace in Palestine and are doing lots of initiatives to support them and their communities[.]"

45. Rob Michalak, Global Director of Social Mission at B&J, reiterated Solheim's message in his own letter to VTJP, dated April 16, 2014, stressing that Avi had B&J's support and confidence: "[O]ur Licensee . . . works to serve Ben & Jerry's Mission and Values. We are confident that our Licensee in Israel is operating his business in a responsible and appropriate way." Echoing Solheim, Michalak added, "We are working to build the constructive business relationships that can create positive outcomes such as sourcing Fairtrade-certified ingredients from local farmers."

46. In 2015, VTJP sought to increase its pressure on B&J by targeting hundreds of the company's U.S. scoop shop franchisees, urging them to demand that the company either cease its operations in the Areas or close the Israeli "franchise" altogether.

47. Around the same time, BDS activists began harassing store owners and organizing demonstrations at which they handed out anti-Israel flyers to customers waiting on line at B & J's annual "free cone day," the franchisees' top marketing event each year. This activity continued and increased year after year.

H. **The B&J Board Succumbs to BDS Pressure While B&J Executives Continue To Assure Avi that the License Agreement Will Be Extended.**

48. In or around 2018 and 2019, B&J's Board began to succumb to pressure from the BDS Movement's increasingly relentless attacks. Defendants urged Avi to cease AQP's operations in the Areas.

49. On more than one occasion between 2018 and 2021, Avi informed the Board that it would be a violation of both Israel's anti-discrimination law and Israel's anti-boycott law for Plaintiffs to cease distribution of Ben & Jerry's products in the Areas.

Avi explained that violating these laws could subject Plaintiffs to administrative fines and criminal prosecution in Israel, in addition to the loss of numerous government benefits. In addition, Avi advised Defendants to "check the legal status of such action in the US."

50. In February 2020, Avi requested that B&J extend the license beyond the end of December 2022, writing to Matthew McCarthy, CEO of B&J with a copy to Anuradha Mittal, Chairperson of the Board, shortly after the B&J's annual global meeting in San Diego:

> "As I mentioned to you in our meeting in San Diego, this year is going to be very challenging – competitors are coming out with super primum [sic] pints, red labels on our packaging, Froneri is taking over Nestle and Haagen Dazs with very aggressive plans, cost of cream is going up, and more.
>
> In order to be able to deal with these changes I have to prepare myself for the future with long term investments, as mentioned to you – for instance, expanding and extending our lease agreement on the factory, new mix plant, and expanding our budget for purchasing ice cream cabinet, among other things."

51. Avi reminded McCarthy and Mittal that in the past, renewal discussions had taken a long time and the previous renewal extension was not signed for more than a year after the contract had expired.  The parties had renewed the license consistently since 1987. Avi added:

> "This time my challenges and responsibilities are much greater than the previous years and I want to avoid the entering a period of uncertainty once again.
> My agreement with Ben & Jerry [*sic*] expires in the end of December 2022, a little less than 3 years from now and if possible, I will like to start the conversation with you now to extend it."

52. McCarthy promptly responded in an email with a copy to Mittal, indicating that he agreed to extend:

> "After your amazing performance in 2019 I know 2020 will be tougher. Thank you for initiative [*sic*] discussion on contract – I look forward to extending it."

I.  **Avi Seeks To Accommodate B&J's BDS Concerns.**

53. In September 2020, Plaintiffs were advised that the emerging Board position was that no B&J ice cream be present in the Areas.

54. In an effort to accommodate B&J and Unilever while adhering to the law, Avi proposed that the language of the License Agreement be revised to define "Territory" as "the State of Israel" instead of "The State of Israel, including the occupied territories under sole Israeli control." The parties understood this to be a cosmetic change, made to appease BDS activists. It was not intended to affect, and did not affect, the geographic scope of the license that Avi and his companies had contracted for and been following

18

since the inception of the license in 1987. B&J and Unilever were fully aware that Plaintiffs were continuing to sell B&J products in the Areas.

55. In September 2020, McCarthy provided Avi with an amendment that adopted the "State of Israel" language, but B&J did not provide the promised extension of the License Agreement. Nothing changed regarding the sale of B&J ice cream in the Areas.

56. In October 2020, Avi again wrote to McCarthy regarding license extension. Avi had initially proposed a ten-year renewal, but modified his proposal to five years with an option for an additional five years. To this end, Avi enclosed a copy of the prior five-plus-five-year renewal signed by Solheim and said, "As I told you, it is very necessary for the continued operation of the company, please, let's make it happen." McCarthy replied, "Thank [*sic*] Avi. Clear. I agree we need to extend."

57. Upon information and belief, BDS attacks grew increasingly harsh and personal in May 2021. B&J's Board doubled down on its demand that Avi stop selling in the Areas. Avi continued to explain to McCarthy and others at B&J, as he had for years, that he could not comply with B&J's request to stop distribution and sales in the Areas because doing so would violate Israeli and U.S. law and breach the License Agreement's provisions prohibiting such violations.

58. Plaintiffs nevertheless sought to address the Board's concerns by suggesting that a Palestinian distributor could be found to handle **all** distribution in the Areas. This would have created a significant economic opportunity for a Palestinian distributor. When B&J learned that the Palestinian distributor Avi located wanted to **expand** sales in the Areas, however, B&J rejected the proposal.

**J.  B&J Abruptly Informs Plaintiffs It Will Not Extend the License Agreement.**

59. On July 19, 2021, McCarthy abruptly informed Plaintiffs in a letter that B&J would not continue the Agreement beyond December 31, 2022, ending a 34-year-old business relationship, solely because Plaintiffs refused to violate the law by stopping sales of Ben & Jerry's ice cream in the Areas.

60. On the same day Unilever issued a public statement that said:

"We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT). We also hear and recognize the concerns shared with us by our fans and trusted partners. We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year. Although Ben & Jerry's will no longer be sold in the OPT, we will stay in Israel through a different arrangement. We will share an update on this as soon as we're ready."

61. Unilever USA's statement was rejected by B&J's Board, which released its own statement, declaring that:

"The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory (the OPT) does not reflect the position of the independent board, nor was it approved by the independent board. By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social

mission and brand integrity, Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement."

K. **While Defendants Insist that Plaintiffs Violate the Law (Thereby Violating the Laws and Policies of the United States and Many States ), Unilever Continues To Sell Its Own Ice Cream and Other Products in Israel, Including the Areas.**

62. As a result of Defendants' wrongful and unlawful breach and termination of the business relationship with Plaintiffs, Defendants have been found to have violated numerous United States anti-boycott laws, including those of New Jersey and New York, which has resulted in those States divesting their pension funds of any ownership of Unilever stock.

63. In addition, numerous other parties have taken legal action against Defendants, including a complaint filed by Palestinian activist Bassam Eid with the New York State Division of Human Rights, explaining that Unilever's decision will harm Palestinians, who are among Ben & Jerry's most devoted consumers.

64. After demanding that Plaintiffs stop selling in the Areas and terminating the Agreement when Plaintiffs refused to do so, Unilever continues to sell many of its other products in the Areas, including Strauss ice cream, Ben & Jerry's competitor in Israel, along with many other food and personal hygiene products.

L. **Plaintiffs Are Suffering Immediate and Irreparable Harm.**

65. The prospective termination of the Agreement at the end of 2022 has caused and continues to cause immediate and irreparable harm to Plaintiffs, including to their reputation and goodwill built up over more than three decades. Unilever's recent announcement that it is planning a "new arrangement" for Ben & Jerry's ice cream in

Israel has accelerated, intensified, and exacerbated the harm to Plaintiffs' business operation.

66. Prospective termination endangers the continuation of Plaintiffs' businesses in Israel (including in the Areas), placing them under imminent threat of partial or total destruction.

67. As a direct result of Defendants' wrongful conduct, accumulated sales of Ben & Jerry's ice cream throughout Israel have dropped 23% since August 2021 and continue to decline at an increasingly rapid rate each month. Sales for January 2022 were 30% lower than January 2021, reversing an average annual sales growth of 15% per year. Sales at Avi's two ice cream shops have dropped 34% and 28% respectively since August 2021 compared to the same period in 2020. Sales in the Areas have dropped 39%, reversing double-digit growth in 2018, 2019, and 2020.

68. Sales to anchor stores (mainly food chains) have dropped precipitously since Defendants published their statements in July 2021. Plaintiffs have experienced a 45% drop in sales to convenience stores on IDF bases; a 45% drop in sales to Domino's Pizza; a 42% decrease in sales to the Victory food chain; a 34% drop in sales to convenience store AM/PM; a 29% drop in sales to Israeli supermarket chain, Tiv Ta'am; and a 26% drop in sales to Rami Levi, one of Israel's largest grocery market chains.

69. Defendants' wrongful conduct has caused extensive damage to Plaintiffs' reputation and goodwill. Until the July 2021 statements were published, Plaintiffs' products were very highly regarded and sought after. As a result of the fallout caused by Defendants' conduct, there are incessant calls on social media to boycott Plaintiffs, including ads

by well-known individuals. Plaintiffs have also experienced attacks on, and destruction of, equipment, including vandalized freezers at points of sale. In addition, government bodies, organizations, institutions, and private companies have succumbed to public pressure and are distancing themselves from AQP because they are reluctant to associate with the ostracized Ben & Jerry's brand.

70. Business competitors are exploiting the damage to Plaintiffs' reputation to increase their own sales at Plaintiffs' expense. Competitors have begun poaching Plaintiffs' delivery truck drivers and pressuring supermarket chains to relinquish to them a portion of Plaintiffs' freezer space.

71. Plaintiffs have suffered damage to their ability to equip themselves for business operations. They have been unable to plan for the coming season, prepare budgets and projections, commit to long-term contracts, arrange necessary financing, procure inventories of raw materials and supplies, make arrangements for distribution, hire management and workforce, develop new products and promotional materials, and prepare and develop marketing and advertising campaigns (as they have done each year).

72. With Defendants' knowledge, and in reliance upon assurances that his license would be renewed, Avi invested millions of dollars from his own resources in a series of projects aimed at gearing up for the coming decade. He took steps, for example, to upgrade his manufacturing line, purchasing and installing a new multi-million dollar mix plant and packaging equipment, a large portion of which was already in place but not yet operational when Defendants' statements were published.

73. The prospective termination and attendant uncertainty have  made it impossible for Plaintiff to hire needed managerial staff and have threatened Plaintiffs' ability to retain current staff. Plaintiffs' 169 employees, who include refugees from Sudan and Ethiopia, new immigrants struggling with the Hebrew language, and people with disabilities, are now uncertain whether their employment will continue. Some have already resigned, others are considering resigning, and it is hard for Plaintiffs to recruit workers in light of the hostile atmosphere, tight employment market, and the uncertainty created by Defendants' wrongful conduct.

74. Plaintiffs' credibility and financial status with providers of bank credit and suppliers, whose cooperation is needed months in advance of actual sales, have also been harmed by Defendants' wrongful conduct.

75. Avi has been forced to cancel a substantial transaction for the purchase of commercial real estate adjacent to his factory, which would have been used to store raw materials and park delivery trucks.

76. Defendants' wrongful termination of AQP's license has placed Avi and AQP in a false light in the eye of the public both within Israel (including the Areas) and outside by creating the false impression that Plaintiffs engaged in discriminatory practices causing B&J to stop selling in the Areas. Exactly the opposite is true.

77. For the foregoing reasons, Plaintiffs are seeking immediate injunctive relief, pending the final outcome of litigation on the merits, to preserve the status quo and prevent Defendants from unlawfully refusing to renew the License Agreement thereby terminating the parties' 34-year business relationship and causing irreparable and irreversible harm to Plaintiffs' business and reputation.

78. Plaintiffs also seek compensatory and punitive damages.

## CAUSES OF ACTION

### FIRST CLAIM: BREACH OF CONTRACT
(AQP v All Defendants)

79. Plaintiffs repeat and reiterate the forgoing paragraphs of the Complaint as if set forth herein.

80. AQP and Defendants entered into a valid and binding contract, namely, the 2004 License Agreement, as later amended and extended.

81. At all times during the term of the Agreement, as extended, Defendants repeatedly acknowledged that Plaintiffs not only met but exceeded their obligations under the contract by creating an extremely successful market for Ben & Jerry's ice cream in Israel, including the Areas, while fulfilling B&J's social mission and corporate responsibility policies.

82. Defendants materially breached the Agreement by openly and notoriously declaring to the entire world that they would not renew the contract, despite express assurances to do so and despite the parties' 34-year business relationship and course of dealing.

83. Defendants breached the Agreement by mismanaging it and adopting policies that were contradictory and confusing and not authorized by the Agreement.

84. Defendants breached the Agreement by demanding that Plaintiffs stop selling Ben & Jerry's ice cream in the Areas, in violation of the following Israeli laws:

   a. The Prohibition of Discrimination in Products, Services and Entrances to Entertainment Places and Public Places, 5761-2000. This law prohibits discrimination in supplying products and public services and giving entry "on the basis of . . . a place of residence."

    b. The Law to Prevent Harm to the State of Israel through Boycott, 5771-2011. This law defines a boycott against the State of Israel as "deliberately avoiding economic, cultural or academic ties with another person solely because of their affinity with the State of Israel, one of its institutions or an area under its control, in such a way that may cause economic, cultural or academic damage."

85. Defendants' unlawful demand is in and of itself a violation of the ICA Consent Decree, which established conditions for approval of Unilever's merger with B&J. The Consent Decree requires the following:

    a. Ben & Jerry's products were to be distributed in Israel by a person who has no affiliation, direct or indirect, with Unilever or Strauss;

    b. B&J and Unilever were barred from narrowing the scope of the license and and degrading the terms with regard to the license, the conditions thereof and the products to be distributed pursuant thereto, without first obtaining the consent of the ICA. Neither the scope of the license nor its conditions could be restricted or narrowed by B&J or Unilever;

    c. no further restraints on the licensee's business could be made without ICA approval;

    d. Unilever could not be involved in the licensee's business;

    e. neither Unilever nor B&J could take any action to disrupt the licensee's activity in the frozen desserts market, and no transfer of license or change of ownership would take place without ICA approval. Any attempt by Unilever or B&J to restrict, narrow, or impair the scope of the existing

License, let alone terminate it based on the Licensee's refusal to accede to or participate in an act in violation of Israeli law, violates the Consent Decree.

86. Defendants' actions restrict, narrow, and impair the scope of the existing Agreement in violation of the Consent Decree.

87. Defendants' unlawful demand violates U.S. policies, including but not limited to the following:

      a. The policies articulated by the boycott provisions of the U.S. Export Control Reform Act of 2018, 50 U.S.C. 4801-4852 ("ECRA"), administered and enforced by the Office of Antiboycott Compliance ("OAC") of the Bureau of Industry and Security ("BIS") in the Department of Commerce, which prohibit companies and individuals, *inter alia*, from refusing or agreeing to refuse to do business for boycott-related reasons, from furnishing information for boycott-related reasons, and taking discriminatory acts for boycott-related reasons. *See* 50 U.S.C. §§ 4841-4843 and "Antiboycott Regulations" at 15 C.F.R. pt. 760. There are both criminal and civil penalties for violations of these laws and regulations, including imprisonment for up to twenty years and fines up to one million dollars. 50 U.S.C. § 4843.

      b. The policies articulated in 19 U.S.C. § 4452(b)(4) and (b)(7), which state, *inter alia*, that Congress "opposes politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel, such as

28

boycotts of, divestment from, or sanctions against Israel." These policies apply to Israel and "any territory controlled by Israel."

c.  The policies underlying the U.S. Tax Code's reporting requirements for activities related to boycotts (and penalties for violation of these requirements). *See* 26 U.S.C. § 999.

d.  The policies behind U.S. tax laws and/or the anti-boycott provisions of ECRA that include knowing agreements to refuse or actual refusal to do business with or in a boycotted country or with blacklisted companies. *See* 26 U.S.C. § 999, 50 U.S.C.A. §§ 4841-4843, and 15 C.F.R. pt. 760.

e.  The anti-discrimination policies included in the ECRA provisions that bar a company from refusing to employ or otherwise discriminate against any U.S. person on the basis of race, religion, sex, or national origin grounds and/or for a company to agree to require that its business partners engage in the same type of discrimination. *See* 50 U.S.C.A. §§ 4841-4843; 15 C.F.R. pt. 760.2(b).

