# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

**AVI AVRAHAM ZINGER,**

*and*

**AMERICAN QUALITY PRODUCTS LTD.,**

*Plaintiffs*

*v.*

**BEN & JERRY'S HOMEMADE, INC.**

*and*

**UNILEVER UNITED STATES, INC.**

*and*

**CONOPCO, INC.,**

*Defendants*

Civil Case No.:

2:22cv01154(KM)(JBC)

---

### MEMORANDUM ON BEHALF OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

---

EDWARD J. DAUBER, ESQ.
LINDA G. HARVEY, ESQ.
    On the Brief

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 4

    A.  The Parties .................................................................................... 4

    B.  B&J licenses Avi to Manufacture and sell its ice cream in Israel ...................... 5

    C.  B&J and Unilever merge in 2000 and agree to conditions imposed by
        Israeli antitrust authorities .............................................................. 6

    D.  Unilever, B&J, and AQP enter into the 2004 license agreement .................... 8

    E.  Plaintiffs expand their business ...................................................... 10

    F.  Plaintiffs actively promote social justice causes ................................ 10

    G.  BDS pressures B&J to boycott Israel ................................................ 12

    H.  Defendants renew the Agreement and B&J officers defend Plaintiffs against
        BDS attacks ................................................................................. 14

    I.  The B&J Board succumbs to BDS pressure, while B&J executives continue
       to assure Plaintiffs the Agreement will be extended ............................. 15

    J.  Avi seeks to accommodate B&J's BDS concerns ................................ 17

    K.  B&J informs Plaintiffs it will not extend the Agreement ...................... 19

    L.  Unilever continues to sell its own Strauss ice cream and other products in the Areas ...... 20

    M.  AQP is suffering immediate and irreparable harm ............................. 21

ARGUMENT ..................................................................................................... 24

THE VERIFIED FACTS SUPPORT ISSUANCE
OF A PRELIMINARY INJUNCTION ................................................................ 24

    A.  Maintaining the plaintiffs' license as it is currently implemented maintains
        the *status quo* ............................................................................ 25

    B.  Plaintiffs will succeed in this lawsuit because termination of the license is unlawful ...... 25

1. Compliance with Defendants' demand would have violated Israel's Anti-discrimination and Anti-boycott laws ........................................................... 26

2. The Unlawful Demand violates the ICA Consent Decree ............................................. 27

3. Defendants' Unlawful Demand violates U.S. policy against boycotts ....................... 28

4. Defendant's Unlawful Demand violates New Jersey law and policy ......................... 29

5. Compliance with Defendants' Unlawful Demand conflicts with New York law and policy ................................................................................................. 29

C. Plaintiffs will succeed in this lawsuit because Defendants breached the Agreement ........ 31

D. Plaintiffs will succeed in this lawsuit because Defendants breached the implied covenant of good faith and fair dealing ............................................................ 32

E. Plaintiffs are suffering irreparable harm and will continue to do so absent an injunction ..................................................................................................... 34

F. The balance of harms weighs in favor of an injunction .................................................... 39

G. A preliminary injunction will serve the public interest ..................................................... 39

CONCLUSION ........................................................................................................................... 41

## **TABLE OF AUTHORITIES**

### **CASES**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*
  98 N.Y.2d 144 (2002) .....................................................................32, 33

*Acierno v. New Castle Cty.*
  40 F.3d 645 (3d Cir. 1994)............................................................2, 24, 34

*Atlantic City Coin & Slot Serv. Co. v. IGT*
  14 F. Supp. 2d 644 (D.N.J. 1998) ...........................................35, 37, 39

*Bateman v. Ford Motor Co.*
  302 F.2d 63 (3d Cir. 1962)..................................................................35

*Black Horse Lane Assoc. v. Dow Chem. Corp.*
  228 F.3d 275 (3d Cir. 2000)................................................................33

*Bronx Auto Mall, Inc. v. Am. Honda Motor Co.*
  113 F.3d 329 (2d Cir. 1997)................................................................32

*Carlo C. Gelardi Corp. v. Miller Brewing Co.*
  421 F.Supp. 233 (D.N.J. 1976) ...........................................35, 37, 38

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*
  664 F.3d 922 (Fed. Cir. 2012)............................................................37

*Emerson Radio Corp. v. Orion Sales, Inc.*
  253 F.3d 159 (3d Cir. 2001)............................................................32, 33

*Goldfarb v. Solimine*
  245 N.J. 326 (2021) ...........................................................................31

*Goldhaber v. Foley*
  519 F.Supp. 466 (E.D.Pa. 1981) .........................................................35

*In Bak–A–Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*
  69 N.J. 123 (1976) ...........................................................................33

*Instant Air Freight Co. v. C.F. Air Freight Inc.*
  882 F.2d 797 (3d Cir. 1989)................................................................24

*Janmort Leasing, Inc. v. Econo-Car Int'l, Inc.*
  475 F.Supp. 1282 (E.D.N.Y.1979) .......................................................36

*Legum v. Russo*
    173 A.D.3d 998 (N.Y. 2019) ......................................................................31

*McCarthy v. Arnold Foods Co., Inc.*
    717 F.Supp. 325 (E.D.Pa. 1989) ...............................................................35

*Nekrilov v. City of Jersey City*
    528 F. Supp. 3d 252 (D.N.J. 2021) .........................................................2, 40

*Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prod. Div., Litton Sys., Inc.*
    190 N.J. Super. 153 (App. Div. 1983) ......................................................37

*Opticians Ass'n of America v. Independent Opticians of America*
    920 F.2d 187 (3d Cir. 1990).......................................................................37

*Reilly v. City of Harrisburg*
    858 F.3d 173 (3d Cir. 2017).....................................................................2, 24

*Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.*
    749 F.2d 124 (2d Cir. 1984).......................................................................36

*Score Bd., Inc. v. Upper Deck Co.*
    959 F. Supp. 234 (D.N.J. 1997) ......................................................34, 37, 39

*Seidenberg v. Summit Bank*
    348 N.J. Super. 243 (App. Div. 2002) ......................................................33

*Semmes Motors, Inc. v. Ford Motor Co.*
    429 F.2d 1197 (2d Cir. 1970).....................................................................35

*Simpson v. Union Oil Co. of Cal.*
    377 U.S. 13 (1964)................................................................................25, 32

*SK & F Co. v. Premo Pharm. Lab., Inc.*
    625 F.2d 1055 (3d Cir. 1980).....................................................................39

*Sons of Thunder, Inc. v. Borden, Inc.*
    148 N.J. 396 (1997) ...................................................................................32

*Telebrands Direct Response Corp. v. Ovation Comms., Inc.*
    802 F.Supp. 1169 (D.N.J. 1992) ...............................................................37

*United States v. Bonanno Org. Crime Family*
    879 F.2d 20 (2d Cir. 1989)........................................................................26

*Wilson v. Amerada Hess Corp.*
    168 N.J. 236 (2001) ........................................................................................33, 34

## **RULES/STATUTES**

15 C.F.R. pts. 760 ........................................................................................28

19 U.S.C.A. § 4452(b)(4).............................................................................28

26 U.S.C. §999 ...........................................................................................28

50 U.S.C.A. §4841-4843 ..............................................................................28

New York Exec. Law §296(2)(a)...................................................................29

N.J.S.A. § 52:18A-89.13 ..............................................................................29

N.J.S.A. § 52:18A-89.14 ..............................................................................29

U.S.C. §4801-4852 ......................................................................................28

U.S.C. §4841-4843 ......................................................................................28

**INTRODUCTION**

For over 34 years, plaintiffs Avi Zinger ("Avi") and his company, plaintiff and moving party American Quality Products Ltd. and its predecessor companies ("AQP"), have been licensed by defendant Ben & Jerry's Homemade, Inc. ("B&J") to manufacture and distribute Ben & Jerry's ice cream in Israel, including in the areas acquired by Israel in 1967 (the "Areas," a.k.a. the "disputed" or "occupied" territories). The relationship was undisputedly successful and mutually beneficial.