88. Defendants' actions also violate New Jersey's anti-boycott law and public policy, including but not limited to the following:

a.  New Jersey law requiring the withdrawal of pension funds from investments in any company that boycotts the goods, products, or businesses of Israel or companies operating in Israel or territories occupied by Israel. New Jersey Stat. § 52:18A-89.14 ("no assets of any pension or annuity fund under the jurisdiction of the Division of Investment in the Department of the Treasury ... shall be invested in any company that boycotts the goods,

products, or businesses of Israel, boycotts those doing business with Israel, or boycotts companies operating in Israel or Israeli-controlled territory."); see also New Jersey Stat. § 52:18A-89.13 ("The State is deeply concerned about the Boycott, Divestment and Sanctions (BDS) effort to boycott Israeli goods, products, and businesses which is contrary to federal policy articulated in numerous laws.") As a result of Defendants' violation of the law, the State of New Jersey announced in December 2021 that it was divesting from $182 million in Unilever stocks and bonds.

b. New Jersey's Law Against Discrimination, N.J.S.A.: 10:5-12 et seq regarding unlawful practices and discrimination which expressly prohibits unlawful discrimination in business contracts and trade.

89. Defendants' unlawful demand violates New York State's anti-boycott and anti-discrimination policies, including but not limited to the following:

a. N.Y. Executive Order No. 157 (June 5, 2016), Directing State Agencies and Authorities, to Divest Public Funds Supporting BDS Campaign Against Israel. As a result of Defendants' violation of the Executive Order policy, in October 2021, the New York State Controller determined that Unilever had "engaged in BDS activities" and announced that the New York State Common Retirement Fund was divesting from $111 million in Unilever equity.

b. Defendants actions violate the policy underlying New York Exec. Law §296(2)(a) that provides in pertinent part: "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor,

manager, superintendent, agent or employee of any place of public accommodation . . . because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ...."

c. Defendants' actions violate the policy behind New York Exec. Law § 296(6) that provides "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article."

90. Defendants' unlawful demand, if carried out, would violate the longstanding policies of the State of New York against discrimination on the basis of religion and national origin by cutting off supplies of Ben & Jerry's ice cream to residents of the Areas on the basis of animus toward the Jewish State of Israel and by discontinuing sales to Palestinians and Israelis who live in these Areas.

91. Defendants' actions constitute a breach of contract and have caused and are causing Plaintiffs substantial injury and damage.

## SECOND CLAIM: WRONGFUL TERMINATION

(AQP v All Defendants)

92. Plaintiffs repeat and reiterate the foregoing paragraphs of the Complaint as if set forth herein at length.

93. Defendants' refusal to renew was wrongful because it was based entirely on Plaintiffs' objection to Defendants' unlawful demand that Plaintiffs violate the laws and public policies of Israel, the United States, the State of New Jersey and the State of New York, as set forth above.

94. Defendants' refusal to renew and wrongful actions and unlawful demand have caused and are causing significant damage and injury to the Plaintiffs.

## THIRD CLAIM: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

(AQP v. all Defendants)

95. Plaintiffs repeat and reiterate the foregoing paragraphs of the Complaint as if set forth herein at length.

96. The Agreement includes an implied covenant of good faith and fair dealing and embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

97. Defendants have breached the implied covenant of good faith and fair dealing by their actions which undermine the purpose of the Agreement and have deprived the Plaintiffs of the benefit of their bargain.

98. Defendants have breached the implied covenant of good faith and fair dealing by requiring Plaintiffs to engage in unlawful conduct as a condition of continuing their decades-old business relationship with B&J, and by curtailing that relationship based on Plaintiffs' refusal to engage in such unlawful conduct.

99. Defendants encouraged the Plaintiffs to continue performing under the Agreement in the expectation it would be renewed and made statements and representations causing Plaintiffs to rely upon those statements and representations and expand their business,

32

incurring significant costs and expense, while Defendants knew that they would terminate the business with the Plaintiffs.

100.     Defendants' actions constitute a breach of the implied covenant of good faith and fair dealing resulting in injury and harm to the Plaintiffs.

### FOURTH CLAIM: FALSE LIGHT INVASION OF PRIVACY

(Avi Zinger v. All Defendants)

101.     Plaintiffs repeat and reiterate the foregoing paragraphs of the Complaint as if set forth herein at length.

102.     Over the past three decades, Avi has worked passionately to promote peaceful coexistence and collaboration between Israelis and Palestinians. He has devoted time and resources to supporting disadvantaged communities, including providing economic opportunities for Palestinian farmers and businesses. He has also gone to extraordinary lengths to take care of his diverse workforce, including those employees whose economic stability was particularly vulnerable during the pandemic. Avi's efforts have earned him an outstanding reputation as an honest, caring business owner, philanthropist, and as a force for peace. Indeed, in 2018, Avi received Israel's prestigious Industry Award, presented to him by the President of the State of Israel, and the President of Israel's Manufacturer's Association, in recognition of Avi's many years of significant contribution to Israel's food industry and the broader community.

103.     Avi's reputation has been not only damaged, but has been turned on its head by Defendants' public statements concerning the non-renewal of his company's License Agreement, as alleged above. In its public statements, Unilever explained that it

33

would not be renewing Plaintiffs' contract, because "[w]e believe it is inconsistent with our values . . . " and added, "[w]e also hear and recognize the concerns shared with us by our fans and trusted partners . . . ." In an effort to appease the BDS activists and demonstrate that they had been "heard," Unilever's public statements endorsed the BDS Movements' misrepresentations as legitimate "concerns" and portrayed Avi, the licensee, as operating contrary to Defendants' values. In this way, Defendants permitted Avi to be portrayed as a villain who discriminates among his customers and who is responsible for unlawful practices in the Areas. Defendants intentionally placed Avi in this false light, while knowing full well that nothing could be further from the truth.

104.    As a result, Avi has become the object of derision and condemnation by many members of the public both in Israel (including the Areas) and around the world, including New Jersey and the United States. The false light in which Defendants have placed Avi is highly offensive to a reasonable person and has caused Avi significant harm.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs hereby request and demand the following relief:

1.  A preliminary and permanent injunction barring Defendants from terminating or non-renewing the business relationship and maintaining the status quo pending the outcome of the litigation on the merits.

2.  Declaratory judgment that non-renewal of the Agreement on the basis of Plaintiffs' failure to cease selling and distributing Ben & Jerry's ice cream products in the Areas

is wrongful and a violation of law and public policy and that the Agreement is automatically renewed for another five-year period;

3. Damages in excess of $75,000, with the exact amount to be determined at trial;

4. Punitive damages;

5. The reasonable costs and expenses of this litigation, including reasonable attorneys' fees and costs of suit; and

6. Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Greenberg Dauber Epstein and Tucker
Attorneys for Plaintiffs

By:   */s/Edward J. Dauber*

Edward J. Dauber, Esq.


And


By:   */s/Linda G. Harvey*

Linda G. Harvey, Esq.


*Of Counsel:*
Nathan Lewin, *Pro Hac Vice* application forthcoming.
LEWIN & LEWIN, LLP
888 17th Street, NW
Fourth Floor
Washington, DC 20006
(202)828-1000

L. Rachel Lerman, *Pro Hac Vice* application forthcoming.
Alyza D. Lewin, *Pro Hac Vice* application forthcoming
The Louis D. Brandeis Center
For Human Rights Under Law
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, DC 20006
(202)559-9296

L. Marc Zell, Adv., *Pro Hac Vice* application forthcoming.
Zell, Aron & Co.
34 Ben Yehuda Street
15th Floor
Jerusalem 9423001
ISRAEL
Tel.: +972-2-633-6300
Email: mzell@fandz.com

## VERIFICATION

I, Avi Avraham Zinger, hereby declare and affirm under penalty of perjury under the

laws of the United States of America, pursuant to 28 U.S.C. § 1746(1), that the

foregoing Complaint is true and correct.

Date: __March 1, 2022__

_____

Avi Avraham Zinger

# ATTACHMENT A

## LICENSE AGREEMENT

This License Agreement ("**Agreement**") is made and entered into as of January __, 2004 between Ben & Jerry's Homemade, Inc. ("**Homemade**"), a corporation with its principal place of business at 30 Community Drive, South Burlington, Vermont, USA, and Unilever N.V., a corporation with its principal place of business at Weena 455, Rotterdam, the Netherlands ("**Unilever**") ("**Ben & Jerry's**" shall mean one or other or both of Homemade and Unilever as the case may be) on the one hand and American Quality Products Ltd. ("**Licensee**"), a corporation with its principal place of business at 1 Hameisav Street, Yavne, 70600, Israel, on the other hand.

### Introduction and Background

The purpose of this Agreement is to replace the presently existing agreement dated June 25, 1998 (the "**1998 Agreement**") and its addendum dated February, 1999 (the "**1999 Addendum**") between Ben & Jerry's Franchising, Inc., on the one hand as the assignee of Homemade, Ben & Jerry's Homemade Holdings Inc. and The American Company For Ice Cream Manufacturing E.I. Ltd., on the other hand, which 1998 Agreement and 1999 Addendum are being terminated concurrently with the execution of this Agreement, and to set forth the mutual obligations and rights between Ben & Jerry's and the Licensee in the Territory (as defined hereunder), regarding Licensee's execution of the rights granted to it hereunder, all as set forth in this Agreement.

### Definitions

In this Agreement the following expressions shall have the meanings appearing alongside them, unless the context otherwise requires:

**ACIC** – means the American Company for Ice Cream Manufacturing E.I. Ltd.

**Affiliate** – means a person or entity that directly or indirectly controls another person or entity, or that is directly or indirectly controlled by, or is under common control with such other person or entity, or any employee, officer, director, agent, or shareholder of such person or entity. In particular, an Affiliate of Homemade or an Affiliate of Unilever shall also include Unilever N.V., Unilever PLC or any entity a

majority of the voting shares of which is owned directly or indirectly by Unilever N.V. or Unilever PLC or both of them together.

**Agreement** - means this license agreement.

**Appendix A** -- as referred to in Proprietary Marks.

**Appendix B** -- as referred to in Quality Assurance

**Appendix C** -- which defines the Wholesale Distribution Concept.

**Appendix D** -- as referred to in Section 11.3 and as modified by Ben & Jerry's from time to time, in accordance with the general international marketing policy of Ben & Jerry's.

**Appendix E** -- as referred to in Section 11.3 and as modified by Ben & Jerry's from time to time based on any changes in Ben & Jerry's actual costs.

**Ben & Jerry's** -- as defined in the Preamble.

**Business Plan** - as defined in Section 20.2.

**Certificates of Insurance** - as defined in Section 21.3.

**Confidential Information** - as defined in Section 18.1

**Customer Service** - as defined in Section 8.2.

**Gross Turnover/Gross Sales** --means the gross invoiced amount for Products (as defined hereunder) sold by Licensee or any of its Affiliates to third party customers minus actual returns regardless of any discounts, allowances, collection or any taxes other than purchase tax and value added tax. For the purpose of this definition, a sale shall not be deemed to have occurred when Products are transferred or "sold" by Licensee to its Affiliates for resale, but only upon the resale by Licensee or any of its

2

Affiliates to a third party. Gross Turnover/Gross Sales shall also include any other income from any source relating to the Licensed Business or the Products, including, without limitation, any income from sub-licensing or franchising the Licensed Business or any part thereof.

**Initial Term** – as defined in Section 4.1.

**Licensee** - as defined in the Preamble.

**Licensed Business** – means the business of the Licensee regarding the Products only in accordance with the terms of the Agreement.

**Licensed Technology** – means any document, information, know-how and devices disclosed to Licensee by Ben & Jerry's under this Agreement or under any agreement with ACIC.

**Local Proprietary Products** – means the products to be manufactured by the Licensee in the Territory and sold under the Proprietary Marks.

**Managers** – means Retail Shop Managers and Product Managers.

**Manuals** – as defined in Section 10.5

**Marketing Budget** – as defined in Section 12.5.1.

**Net Income** – calculated in accordance with U.S. generally accepted accounting principles.

**Non-Proprietary Products** – means a limited selection of complementary and compatible products, including gift products, that do not bear the Proprietary Marks and are approved from time to time by Ben & Jerry's for sale at Retail Shops by Licensee.

3

**Outline of Terms** – means the agreement signed on December 18, 2001, between Ben & Jerry's Homemade, Inc. and Mr. Avi Zinger.

**Premises** - as defined in Section 4.2.3.

**Products** – means Proprietary Products together with Non-Proprietary Products.

**Product Manager** – as defined in Section 20.5.

**Promotional Materials** – as defined in Section 20.7.

**Proprietary Gift Products** – means T-Shirts, hats, mugs, clothes and the like using or associated with the Proprietary Marks.

**Proprietary Marks** – means certain trade names, service marks, trademarks, logos, emblems, domain names and indicia of origin used in connection with Ben & Jerry's products and Retail Shops as listed in **Appendix A**, and as modified by Ben & Jerry's from time to time.

**Proprietary Products** – the Local Proprietary Products together with products to be imported by the Licensee from Ben & Jerry's and distributed and sold in the Territory under the Proprietary Marks, and the Proprietary Gift Products.

**Quality Assurance** and Q.A. - as defined in Section 6.3; and as modified by Ben & Jerry's from time to time and as set out in **Appendix B**.

**Renewal Fee** - as defined in Section 4.2.7.

**Renewal Term** – as defined in Section 4.2.

**Retail Shops** – means any retail sales location, including but not limited to free standing retail stores, concessions, food court locations, vending carts (fixed or mobile), stands, or counters (stand alone or installed in the business of another retail

4

location), operating under the Proprietary Marks and Ben & Jerry's system of operating retail ice cream and frozen dessert shops.

**Retail Shop Manager** – as defined in Section 15.21.

**Rules** – as defined in Section 32.2.

**Scoop U Training** – as defined in Section 14.1.

**Term** – as defined in Section 4.1.

**Territory** – The State of Israel, including the "occupied territories" under sole Israeli control.

**The 1998 Agreement** – as defined in the Introduction and Background.

**The 1999 Addendum** – as defined in the Introduction and Background.

**Unilever** – as defined in the Preamble.

**Website** – as defined in Section 20.12.

**Wholesale Distribution/Wholesale Distribution Channel** – means the distribution channels specifically defined as supermarkets, grocery stores, convenience stores, contract food service accounts, department stores, other food outlets, provided however, that it does not include Retail Shops.

**Wholesale Distribution Concept** - as defined in Appendix C.

**NOW, THEREFORE**, the parties agree as follows:

1.   <u>Grant</u>

1.1   Subject to the terms and conditions of this Agreement and to the continued faithful performance by Licensee of its obligations hereunder, Ben & Jerry's

5

grants to Licensee an exclusive, non-transferable and personal license (other than the right to sublicense and franchise as provided hereunder in Section 1.3 and the right to subcontract the manufacture of the Local Proprietary Products as provided hereunder in Section 5.5) in the Territory (i) to manufacture solely in the Territory, under Ben & Jerry's know-how and trade secrets contained in the Licensed Technology, and to package the Local Proprietary Products solely in the Territory, (ii) to offer, sell and distribute Proprietary Products solely through the Wholesale Distribution Channels of distribution in the Territory, (iii) to construct, open, own and operate Retail Shops in the Territory through which the Proprietary Products are sold and (iv) to use the Proprietary Marks which are registered for use in the Territory in connection with the Licensee's rights under this Agreement.   The right to distribute includes the right to market, sell, display, advertise and otherwise promote the Products.  Licensee agrees and understands that its right to sell and distribute Proprietary Gift Products is limited to selling the same through Retail Shops only and Licensee is acquiring no right, without Ben & Jerry's prior written approval, to manufacture the Proprietary Gift Products or to distribute the same in any other channel of distribution. Ben & Jerry's agrees that, so long as this Agreement is in effect and has not been cancelled or otherwise terminated in accordance with the terms hereof: (i) it shall not grant any other person or entity the right to manufacture, package, or distribute Proprietary Products through the Wholesale Distribution Channels of distribution in the Territory during the Term of this Agreement, (ii) it shall not grant any other person or entity the right to open and operate Retail Shops within the Territory; and (iii) it shall refrain from conducting identical operations as described herein, or any such operations using the name "Ben & Jerry's", with respect to the Proprietary Products and Retail Shops within the Territory, in each case, provided that Licensee is in full compliance with all the terms and conditions of this Agreement.