In July 2021, however, defendant B&J and its present owner, defendant Unilever,[1] abruptly announced they were ending the relationship with AQP at the end of this year, and for a single reason: Plaintiffs' refusal to comply with Defendants' unlawful demand that they stop selling Ben & Jerry's ice cream in the Areas, a demand designed to appease members of the Boycott, Divestment and Sanctions movement ("BDS") who have targeted B&J. While boycotting all or part of Israel might appease some BDS activists, it would violate several Israeli laws and the anti-boycott public policies of the U.S. and the states of New Jersey and New York, among others. Defendants were well aware that Plaintiffs could not comply with

---

[1] The Unilever Defendants in this case are Unilever United States, Inc. and Conopco, Inc. (collectively, for purposes of this litigation, "Unilever"). These are the U.S. branches of the global Unilever entity (Unilever PLC, a British company) whose predecessor (Unilever NV, a Netherlands company) signed the operative agreement in this case. Only the U.S. branches were actively involved in the conduct at issue. We refer to Unilever and B&J together as "Defendants."

their demand without breaking the law and violating the agreement. Defendants were also well aware that their demand violated the consent decree they signed in 2001 with Israel's antitrust authority as a condition of the Unilever-B&J merger. Yet Defendants continued to pressure AQP to acquiesce. When AQP refused, Defendants abandoned their long-time business partner.

AQP urgently needs injunctive relief to maintain the *status quo* and keep the agreement in place pending final adjudication of Plaintiffs' claims on the merits. *See*, *e.g.*, *Nekrilov v. City of Jersey City*, 528 F. Supp. 3d 252, 266 (D.N.J. 2021) ("The primary purpose of preliminary injunctive relief is 'maintenance of the status quo until a decision on the merits of a case is rendered.'") (quoting *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994)).

To obtain a preliminary injunction, the moving party first must show: "'(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted.'" *Id*. (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (ellipses omitted)). Once these "gateway factors" are established, the district court considers: (3) the possibility of harm to other interested persons, and (4) the public interest, and "'determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *Id*. (citation omitted).

The requisite elements are readily met here. First, AQP can show that Defendants are wrongfully terminating the relationship and breaching the Agreement and the implied covenant of good faith and fair dealing by ending AQP's license based on Plaintiffs' refusal to comply with Defendants' unlawful demand. A party to a contract, especially the one with outsized bargaining power, cannot lawfully or in good faith coerce the weaker party into violating the law as a condition of maintaining the contract.

Second, AQP has been and will be irreparably harmed by the destruction of its 34-year-old business and the loss of goodwill and reputation it has acquired over these many years. AQP's 169 employees, who include disabled persons, refugees from African countries, and recent immigrants struggling to learn Hebrew, will also suffer irreparable harm, because they will lose their jobs. AQP needs injunctive relief immediately because it is hemorrhaging sales and because it requires months of lead time to ensure the provision of supplies and services necessary to maintain its business. By contrast, Defendants will suffer **_no_** colorable harm if the _status quo_ is maintained pending resolution of this dispute. And the public interest will be served by the grant of injunctive relief, which will further and protect the laws and public policies of Israel and the public policies of the United States, New Jersey, and New York.

## FACTUAL BACKGROUND

### A.    The parties

Plaintiff American Quality Products Ltd. is an Israeli limited liability company licensed to manufacture and distribute Ben & Jerry's ice cream products in Israel, including in the Areas. It is the sole and exclusive licensee of the Ben & Jerry's brand.

Plaintiff Avi Avrahman Zinger ("Avi") is an Israeli citizen who has been licensed through American Quality Products Ltd. and its predecessors ("AQP") since 1987 to manufacture and sell Ben & Jerry's ice cream products in Israel, including in the Areas. Zinger is the sole ultimate beneficial owner of AQP. Declaration of Avi Avrahman Zinger, dated March 11, 2022 ("Zinger Decl.") at ¶1, 5.

Defendant Ben & Jerry's Homemade, Inc. ("B&J") is a Vermont corporation formed by Ben Cohen ("Ben") and Jerry Greenfield ("Jerry"). In 2000, the Unilever Group acquired 100% of B&J through a merger in which B&J became a wholly owned subsidiary of defendant Unilever United States, Inc.

Defendant Unilever United States, Inc. ("Unilever USA") is a Delaware corporation headquartered in New Jersey, and a wholly owned subsidiary of defendant Conopco, Inc. ("Conopco"), a New York corporation headquartered in New Jersey. AQP delivers its royalty payments directly to Conopco. We refer to Unilever USA and Conopco collectively as "Unilever."

4

**B.     B&J licenses Avi to manufacture and sell its ice cream in Israel.**

In or around 1984, Avi learned about a fledgling ice cream business in Vermont started by Ben and Jerry. Zinger Decl. ¶2. Ben & Jerry's ice cream was relatively unknown at the time and had no international market presence. *Id*. Avi was impressed by the quality of the ice cream and concluded there was a potential market for it in Israel, which had no quality ice cream at the time. *Id*. Ben and Jerry agreed that Avi should manufacture and sell Ben & Jerry's ice cream in Israel, including in the Areas. *Id*. at ¶4. The initial contract had a 10-year term lasting to 1998. Zinger Decl. ¶7, Ex. 1.

Avi returned to Israel in 1987 and began building his ice cream business from scratch. Zinger Decl. ¶ 5. He travelled to Vermont to learn how the ingredients were sourced and how the ice cream was made. He identified a factory in Israel and arranged to rent it part-time. Over a year later, Avi opened his first B&J's "scoop shop" (ice cream parlor) in Tel Aviv. It became an instant success. *Id*. Over the years, Avi opened 15 more. *Id*.

Beginning in the early 1990's, Avi expanded his business beyond the scoop shops and began distributing Ben & Jerry's ice cream to supermarkets, hotels, convenience stores, and restaurants throughout Israel, including in the Areas. Zinger Decl. ¶6.

In 1998, B&J and an AQP predecessor signed a new license agreement which contemplated expanding Avi's business to include Cyprus, Greece, and Turkey. Zinger Decl. Ex. 1. In 1999, B&J purchased a 60% interest in Avi's business. Zinger Decl. ¶9.

### C.   B&J and Unilever merge in 2000 and agree to conditions imposed by Israeli antitrust authorities.

In May 2000, B&J agreed to merge with the Unilever Group then headed by Unilever N.V. Merger negotiations were managed and coordinated primarily by Unilever USA on behalf of the Unilever Group. Then, as now, Unilever was the world's largest manufacturer of ice cream. Not only did Unilever have a controlling interest in Strauss, the dominant ice cream company in Israel, it also controlled many of the largest U.S. brands, include Popsicle, Klondike, Breyers, Good Humor, and Magnum. Zinger Decl. ¶11-13, Ex. 3.