1.2.    Licensee accepts such grant and licenses and agrees to such rights and obligations to manufacture the Local Proprietary Products within the Territory and to distribute the Proprietary Products within the Territory and to construct, open, own and operate Retail Shops all in accordance with the terms and

conditions of this Agreement.   The Licensee will at all times faithfully, honestly, and diligently perform its obligations hereunder and will continuously exert its best efforts to promote and enhance the Licensed Business.

1.3.   During the Term of this Agreement, Licensee shall not, directly or indirectly, manufacture, distribute or sell Proprietary Products or other products subject to this Agreement in the Territory nor establish or operate or license or sublicense any other person or entity to exercise any of the rights hereunder at any location within .the Territory other than as set forth herein. Notwithstanding the foregoing, Licensee will have the right to sub-license or franchise, subject to obtaining Ben & Jerry's written consent, which consent shall not be unreasonably withheld or delayed, and provided that quality standards (including Quality Assurance) and all other requirements under this Agreement are assured.   Ben & Jerry's shall be entitled to veto any specific sublicensee or franchisee proposed by Licensee, if in the sole opinion of Ben & Jerry's such a sublicensee or franchisee, or any of their Affiliates, would have an adverse effect upon the Proprietary Marks or any related proprietary information.   In the event that Ben & Jerry's has approved a sublicensee or franchisee, then Licensee agrees that it shall cause such sublicensee or franchisee to comply with the terms and conditions of this Agreement as if they were a party hereto and shall be responsible to Ben & Jerry's for any breach by such sublicensee or franchisee of any such terms or conditions. Ben & Jerry's shall have the right to require that its representatives, or third parties on its behalf, be permitted to inspect the facilities of the sublicensee or franchisee and the Products distributed by them.   Ben & Jerry's further reserves the right, in its sole discretion, to determine and advise Licensee that any sublicensee or franchisee does not meet, or no longer meets, the standards of Ben & Jerry's.   Upon receipt of written notice of such determination and advice, Licensee shall promptly cease to conduct business with any disapproved sublicensee or franchisee.

1.4.   Licensee shall not export Proprietary Products outside of the Territory and Licensee is expressly prohibited from soliciting sales for the Proprietary

Products outside the Territory, except for the export of any Proprietary Products outside of the Territory to Unilever or a Unilever Affiliate upon the prior approval of an officer of Homemade, Vermont. Except as aforesaid, Licensee agrees that it will not distribute any Proprietary Products to any party or in any manner dispose of any Proprietary Product under circumstances where Licensee knows, or in the exercise of prudent business judgment should know, that such activity ultimately will result in the exporting of the same outside of the Territory.

1.5. Licensee acknowledges that the manufacturing of the Local Proprietary Products and/or the distribution process for the Proprietary Products and/or the standards of operation for the Retail Shops may be supplemented, improved, and otherwise modified from time to time by Ben & Jerry's, and Licensee agrees to comply with all reasonable requirements of Ben & Jerry's in that regard.

1.6. Licensee understands and agrees that no license or other right is granted herein, expressly or impliedly or by estoppel or otherwise, relative to any know-how, trade secrets, inventions, patents, copyrights or other intellectual property rights, except as expressly provided in Section 1 hereof.

2. **Additional Limitations on Rights Granted**

2.1. Nothing in this Agreement shall be construed as giving Licensee any right to, and Licensee agrees that it shall not, and shall not permit or assist any Affiliate or any other party to, manufacture, modify, adapt any of the Proprietary Products (in whole or in part) or sell all or any part of any Proprietary Products, except as may be expressly and clearly permitted by this Agreement. Without limiting the materiality of any other term of this Agreement, the failure of Licensee to comply with the provisions of this Section 2.1 shall be considered a material breach of this Agreement.

2.2. Licensee recognizes and acknowledges the vital importance to Ben & Jerry's of the Proprietary Marks and other proprietary material which Ben & Jerry's owns and creates and the association of the Ben & Jerry's name with them. In

8

order to prevent the denigration of the Proprietary Products and the value of their association with the "Ben & Jerry's" name, and in order to ensure the dedication of Licensee's best efforts to preserve and maintain that value, Licensee agrees that, during the Term, Licensee will not manufacture, sell or distribute any product embodying or displaying any artwork or other representation that is confusingly similar to the Proprietary Marks or other proprietary material of Ben & Jerry's.

2.3.   All rights not specifically and expressly granted by Ben & Jerry's to Licensee are hereby reserved by Ben & Jerry's.

**3.   Development Obligation**

Licensee accepts the obligation to develop the Licensed Business.  Licensee will at all times, faithfully, honestly and diligently, perform its obligations hereunder and will continuously exert its best efforts to promote and enhance the development and operation of all components of the Licensed Business in the Territory.

**4.   Term and Renewal**

4.1.   The initial term of this Agreement is effective upon the date of the execution of the Outline of Terms (December 18, 2001), except as otherwise provided herein, and shall expire on June 24, 2005 (the "**Initial Term**").   Unless otherwise stated, "**Term**" shall refer to the Initial Term and the period of any renewal rights that Licensee exercises in accordance with Section 4.2.

4.2.   Licensee may renew the rights granted hereunder for one (1) additional consecutive term of seven (7) years (the "**Renewal Term**") if the following conditions are met prior to renewal:

4.2.1.   Licensee shall give Ben & Jerry's written notice of Licensee's election to renew at least nine (9) months, but not more than twelve (12) months, prior to the end of the Initial Term; and

9

4.2.2. Licensee shall not have any past due monetary obligations or other outstanding obligations to Ben & Jerry's or its Affiliates; and

4.2.3. Licensee shall not be in default of any material provision of this Agreement, or successor hereto, or any other agreement between Licensee and Ben & Jerry's or its Affiliates or any lease or sublease for the premises of any Retail Shop or other facility ("**Premises**"). Licensee shall have substantially complied with all the terms and conditions of such agreements during the terms thereof; and

4.2.4. Licensee shall execute a general release, in a form prescribed by Ben & Jerry's, of any and all claims against Ben & Jerry's and its Affiliates, and their respective present and former officers, directors, agents, and employees; and

4.2.5. Licensee shall make or provide for, in a manner satisfactory to Ben & Jerry's, such renovation and modernization of the manufacturing facility(ies) and/or of any location used in the wholesale component of the Licensed Business, and any open and operating Retail Shop, as Ben & Jerry's may reasonably require, including installation of new equipment and renovation of existing fixtures, replacement of obsolete signage, furnishings and décor in order to accommodate the then current technology relative to the manufacture of the Local Proprietary Products, the Wholesale Distribution of Products and the design and image of the then current Retail Shops; and

4.2.6. Licensee shall comply with the then current Ben & Jerry's qualification and training requirements for operators of Retail Shops outside of the U.S. so long as the said qualifications and requirements have actually substantially been enforced, to the extent required, by Ben & Jerry's, in the previous twelve (12) months, upon other Ben & Jerry's licensees outside of the U.S. and Canada; and

4.2.7. Licensee shall pay Ben & Jerry's a renewal fee (the "Renewal Fee") in US dollars equal to 10% of the greater of: (i) 50% of Licensee's Net Income generated from the Products or other rights pursuant to this Agreement for the last year of the Initial Term or (ii) 1.25% of Licensee's Gross Turnover from all sources of income of Licensee generated from the Products or other rights pursuant to this Agreement for the last year of the Initial Term. Payments shall be made in accordance with Section 12.

5.   **Manufacturing**

5.1.   Licensee shall manufacture Local Proprietary Products only in the manner and under the conditions that are expressly authorized by Ben & Jerry's and which are in full compliance with the Licensed Technology, and with the Manuals and with the terms hereof and with Quality Assurance standards and any other requirement of Ben & Jerry's and in compliance with all applicable law. Licensee shall construct and equip any manufacturing facility, in compliance with Ben & Jerry's specifications, at Licensee's own expense. Licensee shall obtain all licenses, permits and certifications required for the lawful construction and operation of each such location and shall certify in writing to Ben & Jerry's that all such licenses, permits and certifications have been obtained.

5.2.   Licensee covenants and agrees that it will manufacture the Local Proprietary Products, in accordance with the specifications for the Local Proprietary Products as supplied by Ben & Jerry's. Such manufacture will be subject to the approval of Ben & Jerry's for frozen dessert products and must meet the Quality Assurance requirements for such quality as prescribed by Ben & Jerry's and its quality control agent. Licensee shall be in full compliance with all applicable laws as well as applicable standards generally in use for the normal manufacture of frozen dessert products.

5.3.   Licensee represents that it is a manufacturer qualified to produce frozen dessert products in general and has the ability to produce the Local Proprietary Products (with the use of the Licensed Technology) in sufficient quantity to

11

meet the requirements of this Agreement and to gain a substantial market for the Local Proprietary Products in the category in which the same will be positioned. The Licensee confirms that it has invested in and presently maintains manufacturing facilities and will either continue to maintain manufacturing facilities or contract for manufacturing facilities in Israel to produce the Local Proprietary Products and Licensee will produce Local Proprietary Products of the highest quality in the frozen dessert products category, meeting Q.A. standards as specified by Ben & Jerry's.

5.4.   Licensee will not deviate in the formulation, labeling and packaging for the Proprietary Products without the prior written consent of Ben & Jerry's.

5.5.   In the event Licensee wishes to subcontract the manufacture of the Local Proprietary Products, Licensee must obtain the prior written consent of Ben & Jerry's. Ben & Jerry's will not unreasonably withhold or delay its consent provided that Quality Assurance requirements and all other requirements of this Agreement are assured. Ben & Jerry's shall be entitled to veto any specific subcontractor proposed by Licensee if in the sole opinion of Ben & Jerry's such a subcontractor or any Affiliate of such a subcontractor would have an adverse effect upon the Proprietary Marks or any related Confidential Information. In the event that Ben & Jerry's has approved a subcontractor then Licensee agrees that such approval shall not relieve Licensee of any of its obligations pursuant to this Agreement, and Licensee shall be responsible to Ben & Jerry's for any breach by such subcontractor of any of the terms or conditions of this Agreement. Ben & Jerry's shall have the right to require that its representatives, or third parties on its behalf, be permitted to inspect the manufacturer's facilities, and that samples from the products produced by the manufacturer or components used by the manufacturer be delivered for evaluation and testing either to Ben & Jerry's or to an independent testing facility designated by Ben & Jerry's. A charge not to exceed the reasonable cost of the evaluation and testing shall be paid by Licensee. Ben & Jerry's further reserves the right, in its sole discretion, to determine and advise Licensee that the manufacturer of the products supplied does not meet, or no longer meets, the standards of Ben & Jerry's. Upon receipt of written notice

12

of such determination and advice, Licensee shall immediately cease to conduct business with any disapproved manufacturer.

6.  **Quality Control**

6.1.   Upon request from Ben & Jerry's at any time, but not less than twice per year, Licensee shall deliver to Ben & Jerry's or its designated representative, at Licensee's expense, to a location prescribed by Ben & Jerry's, samples of the finished Local Proprietary Products. Licensee will also submit upon request from Ben & Jerry's at any time, but not less than twice a year, production, quality control and finished product manufacturing biological testing records for review. In addition, Licensee shall submit such testing records prior to the manufacture of any new Products. If at any time a Local Proprietary Product is, in the sole and exclusive judgment of Ben & Jerry's, not manufactured in strict compliance with Ben & Jerry's Quality Assurance standards or as otherwise approved in writing by Ben & Jerry's, Ben & Jerry's shall notify Licensee to suspend the production and sale of such Local Proprietary Product until the same is brought by the Licensee, at its sole expense, into conformity with all required specifications pursuant to this Agreement. Ben & Jerry's will give Licensee written notice of any such non-compliance, which notice shall specify the details thereof. Within five (5) days after receipt of such notice, Licensee shall promptly correct any problem specified by Ben & Jerry's therein. If such Local Proprietary Product, as corrected by Licensee, still is not approved by Ben & Jerry's, or if Licensee fails to correct any such problem in the time provided herein, the Proprietary Marks shall be promptly removed from such Local Proprietary Products, at the option of, and at no cost to Ben & Jerry's, and all such products shall be promptly destroyed and evidence of such destruction shall be provided to, Ben & Jerry's. In addition, Ben & Jerry's shall have the right to terminate this Agreement forthwith.

6.2.   In order to carry out the purposes of this Agreement, but without relieving Licensee of its continuing obligation of maintaining proper conformity, Ben & Jerry's retains the right, with or without notice, to inspect, during normal business hours, the facilities utilized by Licensee and by suppliers to Licensee in connection with the manufacture, storage and distribution of Proprietary

13

Products and to examine Proprietary Products in the process of manufacture and all documents and records related hereto.

6.3.    Licensee agrees that each Local Proprietary Product manufactured and offered for sale by it shall be in conformity with the Quality Assurance ("**Quality Assurance**" or "**Q.A.**") standards and specifications set for the Proprietary Products by Ben & Jerry's. The Local Proprietary Products shall be of a high quality which is at least equal to comparable other super premium ice cream products and to comparable products in the market of the same premium quality, and always in conformity with a standard sample approved by Ben & Jerry's.

## 7.    Distribution

7.1.    The Wholesale Distribution Channels, including Proprietary Product availability, Proprietary Product variety, and quantity of Proprietary Product are critical to the promotion of the Proprietary Products and to the protection of the Proprietary Marks within the Territory. Licensee shall use its best efforts to maximize the rights granted hereunder throughout the Territory, including but not limited to, selling significant quantities of Proprietary Products and maintaining sufficient personnel to provide effective distribution of the same.

## 8.    Public Relations and Customer Service

8.1.    Licensee will maintain a public relations department in connection with its marketing and sales undertakings and will continue to maintain such department during the Term of this Agreement and utilize the same for marketing of the Products.

8.2.    Licensee shall be solely responsible for, and shall use its best efforts to provide and maintain, high-quality customer service and technical support in the Territory to all customers (e.g. dealers, distributors and end-users) with respect to all Products. Subject to Licensee having obtained Ben & Jerry's prior written approval in connection with the form and content thereof,

14

Licensee's name and appropriate information for contacting Licensee with respect to customer service issues shall be prominently displayed on the packaging or label of each Product sold by Licensee. For purposes of this Agreement, **"Customer Service"** means the resolution of customer complaint issues pertaining to the Products in the following general categories: inventory processing, payment processing, order inquiries, product returns, defects and replacements and technical support.

8.3.    Licensee and its staff shall be conversant with the Products and similar frozen dessert products in general and shall develop sufficient knowledge of the industry and of products competitive with the Products so as to be able to explain the Products in detail to distributors, dealers, retailers and end-users. Licensee shall conduct or provide for any training of its personnel that may be necessary to impart such knowledge.

8.4.    Licensee shall maintain a high-quality adequately staffed Customer Service department to address all Customer Service issues relating to Products sold by Licensee. All Customer Service issues shall be categorized by type of issue and problem resolution. Problem resolution shall be guided by reasonable written Customer Service policies applied by Licensee uniformly throughout the Territory after consultation with Ben & Jerry's.