The merger raised antitrust issues in Israel because of Unilever's controlling interest in Strauss ice cream. Zinger Decl. ¶13. The Israeli Competition Authority ("ICA"), Israel's antitrust authority, agreed to the merger subject to B&J's relinquishing its 60% interest in Avi's business, which it did in 2001, and to Unilever and B&J's agreeing to strict conditions ultimately set forth in a 2001 consent decree. Zinger Decl. Ex. 4. The consent decree, *inter alia*, prohibited Unilever and B&J from "narrow[ing] the scope of" the license granted to AQP or "degrad[ing] the terms" of the license without first notifying and receiving the approval of the ICA. The decree

further provided that full management separation had to be maintained between Unilever and AQP, and that "Unilever and/or [B&J] shall have no involvement with [AQP]'s decisions regarding conditions of contracting with retailers, the scope and timing of such contracts and the opening of retail stores for the sale of ice cream, the locations thereof and prices at which Ben & Jerry's products will be sold in such stores." The consent decree also prohibited B&J, Unilever, and Strauss from taking any action that might "interfere with the activities of [AQP] in the field of frozen desserts generally and, particularly, in the distribution and marketing of Ben & Jerry's products." *Id*. Unilever and B&J agreed to the conditions and the merger went forward.



At the time of the merger, Unilever agreed that B&J's newly formed Board would retain the right to "oversee" the "historical social mission of the Company," defined as including: "a commitment to purchase 'fair trade' products, … to open scoop shops in …  partnership with non-profit organizations, … to use unbleached paper … and … to purchase, if commercially feasible, a portion of its ingredients from not-for-profit suppliers and suppliers from economically disadvantaged groups and to [assist] such suppliers." Zinger Decl. Ex. 3.

### D.     Unilever, B&J, and AQP enter into the 2004 license agreement.

In 2004, Unilever, B&J, and AQP signed a license agreement (the "Agreement") authorizing AQP to manufacture, sell and distribute Ben & Jerry's ice cream products in the "Territory" defined, consistent with the earlier license agreements and the 2001 Outline of Terms, as "The State of Israel, including the 'occupied territories' under sole Israeli control." Zinger Decl. Ex. 6. The Agreement expressly granted AQP the right to distribute Ben & Jerry's ice cream products through supermarkets, grocery stores, convenience stores, contract food service accounts and other food outlets. *Id*. at 6 [L.A., Definitions, "Wholesale Distribution/Wholesale Distribution Channel"].

The Agreement also gives AQP an "exclusive, non-transferable and personal license" and the rights to offer, sell, and distribute Ben & Jerry's ice cream, to subcontract the manufacture of Ben & Jerry's ice cream, to construct, open, own,

and operate retail shops, to use Ben & Jerry's proprietary marks, and to promote the products in Israel including the Areas. The Agreement requires AQP to "use best efforts to (1) maximize the sale of the Property Products in the Territory and (2) promote the Wholesale Distribution thereof…," *id*. at [LA § 25.1], and to pay a 3 percent royalty of the "gross turnover," in U.S. dollars, to B&J during the renewal term, *id*. at [LA ¶¶ 12.1, 12.4].

The parties agreed that AQP "shall comply, and shall use its best efforts to ensure that it…comply with **all applicable national or local laws and regulations** in performing its duties hereunder and in any of its dealings with respect to the Products…" *Id*. at [LA §15.20], emphasis added].

With respect to U.S. export control laws, the Agreement states: "[AQP] agrees that it shall not act or omit to act in any way that would violate any of the export control laws or regulations of the U.S. and no party shall be required hereunder to act or omit to act in any way that it believes in good faith would violate any such law or regulation." *Id.* at [LA §15.24].

The parties further agreed that it would be an immediate event of default— not subject to any opportunity to cure—for AQP to take any "action or inaction… [that] results in the loss of the right or forfeiture of the right, to do or transact business in the Territory." *Id.* at [LA §23.2.4].

### E.   Plaintiffs expand their business.

Between 2000 and 2005, Avi closed most of his scoop shops and focused his business primarily on manufacturing and distribution. Zinger Decl. ¶ 29. A surge in terrorist attacks in Israel, including suicide bombings that targeted locations popular with young Israelis, made Avi concerned for the safety of his scoop shop employees and patrons. He chose instead to make Ben & Jerry's ice cream available throughout Israel, including in the Areas, by distributing to supermarkets and gas station mini-markets throughout the region. AQP also became part of Unilever's supply chain and began providing Ben & Jerry's products manufactured in Israel to Europe. *Id.* ¶ 30.

In 2010, pursuant to Defendants' direction and guidance, Avi, at great personal risk, undertook substantial financial commitments to enable AQP to move to a new, larger factory in Be'er Tuvia near Kiryat Malachi, in southern Israel, to meet Unilever's anticipated supply-chain demands. *Id.* ¶ 31.

### F.   Plaintiffs actively promote social justice causes.

36.    Avi and AQP have, over many years, initiated and supported projects that promote coexistence between Israelis and Palestinians and provide educational and occupational opportunities to disadvantaged communities, including Palestinians. Plaintiffs also elected to use Fairtrade Certified Ingredients, at significant additional cost to their business. Zinger Decl. ¶ 32. Avi's social mission projects include support for:

- The Middle East Entrepreneurs of Tomorrow ("MEET"), a program conducted together with MIT to educate Israeli and Palestinian high-school students and teach them computer sciences, entrepreneurship, and innovative leadership skills over a three-year period.

- "Seeds of Peace" – an organization that promotes co-existence between Israeli and Palestinian students.

- The Global Learning and Observations to Benefit the Environment ("GLOBE") Program - a worldwide, hands-on, primary and secondary school-based science and education program sponsored by the U.S. Government and NASA that works with Palestinian and Israeli children.

- Kids4Peace – a global movement of Jewish, Christian, and Muslim youth dedicated to ending conflict and inspiring hope in divided societies around the world. Kids4Peace operates five international summer camps and a six-year, year-round program for Palestinian, Israeli and North American youth.

- Jordan River Village – an overnight camp and retreat center in the Middle East where children living with serious illnesses of all ethnic and religious backgrounds (including Jewish Israelis, Israeli Arabs, and Palestinians) participate together.

- The Ethiopian National Project ("ENP"), an organization that assists Ethiopian youth in Israel.

11

- "Fruits of Peace" – a project initiated by Avi to strengthen economic cooperation between Israelis and Palestinians by developing new Ben & Jerry's ice cream flavors using ingredients sourced from Palestinian farmers in the Areas. Avi worked with USAID, and non-profit peace organizations to identify and connect with Palestinian farmers. He developed a "Fruits of Peace" ice cream flavor ("Creamy Fig Ice Cream with Dates") and had artists design the packaging. Then, the Palestinian partners abruptly stopped communicating with him, apparently due to BDS anti-normalization pressure. As a result, the "Fruits of Peace" project shut down.

Zinger Decl. ¶ 32.