8.5.    Licensee shall establish and maintain adequate telephone access within the Territory for answering questions from end-users and potential end-users concerning the sale and use of the Products sold by Licensee and for addressing other Customer Service issues.

8.6    Licensee shall promptly notify Ben & Jerry's in writing of any claimed or suspected defect in a Product no later than five (5) business days after Licensee learns of the same, whether directly or through a distributor, dealer, retailer or an end-user.

8.7    Licensee agrees that any Wholesale Distribution Channel wishing to sell the Proprietary Products will meet Ben & Jerry's then standard criteria for

15

cleanliness and standards of operation as directed in the Manuals or otherwise in writing.

**9.     Licensed Technology**

9.1.    Licensee acknowledges that Ben & Jerry's has provided and disclosed to Licensee the Licensed Technology with respect to the formulation and manufacture of the Local Proprietary Products. Licensee agrees to use its best efforts to protect the confidentiality of this information and use this Licensed Technology only as it relates to the formulation and manufacture of the Local Proprietary Products.

9.2.    Any improvements (including additions, modifications, substitutions) made to the process of formulating or manufacturing the Proprietary Products, whether done by Licensee or another third party, will constitute part of the Licensed Technology and will remain and be the sole property of Ben & Jerry's. Licensee will execute any and all documents which Ben & Jerry's deems necessary in order to vest all right, title, and interest in and to the improvements in Ben & Jerry's.

9.3.    Licensee acknowledges that Licensed Technology (including but not limited to manufacturing methods, recipes and formulae now or hereafter used) received from Ben & Jerry's constitute valuable trade secrets of Ben & Jerry's and Confidential Information, and is revealed in confidence hereunder. Licensee agrees, at a minimum, to make such Confidential Information available only to those parties having a need-to-know and require the same parties to agree to the obligations of confidentiality and to sign a non-disclosure undertaking in the form provided by Ben & Jerry's. Licensee agrees to notify and obtain Ben & Jerry's prior written consent to any transfer of Confidential Information to any such party.

**10.    Duties of Ben & Jerry's**

10.1.   Ben & Jerry's shall make available to Licensee standard U.S. plans and specifications for the manufacture of the Local Proprietary Products and for the retail and wholesale components of the Licensed Business.

16

10.2.   At Licensee's sole expense, Ben & Jerry's shall provide initial training for operation of a Retail Shop as set forth in Section 14 of this Agreement, to the extent such training has not been previously provided.

10.3.   Upon request, and at Licensee's expense, Ben & Jerry's shall provide such on-site pre-opening and opening supervision and assistance for each Retail Shop as Ben & Jerry's deems advisable.

10.4.   At Licensee's request and in Ben & Jerry's sole discretion, Ben & Jerry's may make available to Licensee, at Ben & Jerry's expense, standard U.S. marketing plans and promotional materials as the same exist in English.

10.5.   After Licensee's execution of this Agreement, Ben & Jerry's shall provide Licensee, on loan and at Ben & Jerry's expense, English-language copies of the Ben & Jerry's Confidential Operating Manuals, including, without limitation, copies of Ben & Jerry's Manufacturing Standards, Quality, Distribution and Product Handling Requirements (collectively, the "Manuals"), as described in Section 17. All Manuals and translations thereof (as provided for in Section 17.3) are the sole property of Ben & Jerry's and are to be treated as confidential by Licensee. The Manuals may be set forth in several volumes, including such amendments thereto as Ben & Jerry's may publish from time to time. Additionally, Licensee acknowledges and agrees that Ben & Jerry's may provide a portion or all (including updates and amendments) of the Manuals, and other instructional information and materials in, or via, electronic media, including without limitation, through the use of computer disks, the internet or the Ben & Jerry's extranet.

10.6.   Ben & Jerry's shall provide to Licensee, from time to time, as Ben & Jerry's deems appropriate and at Ben & Jerry's expense, advice and written materials concerning techniques of managing and operating the manufacturing of the Local Proprietary Products, the distribution of the Proprietary Products through the Wholesale Distribution Channels and the operation of the Retail Shops, including suggested inventory and cost control methods, new

17

developments and improvements in manufacturing techniques, new developments and improvements in products and marketing techniques, new developments and improvements in wholesale concept and service standards and new developments and improvements in the Retail Shop layout and design.

11.    **Purchase and Sale of Products**

11.1.   Licensee shall notify Ben & Jerry's of any changed requirements for packaging and marking and the parties shall agree on the actions needed for such compliance, and until the parties agree on the actions to be taken by Licensee, Licensee shall refrain from preparing, purchasing or selling Products using such packaging and/or marketing. Notwithstanding the foregoing, Licensee shall be solely responsible for all such requirements, including any unique to Israel packaging requirements, and for all labeling or any other similar requirements. In addition to purchasing finished Proprietary Products from Ben & Jerry's (subject to availability and as the need arises), the Licensee shall not purchase any ingredients of any kind or nature, used in the manufacture of Local Proprietary Products, or any Proprietary Gift Products, from any entity unless such ingredients conform with all Quality Assurance requirements and all other requirements pursuant to Section 15.8.

11.2.   Licensee shall manufacture the Local Proprietary Products and/or buy and distribute (in both the wholesale and the retail concepts) its annual requirements of Proprietary Products pursuant to the projections in the Business Plan.

11.3.   In the event that Licensee purchases Proprietary Products from Ben & Jerry's, Licensee will purchase the same upon at least thirty (30) days' notice to Ben & Jerry's. During the initial three years, beginning from the date of the Outline of Terms, Ben & Jerry's will sell certain quantities and products as set out in Appendix D, to the Licensee on a cost basis, FOB Bellows Falls, V.T., U.S.A. The agreed initial cost prices are set out in Appendix E and will be adjusted from time to time based on any changes in Ben & Jerry's actual costs. Upon conclusion of the initial three years, the products will be sold by Ben & Jerry's

to the Licensee at prices to be determined by the Licensor and the Licensee based on arms-length negotiations. All sales shall be on a 90-day credit basis from date of FOB shipment. Licensee agrees to accept full responsibility for the handling and transportation of orders for the Proprietary Products from the Ben & Jerry's facilities in Vermont U.S.A. or such other Ben & Jerry's manufacturing facilities as may be designated by Ben & Jerry's, and all expenses connected therewith including, but not limited to, all freight, import costs and fees, taxes and duties, and any other applicable taxes, shall be borne by the Licensee.

11.4. Purchases shall be paid for by Licensee on a 90-Day credit from date of FOB shipment, and all other terms of Section 12 shall apply.

11.5. With respect to Local Proprietary Products manufactured and/or Proprietary Products purchased by Licensee from Ben & Jerry's to be sold by Licensee in the Territory through the Wholesale Distribution Channels of distribution and/or Retail Shops, Ben & Jerry's reserves the right:

11.5.1. To discontinue, in its sole discretion, the availability of particular Proprietary Products from time to time, to the extent consistent with Ben & Jerry's world wide policy (outside of the U.S. and Canada) with respect to licenses;

11.5.2. To limit the offer and sale of any new Proprietary Product in such manner and for such period of time as Ben & Jerry's may reasonably deem necessary to determine the marketability of a Proprietary Product or the feasibility and desirability of offering a Proprietary Product for sale under this Agreement, to the extent consistent with Ben & Jerry's world wide policy (outside of the U.S. and Canada) with respect to licenses; and

11.5.3. To require the return or proper disposal of, in accordance with all legal and regulatory requirements as Ben & Jerry's shall direct in its sole discretion, Proprietary Products which Ben & Jerry's reasonably

believes to be adulterated, tainted, contaminated, spoiled, undated, hazardous, expired or otherwise unfit to be used for its intended purpose. Ben & Jerry's shall reimburse Licensee for the cost of any such Proprietary Products provided that the defect in such Proprietary Products existed before the Proprietary Products were delivered to Licensee's designated carrier and further provided that such Proprietary Products were not returned or disposed of as a result of an act or failure to act by Licensee or its shippers, transporters or carriers or any purchaser from Licensee.

## 12. Payments

12.1 There shall be no royalties paid or due to Ben & Jerry's or Unilever with respect to any of Ben & Jerry's Products manufactured or sold in the territory by the Licensee or any of its Affiliates during the Initial Term. During the Renewal Term, Licensee shall pay Unilever an annual royalty fee equal to 3% of the Gross Turnover.

12.2 Remittances to Ben & Jerry's of all of the royalties set forth in this Section 12 shall be paid to Unilever N.V. or to any other Unilever Affiliate as instructed in writing by Ben & Jerry's by the fifteenth (15th) day of each month following the end of a calendar quarter (unless otherwise set forth herein) and shall be submitted to Unilever N.V., together with any reports or statements required hereunder. Any contribution, payment, statement or report due to, but not actually received by, Unilever on or before the prescribed date herein shall be overdue. If any contribution or payment is overdue, Licensee shall pay Unilever N.V. immediately upon demand, and in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of twelve percent (12%) per annum, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Ben & Jerry's may have. Licensee shall not be entitled to set off any contributions or payments required to be made under this Agreement against any monetary claim it may have against Ben & Jerry's. All payments will be made in U.S. Dollars and will be as directed by Ben & Jerry's.

20

12.3. All payments by Licensee to Ben & Jerry's (including any payments to Unilever) shall be made without any deduction for any taxes, except that Licensee shall deduct and pay to the appropriate taxing authorities, on behalf of Ben & Jerry's, any amount which Licensee is required to withhold under any laws of Israel on payments made by Licensee to Ben & Jerry's. Licensee shall transmit to Ben & Jerry's official receipts for payment on all taxes withheld. If Licensee fails to withhold or pay such taxes, it shall indemnify Ben & Jerry's for the full amount of such taxes and for any loss or liability occasioned by Licensee's failure to withhold as required by law, including, but not limited to, any penalties, interest, and expenses incurred by Ben & Jerry's. All other taxes imposed on payments by Licensee to Ben & Jerry's, including, but not limited to, value added taxes, consumption taxes, and salary taxes, which may be imposed now or in the future under the laws of the Territory or any taxing authority therein, shall be Licensee's sole responsibility, and Licensee shall transmit such taxes to the appropriate fiscal authorities. Such taxes shall not affect Licensee's obligation to make payments to Ben & Jerry's as required under this Agreement.

12.4 All payments made to Ben & Jerry's (including payment to Unilever) pursuant to this Section 12 shall be paid to in U.S. Dollars and will be wire-transferred, at Licensee's expense, to such bank account as Ben & Jerry's shall designate from time to time. Computation of any amounts payable under this Agreement which require conversion to U.S. Dollars shall be made at the electronic transfer selling rate for U.S. Dollars on the date of transfer at a bank in the Territory mutually agreed upon by Ben & Jerry's and Licensee, and if there is no such agreement then at First International Bank.

12.5. Recognizing the value of marketing and promotion, and the importance of standardization of marketing and promotion programs to the furtherance of the goodwill and public image of the Licensed Business, Licensee and Ben & Jerry's agree:

12.5.1 Each month during the Term of this Agreement, Licensee shall contribute to its own marketing budget (the "**Marketing Budget**") a

sum equal to not less than five (5) percent of Licensee's total sales from the sale of all Products through the Wholesale Distribution Channels and the Retail Shops for the preceding month. Licensee understands and acknowledges that such required expenditure is a minimum requirement only, and that Licensee may, and is encouraged to, expend additional funds for marketing and promotion. Licensee agrees to include the proposed expenditures for this fund in the annual Business Plan.

12.5.2 The Marketing Budget, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all marketing, advertising, public relations and/or promotional programs, and other activities including socially responsible activities. Licensee shall be responsible for the spending of the Marketing Budget in accordance with the provisions of this Agreement, but Licensee will keep Ben & Jerry's informed of any such spending. Based on performance, Ben & Jerry's reserves the right to approve the manner in which the Marketing Budget is spent to the extent necessary to ensure that there is no adverse effect upon the Proprietary Mark or the Quality Assurance of the Products.

12.6    In the event that any government authority having jurisdiction in the Territory imposes restrictions on the transfer of U.S. Dollars to places outside of the Territory, or imposes any tax or other imposition which is required to be paid or borne by Ben & Jerry's, Ben & Jerry's, in its sole discretion, shall have the option to: (i) with respect to restriction on the transfer of U.S. Dollars, require that Licensee deposit all payments required under this Agreement to a designated account in the name of Ben & Jerry's in the Territory; or (ii) terminate this Agreement pursuant to the terms of Section 23.2.

**13.    Construction and Opening of Retail Shops**

13.1.   Licensee shall renovate or construct, and equip, the Retail Shops at Licensee's own expense. Licensee shall obtain all permits and certifications required for the lawful construction and operation of each Retail Shop and shall certify in

writing to Ben & Jerry's reasonable satisfaction that all such permits and certifications have been obtained.

13.2.   Licensee shall be responsible for obtaining all licenses, permits, zoning classifications and clearances which may be required by applicable laws, ordinances, or regulations, or which may be necessary or advisable owing to any restrictive covenants relating to the premises of any Retail Shop.

13.3.   Except as otherwise provided herein, prior to opening for business of each Retail Shop, Licensee shall comply with all design and layout requirements and pre-opening requirements set forth in this Agreement, the Manuals and/or elsewhere in writing by Ben & Jerry's.  Licensee also shall obtain written approval by Ben & Jerry's, a response to which should be provided by Ben & Jerry's without delay, prior to opening each Retail Shop.  Ben & Jerry's, in its sole discretion, may conduct a pre or post opening inspection of any Retail Shop within fifteen (15) business days of the request by Licensee.  If the Retail Shop fails the inspection, Licensee shall reimburse Ben & Jerry's for the travel expenses and room and board of representatives of Ben & Jerry's for each inspection including the first one.

13.4.   Licensee shall submit the design and layout for each proposed Retail Shop to Ben & Jerry's for approval prior to beginning construction, a response to which should be provided by Ben & Jerry's without delay.

## 14.   Training

14.1.   Licensee's Retail Shop Managers shall attend and complete, to the satisfaction of Ben & Jerry's, the training ("**Scoop U Training**") for owners and Retail Shop Managers offered by Ben & Jerry's. At the option of Ben & Jerry's, and at Licensee's expense, any persons subsequently employed by Licensee in the position of Retail Shop Manager shall also attend and complete, to the satisfaction of Ben & Jerry's, Scoop U Training for Retail Shop Managers. Licensee, Retail Shop Managers, and other employees of Licensee also shall attend such additional courses, seminars, and other training programs as Ben & Jerry's may reasonably require from time to time. Every five (5) years, the

23

current Retail Shop Managers must attend, to the extent requested by Ben & Jerry's, a refresher training program held at a designated Scoop U Training facility.

14.2.   All training programs shall be at such times as may be designated by Ben & Jerry's.  Training programs shall be provided in Vermont, USA or such other locations as Ben & Jerry's may designate.  Licensee shall be responsible for any and all other expenses incurred by Licensee's trainees in connection with Scoop U Training, including, without limitation, such costs as transportation, lodging, meals and wages. Ben & Jerry's may authorize a qualified employee of the Licensee to provide such Scoop U Training, provided such employee completes a Ben & Jerry's training course, and thereafter remains up-to-date by completing any additional training as Ben & Jerry's may deem appropriate from time to time.  Ben & Jerry's may in its sole discretion at any time rescind such authorization.

14.3.   Ben & Jerry's shall provide, at its expense, manufacturing standards and procedures, product handling procedures and standards of operation for Retail Shop operations, approved product list, ice cream sampling handbooks and vend cart manual, whether in the Manuals or otherwise, any and all which may be updated from time to time.

**15.**   **Duties of Licensee**

15.1.   Licensee understands and acknowledges that every detail of each of the three (3) components of the Licensed Business, as communicated by Ben & Jerry's to Licensee in the Manuals, training, on-going consultation, and in this Agreement, is important to Licensee, Ben & Jerry's, and other operators and distributors of Ben & Jerry's in order to develop and maintain quality manufacturing standards, high operating standards, to increase the demand for the Products sold, to protect the Wholesale Distribution Concept, including the food service component, and to protect the reputation and goodwill of Ben & Jerry's.