### G.     BDS pressures B&J to boycott Israel.

In or around 2011, B&J became a target of BDS, a movement that seeks to disrupt the normalization of relations between Israelis and Palestinians and ultimately eliminate the State of Israel.[2]

B&J began receiving letters from Vermonters for A Just Peace in Palestine ("VTJP"), a BDS group, demanding that B&J stop selling ice cream in Israel, based

---

[2] The BDS "movement has been defined as a movement of individuals and institutions seeking to penalize or otherwise limit commercial relations with the state of Israel or persons doing business in Israel or in any territory controlled by Israel."  Daniel A. Klein, *State Statutes or Executive Orders Restricting Boycotts of Israel*, 46 A.L.R.7th Art. 4, 1 (2019).

on VTJP's allegations that B&J was selling ice cream in "illegal Jewish-only settlements" in the Areas. VTJP ignored that Ben & Jerry's was also being sold in Palestinian cities, villages, and communities throughout the Areas. Many Palestinians shop at the supermarkets and mini-markets to which Plaintiffs distribute Ben & Jerry's ice cream in the Areas. Zinger Decl. ¶ 33-34.

Plaintiffs have never limited sales of Ben & Jerry's ice cream to "Jewish-only settlements." Nor could they lawfully do so. Israel's non-discrimination laws prohibit discrimination in the furnishing of a product or public service on the basis of many categories including, race, religion, nationality, place of origin, gender, sexual orientation, age, and **residence**. Zinger Decl. ¶ 35; Harvey Decl. Ex. 2. Pursuant to this law, an Israeli company like AQP may not refuse to provide its product to customers residing in the Areas, regardless of their religion, ethnicity, national origin, gender, race etc. Harvey Decl. Ex. 2. Israel's anti-boycott law also prohibits any person from knowingly calling for a boycott against the State of Israel or any area under its control (*i.e.* the Areas). Zinger Decl. ¶ 36; Harvey Decl. Ex. 3.

### H.   Defendants renew the Agreement and B&J officers defend Plaintiffs against BDS attacks.

In 2013, the Agreement was renewed for the first of two successive five-year terms. The first term ran from 2013 – 2018. The second term began in 2018 and continues through December 31, 2022. Zinger Decl. ¶ 37.

In March 2014, Jostein Solheim, then CEO of B&J (who had been placed as CEO by Unilever USA), and the members of B&J's independent Board of Directors (the "Board") visited Israel and witnessed AQP's operation and involvement in social mission projects. Zinger Decl. ¶ 38.

In the same month, VTJP sent a letter to Solheim urging B&J to end its business relationship with its Israel "franchise." Zinger Decl. ¶39. Rob Michalak, Global Direct of Social Mission at B&J, sent a letter to VTJP, dated April 16, 2014, stressing that Avi had B&J's support and confidence: "[O]ur Licensee . . . works to serve Ben & Jerry's Mission and Values. We are confident that our Licensee in Israel is operating his business in a responsible and appropriate way." Echoing Solheim, Michalak added, "We are working to build the constructive business relationships that can create positive outcomes such as sourcing Fairtrade-certified ingredients from local farmers." Zinger Decl. Ex. 8.

In 2015, VTJP sought to increase its pressure on B&J by targeting hundreds of the company's U.S. scoop shop franchisees, urging them to demand that the company either cease its operations in the Areas or close the Israeli "franchise" altogether. Zinger Decl. Ex. 9. Around the same time, BDS activists began harassing store owners and organizing demonstrations at which they hand out anti-Israel flyers to customers waiting in line at B&J's annual "free cone day," the franchisees' top

marketing event each year. Zinger Decl. ¶42. This activity continued and increased year after year. *Id.*

### I.     The B&J Board succumbs to BDS pressure, while B&J executives continue to assure Plaintiffs the Agreement will be extended.

In or around 2018 and 2019, the Board began to yield to pressure from the BDS movement's increasingly relentless attacks, and AQP was urged to cease operations in the Areas. Zinger Decl. ¶ 43. On more than one occasion between 2018 and 2021, Avi informed the Board that it would be a violation of both Israel's anti-discrimination law and Israel's anti-boycott law for Plaintiffs to cease distribution of Ben & Jerry's products in the Areas. Zinger Decl. ¶ 44.

Avi explained that violating these laws could subject Plaintiffs to administrative fines and criminal prosecution in Israel in addition to the loss of numerous government benefits. Zinger Decl. ¶ 45.

In February 2020, Avi asked B&J to extend the Agreement beyond the end of December 2022, writing to Matthew McCarthy, CEO of B&J with a copy to Anuradha Mittal, Chairperson of the Board: "As I mentioned to you in our meeting . . . , this year is going to be very challenging—competitors are coming out with super primum [sic] pints, red labels on our packaging, Froneri is taking over Nestle and Haagen Dazs with very aggressive plans, cost of cream is going up, and more.

"In order to be able to deal with these changes I have to prepare myself for the future with long-term investments, as mentioned to you – for instance, expanding

and extending our lease agreement on the factory, new mix plant, and expanding our budget for purchasing ice cream cabinet, among other things." Zinger Decl. ¶46-47.

Avi reminded McCarthy and Mittal that, in the past, renewal discussions had taken a long time and the previous renewal extension was not signed for a year after the contract had expired. Zinger Decl. ¶48. The parties had renewed the license consistently since 1987. Avi added: "This time my challenges and responsibilities are much greater than in previous years and I want to avoid the entering a period of uncertainty once again. [¶] My agreement with [B&J] expires in the end of December 2022, a little less than 3 years from now and if possible, I will like to start the conversation with you now to extend it." Zinger Decl. ¶49.

McCarthy promptly responded in an email with a copy to Mittal, indicating that he agreed to extend: "After your amazing performance in 2019 I know 2020 will be tougher. Thank you for initiative [sic] discussion on contract – I look forward to extending it." Zinger Decl. ¶50.

### J.   Avi seeks to accommodate B&J's BDS concerns.

In September 2020, Plaintiffs were advised that the emerging Board position was that no Ben & Jerry's ice cream be available in the Areas. Zinger Decl. ¶ 51.

To accommodate B&J and Unilever while adhering to the law, Avi proposed that the language of the Agreement be revised to define "Territory" as "the State of Israel" instead of "The State of Israel, including the occupied territories under sole

Israeli control." The parties understood this to be a cosmetic change, made to appease BDS activists; it was not intended to affect, and indeed did not affect, the geographic scope of the license that Avi and his companies had contracted for and been following since the inception of the license in 1987. Zinger Decl. ¶ 51. B&J and Unilever were fully aware that Plaintiffs were continuing to sell B&J products in the Areas. *Id.*

In September 2020, McCarthy provided Avi with an amendment that adopted the "State of Israel" language, but B&J did not provide the promised extension. Nothing changed regarding the sale of Ben & Jerry's ice cream in the Areas. Zinger Decl. Ex. 10.