24

15.2.  Licensee shall refrain from using or permitting the use of the Retail Shops for any purpose other than the conduct of the Licensed Business, without first obtaining the written consent of Ben & Jerry's.

15.3.  Licensee shall keep the Retail Shops open and in normal operation for such minimum hours and days as Ben & Jerry's may specify.

15.4.  To insure that the highest degree of quality and service is maintained, Licensee shall exercise the rights granted to it herein in strict conformity which such standards and specifications as Ben & Jerry's may from time to time prescribe in the Manuals or otherwise in writing. Licensee shall refrain from deviating from such standards, specifications, and procedures without the prior written consent of Ben & Jerry's. Accordingly, Licensee agrees to purchase and install, at Licensee's expense, all equipment, supplies, signs, furnishings, fixtures, décor and materials as Ben & Jerry's may reasonably direct from time to time in the Manuals or otherwise in writing, and to refrain from installing or permitting to be installed on or about the premises of any of its manufacturing facilities, distribution facilities and Retail Shops, without the prior written consent of Ben & Jerry's, any equipment, supplies, signs, furnishings, fixtures, décor and materials not previously approved as meeting the standards and specifications of Ben & Jerry's.

15.5.  Licensee agrees not to install or permit to be installed in any Retail Shop any vending machine, game or coin operated device, unless specifically previously approved in writing by Ben & Jerry's.

15.6.  Licensee agrees to maintain an adequate supply of required supplies, including required proprietary paper products as specified in the Manuals and other written Ben & Jerry's instructions.

15.7.  Licensee acknowledges that: (i) the Local Proprietary Products, manufactured hereunder, and the Proprietary Products distributed, offered and sold under this Agreement, are prepared from proprietary recipes developed by and, in some cases, exclusively for Ben & Jerry's; (ii) the Proprietary Products are

25

unique and their formulae and manufacturing processes constitute trade secrets essential to the success of the Ben & Jerry's business as a whole and to Licensee's success hereunder; and (iii) Licensee has entered into this Agreement in order to, among other things, obtain the right to manufacture the Local Proprietary Products, to distribute, offer and sell the Proprietary Products through the Wholesale Distribution Channels and to operate Retail Shops. In order to protect the interest of Ben & Jerry's in the Proprietary Products and to ensure the quality, uniformity, and distinctiveness of the same, Licensee agrees:

15.7.1  To handle and store the Products and their ingredients solely in the manner directed by Ben & Jerry's in the Manuals or otherwise in writing; and

15.7.2  Not to sell, offer for sale, or sample, and to destroy immediately in accordance with procedures set forth in the Manuals and other written Ben & Jerry's instructions, any Product or ingredients therefore which it knows, or should know through the exercise of reasonable care, to be adulterated, tainted, contaminated, spoiled, expired, unsafe, or otherwise unfit for human consumption.

15.8.   All Products sold or offered for sale by Licensee shall meet the then current standards and specifications of Ben & Jerry's, as established in the Manuals or otherwise in writing. Ben & Jerry's may agree to allow Licensee to purchase any or all ingredients for the same solely from suppliers who, (i) demonstrate to Ben & Jerry's continuing reasonable satisfaction the ability to meet the quality standards and specifications of Ben & Jerry's, (ii) possess adequate quality controls and capacity to supply Licensee's needs promptly and reliably, and (iii) previously have not been disapproved by Ben & Jerry's. Ben & Jerry's may, from time to time, disapprove ingredients or suppliers, if Ben & Jerry's determines, in its sole discretion, that the ingredients or suppliers of these ingredients do not meet the quality standards of Ben & Jerry's. Upon receipt of written notice of such disapproval, Licensee shall cease to use any disapproved ingredients and/or cease to purchase from any disapproved

26

supplier. Licensee must obtain prior written approval to use ingredients, by forwarding samples of such ingredients to Ben & Jerry's or to an independent testing facility designated by Ben & Jerry's. A charge not to exceed the reasonable cost of evaluation and testing shall be paid by the Licensee. Ben & Jerry's will use reasonable efforts to ensure that test results will be communicated to the Licensee in a timely fashion. As a function of the ongoing quality assurance, Ben & Jerry's shall have the right, but not the obligation, to require that its representatives be permitted to inspect the facilities of the suppliers from which ingredients are purchased.

15.9.   Licensee shall stock and maintain, for both the wholesale and the retail components, all types of Proprietary Products in quantities sufficient to meet reasonably anticipated customer demand in the Territory.

15.10.   Licensee shall manufacture a sufficient amount of Local Proprietary Products and purchase a sufficient amount of the Products to meet the projections of the Business Plan.

15.11.   Licensee shall permit Ben & Jerry's and their agents to enter upon any of Licensee's facilities at any time and from time to time during normal business hours for the purpose of conducting inspections of the facilities and the books, records and/or accounts of Licensee. Licensee shall cooperate with representatives of Ben & Jerry's in such inspections by rendering such assistance as they may reasonably request, and, upon written notice from Ben & Jerry's or its agents, and without limiting other rights of Ben & Jerry's under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. If Licensee fails an inspection and Ben & Jerry's determines that a re-inspection is required, Licensee shall reimburse Ben & Jerry's for the travel expenses and room and board of their representatives for subsequent inspections to ensure that all deficiencies have been corrected.

15.12.   Licensee shall ensure that all marketing and promotional materials, signs, decorations, paper goods (including disposable food containers, napkins, menu

27

boards and all forms of stationery) used in each component of the Licensed Business and other items specified by Ben & Jerry's bear the Proprietary Marks in the then current form, color, location, and manner prescribed from time to time by Ben & Jerry's and are maintained in good and clean condition.

15.13. Licensee shall maintain its manufacturing, wholesale distribution facilities and Retail Shop locations (including adjacent public areas) in a clean, orderly condition and in excellent repair, and, in connection therewith, Licensee shall, at its expense, make such repairs and replacements thereto (but no others without prior written consent of Ben & Jerry's) as may be required for that purpose.

15.14. Licensee shall not implement any change to any of the three (3) components of the Licensed Business without the prior written consent of Ben & Jerry's. Licensee shall notify Ben & Jerry's in writing of any change, amendment, or improvement in the Manuals which Licensee proposes to make, and shall provide to Ben & Jerry's such information as Ben & Jerry's requests regarding the proposed change. Ben & Jerry's shall use reasonable efforts to respond to Licensee's requests submitted under this Section 15.14 in a reasonable amount of time. Under no circumstances shall the approval or consent of Ben & Jerry's to any request be deemed to have been granted to Licensee absent Licensee's receipt of express written notice thereof from Ben & Jerry's. Licensee acknowledges and agrees that Ben & Jerry's shall have the right to incorporate the proposed change into the manufacturing of the Proprietary Products and/or distribution of the same and shall thereupon obtain all right, title, and interest therein without compensation to Licensee. Ben & Jerry's may, from time to time, on a reasonable basis, revoke its approval of a particular change or amendment. Upon receipt of written notice of such revocation, Licensee shall modify its activities in the manner prescribed by Ben & Jerry's.

15.15. At the request of Ben & Jerry's, but not more often than once every five (5) years, Licensee shall refurbish the Premises of each Retail Shop, at its expense, to conform to the store design, trade dress, color schemes and

presentation of the Proprietary Marks in a manner consistent with the then current image for new Retail Shops located outside the U.S. Such refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration and modifications to existing improvements.

15.16. Licensee shall comply with all terms of its leases or subleases, its financing agreements (if any), and all other agreements affecting the operation of the Licensed Business and shall undertake best efforts to maintain a good and positive working relationship with its landlords and/or lessors; and shall not engage in any activity which may jeopardize Licensee's right to remain in possession of, or to renew the lease or sublease for, the Premises of each Retail Shop.

15.17. Licensee shall meet and maintain the highest health and safety standards and ratings applicable to the manufacture of the Local Proprietary Products, wholesale distribution of the Proprietary Products and operation of the Retail Shops. Licensee shall furnish to Ben & Jerry's, within twenty-four (24) hours after receipt thereof, a copy of any violation or citation which indicates Licensee's failure to maintain such health or safety standards.

15.18. If Licensee learns that any retail outlet in Licensee's Territory is selling Proprietary Products which were not sold to such outlet by Licensee, Licensee shall notify Ben & Jerry's in writing within fourteen (14) days. Failure by Licensee to notify Ben & Jerry's within fourteen (14) days of Licensee's learning of the same shall constitute a default under this Agreement and a material waiver of any and all of Licensee's rights against Ben & Jerry's under this Agreement.

15.19. Licensee shall use its best efforts to integrate into its business a reasonable number (given the size of Licensee's operation) of socially responsible activities which are consistent with those activities and programs which Ben & Jerry's conducts to implement its social mission priorities.

29

15.20. Licensee shall comply, and shall use its best efforts to ensure that it and all entities dealing through Licensee comply with all applicable national, or local laws and regulations in performing its duties hereunder and in any of its dealings with respect to the Products (including without limitation any approvals necessary in connection with any advertising that may be approved by Ben & Jerry's pursuant to this Agreement). Licensee shall be solely responsible for obtaining any required governmental, regulatory or other approval in the Territory for this Agreement (except for the approval or approvals of the Controller of Restrictive Trade Practices which shall be the joint responsibility of Ben & Jerry's and the Licensee), and Licensee represents and warrants that this Agreement is valid, binding and enforceable in accordance with its terms in the Territory, without any requirement of any approval, consent, license or permit from any government entity, agency or authority (other than such approval, consent, license or permits as has already been obtained by Licensee, and the approval of the Controller of Restrictive Trade Practices as aforesaid).

15.21. Each Retail Shop shall at all times be under the direct, on premises supervision of Licensee or a manager appointed by the Licensee and approved of by Ben & Jerry's ("**Retail Shop Manager**"), who has satisfactorily completed the Scoop U Training. Licensee shall maintain a competent, conscientious, trained staff at each Retail Shop. Licensee shall use its best efforts to ensure that all of its employees preserve good customer relations, render competent, prompt, courteous and knowledgeable service, and meet such minimum standards as Ben & Jerry's may establish from time to time in the Manuals and other writings. Licensee and its employees shall handle all customer complaints, refunds, returns and other adjustments in a manner that will not detract from the name and goodwill of Ben & Jerry's. Licensee will use the system designed by Ben & Jerry's for training employees, as communicated to Licensee by Ben & Jerry's in the Manuals and in Scoop U Training, and by Ben & Jerry's in continuing consultation. Licensee shall be solely responsible for all employment decisions and functions of the Licensee's business including those related to hiring, firing, wage and hour requirements, record keeping, supervision and discipline of employees.

15.22. At the request of Ben & Jerry's, Licensee agrees to return obsolete signage (which is used in the Retail Shops) to a location prescribed by Ben & Jerry's. Upon receipt of such signage, Ben & Jerry's agrees to pay to Licensee the depreciated value of any obsolete signage.

15.23. Licensee shall promptly notify Ben & Jerry's in the event that Licensee knows or has reason to believe that any act or refrainment from acting required by or contemplated under this Agreement violates any law, rule or regulation (whether criminal or non-criminal) of the Territory or any political or governmental subdivision thereof. Licensee shall promptly notify Ben & Jerry's in writing of any claim or proceeding involving any Product no later than ten (10) days after Licensee learns of such claim or proceeding.

15.24. Licensee agrees that it shall not act or omit to act in any way that would violate any of the export control laws or regulations of the U.S., and no party shall be required hereunder to act or omit to act in any way that it believes in good faith would violate any such law or regulation.

## 16.   Proprietary Marks

16.1.  Ben & Jerry's represents, with respect to the Proprietary Marks, that Ben & Jerry's has the right to use, and to license Licensee to use, the Proprietary Marks in connection with the rights granted herein within the Territory. Notwithstanding the foregoing and without derogating from any of Ben & Jerry's rights pursuant to any law, Ben & Jerry's shall be entitled to assign any or all of the Proprietary Marks and any or all of its rights under this Agreement to any of its Affiliates. Accordingly, Licensee acknowledges that Ben & Jerry's is considering to assign such rights to Unilever Plc. and is entitled to do so.

16.2.  Licensee acknowledges that the rights granted to Licensee pursuant to this Agreement are granted only in connection with Licensee's exercise of the rights granted pursuant to Section 1.1., all as specifically provided for in the Agreement.

16.3. With respect to Licensee's use of the Proprietary Marks, Licensee agrees to:

16.3.1 Use only the Proprietary Marks designated by Ben & Jerry's, and to use them only in the manner authorized and permitted by Ben & Jerry's;

16.3.2 Use the Proprietary Marks only for the manufacture of the Local Proprietary Products, distribution of the Proprietary Products in the Territory, operation of the Retail Shops, and the preparation and use of the Promotional Materials;

16.3.3 Manufacture the Local Proprietary Products, distribute the Proprietary Products and operate the Retail Shops only under the name "Ben & Jerry's," and use the Proprietary Marks without prefix or suffix, unless otherwise authorized or required by Ben & Jerry's. Licensee shall not use the Proprietary Marks, the abbreviations "B&J" or "BJ", or any name that is now, or in the future, used for the Proprietary Products, or other products of Ben & Jerry's as part of its corporate or other legal name or any e-mail address, domain name, or other identification of Licensee or any component of the Licensed Business in any electronic medium, unless agreed to in advance, in writing, by Ben & Jerry's. Without derogating from the above, Licensee shall not combine as a unitary or composite mark any other trademark, name or symbol with any Proprietary Mark or use any other trademark, name or symbol on Product labels or Promotional Materials, except as may be required by law and/or approved in advance in writing by Ben & Jerry's.

16.3.4 Identify itself as an authorized licensee of Ben & Jerry's in conjunction with any use of the Proprietary Marks in the manner required by Ben & Jerry's, including equipment, invoices, order forms, receipts, and business stationery; as well as at such conspicuous locations on each manufacturing, distribution facility, Retail Shop and food service outlet as Ben & Jerry's may designate in writing;

16.3.5 Not to use the Proprietary Marks to incur any obligation or indebtedness on behalf of Ben & Jerry's;

16.3.6 Execute any documents deemed necessary by Ben & Jerry's to obtain protection for the Proprietary Marks, or to maintain their continued validity and enforceability, in the Territory;

16.3.7 Promptly notify Ben & Jerry's of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to the ownership by Ben & Jerry's of, the right of Ben & Jerry's to use and to license others to use, or Licensee's right to use, the Proprietary Marks. Licensee acknowledges that Ben & Jerry's has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. Ben & Jerry's has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. In the event of any litigation relating to Licensee's use of the Proprietary Marks, Licensee shall execute any and all documents and do such acts as may, in the opinion of Ben & Jerry's, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Licensee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, Ben & Jerry's agrees to reimburse Licensee for its out-of-pocket costs in doing such acts; and

16.3.8 Not to use any marks, names, logos or other promotional or marketing materials that are confusingly similar to, or are colorable imitations of, the Proprietary Marks or any of them, or Promotional Materials that are or were used in connection with or bearing the Proprietary Marks.

16.4. Licensee expressly understands and acknowledges that:

33

16.4.1 Ben & Jerry's is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them. Except as specifically and clearly granted herein, it is understood that Ben & Jerry's is not granting to Licensee, and Licensee does not acquire, by the operation of this Agreement or otherwise, any right to or interest in the name "Ben & Jerry's" or in any derivation of said name or any Proprietary Mark.

16.4.2 Licensee agrees that Ben & Jerry's may immediately terminate this Agreement pursuant to Section 23.2 if, during the Term of this Agreement: (i) Licensee directly or indirectly contests the validity of, the ownership of Ben & Jerry's of, or the right of Ben & Jerry's to use and to license others to use, the Proprietary Marks or (ii) Licensee attempts to register in its own name any of the Proprietary Marks or any variation thereof, or any trademark and/or copyright associated with any portion of the rights granted hereunder.