In October 2020, Avi again wrote to McCarthy regarding the extension. Avi had initially proposed a ten-year renewal, but modified it to five years with an option to renew for an additional five years. To this end, Avi enclosed a copy of the prior five-plus five-year renewal signed by Solheim, and said, "As I told you, it is very necessary for the continued operation of the company, please, let's make it happen." Zinger Decl. ¶ 53. McCarthy replied, "Thank [sic] Avi. Clear. I agree we need to extend." *Id.*

Upon information and belief, BDS attacks grew increasingly harsh and personal in May 2021. The Board doubled-down on its demand that Avi stop selling in the Areas. Avi continued to explain to McCarthy and others at B&J, as he had for

years, that he could not comply with B&J's request to stop distribution and sales in the Areas because doing so would violate Israeli and U.S. law and breach the Agreement's provisions prohibiting such violations. Zinger Decl. ¶ 55.

Plaintiffs nevertheless sought to address the Board's concerns by suggesting that a Palestinian distributor handle all distribution in the Areas. This would have created a significant economic opportunity for the Palestinian candidate. However, when B&J learned that the proposed Palestinian distributor wanted to expand sales in the Areas, B&J rejected the proposal. Zinger Decl. ¶ 56.

### K.    B&J informs Plaintiffs it will not extend the Agreement.

On July 19, 2021, McCarthy abruptly informed Avi in a letter that B&J would not continue the Agreement past December 31, 2022, ending a 34-year-old business relationship. Zinger Decl. ¶ 57, Ex. 11.

On the same day, Unilever issued a public statement stating:

"We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT). We also hear and recognize the concerns shared with us by our fans and trusted partners. [¶] We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year. [¶] Although Ben & Jerry's will no longer be sold in the OPT,

we will stay in Israel through a different arrangement. We will share an update on this as soon as we're ready." Zinger Decl. Ex. 12.

Apparently dissatisfied with Unilever's statement that it would cease sales in the Areas, but find a new "arrangement" for staying in Israel, the Board released its own statement, declaring that:

> "The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory ("OPT") does not reflect the position of the independent board, nor was it approved by the independent board. By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social mission and brand integrity, Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement."

Zinger Decl. Ex. 13.

### L. Unilever continues to sell its own Strauss ice cream and other products in the Areas.

After demanding that Plaintiffs stop selling in the Areas and refusing to renew the Agreement when Plaintiffs refused to do so, Unilever continues to sell many of its other products in the Areas, including Strauss ice cream and many other food and personal hygiene products. Zinger Decl. ¶ 60.

As a result of Defendants' wrongful and unlawful breach and termination of the business relationship with Plaintiffs, Defendants have been found to have violated numerous United States anti-boycott laws, including those of New Jersey and New York, which have divested their pension funds of any ownership of Unilever stock as a result. Zinger Decl. ¶ 61.

In addition, numerous other parties have taken legal action against Defendants, including a complaint filed by Palestinian activist Bassam Eid with the New York State Division of Human Rights, explaining that Unilever's decision will harm Palestinians, who are among Ben & Jerry's most devoted consumers. Zinger Decl. ¶ 62.

### M. AQP is suffering immediate and irreparable harm.

Meanwhile, the prospective termination of the Agreement at the end of 2022 has caused and continues to cause immediate and irreparable harm to AQP, including to its reputation and goodwill built up over more than three decades. Unilever's recent announcement that it is planning a "new arrangement" for Ben & Jerry's ice cream in Israel has accelerated, intensified, and exacerbated the harm to Plaintiffs' business operation. Zinger Decl. ¶ 63.

Prospective termination has endangered the continuation of Plaintiffs' businesses in Israel (including in the Areas), placing them under imminent threat of partial or total destruction. Specifically, as a direct result of Defendants' wrongful conduct, accumulated sales of Ben & Jerry's ice cream throughout Israel have dropped 23% since August 2021 and continue to decline at an increasingly rapid rate each month. Sales for January 2022 were 30% lower than January 2021, reversing an average annual sales growth of 15% per year. Sales at Avi's two ice cream shops have dropped 34% and 28% respectively since August 2021 compared to the same

period in 2020. And sales in the Areas have dropped 39%, reversing double-digit growth in 2018, 2019 and 2020. Zinger Decl. ¶ 65.

Sales to anchor stores (mainly food chains) have dropped precipitously since Defendants published their letters in July 2021. Plaintiffs have experienced a 45% drop in sales to convenience stores on IDF bases; a 45% drop in sales to Domino's Pizza; a 42% decrease in sales to the Victory food chain; a 34% drop in sales to convenience store AM/PM; a 29% drop in sales to Israeli supermarket chain, Tiv Ta'am; and a 26% drop in sales to Ram Levi, one of Israel's largest grocery market chains. Zinger Decl. ¶ 66.

Defendants' wrongful conduct has also caused extensive damage to Plaintiffs' reputation and goodwill. Until the July 2021 statements were published, Plaintiffs' products were very highly regarded and sought after. As a result of the fallout caused by Defendants' conduct, there are incessant calls on social media to boycott Plaintiffs, including in the form of ads by well-known individuals. Plaintiffs have also experienced attacks on and destruction of equipment. In addition, government bodies, organizations, institutions and private companies have succumbed to public pressure and are distancing themselves from AQP because they are reluctant to associate with the ostracized Ben & Jerry's brand. Zinger Decl. ¶ 67.

Business competitors are exploiting the damage to Plaintiffs' reputation to increase their own sales at Plaintiffs' expense. Competitors have begun poaching

Plaintiffs' delivery truck drivers and pressuring supermarket chains to relinquish to them a portion of Plaintiffs' freezer space. Zinger Decl. ¶ 68.

Plaintiffs have suffered damage to their ability to equip themselves for business operations. They have been unable to plan for the coming season, prepare budgets and projections, commit to long-term contracts, arrange necessary financing, procure inventories of raw materials and supplies, make arrangements for distribution, hire management and workforce, develop new products and promotional materials, and prepare and develop marketing and advertising campaign (as they have done each year). Zinger Decl. ¶ 69.

With Defendants' knowledge, and in reliance on assurances that his license would be renewed, Avi invested millions of dollars from his own resources in a series of projects aimed at gearing up for the coming decade. He took steps, for example, to upgrade his manufacturing line, purchasing and installing a new multi-million-dollar mix plant and packaging equipment, a large portion of which was already in place but not yet operational when Defendants' statements were published. Zinger Decl. ¶ 70.

The prospective termination and the uncertainty it created has made it impossible for Plaintiff to hire needed managerial staff and has threatened Plaintiffs' ability to retain current staff. Plaintiffs' 169 employees, who include refugees from Sudan and Ethiopia, new immigrants struggling with the Hebrew language, and

people with disabilities, are now uncertain whether their employment will continue. Some have already resigned, others are considering resigning, and it is hard for Plaintiffs to recruit workers in light of the hostile atmosphere, tight employment market, and the uncertainty created by Defendants' wrongful conduct. Zinger Decl. ¶ 71.

Plaintiffs' credibility and financial status with providers of bank credit and suppliers, whose cooperation is needed months in advance of actual sales, have also been harmed by Defendants' wrongful conduct. Zinger Decl. ¶ 72.

Avi has been forced to cancel a substantial transaction for the purchase of commercial real estate adjacent to his factory, which would have been used to store raw materials and park delivery trucks. Zinger Decl. ¶ 73.