16.4.3 Licensee's use of the Proprietary Marks does not give Licensee any ownership interest or any other interest in or to the Proprietary Marks.

16.4.4 Any and all goodwill arising from Licensee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Ben & Jerry's, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the Proprietary Marks.

16.4.5 Ben & Jerry's reserves the right to add to the Proprietary Marks and to substitute different proprietary marks for use in identifying the Proprietary Products and the businesses operating hereunder at the sole discretion of Ben & Jerry's, which different proprietary marks shall also be considered "Proprietary Marks" hereunder. Licensee shall make all such additions and substitutions, at its expense.

16.4.6 Licensee will be responsible, at its own sole expense and cost, to design, manufacture and place all Promotional Materials, including point of purchase displays and advertising materials for promotion of the Products in the Territory. All advertising, brochures, displays and other marketing materials or literature in any way relating to the Products and/or using the Proprietary Marks will be subject to the prior written approval of Ben & Jerry's as set forth in Section 20, both with respect to copy and mode of use, all as set forth in this Agreement.

## 17.  Operating Manuals

17.1. In order to protect the reputation and goodwill of Ben & Jerry's and to maintain high standards of manufacturing, distribution through Wholesale Distribution Channels and the operation of Retail Shops, Licensee shall exercise the rights granted to it hereunder in strict accordance with the standards, methods, policies, and procedures specified in the English language Manuals which Licensee shall receive on loan from Ben & Jerry's, for the Term of this Agreement.

17.2. Licensee shall treat the Manuals, any translation thereof, any other materials created for or approved for use in the manufacturing of the Proprietary Products and the operation of the Retail Shops and the information contained therein as confidential, and shall use best efforts to maintain such information as secret and in strict confidence. Except as described in Section 17.3, Licensee shall not copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

17.3. Licensee may obtain, at its sole expense, a local-language translation of the Manuals, and any operating and instructional materials Ben & Jerry's provides to Licensee, if Licensee deems such translation necessary for the full and proper exercise of the rights granted herein within the Territory. Such translation shall be approved by Ben & Jerry's prior to its use, and all translators shall execute such document or documents as Ben & Jerry's may require to assign to Ben & Jerry's any rights said translators may have in the

35

translated materials. Ben & Jerry's shall use its best efforts to review for approval all translations submitted to Ben & Jerry's by Licensee within sixty (60) days of receipt of such translations by Ben & Jerry's.

17.4.    All copies of the Manuals, including any translations thereof, shall remain the sole property of Ben & Jerry's and shall be kept by the Licensee in a secure place and returned to Ben & Jerry's as provided herein.

17.5.    Ben & Jerry's may from time to time revise the contents of the Manuals. Licensee expressly agrees to comply with each such new or revised Manuals upon receipt of written notice from Ben & Jerry's of such change(s). Licensee may suggest changes to the Manuals as described in Section 15.14.

17.6.    Licensee shall ensure that all copies of the Manuals, whether translations or originals, are kept current at all times. In the event of any dispute as to the contents of the Manuals, the terms of the master copies maintained at the home office of Ben & Jerry's shall be controlling.

## 18.    Confidential Information

18.1.    Each party to this Agreement shall keep in strict confidence all information received from the other party to this Agreement. Such confidential information (the "**Confidential Information**") shall include, without limitation, not only the Licensed Technology and the Manuals but also any information: (i) relating to the formulation of the Proprietary Products or the operation of the Retail Shops, or (ii) which, prior to or concurrent with its disclosure to the other party, is identified in writing as confidential; provided, however, that Licensee may use and disclose to others such of the Confidential Information received from Ben & Jerry's as may be necessary in connection with the full and proper exercise of the rights granted hereunder. Neither party to this Agreement shall be bound by any confidentiality restrictions with respect to any information to the extent that such information:

18.1.1   Came into the lawful possession of the receiving party through sources other than the other party to this Agreement or any of their Affiliates,

36

and where the sources providing such information were under no direct or indirect confidentiality obligation to the other party to this Agreement with respect to such information; or

18.1.2 Became publicly available through no act or failure to act on the part of the receiving party.

18.2 The manufacture of any Proprietary Product as well as the marketing, distribution, sale, and service by Licensee of the same, including the supporting documentation therefore, which inherently discloses the Confidential Information of Ben & Jerry's, shall not in itself be deemed publication, disclosure or dissemination of such Confidential Information for purposes of this Section 18; provided, however, that none of the documents containing Confidential Information transferred by Ben & Jerry's to Licensee hereunder, or any portion thereof, may be used by Licensee as such supporting documentation without prior written consent by Ben & Jerry's.

18.3 Upon termination of this Agreement, whether by default or expiration, Licensee shall use the same care and discretion to protect the Confidential Information, and shall not in any way use or disclose the Confidential Information.

18.4. At Ben & Jerry's request, Licensee shall require its shareholders, directors, Managers and any other personnel, agents, subcontractors or translators as permitted by Section 17.3 having access to any of Ben & Jerry's Confidential Information, to execute covenants, in a form approved by Ben & Jerry's, that such personnel will maintain the confidentiality of information they receive in connection with their employment or retention by Licensee. Such covenants shall be in a form satisfactory to Ben & Jerry's, including specific identification of Ben & Jerry's as a third-party beneficiary of such covenants with the independent right to enforce them.

37

19. **Accounting Records**

19.1.   Licensee shall record all sales of all components of the Licensed Business on a suitable computer-based, point-of-sale record keeping and control system. Licensee shall prepare, and shall preserve for at least five (5) years from the dates of their preparation, complete and accurate books, records, and accounts, in accordance with generally accepted accounting principles and in the form and manner prescribed by Ben & Jerry's from time to time in the Manuals or otherwise in writing.

19.2.   All Gross Sales, sales tax, and charges collected on behalf of third parties shall be recorded by Licensee in accordance with the procedures prescribed in the Manuals, and on such point-of-sale record keeping and control system as shall be agreed upon with Ben & Jerry's.

19.3.   Licensee shall, at Licensee's expense, submit to Ben & Jerry's in the form prescribed by Ben & Jerry's, the following reports, financial statements, and other data:

19.3.1 No later than the fifteenth (15th) day of the months of January and October, a profit and loss statement (including but not limited to profit and loss statements for each Retail Shop) reflecting all Gross Sales, during the preceding three calendar months, for all sales of the Products sold by Licensee, or the equivalent in the Territory, prepare profit and loss statements on an accrual basis using generally accepted accounting principles; and

19.3.2 Other forms, statements, reports, records, information, and data as Ben & Jerry's may reasonably designate with respect to the Licensed Business.

19.4.   Ben & Jerry's and its agents shall have the right at all reasonable times to examine and copy, at their expense, the books, records, accounts, and/or business tax returns of Licensee relating to the Licensed Business, including, but not limited to, those relating to any particular component of the Licensed

Business. Ben & Jerry's shall also have the right, at any time, to have an independent audit made of the books of Licensee relating to the Licensed Business. If an audit reveals that any contributions or payments have been understated in any statement or report to Ben & Jerry's, then Licensee shall immediately pay to Ben & Jerry's the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of twelve percent (12%) per annum, or the maximum rate permitted by law, whichever is less. If any audit discloses an understatement in any statement or report of three percent (3%) or more, Licensee shall, in addition to repayment of monies owed with interest, pay for any and all costs and expenses connected with such audit (including travel, lodging and wages expenses, and reasonable accounting and legal costs). The foregoing remedies shall be in addition to any other remedies Ben & Jerry's may have.

## 20.   Marketing and Promotion

20.1.   Recognizing the value of marketing and promotion, and the importance of the standardization of marketing and promotion programs to the furtherance of the goodwill and public image, Licensee and Ben & Jerry's agree, for the Term of this Agreement, in accordance with the following:

20.2.   Upon the execution of this Agreement and prior to October in each following year, Licensee shall complete and provide to Ben & Jerry's a business plan in a format to be provided by Ben & Jerry's ("**Business Plan**") for the Territory for the next calendar year, which shall include projected sales, projected purchases of Products from Ben & Jerry's, all material planned Promotional Materials, and Licensee's plan to fulfill its social mission activity as set forth in Section 15.19.

20.3.   All marketing and promotion materials used by Licensee must strictly conform to the requirements of Ben & Jerry's as set forth in the Manuals or otherwise in writing. As described in Section 15.14, Licensee may request Ben & Jerry's in writing to change such requirements.

39

20.4.   When Licensee advertises and/or markets any of the Products, Licensee shall ensure that its marketing and advertising efforts are in accordance with high quality and good taste and will be comparable to the highest quality marketing efforts in the Territory for competitive products.  Licensee shall bear all costs of its marketing and advertising of the Products hereunder.

20.5.   At all times during the Term, Licensee shall employ a "**Product Manager**" who shall be reasonable satisfactory to Ben & Jerry's.  The Product Manager shall be a designated employee of Licensee who shall be available to Ben & Jerry's on a reasonable basis during Licensee's regular business hours.  The Product Manager shall maintain continuous contact with such Ben & Jerry's employee as Ben & Jerry's may from time to time designate, and shall be fully familiar with Ben & Jerry's methods of operation in general and with the Proprietary Products in particular, and shall coordinate the performance by Licensee of its manufacturing, distribution, retail operations, marketing, promotional and product support obligations under this Agreement, and shall promptly respond to all of Ben & Jerry's both oral and written requests.

20.6.   Licensee shall (a) conduct business in a manner that reflects favorably at all times on the Proprietary Products, the Retail Shops, the Proprietary Marks and the good name, goodwill and reputation of Ben & Jerry's; (b) avoid deceptive, misleading or unethical practices that are or might be detrimental to Ben & Jerry's, the Proprietary Products, the Retail Shops, the Proprietary Marks or the public, including, but not limited to, disparagement of Ben & Jerry's, the Products, the Retail Shops, or the Proprietary Marks; (c) make no false or misleading representations with regard to Ben & Jerry's, the Proprietary Products, the Retail Shops, or the Proprietary Marks; (d) not publish or employ or cooperate in the publication or employment of any misleading or deceptive advertising material; (e) make no representations, warranties or guaranties to anyone with respect to the specifications, features or capabilities of the Products that are inconsistent with any literature distributed by Ben & Jerry's, including all warranties and disclaimers contained therein; and (f) not engage in illegal or deceptive trade practices such as bait and switch techniques or any other practices proscribed hereunder.

40

20.7.  Ben & Jerry's acknowledges that, subject to the terms and conditions of this Agreement, Licensee has the right to use the Proprietary Marks in or on catalogues and display, advertising and promotional materials (all such catalogues and display, advertising and promotional materials incorporating of the Proprietary Marks referred to collectively herein as "**Promotional Materials**") for the Products; *provided however,* that Licensee shall submit the material Promotional Materials to Ben & Jerry's for its written approval prior to any use thereof.  Licensee shall procure Ben & Jerry's approval of material Promotional Materials in two steps: first, when Licensee has put the Promotional Materials in rough or story board format, and second, when Licensee has put the Promotional Materials in final form.  In each case, Licensee shall provide Ben & Jerry's with copies of the Promotional Materials both in English and in the language in which Licensee proposes to use such Promotional Materials. Approval or disapproval shall be at Ben & Jerry's sole discretion, and the use of unapproved Promotional Materials is strictly prohibited.  Ben & Jerry's shall endeavor to provide its approvals or disapprovals hereunder reasonably promptly; *provided, however,* that all Promotional Materials not approved in writing by Ben & Jerry's within ten (10) days of Ben & Jerry's written receipt of Licensee's request for approvals shall be deemed disapproved.  Printed matter submitted to Ben & Jerry's for approval hereunder shall be submitted with four (4) additional copies thereof. If Ben & Jerry's provides Licensee with forms for use in the submission of Promotional Material approval requests, Licensee shall use the same. Licensee acknowledges and agrees that any and all copyright and any other intellectual property rights in and to advertising and Promotional Materials developed by or on behalf of Licensee which bear the Proprietary Marks shall be the sole property of Ben & Jerry's, and Licensee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Ben & Jerry's to give effect to this provision, without any compensation to Licensee.

20.8.  Licensee shall not, without Ben & Jerry's prior written consent (which may be granted or withheld in Ben & Jerry's sole discretion), sell or otherwise provide

41

any Products for use in fundraisers, sweepstakes or similar activities. All costs of all advertising and promotions shall be borne by Licensee. Licensee shall pay to Ben & Jerry's all out of pocket costs of Ben & Jerry's for the artwork and copy provided by Ben & Jerry's.

20.9. Licensee shall not utilize the Promotional Materials or any part thereof in connection with any products or services other than the Products or solely to promote Licensee and, without limiting the materiality of any other term of this Agreement, such use shall be considered a material breach of this Agreement.

20.10. Licensee shall be solely responsible for ensuring that all campaign and marketing materials (including, without limitation, any Promotional Materials) shall comply with all applicable laws and regulations. Ben & Jerry's authorization of the use or manner of use of any proposed Promotional Materials hereunder shall not constitute an opinion as the legal appropriateness or adequacy of such use or manner of use and Licensee's use of the same shall be its sole responsibility.

20.11. Ben & Jerry's may, in its sole discretion and at its sole expense, contribute Proprietary Products (including Proprietary Gift Products) to be used for promotions.

20.12 Licensee specifically acknowledges and agrees that any Website (as defined below) shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Ben & Jerry's approval under the provisions of Section 20.7. As used in this Agreement, the term "Website" means an interactive electronic document, series of symbols, or otherwise, that is contained in a network of computers linked by communications software. The term Website includes, but is not limited to, Internet and World Wide Web home pages. In connection with any Website, Licensee agrees to the following:

20.12.1 If required by Ben & Jerry's, Licensee shall not establish a separate Website. Ben & Jerry's shall have the right, but not the obligation, to designate one or more web page(s) to describe Licensee and/or the Licensed Business, such web page(s) to be located within Ben & Jerry's Website;

20.12.2 If Ben & Jerry's gives written approval for Licensee to establish a separate Website, then each of the following provisions shall apply:

20.12.2.1 Before establishing the Website, Licensee shall submit to Ben & Jerry's, for Ben & Jerry's prior written approval, a sample of the proposed Website domain name, format, visible content (including, but not limited to, meta tags) in the form and manner Ben & Jerry's may reasonably require; and Licensee shall not use or modify such Website without Ben & Jerry's prior written approval as to such proposed use or modification.

20.12.2.2 In addition to any other applicable requirements, Licensee shall comply with Ben & Jerry's standards and specifications for Websites as prescribed by Ben & Jerry's from time to time in the Manuals or otherwise in writing.

20.12.2.3 If required by Ben & Jerry's, Licensee shall establish such hyperlinks to Ben & Jerry's Website and other Websites, as Ben & Jerry's may request in writing. Licensee shall not establish any hyperlinks to Ben & Jerry's Website or other Unilever Websites without obtaining Ben & Jerry's prior written approval.

20.12.3 Ben & Jerry's may revoke its approval at any time, in writing, and require that Licensee discontinue operation of a separate Website, upon which Licensee shall immediately discontinue use of such separate Website.

43

**21.**   **Insurance**

21.1.   Licensee shall procure, prior to the commencement of any operations under this Agreement, and shall maintain in full force and effect at all times during the term of this Agreement, at Licensee's expense, an insurance policy or policies protecting Licensee, and Ben & Jerry's and their respective officers, directors, partners, agents and employees against any demand or claim with respect to personal injury, death or property damage, or any loss, liability, or expenses whatsoever arising or occurring upon or in connection with the manufacture of the Local Proprietary Products, distribution of the Products, or the operation of Retail Shops, including, but not limited to, comprehensive general liability insurance, property and casualty insurance, statutory workers' compensation insurance, and product liability insurance. Such policy or policies shall be written by a responsible carrier or carriers acceptable to Ben & Jerry's, shall name Ben & Jerry's and their Affiliates as additional insured parties, and shall provide at least the types and minimum amounts of coverage specified in the Manuals and other writings. If the type of insurance coverage typically obtained by businesses operating in the Territory that are similar to or the same as operation of the business differs from that described in the Manuals, Licensee may petition Ben & Jerry's to deviate from the requirement that Licensee purchase such insurance.