## ARGUMENT

### THE VERIFIED FACTS SUPPORT ISSUANCE
### OF A PRELIMINARY INJUNCTION

Oft-repeated and well-established federal standards govern the issuance of preliminary injunctive relief. *E.g., Instant Air Freight Co. v. C.F. Air Freight Inc*., 882 F.2d 797, 799  n.4 (3d Cir. 1989). The primary purpose of a court order at the inception of a federal lawsuit  is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994). The plaintiff must also  show: (1) a reasonable probability of eventual success in the litigation and (2) irreparable injury if relief is not granted. *Reilly v.*

*City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors (3) relative harm to the nonmoving party and (4) the public interest and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*. at 179 (quotations omitted).

Courts in this Circuit "do not require at the preliminary stage a more-likely-than-not showing of success on the merits because a likelihood of success on the merits does not mean more likely than not." *Reilly*, 858 F.3d at 179 & n.3 (citing *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)) (quotations and alterations omitted). Instead, the moving party "must demonstrate that it **can win** on the merits (which requires a showing significantly **better than negligible but not necessarily more likely than not**)." *Id*. at 179 (emphasis added). AQP readily meets this requirement.

### A. Maintaining the plaintiffs' license as it is currently implemented maintains the *status quo*.

The plaintiffs have, for the past 34 years, been manufacturing and distributing Ben & Jerry's ice cream with great commercial success in Israel and in other neighboring countries. The threatened termination of their license will disrupt and substantially change the status quo. Hence there can be no doubt that the threshold condition for issuance of preliminary injunctive relief—preventing a substantial alteration of the existing condition—is satisfied.

**B.     Plaintiffs will succeed in this lawsuit because termination of the license is unlawful.**

The U.S. Supreme Court has held that an oil company could not lawfully terminate the license of an independent dealer because the dealer rejected the company's request that it impose noncompetitive prices. *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 14-21 (1964). The Defendants' threatened termination of the plaintiffs' license only because the plaintiffs have refused to comply with the Defendants' insistence that they violate Israeli law and American policy is equivalent to the termination that the Supreme Court voided in the *Simpson* case. The Court of Appeals for the Third Circuit applied the Supreme Court's Simpson v. Union Oil Co. precedent in sustaining an action for damages by a wholesale dealer who was terminated for refusing to abide by an illegal agreement. *Pace electronics, inc. v. Cannon computer Systems, Inc.,* 213 F. 3d 118, 122-124 (3d Cir 2000).

In 2004, Unilever, B&J, and AQP entered into a valid and binding contract under which Avi and AQP were licensed to manufacture and distribute Ben & Jerry's ice cream. Defendants thereafter demanded that the plaintiffs engage in illegal conduct in order to retain the license. Avi repeatedly advised the Defendants that U.S. and Israeli law and public policy prohibit AQP from discriminating against persons living in the Areas by refusing to sell there. Defendants nevertheless continued to insist that AQP violate these laws.

When AQP refused to do so, Defendants decided in July 2021 to end the 34-year-old business relationship between Avi and B&J by announcing the termination of the Agreement. This decision was an illegal termination of the license under the governing Supreme Court and Third Circuit decisions.

In *United States v. Bonanno Org. Crime Family,* 879 F.2d 20, 28 (2d Cir. 1989), the Second Circuit held that "agreements contrary to public policy, have long been held to be unenforceable and void." Had the plaintiffs acceded to the Defendants' demand that they violate Israeli law and American policy, their arrangement would be "unenforceable and void" under what the Second Circuit characterized as "both federal and state law."

### 1. Compliance with Defendants' demand would have violated Israel's Anti-discrimination and Anti-boycott laws.

Israel's Anti-discrimination Law, 5761-2000, prohibits discrimination in supplying products and public services  "on the basis of . . . a place of residence." Harvey Decl. Ex. 2.   AQP could not refuse to make B&J's ice cream products available in the Areas without violating this law.

Israel's Anti-Boycott Law, 5771-2011 defines a boycott against the State of Israel as "deliberately avoiding economic, cultural or academic ties with another person solely because of their affinity with the State of Israel, one of its institutions or an area under its control, in such a way that may cause economic, cultural or

academic damage." Harvey Decl. Ex. 3.   AQP could not refuse to sell or distribute B&J's ice cream products in the Areas without violating this law.

### 2.   The Unlawful Demand violates the ICA Consent Decree.

Defendants' unlawful demand violated at least seven terms of the 2001 ICA consent decree that set conditions for approval of Unilever's merger with B&J: (1) B&J's products must be marketed by a person with no proximity to Unilever or Strauss; (2) the scope of the license would not be restricted or narrowed and its conditions would not be deteriorated by B&J or Unilever; (3) neither B&J nor Unilever could intervene in the prices of the products or lower the quantities supplied to the licensee; (4) no further restraints on the licensee's business could be made without ICA approval; (5) Unilever could not be involved in the licensee's business and could not even contact the licensee about business matters; (6) neither Unilever nor B&J could take any action to disrupt the licensee activity in the frozen desserts market; and (7) no transfer of license or change of ownership could take place without ICA approval. Zinger Decl. Ex. 4.

Unilever's directive to AQP to restrict, narrow, or impair the scope of its existing manufacturing and distribution  would, if implemented, have violated the Israeli consent decree.

### 3.      Defendants' Unlawful Demand violates U.S. policy against boycotts.

The boycott provisions of the U.S. Export Control Reform Act of 2018, 50 U.S.C. 4801-4852 ("ECRA") prohibit companies and individuals from (1) refusing or agreeing to refuse to do business for boycott-related reasons, (2) furnishing information for boycott-related reasons, and (3) taking discriminatory acts for boycott-related reasons. *See* 50 U.S.C. §§ 4841-4843 and "Antiboycott Regulations" at 15 C.F.R. pt. 760. The U.S. Tax Code also contains detailed substantive and reporting requirements for activities related to boycotts and penalties for violation of these requirements. *See* 26 U.S.C. § 999.

Knowing agreements to refuse or actual refusal to do business with or in a boycotted country or with blacklisted companies may be penalized under the U.S. tax laws and/or the anti-boycott provisions of ECRA. *See* 26 U.S.C. § 999, 50 U.S.C.A. §§ 4841-4843, and 15 C.F.R. pts. 760, 760.2(b); *see also* 19 U.S.C.A. § 4452(b)(4) (the U.S. government "opposes politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel, such as boycotts of, divestment from, or sanctions against Israel").

AQP could not accede to Defendants' demand that it stop selling or distributing B&J's ice cream products in the Areas without violating the policies of these laws. Indeed, the Agreement itself requires the parties to follow these policies.. (*See* Zinger Decl., Ex. 6, Agreement § 15.24 [neither party shall be "required

hereunder to act or omit to act in any way that it believes in good faith would violate [U.S. export laws]."].)

4.    **Defendant's Unlawful Demand violates New Jersey law and policy.**

New Jersey law, NJ.S.A. § 52:18A-89.14, provides "[N]o assets of any pension or annuity fund under the jurisdiction of the Division of Investment in the Department of the Treasury … shall be invested in any company that boycotts the goods, products, or businesses of Israel, boycotts those doing business with Israel, or boycotts companies operating in Israel or Israeli-controlled territory." *See also* N.J. Stat. § 52:18A-89.13 ("The State is deeply concerned about the [BDS] effort to boycott Israeli goods, products, and businesses which is contrary to federal policy articulated in numerous laws."). As a result of Defendants' announced termination of Plaintiffs' license, the State determined in December 2021 to divest $182 million in Unilever stocks and bonds.