21.2.   Licensee's obligation to obtain and maintain the policy or policies in the amounts specified in the Manuals and other writings shall not be limited in any way by reason of any insurance which may be maintained by Ben & Jerry's, nor shall Licensee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 28 of this Agreement.

21.3.   Prior to the commencement of any operations under this Agreement, and thereafter on an annual basis, Licensee shall deliver to Ben & Jerry's, certificates of insurance ("**Certificates of Insurance**") evidencing the proper types and minimum amounts of coverage for all components of the Licensed Business. Licensee also shall maintain Certificates of Insurance evidencing

44

the proper types and minimum amounts of coverage and furnish a copy to Ben & Jerry's. All Certificates of Insurance shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Ben & Jerry's in the event of material alteration to or cancellation of the coverage's evidenced by Certificates of Insurance.

21.4.   Should Licensee fail, for any reason, to procure or maintain the insurance required by this Agreement, as such requirements may be revised by Ben & Jerry's in the Manuals or otherwise in writing, Ben & Jerry's shall have the right and authority (but not the obligation) to procure such insurance and to charge the cost of that insurance to Licensee, which charges, together with a reasonable fee for the expenses of Ben & Jerry's in so acting, shall be payable by Licensee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Ben & Jerry's may have.

## 22.   Transfer of Interest in the Licensed Business

22.1.   Ben & Jerry's shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, provided that such assignee agrees to be bound by all of the provisions of this Agreement, and any designated assignee of Ben & Jerry's shall become solely responsible for all obligations of Ben & Jerry's under this Agreement from the date of assignment. Licensee shall execute such documents of acknowledgement of assignment, or otherwise, which Ben & Jerry's shall request with respect to such assignment by Ben & Jerry's.

22.2.   Licensee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Licensee, and that Ben & Jerry's has granted this license in reliance on the business skill, financial capacity, and personal character of Licensee's shareholders. Accordingly, Licensee shall not sell, assign, transfer, convey, pledge, encumber, merge, or give (collectively, "**transfer**") away any rights or obligations under this Agreement, or in all or substantially all of the assets of the Licensee, without notifying, and obtaining the prior written consent of, Ben & Jerry's. For the purposes of this Section

45

22.2, any direct or indirect change of control of Licensee shall constitute a transfer of Licensee's rights and obligations under this Agreement.

22.3. Licensee shall not grant a security interest in the rights granted by Ben & Jerry's hereunder unless the secured party agrees that in the event of any default by Licensee under any documents related to the security interest, Ben & Jerry's shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Licensee, and, in the event Ben & Jerry's exercises such option, any acceleration of indebtedness due to Licensee's default shall be void.

22.4. The consent of Ben & Jerry's to a transfer pursuant to this Section 22 shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be a waiver of the right of Ben & Jerry's to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

22.5 Ben & Jerry's may require, as a condition of its consent to a transfer pursuant to this Section 22, that the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Ben & Jerry's may request) enter into a written agreement, in a form satisfactory to Ben & Jerry's, assuming and agreeing to discharge all of Licensee's obligations under this Agreement for the remainder of the Term; and, if the transferee is other than an individual, Ben & Jerry's may request that such of the owners of a beneficial interest in the transferee as Ben & Jerry's may determine, provide a guarantee of the performance of all such obligations in writing in a form satisfactory to Ben & Jerry's.

22.6. Any Retail Shop which has not been refurbished pursuant to Section 4.2.5 or Section 15.15 within five (5) years prior to the proposed transfer, shall, in a manner satisfactory to Ben & Jerry's, be refurbished, renovated, and/or reconstructed by transferee and the transferee shall expend such funds as Ben & Jerry's requires in doing so, to conform to the general building design, trade dress, color schemes, and presentation of the Proprietary Marks to the image

then current for new or the most recently remodeled Retail Shops within Ben & Jerry's retail system (including, without limitation, structural changes, remodeling, redecoration and modification to existing improvements).

22.7.   The transferee and the transferee's managers will, at the transferee's expense, successfully complete the then current Ben & Jerry's training programs for operators and managers upon such terms and conditions as Ben & Jerry's reasonably may require.

22.8.   The Licensee shall pay Ben & Jerry's a transfer fee in the amount equal to three percent (3%) of the average annual fee for the prior three calendar years of the Gross Turnover, or the Renewal Fee, whichever is greater at the time of the transfer.   Payments shall be made in accordance with Section 12. However, in the case of a transfer to a business entity owned by Licensee or Licensee's current shareholder for the convenience of ownership or any other reason approved by Ben & Jerry's, no such transfer fee shall be required; provided that such transfer remains subject to Ben & Jerry's prior written consent pursuant to Section 22.2 above.

22.9   Licensee shall remain liable for all of the obligations to Ben & Jerry's in connection with the Licensed Business that arose prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Ben & Jerry's to evidence such liability.   Notwithstanding the foregoing, Licensee shall be permitted to allow Avi Zinger to bring a partner into the Licensed Business by issuing new shares in the Licensee or by Avi Zinger selling part of his existing shares in the Licensee, provided that Avi Zinger retains control of the Licensee and the Licensed Business and subject to all other provisions, of this Agreement.   Licensee shall provide Ben & Jerry's with ninety (90) days' prior written notice of any intended change in the shareholders of the Licensee.   Ben & Jerry's shall be entitled to veto any specific partner proposed by the Licensee, if in the sole opinion of Ben & Jerry's such a partner would have an adverse effect upon Proprietary Marks or any related Proprietary Information.

47

**23.**   <u>**Default and Termination**</u>

23.1.   Licensee shall be in default under this Agreement, and all rights granted to Licensee herein shall automatically terminate without notice to Licensee, if Licensee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Licensee or such a petition is filed against and not opposed by Licensee; if Licensee is adjudicated bankrupt or insolvent; if a proceeding for the appointment of a receiver of Licensee or other custodian for Licensee's business or assets is filed and consented to by Licensee; if a receiver or other custodian (permanent or temporary), or the local equivalent thereof, of Licensee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any law of the Territory is instituted by or against Licensee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer; if Licensee is dissolved; if execution is levied against Licensee's business or property; if suit to foreclose any lien or mortgage against the equipment used for the manufacture of the Local Proprietary Products is instituted against Licensee and not dismissed within thirty (30) days; or if the real or personal property of the Licensee shall be sold after levy thereupon by any government official.

23.2.   In addition to the events described elsewhere in this Agreement upon, or subsequent to, the occurrence of any of the following events of default, Ben & Jerry's may, at its option, terminate this Agreement and all rights granted hereunder, without affording Licensee any opportunity to cure the default, effective immediately upon the provision of notice to Licensee (in the manner provided under Section 30):

23.2.1 If Licensee acts, or fails to act, in any manner which is inconsistent with or contrary to the terms and conditions of the rights granted hereunder;

23.2.2 If Licensee or any of its owners is convicted of a serious crime, or any other crime or offense that Ben & Jerry's believes is reasonably likely

48

to have an adverse effect on the manufacture of the Local Proprietary Products and/or distribution of the Proprietary Products or the operation of the Retail Shops, the Proprietary Marks, the goodwill associated therewith, or the interest of Ben & Jerry's therein;

23.2.3 If a threat or damage to public health or safety results from Licensee's manufacture of the Local Proprietary Products, distribution of the Products or operation of the Retail Shops;

23.2.4 If Licensee's action or inaction, at any time, results in the loss of the right, or forfeiture of the right, to do or transact business in the Territory;

23.2.5 If Licensee fails to maintain or observe any of the health and sanitation standards and procedures prescribed by Ben & Jerry's in this Agreement or by Ben & Jerry's in the Quality Assurance Manuals, or otherwise in writing;

23.2.6 If Licensee permits or assists any Affiliate or any other party to act in breach of Section 2.1, or if Licensee purports to grant, license or sublicense any other person or entity to distribute the Proprietary Products without assuring quality standards and all other requirements in violation of Section 1.3, or if Licensee exports Proprietary Products except in accordance with, or otherwise violates, Section 1.4 or purports to make any transfer contrary to the terms of Section 22;

23.2.7 If Licensee knowingly maintains false books or records, or knowingly submits any false statements or reports to Ben & Jerry's;

23.2.8 If, contrary to the terms of Section 17 and Section 18, Licensee discloses, divulges or fails to protect the contents of the Manuals or other Confidential Information provided to Licensee by Ben & Jerry's;

23.2.9 If Licensee misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the Proprietary Products or files for a mark, in its own name, which relates to any portion of the rights granted hereunder;

23.2.10 If Licensee exercises the rights granted hereunder in a manner that materially impairs the reputation or goodwill associated with the Proprietary Marks, Proprietary Products, or the rights of Ben & Jerry's therein;

23.2.11 If Licensee, after curing a default pursuant to Sections 23.3 or 23.4, commits the same default again;

23.2.12 If any purported assignment or transfer is made to any third party without the prior written consent of Ben & Jerry's contrary to the terms of Section 22, or if Avi Zinger ceases to control or to be actively involved in the management of Licensee without the prior written consent of Ben & Jerry's.

23.3    Upon or subsequent to the occurrence of any of the following events of default, Ben & Jerry's may, at its option, terminate this Agreement by giving written notice of termination (in the manner set forth under Section 30) stating the nature of the default to Licensee at least fourteen (14) days prior to the effective date of termination; provided, however, that Licensee may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of Ben & Jerry's within the fourteen (14) day period. If any such default is not cured within the specified time, this Agreement shall terminate without further notice to Licensee, effective immediately upon the expiration of the fourteen (14) day period. Defaults which are susceptible of cure hereunder include the following illustrative events:

23.3.1 If Licensee fails, refuses, or neglects promptly to pay any monies owing to Ben & Jerry's or its Affiliates when due; or

23.3.2 If Licensee refuses to permit Ben & Jerry's or its representatives to inspect the facilities used to manufacture the Local Proprietary Products or distribution of the Products, or the Retail Shops, or the books, records, or accounts of the Licensed Business upon demand or;

23.3.3 If Licensee fails, refuses, or neglects promptly to submit Certificates of Insurance to Ben & Jerry's when due as required under Section 21.

23.3.4 If Licensee fails to provide Ben & Jerry's with a Business Plan or fails to meet the goals of each Business Plan as required under Section 20.2.

23.3.5 If Licensee utilizes the Promotional Materials in breach of Section 20.9.

23.3.6 If the independent board of Ben & Jerry's Homemade, Inc., determines, in its reasonable discretion, that the Licensee is violating, diluting or otherwise acting contrary to the integrity of the essential elements of the Ben & Jerry's brand name or to the social mission priorities established with respect to the business of Ben & Jerry's.

23.4    Except as otherwise provided in Section 23.1, Section 23.2 and Section 23.3 of this Agreement, upon any other default by Licensee, Ben & Jerry's may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 30) stating the nature of the default to Licensee at least thirty (30) days prior to the effective date of termination; provided, however, that Licensee may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of Ben & Jerry's and by promptly providing proof thereof to Ben & Jerry's within the thirty (30) day period. If any such default is not cured within the specified time, this Agreement shall terminate without further notice to Licensee, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.

24.    **Obligations upon Termination or Expiration**

51

Upon termination or expiration of this Agreement any and all rights granted hereunder to Licensee shall terminate, and:

24.1   Licensee shall immediately cease to manufacture the Local Proprietary Products and/or distribute the Proprietary Products or operate the Retail Shops, and shall not thereafter, directly or indirectly, represent to the public or hold itself out (other than a modest and reasonable reference in a resume provided by Avi Zinger to a potential employer) as a present or former holder of the rights granted herein in connection with the promotion or operation of any other business.

24.2   Licensee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the rights granted herein; the Proprietary Mark "Ben & Jerry's", and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the manufacture of the Local Proprietary Products and/or distribution of the Proprietary Products or the operation of the Retail Shops or confusingly similar thereto. In particular, Licensee shall cease to use all signs, marketing materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks. Licensee shall promptly transfer and assign to Ben & Jerry's, at Ben & Jerry's' request, all internet or electronic network domain names and/or addresses and any electronically assessable pages, advertising or other Promotional Materials in form so that same may be used or accessed on any electronically assessable network.

24.3   Licensee shall take such action as may be necessary to cancel any assumed name registration or equivalent registration obtained by Licensee which contains the mark "Ben & Jerry's", or any other Proprietary Marks, and Licensee shall furnish Ben & Jerry's with evidence satisfactory to Ben & Jerry's of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

24.4   Licensee agrees, in the event that it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit,

52

copy, or colorable imitation of any of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in the sole discretion of Ben & Jerry's, is likely to cause confusion, mistake, or deception, or which, in the sole discretion of Ben & Jerry's, is likely to dilute the rights of Ben & Jerry's in and to the Proprietary Marks. Licensee further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to Ben & Jerry's, or the Proprietary Marks) which, in the sole discretion of Ben & Jerry's, suggests or represents a present or former association or connection with Ben & Jerry's, or the Proprietary Marks.

24.5    Licensee promptly shall pay all sums owing to Ben & Jerry's and its Affiliates. In the event of termination for any default of Licensee, such sums shall include all damages, costs, and expenses, including reasonable attorney's fees, incurred by Ben & Jerry's as a result of the default and termination, which obligation shall give rise to and remain, until paid in full, a lien in favor of Ben & Jerry's against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Licensee at the time of default, and Licensee hereby acknowledges and agrees that Licensee at all times shall have executed and timely filed all documents necessary in the Territory to give full effect to the terms of this Section 24.5.

24.6    Licensee immediately shall deliver to Ben & Jerry's the Manuals, and all other records, correspondence, and instructions containing Confidential Information relating to the exercise of the rights granted herein (and any translations and/or copies thereof, regardless of whether same were made in violation of this Agreement), all of which are acknowledged to be the property of Ben & Jerry's.

24.7    Ben & Jerry's shall have the option, to be exercised within thirty (30) business days after obtaining the approval of the Controller of Restrictive Trade Practices or obtaining an opinion from its legal advisors that such approval is not necessary, to purchase itself or to designate any other entity to purchase from Licensee any or all of the supplies and inventory related to the

53

manufacture of the Local Proprietary Products and/or distribution of the Products, or the operation of the Retail Shops at fair market value. If the parties are unable to agree on fair market value within fifteen (15) days after termination or expiration, Ben & Jerry's shall appoint a qualified appraiser, such qualified appraiser to be subject to the approval of Licensee, such approval not to be unreasonably withheld, and the appraiser shall determine fair market value within ten (10) days after appointment. Ben & Jerry's shall bear the costs of the appraiser. If Ben & Jerry's elects to exercise this option to purchase, it shall have the right to set off all amounts due from Licensee, if any, against any expenses or payment of the purchase price upon exercise of its option.

24.8  Ben & Jerry's may, subsequent to the termination of this Agreement, exercise its option to repurchase all or any part of the Licensee's Proprietary Products at landed cost (if applicable) or then prevailing market value, whichever is less.

24.9  Licensee and Licensee's Affiliates shall comply with the covenants contained in this Agreement.

24.10  Neither Ben & Jerry's nor Licensee, nor any owner of Licensee, shall make any public statement, to the media or otherwise, except to the extent that such is legally required, whether by virtue of disclosure laws applicable in the Territory or otherwise.

24.11  In the event of termination or non-renewal of this Agreement at the end of the Initial Term or the Renewal Term, or any sooner termination for any reason, Ben & Jerry's will be freed and discharged, and Licensee hereby expressly releases and discharges Ben & Jerry's, of and from any and all obligations and liabilities whatsoever, arising hereunder or in connection with any manner or thing relating to, or in any manner connected with, the subject matter of this Agreement. The foregoing right of termination and the additional right of non-renewal at the end of the stated terms are absolute (such right of non-renewal being subject only to the rights of the Licensee pursuant to Section

4.2 with respect to the Renewal Term), and neither Ben & Jerry's nor the Licensee will be liable to the other because of termination or non-renewal hereof (whether with or without cause) for compensation, reimbursement, or damages on account of the loss of prospective profits on anticipated sales, or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of Ben & Jerry's or Licensee, or for any reason whatsoever. Nothing herein is intended to relieve any party from any obligation to pay any unpaid balances for Proprietary Products ordered or shipped hereunder prior to termination or expiration.