5.    **Compliance with Defendants' Unlawful Demand conflicts with New York law and policy.**

New York Exec. Law § 296(2)(a) provides in pertinent part: "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital

status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof[.]"

Defendants' demand  violated the public policy behind New York Exec. Law § 296(6), which provides "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article."

Defendants' actions explicitly implicate N.Y. Executive Order No. 157 (June 5, 2016), Directing State Agencies and Authorities, to Divest Public Funds Supporting BDS Campaign Against Israel. As a result of Defendants' violation of the Executive Order policy, in October 2021, the New York State Controller determined that Unilever had "engaged in BDS activities" and announced that the New York State Common Retirement Fund was divesting from $111 million in Unilever equity.

If Plaintiffs had complied with Defendants' Unlawful Demand, they would have violated the longstanding policies of the State of New York against discrimination on the basis of religion and national origin by cutting off supplies of Ben & Jerry's ice cream to residents of the Areas on the basis of animus to the Jewish State of Israel and by withholding from  Palestinians who live in these Areas the advantages of purchasing Ben & Jerry's ice cream.

### C.     Plaintiffs will succeed in this lawsuit because Defendants breached the Agreement.

The Agreement contemplated that both sides would be law-abiding and not coerce violations of law. Defendants' demand that the Plaintiffs violate Israeli law and the policies of the United States, New Jersey, and New York to continue in business was a breach of the Agreement.  The Defendants would plainly have breached the Agreement if they had demanded that the Plaintiffs submit false Israeli tax returns or that they violate Israeli anti-discrimination law by refusing to hire applicants who wore a yarmulke or a hijab as a condition for renewal of the Agreement. By the same token, the demand that the Plaintiffs violate Israeli law in the distribution and sale of ice cream breached the Agreement.

The Defendants' notice that they intend to terminate the Plaintiffs' license and not renew the Agreement at the end of 2022 is itself a breach of a valid existing contract. New Jersey and New York law concur in holding that a plaintiff has established a breach of contract by proving that (1) "the parties entered into a contract containing certain terms"; (2) "plaintiffs did what the contract required them to do"; (3) "defendants did not do what the contract required them to do" ; and (4) "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs." *Goldfarb v. Solimine*, 245 N.J. 326, 338–39 (2021) (citations omitted)); *see also Legum v. Russo*, 173 A.D.3d 998, 999 (N.Y. 2019) (listing the same elements).

AQP entered into a contract (the Agreement) with B&J and Unilever. AQP substantially performed and continues to perform all its obligations under the Agreement. Indeed, AQP has gone above and beyond the requirements of the Agreement by identifying and participating in numerous social action initiatives with B&J's encouragement to promote B&J's social mission, and by acquiring, at considerable additional cost to AQP Fair Trade recognition for the B&J's ice cream AQP produces and distributes.  Zinger Decl. ¶ 32.

Defendants have long recognized Avi and AQP's superlative performance. They have repeatedly praised it in correspondence with Avi and AQP and in public statements. None of the Defendants and none of their officers, agents, or employees, has ever given Avi, AQP, or anyone else notice or reason to believe that Avi and AQP failed to perform any obligation under the Agreement. *See, e.g.,* Zinger Decl. ¶50.

Defendants breached the Agreement by announcing that they would terminate B&J's 34-year-old business relationship with Plaintiffs because of AQP's refusal to comply with Defendants' unlawful demand. *See, e.g.*, *Simpson v. Union Oil of Cal.,* 377 U.S. at 14-21.

### D.    Plaintiffs will succeed in this lawsuit because Defendants breached the implied covenant of good faith and fair dealing.

New Jersey law, as confirmed by the Court of Appeals for the Third Circuit, establishes that the Defendants' conduct has breached a contracting party's obligation not to engage in conduct that "will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract.'" *Emerson Radio Corp. v. Orion Sales, Inc*., 253 F.3d 159, 170 (3d Cir. 2001) (quoting *Sons of Thunder, Inc. v. Borden, Inc*., 148 N.J. 396, 420 (1997)). New York law, as confirmed by the Court of Appeals for the Second Circuit, follows the same principle. *511 W. 232nd Owners Corp. v. Jennifer Realty Co*., 98 N.Y.2d 144, 153 (2002); *Bronx Auto Mall, Inc. v. Am. Honda Motor Co*., 113 F.3d 329, 330 (2d Cir. 1997) (franchisor could not condition renewal of franchisee's contract on conditions imposed in bad faith).

The Defendants cannot escape their obligation by claiming that no explicit provision in the Agreement protects the Plaintiffs from unlawful termination. "Implied covenants are as effective components of an agreement as those covenants that are express." *Wilson v. Amerada Hess Corp*., 168 N.J. 236, 244 (2001) (citation omitted).

A New Jersey court has noted that a defendant who "acted in conformity with the express terms of the contract" may be liable because of "plaintiff's unequal bargaining power" that "will bring the implied covenant to the forefront" as "one factor among many to be considered." *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 254–56 (App. Div. 2002); *see also 511 W. 232nd*, 98 N.Y.2d at 154 (unequal bargaining power is a factor to be considered in determining good faith). *See also Emerson*, *supra,* 253 F.3d at 170 (quoting *Black Horse Lane Assoc. v. Dow Chem.*

*Corp.*, 228 F.3d 275, 288 (3d Cir. 2000). In *In Bak–A–Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 130 (1976), a defendant was held to have breached the implied covenant of good faith by withholding intention to impair plaintiff's distributorship although the defendant knew that  plaintiff was embarking on an investment substantially predicated upon its continuation. Indeed, "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." *Wilson*, 168 N.J. at 244. In any event, the Agreement in this case contained no "express and unconditional right to terminate."

Defendants promised AQP that the license would be extended when it ended in 2022, as it had been extended multiple times over more than  thirty years. The Defendants abruptly reversed course and announced in July 2021 that the license would terminate at the end of 2022, knowing that AQP had invested heavily in reliance on Defendants' promise and good faith duty to extend the license, and knowing that a termination would destroy AQP's business after 35 years of loyal and dedicated service.

The Defendants' bad faith in terminating the license is multiplied by the fact that it is the **only** reason for the termination. There was no commercial benefit in the termination, and it cannot be justified by any business necessity or profit motive.

AQP is being terminated because it is unwilling to break the law. It is hard to imagine a clearer case of classic breach of an implied covenant of good faith and fair dealing.

### E.   Plaintiffs are suffering irreparable harm and will continue to do so absent an injunction.

This Court has held that a preliminary injunction should be granted to a plaintiff who makes a "clear showing of immediate irreparable injury,' or a 'presently existing actual threat" as contrasted with "a possibility of a remote future injury." *Score Bd., Inc. v. Upper Deck Co.*, 959 F. Supp. 234, 240 (D.N.J. 1997) (quoting *Acierno v. New Castle County*, 40 F.3d 645, 655 (3d Cir. 1994)).