24.12   The termination of this Agreement will operate as a cancellation, as of the date thereof, of all orders that have not been prepared by Ben & Jerry's for shipment, and thereafter Ben & Jerry's will have no obligation with respect to orders so cancelled.

## 25.   Additional Covenants

25.1   Licensee acknowledges and agrees that the success of the rights granted hereunder is dependent upon the marketing, solicitation, and sale of the Products. To that end, Licensee shall use best efforts to (1) maximize the sale of the Proprietary Products in the Territory; and (2) promote the Wholesale Distribution thereof and (3) operate the Retail Shops in the manner prescribed in the Manuals and (4) implement recommendations from Ben & Jerry's.

25.2   During the Term of this Agreement, Licensee and its Affiliates shall not, directly or indirectly, except as otherwise approved in writing by Ben & Jerry's:

25.2.1 divert or attempt to divert any present or prospective business or customer of any Proprietary Products to any competitor, by inducement or otherwise, or do or perform any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks; or

25.2.2  employ or seek to employ any person who is at that time employed by Ben & Jerry's, or by any other Licensee of Ben & Jerry's, or otherwise encourage any such person to leave his or her employment.

25.5  Licensee represents and warrants that (a) it has the right, power and authority to enter into this Agreement and perform its obligations under this Agreement; (b) the making of this Agreement by Licensee does not violate any agreement existing between Licensee and any other person or entity, and throughout the Term, Licensee shall not make any agreement with any person or entity that is inconsistent with any of the provisions of this Agreement; (c) Licensee is, and at all times during the Term shall be, the holder of all consents necessary for Licensee to perform its obligations hereunder; (d) Licensee complies, and at all time during the Term of this Agreement shall be, the holder of all consents necessary for Licensee to perform its obligations hereunder;

25.6  Homemade undertakes that during the Term of this Agreement it will not employ or seek to employ any person who is at that time employed by the Licensee, or otherwise encourage any such person to leave his or her employment with the Licensee.

## 26.  License As A Business Entity

26.1.  Licensee shall comply with the following requirements:

26.1.1  Copies of Licensee's governing documents, and any amendments thereto, including those documents authorizing entry into this Agreement, shall be promptly furnished to Ben & Jerry's.

26.1.2  Licensee shall maintain a current list of all owners of record of Licensee, including, if applicable, owners of any class of voting securities or securities convertible into voting securities of Licensee, and periodically shall furnish such list to Ben & Jerry's upon request.

26.1.3  License shall not include in its name or that of any subsidiary or Affiliate the words "Ben & Jerry's" and to the extent that those words

56

appear in Licensee's name as of the date hereof they will be removed within fourteen (14) days.

27.   **Taxes Permits and Indebtedness**

27.1.   Licensee promptly shall pay when due all taxes levied or assessed, including unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Licensee in the exercise of the rights granted hereunder. Licensee shall pay to Ben & Jerry's an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Ben & Jerry's with respect to any payments to Ben & Jerry's required under this Agreement, unless the tax is credited against income tax otherwise payable by Ben & Jerry's.

27.2.   In the event of any bona fide dispute as to Licensee's liability for taxes assessed or other indebtedness, Licensee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Licensee permit a tax sale or seizure, or attachment by a creditor, to occur.

27.3.   Licensee shall comply with all laws applicable to the manufacture of the Local Proprietary Products, the sale and distribution of the Products in the Territory and the operation of the Retail Shops within the Territory, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper operations of the same.

27.4.   Licensee immediately shall notify Ben & Jerry's in writing of the commencement of any action, suit, or proceeding, and the issuance of any order, award, or decree of any court, agency, or other governmental instrumentality which may adversely affect the operation or financial condition of the Licensee.

28.   **Independent Contractor and Indemnification; Consents**

28.1.   Licensee is an independent contractor. Ben & Jerry's and Licensee are completely separate entities and are not fiduciaries, partners, joint venturers, or agents of the other in any sense and neither shall have the power to bind the other. No act or assistance given by either party to the other pursuant to his Agreement shall be construed to alter the relationship.

28.2.   During the Term of this Agreement, Licensee shall hold itself out to the public as an independent contractor exercising the rights granted hereunder. Licensee agrees to take such action as may be necessary to do so, including exhibiting a notice of that fact in a conspicuous place at of each of the manufacturing facilities, Wholesale Distribution Channel facilities and Retail Shops the content of which Ben & Jerry's reserves the right to specify.

28.3.   Nothing in this Agreement authorizes Licensee to make any contract, agreement, warranty, or representation on behalf of Ben & Jerry's, or to incur any debt or other obligation in the name of Ben & Jerry's, and Ben & Jerry's shall not in any event assume liability for, or be deemed liable hereunder as a result of any such action, nor shall Ben & Jerry's be liable by reason of any act or omission of Licensee in its exercise of the rights granted herein or for any claim or judgment arising therefrom against Licensee or Ben & Jerry's. Licensee shall indemnify and hold Ben & Jerry's and its Affiliates, their respective present and future officers, directors, employees and agents harmless from and against any and all claims, losses, costs, expenses, liabilities, and damages arising directly or indirectly from, as a result of, or in connection with, Licensee's exercise of the rights granted hereunder, as well as the costs, including attorney's fees, of the indemnified party in defending against them. Notwithstanding the foregoing, Licensee shall only take action with respect to any claims upon consulting with Ben & Jerry's.

28.4.   Except with respect to a failure under the terms of Section 15.16, under no circumstances shall either party to this Agreement be liable to the other party to this Agreement for lost profits or consequential damages.

28.5   The parties hereto agree that whenever, pursuant to this Agreement, Licensee must obtain the approval or consent of Ben & Jerry's with respect to any matter, whether by petition, submission of materials or any other permitted or required request, such consent or approval is subject to Ben & Jerry's sole discretion, unless the Agreement specifically and expressly limits such discretion with respect to that particular approval or consent right. In addition, in order to be deemed effective, such approval or consent must be in writing.

## 29.   Government Approvals: Waivers

29.1.   Licensee shall obtain all approvals, consents, permits and licenses necessary to enter into, make enforceable the terms of, or to perform under, this Agreement from all government, fiscal, and/or other proper authorities which are required by the applicable laws and regulations of the Territory. In obtaining any such approval, consent, permit or license, Ben & Jerry's shall assist Licensee, as requested, in responding to any inquiry in writing to any government or other proper authority.   If, in connection with any government approval, a translation of this Agreement is required, Licensee shall have such translation prepared at its sole cost and expense, and Licensee shall submit such translation to Ben & Jerry's for its written approval prior to submission of the translation to any government authority. Licensee shall inform Ben & Jerry's of the status of any application referred to in this Section 29.1, in a timely fashion.   In the event there exists a difference between any part of this Agreement and any translation hereof, the terms of this Agreement shall control.

29.2.   Ben & Jerry's makes no warranties or guarantees upon which Licensee may rely, and assumes no liability or obligation to Licensee, by providing any waiver, approval, consent, or suggestion to Licensee in connection with this Agreement, or by reason or any neglect, delay, or denial of any request therefor.

## 30.   Notices

30.1   Any and all notices required or permitted under this Agreement shall be in writing, in the English language, and shall be personally delivered, or sent by

any means that affords the sender evidence of delivery, or of rejected delivery (including, but not limited to, transmission by telecopier), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

|                            |                                                                                                                                                                          |
|----------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Notices to Licensee:       | American Quality Products Ltd.<br>1 Hameisav Street<br>Yavne, 70600, Israel<br>Attention:  Avi Zinger                                                                     |
| With a copy to             | Adv. Zvi Chowers<br>Glusman, Chowers, Broid & Co.<br>8 Shaul Hamelech Boulevard<br>Tel Aviv 64733<br>Facsimile: 972-3-693-8680                                            |
| Notices to Ben & Jerry's:1) | Ben & Jerry's Homemade, Inc.<br>30 Community Drive, Suite 1<br>South Burlington, Vermont 05403<br>U.S.A.<br>Facsimile:<br>Attention: Mr. Stuart M. Wiles<br>International Marketing and Sales<br>And |
|                        2)  | Unilever N.V.<br>Weena 455<br>Rotterdam, The Netherlands<br>Facsimile:<br>Attention: Mr. Stuart M. Wiles                                                                  |
| With a copy to             | Adv. Paul H. Baris<br>Yigal Arnon & Co.<br>1 Azrieli Center<br>Tel Aviv 67021<br>Facsimile: 972-3-608-7724                                                                |

Any notice by a means that affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.

30.2    Without derogating from the above, with respect to all supply and other operational issues under this Agreement, other than those pertaining to the Proprietary Marks, the primary contact on behalf of Ben & Jerry's shall be

60

Homemade, and for all issues pertaining to the Proprietary Marks (e.g. renewals, infringements, etc.), the primary contact on behalf of Ben & Jerry's shall be Unilever.

## 31.   Severability and Construction

31.1.   If any provision of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable. The language of each provision of this Agreement shall be construed according to its fair meaning and not strictly against any party. If any change in the law, excluding any new order or change to any order issued by the Controller of Restrictive Trade Practices to the extent such new order or change are initiated by Ben & Jerry's or its Affiliates, has a material effect on the commercial basis or working of this Agreement, or if this Agreement, in whole or in part, is declared by any competent authority to be illegal, invalid, or otherwise unenforceable, the parties shall endeavor to negotiate, in good faith, amendments which as far as practicable give effect to the intentions as expressed herein. If, in the reasonable opinion of either party, the scope of such amendments following such negotiations would destroy the commercial value of this Agreement to that party, such party may terminate this Agreement by giving prior reasonable written notice to the other party.

31.2.   Any provision or covenant in this Agreement which expressly or by it nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination), shall survive such expiration or termination.

31.3.   Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Licensee and Ben & Jerry's, and the officers, directors, shareholders, agents, and employees of Ben & Jerry's, and such successors and assigns of Ben & Jerry's as may be contemplated by Section 22, any rights or remedies under or by reason of this Agreement.

**32.   Applicable Law**

32.1   This Agreement and any disputes arising under or related thereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles.

32.2   Except as otherwise provided herein, upon written demand of either party, any claim or controversy concerning the subject matter hereof shall be submitted to arbitration pursuant to the then prevailing American Arbitration Association rules (the **"Rules"**) before a single arbitrator chosen by the parties, but if the parties cannot agree on an arbitrator, then the arbitrator shall be chosen as provided in the Rules.

32.3   The arbitration proceeding shall be held at an office of the American Arbitration Association in the City of New York, U.S.A. or in such other city as the parties may agree upon at the time arbitration is requested, and the parties hereby waive all questions of personal jurisdiction and venue for the purpose of carrying out this Section. The proceedings and all documents submitted in connection therewith shall be in the English language. The arbitrator's fee shall be borne equally by the parties. All other costs and expenses of the arbitration shall be borne as the arbitrator may determine. Subject to the provisions of Section 28.4, the parties hereby agree that the arbitrator may make any award or awards or enter such orders, including an injunction or specific performance as may be deemed appropriate by the arbitrator, but shall have no authority to award punitive or exemplary damages.

32.4.   Ben & Jerry's and Licensee hereby waive any right to or claim of any punitive or exemplary damages, each against the other, and agree that, in the event of a dispute between them each shall be limited to the recovery of actual damages sustained. Such award or awards shall be the sole and exclusive remedy between the parties hereto regarding any claims, counter-claims, issues, or accounting presented to the arbitrator, except nothing herein shall be deemed

to bar either party's right to obtain injunctive relief against conduct or threatened conduct that will cause it loss of damage. A decision of the arbitrator shall have no collateral estoppel effect with respect to any person or entity not a party to the arbitration proceeding. All awards shall be paid promptly in U.S. dollars, free of any tax, deduction, or offset, and any costs, fees, or taxes incident to enforcing the award shall, to the maximum extent permitted by law, be charged against the party resisting such enforcement. Judgment on the award may be entered by either party in any court of competent jurisdiction. The award shall include interest from the date of any damages incurred for breach or other violation of the contract, and from the date of the award until paid in full, at a rate to be fixed by the arbitrator, but in no event less than twelve percent (12%), or the highest rate permitted by applicable U.S. law, whichever is less. Any arbitration proceeding shall be limited to controversies between Ben & Jerry's and Licensee, and shall not be expanded to include any other parties.

32.5.  Nothing contained in this Agreement shall bar Ben & Jerry's right to seek injunctive relief without the posting of any bond or security to obtain the entry of temporary and permanent injunctions and orders of specific performance enforcing the provision of this Agreement relating to Licensee's: (i) use of the Proprietary Marks; (ii) obligations upon termination or expiration of this Agreement; (iii) assignment or proposed assignment of the rights granted herein, this Agreement, or any ownership interest in Licensee; or (iv) actions covered by the provisions of Sections 13, 15, 16 or 27. Ben & Jerry's and Licensee may each seek injunctive relief to prohibit any act or omission by the other, or the directors, employees of the other, that constitutes a violation of any applicable law, or is dishonest or misleading to customers or to the public. Ben & Jerry's also shall be able to seek injunctive relief to prohibit any act or omission by Licensee or its directors or employees which may impair the goodwill associated with the Proprietary Marks. Any party to the arbitration to which relief is granted pursuant to this Section 32.5 shall be entitled to collect from the other party all costs and reasonable attorneys' fees incurred in obtaining such relief.

**33.   Acknowledgments**

Licensee acknowledges that it has conducted an independent investigation of the rights granted herein, and recognizes that the business contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Licensee's owner as an independent business person. Ben & Jerry's expressly disclaims the making of, and Licensee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

**34.   Force Majeure**

Neither party shall be deemed in default hereunder, nor shall it hold the other party responsible for, any cessation, interruption or delay in the performance of its obligations hereunder other than an obligation to pay money due hereunder, due to causes beyond its reasonable control including, but not limited to: earthquake; flood; fire; storm or other natural disaster; epidemic; accident; explosion; casualty; acts of God; lockout; strike; labor controversy or threat thereof; riot; insurrection; civil disturbance or commotion; boycott; disruption of the public markets; war or armed conflict (whether or not officially declared); sabotage; act of a public enemy; embargo; delay of a common carrier; the inability to obtain sufficient material, supplies, labor, transportation power or other essential commodity or service required in the conduct of its business; or any change in or the adoption of any law, ordinance, rule, regulation, order, judgment, or decree; provided that the party relying upon this Section 34 shall (a) give the other party written notice thereof promptly and, in any event, within five (5) days of discovery thereof and (b) shall take all steps reasonably necessary under the circumstances to mitigate the effects of the *force majeure* upon which such notice is based.

**35.   No Third Party Beneficiaries**

Nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

~~favor of or against either party by reason of such party having drafted this~~
Agreement or any portion of this Agreement.

This Agreement supersedes any prior Agreement between the parties and/or their Affiliates. To the extent any discrepancies exist between the terms of any provision of this Agreement and Section 20 of the Outline of Terms, the terms of this Agreement shall prevail. This Agreement may be executed in ~~counterparts and shall become effective as of the date executed by Licensee~~.

**BEN & JERRY'S HOMEMADE, INC.**

By: _Stuart M Wiles_

Title: _CFO_

Date: _Jan 8, 2004_

**UNILEVER N.V.**

By: _S. Dijkstra_

Title: _Attorney B_

Date: _March 9, 2004_

_E. J. M. Hulders_

_Attorney A_

_March 9, 2004_

**AMERICAN QUALITY PRODUCTS LTD.**

By: ~~AMERICAN QUALITY PRODUCTS LTD~~

Title: _PRESIDENT_

Date: _JAN 10, 2004_

65