Destruction of a longstanding business relationship surely constitutes irreparable harm. *Atlantic City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 667 (D.N.J. 1998) (citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970) and a series of New Jersey and Pennsylvania District Court cases following *Semmes*).[3]

---

[3] *Atlantic City* cites, *inter alia*, *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 233, 236 (D.N.J. 1976) (finding that "the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of preliminary injunction."); *McCarthy v. Arnold Foods Co., Inc.*, 717 F.Supp. 325, 329 (E.D.Pa. 1989) (finding irreparable harm in the termination of a 14-year-old wholesalership); *Goldhaber v. Foley*, 519 F.Supp. 466, 475 (E.D.Pa. 1981) (granting injunction to court reporters who were to be replaced by a court reporting system, because removing "them from their established careers and forc[ing] them to seek new employment would constitute irreparable injury[.]"). *See* 14 F. Supp. 2d 644, 667.

The Second Circuit held in *Semmes* that a franchisee who had held a Ford franchise for over 20 years suffered irreparable harm as a result of Ford's termination of the franchise. "[T]he right to continue a business in which [the franchisee] had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award. [Citation.] Moreover, they want to continue living." 429 F.2d at 1205.

The Third Circuit noted in *Bateman v. Ford Motor Co*., 302 F.2d 63, 66 (3d Cir. 1962), that a "'judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who … has had [the] franchise" for many years. *See also Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co*., 749 F.2d 124, 125-26 (2d Cir. 1984) ("loss of [plaintiffs'] distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages."); *Janmort Leasing, Inc. v. Econo-Car Int'l, Inc*., 475 F.Supp. 1282, 1294 (E.D.N.Y.1979) (loss of business was not reducible to monetary value).

These cases are right on point. Defendants' termination announcement is already harming and will destroy AQP, a 34-year-old business built from the ground up by a single individual. This loss constitutes irreparable harm that cannot be

reduced to monetary value. The harm is magnified by the fact that non-renewal is due solely to AQP's refusal to violate Israeli and U.S. law and public policy, and not to any inadequate performance  on AQP's part or on a commercial interest of the Defendants. AQP did not fall short in any way. Its enterprise was financially successful, praised by B&J at every turn, and held up as a model for the very social mission that B&J uses as an excuse to destroy it.

AQP will suffer not only the destruction of its business but of its goodwill and reputation, built up over 34 years. AQP is already experiencing these harms as a result of Defendants' conduct. AQP's customers are uncertain whether to buy from AQP or to boycott it in response to B&J's support of BDS. AQP's business partners, suppliers, and financing institutions are likewise confused. They  question their relationships with AQP given its uncertain future and association with a business hostile to Israel. "Erosion of good will," injury to reputation, and loss of business are well-established forms of irreparable harm in a licensing dispute. *See Score Bd.*, *supra,* 959 F. Supp. at 240 (citing *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195–97 (3d Cir. 1990); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 926 (Fed. Cir. 2012) ("price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."); *Telebrands Direct Response Corp. v. Ovation Comms., Inc.*, 802 F.Supp. 1169 (D.N.J. 1992). A licensee  like AQP is uniquely vulnerable to

loss of reputation and goodwill if terminated. *See also Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prod. Div., Litton Sys., Inc.*, 190 N.J. Super. 153, 163–64 (App. Div. 1983) ("once a franchisee has succeeded by his efforts and capital in establishing a local reputation for the franchise name, he is vulnerable to termination of the franchise, forfeiture of the business good will and the inability to realize the benefits of his business …")

AQP's owner, Avi, and its employees, will also suffer irreparable harm. This is another factor that weighs strongly in favor of injunctive relief. *See, e.g.*, *Atlantic City*, *supra,* 14 F. Supp. 2d at 667 (citing *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233 (D.N.J. 1976)).  AQP employs 169 people, including newly arrived immigrants struggling to learn Hebrew, refugees from African countries like Sudan, LGBQT refugees, and disabled individuals. Zinger Decl. ¶ 71. These workers will be unemployed if the business shuts down. Because of their circumstances, they will be hard pressed or unable to find new jobs adequate to support themselves and their families.

Injunctive relief cannot wait until the end of this year. AQP is bleeding business. It must  arrange months in advance for the provision of supplies, such as (but not limited to) ingredients and packaging, which are needed to manufacture, distribute, and sell Ben & Jerry's ice cream in Israel. Zinger Decl. ¶63-73. Ingredients that are Fair Trade certified are available only in limited amounts and

must be obtained from countries outside Israel. *Id*. AQP must also arrange in advance for a number of essential time-sensitive services, such as shipping and trucking, and the rabbinical supervision needed to ensure that ice cream products meet kosher standards. *Id*. AQP's business will suffer irreparable harm if it cannot maintain essential service and supply chains. *Id*.

The evidence of irreparable harm to AQP is overwhelming. AQP urgently requires and merits an injunction that preserves the *status quo*.

### F.    The balance of harms weighs in favor of an injunction.

AQP faces irreparable harm while the Defendants will suffer virtually no harm if the *status quo* is maintained pending the outcome of this lawsuit. They   will continue to profit from AQP's sales of B&J's ice cream in Israel and the Areas. Unilever continues to sell other products it manufactures and distributes,  including another brand of ice cream popular in Israel,  in all of Israel.  B&J's effort to violate Israeli and American law is an unlawful goal that should  not  be  promoted  or encouraged.

### G.    A preliminary injunction will serve the public interest.

This Court has held that in considering this final standard for issuance of a preliminary injunction  courts should "look to the public policies embodied in the laws which are the subject of the action." *Atlantic City*, 14 F. Supp. 2d at 671 (citing *SK & F Co. v. Premo Pharm. Lab., Inc*., 625 F.2d 1055, 1067 (3d Cir. 1980)). The

public interest in this case is served by enjoining conduct that is patently contrary to the public policy of Israel, the United States, New Jersey, and New York. It is further served by upholding the moving party's contractual rights.

Moreover, "an injunction is clearly in the public interest" when it will "prevent one company from interfering with the legally protected contractual rights of another, and "deter similar interference in the future[.]" *Score Bd.*, 959 F. Supp. at 240.

Finally, the public interest is surely served by an injunction that protects consumers, such as residents of the Areas whose access to B&J's ice cream and other products would be curtailed by Defendants' conduct. And it furthers the public-service projects supported by the Plaintiffs that benefit young people.

## CONCLUSION

All four factors relevant to the issuance of a preliminary injunction, taken together, weigh firmly in favor of injunctive relief. *See Nekrilov*, 528 F. Supp. 3d at 266. This Court should therefore exercise its discretion to grant the requested injunction and preserve the *status quo* by prohibiting Defendants from terminating the relationship pending final resolution of this case.

Greenberg Dauber Epstein and Tucker
Attorneys for Plaintiffs

By:  _____

Edward J. Dauber, Esq.

40

By: _____  And
        Linda G. Harvey, Esq.

*Of Counsel:*
Nathan Lewin, *Pro Hac Vice* application forthcoming.
LEWIN & LEWIN, LLP
888 17th Street, NW
Fourth Floor
Washington, DC 20006
(202)828-1000

L. Rachel Lerman, *Pro Hac Vice* application forthcoming.
Alyza D. Lewin
The Louis D. Brandeis Center
For Human Rights Under Law
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, DC 20006
(202)559-9296

L. Marc Zell, Adv., *Pro Hac Vice* application forthcoming.
Zell, Aron & Co.
34 Ben Yehuda Street
15th Floor
Jerusalem 9423001
ISRAEL
Tel.:  +972-2-633-6300
Email:  mzell@fandz.com