Edward J. Dauber, Esq.
Linda G. Harvey, Esq.
GREENBERG DAUBER EPSTEIN & TUCKER, P.C.
One Gateway Center, Suite 600
Newark, New Jersey 07102
edauber@greenbergdauber.com
lharvey@greenbergdauber.com
(973) 643-3700

*Attorneys for Plaintiffs Avi Avraham Zinger and
American Quality Products Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **AVI AVRAHAM ZINGER,** and **AMERICAN QUALITY PRODUCTS LTD.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**BEN & JERRY'S HOMEMADE, INC., UNILEVER UNITED STATES, INC.** and **CONOPCO, INC.,**<br><br>Defendants. | Civil Case No.: 2:22-cv-01154-KM-JBC<br><br>**DECLARATION OF AVI ZINGER IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTIVE RELIEF** |

I, Avi Avraham  Zinger ("Avi"), of full age, hereby declare as follows:

1.  I am a Plaintiff in the present case and a citizen of Israel.  I am the sole ultimate beneficial owner of co-Plaintiff American Quality Products ("AQP"), through an intermediate holding company.  AQP is an Israeli corporation.  I am the president of AQP.  I submit this Declaration in Support of Plaintiffs' Motion for a Preliminary Injunction.  I have personal knowledge of the facts set forth herein.

**A.     B&J licenses me to manufacture and sell its ice cream in Israel.**

2.   In 1984, I came to the United States to work and study, and learned about a fledgling ice cream business in Vermont started by Ben Cohen ("Ben") and Jerry Greenfield ("Jerry"), called Ben & Jerry's Homemade, Inc. (B&J).   Ben & Jerry's ice cream was relatively unknown at the time and had no international market presence.

3.   I tasted their ice cream and was impressed by the quality of the ice cream.  There was then no comparable quality ice cream product in Israel, and I believed "B&J" would find a receptive market there.

4.   Ben and Jerry agreed that I should manufacture and sell the B&J ice cream in Israel, including in the areas acquired by Israel in 1967 (the "Areas," a.k.a. the "disputed" or "occupied" territories.)

5.   I returned to Israel in 1987 and began building my ice cream business from scratch. I travelled to Vermont to learn how the ingredients were sourced and how the ice cream was made. I then identified a factory in Israel and arranged to rent it part-time.  Over a year later, I opened my first B&J's "scoop shop" (ice cream parlor) in Tel Aviv. It became an instant success. Over the years, I opened fifteen more.

6.   Beginning in the early 1990's, I expanded my business beyond the scoop shops and began distributing Ben & Jerry's ice cream to supermarkets, hotels, convenience stores, and restaurants throughout Israel, including in the Areas.

7.   The initial contract between B&J and AQP's predecessor, The American Company for Ice Cream Manufacturing (AIC),  had a 10-year term lasting to 1998.  (Exh. 1)

8.   In 1998, B&J's and AIC signed a new license agreement which contemplated expanding my business to include Cyprus, Greece and Turkey, in addition to Israel (the "1998 Contract") (Exh. 2)

9.  In 1999, B&J acquired a 60% interest in AIC.

10. Eventually, AIC and I concentrated on manufacturing and distributing B&J products rather than on retailing them through scoop shops.

**B.     B&J and Unilever merge in 2001 and agree to conditions imposed by Israeli antitrust authorities.**

11. In 2000,  B&J agreed to merge with the Unilever Group then headed by Unilever N.V. (excerpt of filing, attached as Exh. 3)

12. Merger negotiations were managed and coordinated primarily by Unilever USA on behalf of the Unilever Group. Then, as now, Unilever was the world's largest manufacturer of ice cream. Not only did Unilever have a controlling interest in Strauss, the dominant ice cream company in Israel, it also controlled many of the largest U.S. brands, include Popsicle, Klondike, Breyers, Good Humor, and Magnum.

13. Unilever's purchase of B&J raised antitrust issues in Israel because of Unilever's controlling interest in Strauss, the company with the largest share of the ice cream market in Israel, and B&J's direct competitor. The Israeli Competition Authority ("ICA"), the government agency responsible for overseeing antitrust issues in Israel, agreed to the merger subject to B&J's relinquishing its 60% interest in AIC's business, which it did in 2001, and to Unilever and B&J's agreeing to strict conditions ultimately set forth in a 2001 Consent Decree. (Exh. 4)

14. Consistent with the Consent Decree, the ICA required that B&J and I agree to terms detailing how I would wind up the company in which B&J had a 60% interest (AIC) and convey the license, inventory and all assets to a newly formed company, AQP.

15. The Consent Decree, among other things, prohibited Unilever and B&J from "narrow[ing] the scope of the license" granted to AQP or "degrad[ing] the terms" of the license entered into with AQP without first notifying and receiving the approval of the ICA. (Exh. 4).

16. The Consent Decree further provided that full management separation had to be maintained between Unilever and AQP, and that "Unilever and/or [B&J] shall have no involvement with [AQP]'s decisions regarding conditions of contracting with retailers, the scope and timing of such contracts and the opening of retail stores for the sale of ice cream, the locations thereof and prices at which Ben & Jerry's products will be sold in such stores." (Exh. 4).

17. The consent decree prohibited B&J, Unilever, and Strauss from taking any action that might "interfere with the activities of [AQP] in the field of frozen desserts generally and, particularly, in the distribution and marketing of Ben & Jerry's products." (Exh 4) Unilever and B&J agreed to the conditions and the merger went forward.

18. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████

19. At the time of the merger, Unilever agreed that B&J's newly formed Board would retain the right to "oversee" the "historical social mission of the Company," defined as including: "a commitment to purchase 'fair trade' products, … to open scoop shops in …  partnership with non-profit organizations, … to use unbleached paper …  and … to purchase, if commercially feasible, a portion of its ingredients from not-for-profit suppliers and suppliers from economically disadvantaged groups and to [assist] such suppliers."  See Exh. 3.

### C.    Unilever, AQP and B&J sign the 2004 License Agreement.

20.    On January 10, 2004, B&J and AQP continued the relationship and signed the operative License Agreement (the "Agreement" or the "LA"). Unilever NV, the parent company of Unilever US, also signed the Agreement. (Exh. 6)

21.    The Agreement authorized AQP to manufacture, sell and distribute Ben & Jerry's ice cream products in the "Territory" defined, consistent with the earlier license agreements and the 2001 Outline of Terms, as "The State of Israel, including the 'occupied territories' under sole Israeli control." (Exh. 6)

22.    The Agreement expressly granted AQP the right to distribute Ben & Jerry's ice cream products through supermarkets, grocery stores, convenience stores, contract food service accounts and other food outlets. (*Id*. at 6 [L.A., Definitions, "Wholesale Distribution/Wholesale Distribution Channel"].)

23.    AQP became the sole and exclusive licensee of the B&J brand.

24.    Specifically, the Agreement gives AQP an "exclusive, non-transferable and personal license" and the rights to offer, sell, and distribute Ben & Jerry's ice cream, to subcontract the manufacture of Ben & Jerry's ice cream, to construct, open, own, and operate retail shops, to use Ben & Jerry's proprietary marks, and to promote the products in Israel including the Areas. The Agreement requires AQP to "use best efforts to (1) maximize the sale of the Property Products in the Territory and (2) promote the Wholesale Distribution thereof…"  (*Id*. at [LA § 25.1]

25.    AQP agreed to pay a 3 percent royalty of the "gross turnover," in U.S. dollars, to B&J during the renewal term. (*Id*. at [LA  §§ 12.1, 12.4].)

26.    The parties agreed that AQP "shall comply, and shall use its best efforts to ensure that it…comply with **all applicable national or local laws and regulations** in performing its duties

hereunder and in any of its dealings with respect to the Products…" (*Id.* at [LA §15.20], emphasis added].)

27.    With respect to U.S. export control laws, the Agreement states: "[AQP] agrees that it shall not act or omit to act in any way that would violate any of the export control laws or regulations of the U.S. and no party shall be required hereunder to act or omit to act in any way that it believes in good faith would violate any such law or regulation."  (*Id.* at [LA §15.24].)

28.    The parties further agreed that it would be an immediate event of default—not subject to any opportunity to cure—for AQP to take any "action or inaction… [that] results in the loss of the right or forfeiture of the right, to do or transact business in the Territory." (*Id.* at [LA §23.2.4].)

> **D.    Plaintiffs expand their business in Israel, begin exporting B&J's products, and open a new factory.**

29.    Between 2000 and 2005, I closed most of my scoop shops and focused the business primarily on manufacturing and distribution.

30.    A surge in terrorist attacks in Israel, including suicide bombings that targeted locations popular with young Israelis, made me concerned for the safety of my scoop shop employees and patrons. I chose instead to make Ben & Jerry's ice cream available throughout Israel and the Areas by distributing to supermarkets and gas station mini-markets throughout the region. AQP also became part of Unilever's supply chain and began providing Ben & Jerry's products manufactured in Israel to Europe. Foreign export grew to become 40% of AQP's business.

31.    In 2010, pursuant to defendants' direction and guidance, and at great personal risk, I undertook substantial financial commitments to enable AQP to move to a new, larger factory in Be'er Tuvia near Kiryat Malachi, in southern Israel, in order to meet Unilever's anticipated supply-chain demands.

### E.        Plaintiffs Actively Promote Social Justice Causes

32.    AQP and I have, over many years, initiated and supported projects that promote coexistence between Israelis and Palestinians and provide educational and occupational opportunities to disadvantaged communities, including Palestinians. I elected to use Fairtrade Certified Ingredients, at significant additional cost to the business. Our social mission projects include support for:

•        The Middle East Entrepreneurs of Tomorrow ("MEET"), a program conducted together with MIT to educate Israeli and Palestinian high-school students and teach them computer sciences, entrepreneurship, and innovative leadership skills over a three-year period.

•        "Seeds of Peace" – an organization that promotes co-existence between Israeli and Palestinian students.

•        The Global Learning and Observations to Benefit the Environment ("GLOBE") Program - a worldwide, hands-on, primary and secondary school-based science and education program sponsored by the U.S. Government and NASA that works with Palestinian and Israeli children.

•        Kids4Peace – a global movement of Jewish, Christian, and Muslim youth dedicated to ending conflict and inspiring hope in divided societies around the world. Kids4Peace operates five international summer camps and a six-year, year-round program for Palestinian, Israeli and North American youth.

•        Jordan River Village – an overnight camp and retreat center in the Middle East where children living with serious illnesses of all ethnic and religious backgrounds (including Jewish Israelis, Israeli Arabs, and Palestinians) participate together.

• The Ethiopian National Project ("ENP"), an organization that assists Ethiopian youth in Israel.

• "Fruits of Peace" – a project I initiated to strengthen economic cooperation between Israelis and Palestinians by developing new Ben & Jerry's ice cream flavors using ingredients sourced from Palestinian farmers in the Areas. I worked with USAID, and non-profit peace organizations to identify and connect with Palestinian farmers. I developed a "Fruits of Peace" ice cream flavor ("Creamy Fig Ice Cream with Dates") and had artists design the packaging. Then, the Palestinian partners abruptly stopped communicating with me, apparently due to BDS anti-normalization pressure. As a result, the "Fruits of Peace" project shut down.

**F.     The Boycott, Divestment and Sanctions Movement ("BDS") pressures B&J to boycott Israel.**

33.     In or around 2011, B&J became a target of BDS, a movement that seeks to disrupt the normalization of relations between Israelis and Palestinians and ultimately eliminate the State of Israel.

34.     B&J began receiving letters from Vermonters for A Just Peace in Palestine ("VTJP"), a BDS group, demanding that B&J stop selling ice cream in Israel, based on allegations that B&J was selling ice cream in "illegal Jewish-only settlements" in the Areas. VTJP failed to mention that Ben & Jerry's was also being sold in Palestinian cities, villages, and communities throughout the Areas. Many Palestinians shop at the supermarkets and mini-markets to which AQP distributes Ben & Jerry's ice cream in the Areas.

35.     AQP and I have never limited sales of Ben & Jerry's ice cream to "Jewish-only settlements." Nor could we lawfully do so. Israel's non-discrimination laws prohibit discrimination in the furnishing of a product or public service on the basis of many categories including, race,

religion, nationality, place of origin, gender, sexual orientation, age, and residence. Pursuant to this law, an Israeli company like AQP may not refuse to provide its product to customers residing in the Areas, regardless of their religion, ethnicity, national origin, gender, race etc.

36.     Israel's anti-boycott law also prohibits any person from knowingly calling for a boycott against the State of Israel or any area under its control (*i.e.* the Areas).

   **G.     The Agreement is extended for two consecutive five-year periods.**

37.     In 2013, the Agreement was renewed for the first of two successive five-year terms. The first term ran from 2013 – 2018. The second term began in 2018 and continues through December 31, 2022.

38.     In March 2014, Jostein Solheim, then CEO of B&J (who had been placed as CEO by Unilever USA), and the members of B&J's independent Board of Directors (the "Board") visited Israel and witnessed AQP's operation and involvement in social mission projects.

39.     In the same month, VTJP sent a letter to Solheim urging B&J to end its business relationship with its Israel "franchise."

40.     In a letter dated April 8, 2013, Solheim advised VTJP that "our Licensee in Israel operates his business in alignment with Ben & Jerry's Mission and Values," which included "promotion of peace through understanding." Writing to another BDS supporter, Solheim cited the social justice efforts that I was spearheading to demonstrate that "we . . . support peace in Palestine and are doing lots of initiatives to support them and their communities[.]"  (Exh. 7)

41.     Rob Michalak, Global Direct of Social Mission at B&J, reiterated Solheim's message in his own letter to VTJP, dated April 16, 2014, stressing that I had B&J's support and confidence: "[O]ur Licensee . . . works to serve Ben & Jerry's Mission and Values. We are confident that our Licensee in Israel is operating his business in a responsible and appropriate way." Echoing Solheim, Michalak added, "We are working to build the constructive business relationships that

can create positive outcomes such as sourcing Fairtrade-certified ingredients from local farmers."
(Exh. 8)

42.     In 2015, VTJP sought to increase its pressure on B&J by targeting hundreds of the
company's U.S. scoop shop franchisees, urging them to demand that the company either cease its
operations in the Areas or close the Israeli "franchise" altogether. (Exh. 9) Around the same time,
BDS activists began harassing store owners and organizing demonstrations at which they handed
out anti-Israel flyers to customers waiting in line at B&J's annual "free cone day," the franchisees'
top marketing event each year.  This activity continued and increased year after year.

>     **H.     The B&J Board succumbs to BDS pressure, while B&J executives continue
>             to assure Plaintiffs the Agreement will be extended.**

43.     In or around 2018 and 2019, the Board began to yield to pressure from the BDS
movement's increasingly relentless attacks, and urged AQP to cease operations in the Areas.

44.     On more than one occasion between 2018 and 2021, I informed the Board that it would be
a violation of both Israel's anti-discrimination law and Israel's anti-boycott law for AQP to cease
distribution of Ben & Jerry's products in the Areas.

45.     I explained that violating these laws could subject AQP to administrative fines and criminal
prosecution in Israel in addition to the loss of numerous government benefits.

46.     In February 2020, I asked B&J to extend the Agreement beyond the end of December 2022,
writing to Matthew McCarthy, CEO of B&J with a copy to Anuradha Mittal, Chairperson of the
Board: "As I mentioned to you in our meeting . . . , this year is going to be very challenging –
competitors are coming out with super primum [sic] pints, red labels on our packaging, Froneri is
taking over Nestle and Haagen Dazs with very aggressive plans, cost of cream is going up, and
more.

47.    "In order to be able to deal with these changes I have to prepare myself for the future with long-term investments, as mentioned to you – for instance, expanding and extending our lease agreement on the factory, new mix plant, and expanding our budget for purchasing ice cream cabinet, among other things."

48.    I reminded McCarthy and Mittal that, in the past, renewal discussions had taken a long time and the previous renewal extension was not signed for a year after the contract had expired. The parties had renewed the license consistently since 1987.

49.    I added: "This time my challenges and responsibilities are much greater than in previous years and I want to avoid the entering a period of uncertainty once again. My agreement with [B&J] expires in the end of December 2022, a little less than 3 years from now and if possible, I will like to start the conversation with you now to extend it."

50.    McCarthy promptly responded in an email with a copy to Mittal, indicating that he agreed to an extension: "After your amazing performance in 2019 I know 2020 will be tougher. Thank you for initiative [sic] discussion on contract – I look forward to extending it."

**I.     Avi seeks to accommodate B&J's BDS concerns**

51.    In September 2020, I was advised that the emerging Board position was that no Ben & Jerry's ice cream be made available in the Areas.  In an effort to accommodate B&J and Unilever while adhering to the law, I proposed that the language of the Agreement be revised to define "Territory" as "the State of Israel" instead of "The State of Israel, including the occupied territories under sole Israeli control."  B&J and Unilever understood this to be a cosmetic change, made to appease BDS activists; it was not intended to affect, and indeed did not affect, the geographic scope of the license that my companies had contracted for and been following since the inception of the license in 1987.  B&J and Unilever were fully aware that AQP and I were continuing to sell B&J products in the Areas.

52.     In September 2020, McCarthy provided me with an amendment that adopted the "State of Israel" language, but B&J did not provide the promised extension. Nothing changed regarding the sale of Ben & Jerry's ice cream in the Areas. (Exh. 10)

53.     In October 2020, I again wrote to McCarthy regarding the extension. I had initially proposed a ten-year renewal, but modified it to five years with an option for an additional five years. To this end, I enclosed a copy of the prior five-plus five-year renewal signed by Solheim, and said, "As I told you, it is very necessary for the continued operation of the company, please, let's make it happen." McCarthy replied, "Thank [sic] Avi. Clear. I agree we need to extend."

54.     Upon information and belief, BDS attacks grew increasingly harsh and personal in May 2021. The Board doubled-down on its demand that AQP stop selling in the Areas.

55.     I continued to explain to McCarthy and others at B&J, as I had for years, that AQP could not comply with B&J's request to stop distribution and sales in the Areas because doing so would violate Israeli and U.S. law and breach the Agreement's provisions prohibiting such violations.

56.     AQP and I nevertheless sought to address the Board's concerns by suggesting that a Palestinian distributor handle all distribution in the Areas. This would have created a significant economic opportunity for the Palestinian candidate. However, when B&J learned that the proposed Palestinian distributor wanted to expand sales in the Areas, B&J rejected the proposal.

### J.     B&J informs Plaintiffs it will not extend the Agreement..

57.     On or about July 19, 2021, McCarthy abruptly informed me in a letter that B&J would not continue the Agreement past December 31, 2022, ending a 34-year-old business relationship. (Exh. 11).

58.     On the same day, Unilever issued a public statement stating:

> "We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT). We also hear and recognize the concerns shared with us by our fans and trusted partners.

> We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year.
>
> Although Ben & Jerry's will no longer be sold in the OPT, we will stay in Israel through a different arrangement. We will share an update on this as soon as we're ready."

(Exh. 12)

59.     Apparently dissatisfied with Unilever's statement that it would cease sales to the Areas, but find a new "arrangement" for staying in Israel, the Board released its own statement, declaring that:

> "The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory ("OPT") does not reflect the position of the independent board, nor was it approved by the independent board. By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social mission and brand integrity, Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement."

(Exh. 13)

### K.     Unilever continues to sell its own Strauss ice cream and other products in the Areas.

60.     After demanding that AQP and I stop selling in the Areas and terminating the Agreement when we refused to do so, Unilever continues to sell many of its other products in the Areas, including Strauss ice cream and many other food and personal hygiene products.

61.     As a result of Defendants' wrongful and unlawful breach and termination of our business relationship, Defendants have been found to have violated numerous United States anti-boycott laws, including those of New Jersey and New York, which has resulted in those states divesting their pension funds of any ownership of Unilever stock.

62.     In addition, numerous other parties have taken legal action against Defendants, including a complaint filed by Palestinian activist Bassam Eid with the New York State Division of Human

Rights, explaining that Unilever's decision will harm Palestinians, who are among Ben & Jerry's most devoted consumers.

> **L.     AQP is suffering immediate and irreparable harm.**

63.     Meanwhile, the prospective termination of the License Agreement at the end of 2022 has caused and continues to cause immediate and irreparable harm to AQP, including to its reputation and goodwill built up over more than three decades, including to its reputation and goodwill built up over more than three decades. Unilever's recent announcement that it is planning a "new arrangement" for Ben & Jerry's ice cream in Israel has accelerated, intensified and exacerbated the harm to AQP's business operation.

64.     Prospective termination endangers the continuation of AQP's businesses in Israel (including in the Areas), placing them under imminent threat of partial or total destruction.

65.     Specifically, as a direct result of Defendants' wrongful conduct, accumulated sales of Ben & Jerry's ice cream throughout Israel have dropped 23% since August 2021 and continue to decline at an increasingly rapid rate each month. Sales for January 2022 were 30% lower than January 2021, reversing an average annual sales growth of 15% per year. Sales at my two ice cream shops have dropped 34% and 28% respectively since August 2021 compared to the same period in 2020. And sales in the Areas have dropped 39%, reversing double-digit growth in 2018, 2019 and 2020.

66.     Sales to anchor stores (mainly food chains) have dropped precipitously since Defendants published their letters in July 2021. AQP and I experienced a 45% drop in sales to convenience stores on IDF bases; a 45% drop in sales to Domino's Pizza; a 42% decrease in sales to the Victory food chain; a 34% drop in sales to convenience store AM/PM; a 29% drop in sales to Israeli

supermarket chain, Tiv Ta'am; and a 26% drop in sales to Ram Levi, one of Israel's largest grocery market chains.

67.     Defendants' wrongful conduct has also caused extensive damage to AQP's and my reputation and goodwill. Until the July 2021 statements were published, our products were very highly regarded and sought after. As a result of the fallout caused by Defendants' conduct, there are incessant calls on social media to boycott us, including in the form of ads by well-known individuals. We have also experienced attacks on and destruction of equipment. In addition, government bodies, organizations, institutions and private companies have succumbed to public pressure and are distancing themselves from  AQP because they are reluctant to associate with the ostracized Ben & Jerry's brand.

68.     Business competitors are exploiting the damage to AQP's and my reputation to increase their own sales at our expense. Competitors have begun poaching our delivery truck drivers and pressuring supermarket chains to relinquish to them a portion of our freezer space.

69.     AQP and I have suffered damage to our ability to equip ourselves for business operations. We have been unable to plan for the coming season, prepare budgets and projections, commit to long-term contracts, arrange necessary financing, procure inventories of raw materials and supplies, make arrangements for distribution, hire management and workforce, develop new products and promotional materials, and prepare and develop marketing and advertising campaign (as we have done each year).

70.     With Defendants' knowledge, and in reliance on assurances that the license would be renewed, I invested millions of dollars from my own resources in a series of projects aimed at gearing up for the coming decade. I took steps, for example, to upgrade our manufacturing line, purchasing and installing a new multi-million-dollar mix plant and packaging equipment, a large

portion of which was already in place but not yet operational when Defendants' statements were published.

71.     The prospective termination and the uncertainty it has created has made it impossible for AQP to hire needed managerial staff and has threatened our ability to retain current staff.  AQP's 169 employees, who include refugees from Sudan and Ethiopia, new immigrants struggling with the Hebrew language, and people with disabilities, are now uncertain whether their employment will continue. Some have already resigned, others are considering resigning, and it is hard for AQP

to recruit workers in light of the hostile atmosphere, tight employment market, and the uncertainty created by Defendants' wrongful conduct.

72.     AQP and my credibility and financial status with providers of bank credit and suppliers, whose cooperation is needed months in advance of actual sales, have also been harmed by Defendants' wrongful conduct.

73.     I have been forced to cancel a substantial transaction for the purchase of commercial real estate adjacent to our factory, which would have been used to store raw materials and park delivery trucks

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on _____ March 11 _____, 2022

By: _____

Avi Avrahman Zinger

# EXHIBIT 1

## LICENSE AGREEMENT

In consideration of the mutual covenants contained in this Agreement and for TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration, the sufficiency and receipt of which are hereby mutually acknowledged, Ben & Jerry's Homemade, Inc., a Vermont corporation ("Licensor") and Quality Guard, Inc., a Florida corporation ("Licensee"), Avi Zinger and Nacuhm Gendelman hereby agree as follows:

1. <u>Grant of License</u>. Licensor hereby licenses and grants Licensee the right to manufacture, distribute, sell, market and franchise all of Ben & Jerry's product and related merchandising items (the "Product."). Licensor shall provide all formulas (present and future) and manufacturing techniques and shall authorize the use of Licensor's trademarks, packaging, artwork, logos, names, likenesses, and biographical materials regarding Bennett Cohen and Jerry Greenfield. License agrees to use the license in conformity with Licensor's standard rules, regulations, guidelines, and procedures.

2. <u>Territory</u>. This license is solely for Licensee's use within the sovereign State of Israel and those areas, whether legally annexed or not, occupied by the armed forces of Israel as of August 1, 1987 (the "Territory"). Licensor shall license no other person within the Territory.

3. <u>Term</u>. The term of this Agreement shall be ten (10) years from October 1, 1988 (the "Start Date"). Licensee shall have the option of extending the Term for an additional ten (10) years from the date expiration from the initial term upon the same conditions as contained in this Agreement, subject to an adjustment of the minimum royalties proportionate to the increase in the Consumer Price Index. All Items (1966=100) (the "CPI"), over the CPI for the first year of the term of this Agreement.

4. <u>License Fee</u>. In partial consideration for the granting of the License, Licensee shall pay to Licensor a total of $60,000.00 payable as follows:

| | | |
|---|---|---|
| a. | Upon execution and delivery of this Agreement | $15,000.00 |
| b. | Six (6) months from the date hereof | 15,000.00 |
| c. | Twelve (12) months from the date hereof | 15,000.00 |
| d. | Eighteen (18) months from the date hereof | 15,000.00 |

All fee payments other than the initial installment shall bear interest at the rate of 8% per annum, which shall be due and payable every six (6) months form the date of execution of this Agreement.

5. <u>Royalty Fees</u>. As additional consideration for the granting of this License, Licensee shall pay to Licensor the following fee (the "Royalty Fee") on the sale of the Product:

a. Distribution: 2.5% of all wholesale sales to supermarkets, grocery stores, distributors, restaurants. and scoop shops.

    b.   Franchised operations: 2.5% of the gross retail sales of all franchised stores.

    c.   Franchise fee: 5% of any start-up fees and franchise fees collected from franchisees of License.

    d.   Company-owned stores: 2.5% of gross retail sales.

Royalty Fees shall be payable monthly based on Licensee's estimates, and such payments shall be adjusted annually within 90 days of each year end. Any shortfall in such payments shall accrue interest at the rate of 12% per annum from the date it should have been paid.

    6.  Guaranteed Royalty Fees. Notwithstanding the amount of Royalty Fees calculated and paid in accordance with the section above, Licensee guarantees the Royalty Fees shall be not less than the following (the "Guaranteed Royalty Fees").

| | |
|---|---|
| First year end | $ 3,000.00 |
| Second year end | 10,000.00 |
| Third year end | 15,000.00 |
| Fourth and fifth year end | 37,500.00 |
| Sixth, seventh, eighth, ninth, and tenth year end | 62,500.00 |

Licensee agrees to pay Licensor the difference, if any, between the Royalty Fees and the Guaranteed Royalty Fees within 60 days of each year end. The Guaranteed Royalty Figures shall be on a quarterly basis - 1/4th due each quarter. They shall be paid on January 1st, April 1st, July 1st and October 1st of each year beginning with the first payment on January 1st, 1988.

    7.  Additional Fees.

    a.   Licensee shall pay Licensor's actual costs, including travel expenses, in connection with Licensor providing technical assistance regarding manufacturing, equipment, specifications, franchise concept, marketing, and relevant documentation. In addition, Licensee agrees to pay a per diem allowance of $300.00 per person for Licensor's personnel engaged in providing such services.

    b.   Licensee shall pay Licensor's reasonable out-of-pocket expenses in connection with providing cost effective quality control procedures. In addition, Licensee shall pay $250.00 per person per day for Licensor's personnel engaged in providing such quality control services.

    c.   Licensee shall pay Licensor's reasonable out-of-pocket expenses in connection with a promotional tour of the Territory by Mr. Bennett Cohen and Mr. Jerry Greenfield. In addition, Licensee shall pay Mr. Cohen and Mr. Greenfield a per diem allowance of $400.00 per person.

The services provided in this section shall be provided at Licensee's request or upon Licensor's demand if Licensor has reasonable grounds for determining that Licensor's procedures and methods are not being properly implemented by Licensee.

8.   Trade Secrets.   Licensee shall not disclose any trade secrets received from Licensor in connection with the Product and shall exercise reasonable care in restricting its employees' access to such trade secrets and shall obtain from its employees, franchisees, and licensees equivalent covenants to protect Licensor's trade secrets. Upon termination of this Agreement, Licensee shall return all materials provided hereunder to Licensor.

It is understood that Licensee shall carry out the business covered by this Agreement in accordance with the operation standards and specifications established by Licensor and set forth in Licensor's operating manuals and other documents as they presently exist or shall exist in the future, such future provisions to become effective on Licensee only upon reasonable notice, and all with such variations as may be required by the Territory or are otherwise satisfactory to Licensor. Licensee may sell no other products except those Covered Products under Licensor's Trade Name.

8.1 Franchises. The Licensee shall have the right to enter into one or more Franchise Agreements and, in connection therewith, to license his franchisees to use the Brands, including any Trade Marks or Patent Rights on the Covered Products, and to market and sell at retail any or all of the Covered Products in specified areas within the Territory; provided, however, that any such Franchise Agreement shall contain such provisions with respect to trademark protection and quality control as shall be acceptable to the Licensor and such other provisions as are the same as contained in franchise agreements used by Licensor in the United States (with any variations required for the Territory or are otherwise satisfactory to Licensor). Licensee agrees to require its franchisees to conform with operating standards and specifications set forth in Licensor's operating manuals and other documents as they presently exist or shall be reasonably amended in the future, with changes to become effective on Licensee and its franchisees only upon reasonable notice, and all with such variations as may be required for the Territory or are otherwise satisfactory to Licensor.

## 9.  Obligations to the Licensee

9.1   Best Efforts. The Licensee covenants and agrees that it shall use its best efforts to develop and exploit the market for the Covered Products in the Territory, both retail scoop shops and wholesale to supermarkets, etc.

10.  Trade Marks and Brands. The Licensee covenants and agrees that:

a.   if any infringement of a Trade Mark (or other trade mark, trade dress, or similar right with respect to a Covered Product) or any unfair competition or dilution with respect thereto shall come to the attention of the Licensee, the Licensee shall promptly notify the Licensor thereof;

b.   the Licensee shall, at the request of the Licensor, do all acts and things reasonably necessary to enable the Licensor to protect and defend its rights in the Trade Marks (and other trade mark, trade dress and

similar rights with respect to the Covered Products);

c.   the Licensee will not, and will not permit any of its Affiliates or franchisees to, use any Brand (or any mark or name which is similar to or so nearly resembles any Brand as would or is likely to cause confusion, mistake, dilution or deception) in connection with any article or product other than in connection with the manufacture and sale in accordance with this Agreement of the Covered Product to which it relates or sell any other super premium ice cream other than a Covered Product hereunder;

d.   each Covered Product manufactured by the Licensee or a sublicensee shall be known and identified by the Brand relating thereto (the type of, and the form and manner in which the Brands are used in connection with labelling and packaging of Covered Products by the Licensee shall be subject to the approval of the Licensor, which approval shall not be unreasonably withheld);

e.   the Licensee will not, and will not permit any of its Affiliates or franchisees to, in connection with any Covered Product which is (or is to be) known or identified by a Brand, use any trade mark, trade name or brand other than the Brand relating to such Covered Product, except as previously approved in writing by the Licensor;

f.   the Licensee shall, and it shall cause its Affiliates, its franchisees and any sublicensee to, refrain from doing any act

    (i)    which could prejudice or challenge the validity of, or the title of the Licensor to, the Brands or the Trade Marks or other trade mark, trade dress and similar rights used hereunder, which the Licensee hereby acknowledges remain the absolute property of the Licensor, or

    (ii)   which could challenge the validity of any right of, or any right derived from, the Licensor to use the Brands or other trade mark, trade dress and similar rights used hereunder outside the Territory, or

    (iii)  which the Licensee knows could reasonably be expected to know impairs or diminishes the value to the Licensor of any Trade Mark or Brand or the Trade Marks or other trade mark, trade dress and similar rights used hereunder.

g.   all packaging material used by the Licensee (or any Affiliate or franchisee) in connection with a Covered Product which is (or is be) known or identified by a Brand shall bear near the corporate identification of statement (which shall be no less conspicuous than such corporate identification) substantially to the effect that such Covered Product is manufactured in the Territory under license from the Licensor (such statement to be in a form which complies with all applicable legal requirements in the Territory and which is approved in writing by the Licensor);

-4-

h. the Licensee shall cause to appear, in close proximity to any Brand which it may use in any visual medium (whether in packaging, advertising or otherwise), such notice as the Licensor may specify in writing for the protection of its Trade Marks or other trade mark rights with respect to the Brands.

11. Use of Know-how. The Licensee covenants and agrees that it will not disclose to any Person other than its employees, agents and sublicensees, and other than as contemplated by the last sentence of this Paragraph 4.3, any, and shall use its best efforts to preserve the confidential nature of, all Know-how heretofore or hereafter disclosed to the Licensee and shall use such Know-how only in (and shall disclose such Know-how to its employees, agents and sublicensees only to the extent required by each such employee, agent or sublicensee for) the manufacture of Covered Products hereunder. The Licensee hereby acknowledges that all Know-how shall remain the absolute property of the Licensor.

12. Nonexclusive Grant Back of Know-how. Licensee covenants to disclosure and furnish to Licensor, on a non-exclusive basis except in the United States where it shall be exclusive, solely for use outside the Territory, all improvements to Know-how developed by Licensee (or its sublicensees) for the manufacture of Covered Products from time to time.

13. Quality Control. The Licensee covenants and agrees that:

(a) Covered Products shall be manufactured (i) in accordance with the Know-how relating thereto to be supplied by the Licensor and, to the extent the Licensee shall not at the time reasonably object, any improvements thereto hereafter supplied by the Licensor, or as otherwise approved in writing by the Licensor, and (ii) in conformity with such standards of quality (including purity, taste, appearance, temperature, freshness and uniformity) as have been and may reasonably be specified by the Licensor, and without limiting the foregoing, Covered Products shall be of a quality equal to the Covered Products manufactured by Licensor in the United States;

(b) Covered Products shall be manufactured and shipped in compliance with all applicable laws and rules and regulations thereunder;

(c) the Licensor shall have the right, upon reasonable notice to the Licensee, to conduct reasonable regular inspections by means of a Person or Persons acceptable to the Licensee (which acceptance shall not be unreasonably withheld) of the facilities used by the Licensee to manufacture, package and/or store the Covered Products. The Licensee will make available on a regular basis to the Licensor at its plant in Vermont, without charge, samples for test purposes of current production of Covered Products.

14. Indemnification. The Licensee covenants and agrees that it will at all times indemnify the Licensor against and hold it harmless from any claim, damage or liability including reasonable fees and disbursements of

-5-

counsel and including amounts paid in settlement with the approval of Licensee, asserted against or incurred by the Licensor which either

(i) results from or arises out of any actual or alleged impurity, adulteration, or other defect of any kind of any Covered Product manufactured by the Licensee or a sublicensee or

(ii) results from or arises out of any actual breach by the Licensee (or indirectly by any sublicensee or franchisee) of any provision of this Agreement, or

(iii) results from or arises out of any other action or nonaction by Licensee. The Licensor covenants and agrees that it will promptly notify the Licensee of the institution of any suit or the making of any claim against the Licensor in respect of which it may be entitled to indemnity hereunder. The Licensee shall have the right to assume the defense, negotiation and settlement of any such suit or claim in respect of which the Licensor shall not have waived its right to indemnity hereunder and may, as to any such suit or claim the defense of which it has so assumed, exercise sole control of the defense, negotiation and settlement thereof; provided that the Licensor shall have the right to participate therein and shall cooperate with Licensee in such defense, settlement and negotiation.

15.   Insurance.   Licensee shall procure, before commencement of the business hereunder, and shall maintain in effect during the term of this Agreement, at Licensee's expense, one or more insurance policies protecting Licensee and Licensor, and their directors and employees, against any loss, liability or expense whatsoever arising or occurring upon or in connection with any manufacture by Licensee or any sublicensee or any shop of Licensee or shop of any franchisee of Licensee. Such policies shall name Licensor as an additional named insured and shall be written by an insurance company acceptable to Licensor and shall include general liability coverage with a single limit of $ 1,000,000 _ or such higher amount as may be hereafter reasonably required by Licensor and such policies shall contain a provision that the policies may not be cancelled or altered without at least 30 days prior written notice to Licensor.

16.   Restrictions on Licensee's Activities.   Licensee agrees to offer for sale in the Territory, whether directly through its own shops or through franchisees and by wholesale distribution, no ice cream products, including ice cream, sorbet, sherbet, tofutti and other confectionery products, other than the Covered Products (or any other products which may be the subject of mutual agreement between Licensor and Licensee), it being understood that such restrictions shall be imposed upon all franchisees of Licensee. Furthermore, no other products may be sold under Licensor's trade name that have not been approved in writing by Licensor.

17.   No Sales Outside the Territory.   Licensee covenants that it will not, directly or indirectly through franchisees or otherwise, sell Covered Products outside, or for resale outside, the Territory.

18.   Termination.   Licensor may, by notice to Licensee, forthwith terminate this Agreement if:

-6-

(a)  Licensee shall fail to make any payments required by paragraphs 4
     and 5, and such failure shall not have been remedied within ten
     days; or

(b)  Licensee does not, for any yearly period, meet and pay the minimum
     royalty of Schedule A, in which event Licensor may, by written
     notice of not less than 90 days, terminate this Agreement.

(c)  Licensee shall fail to comply with any of the Quality Control
     provisions of Paragraph 9.4, and such failure shall not have been
     remedied within 20 days after reasonable notice to Licensee.

Upon termination of the Agreement by the Licensor, the Licensor has the right
(but not the obligation) to pick up and assume any or all of the sublicenses
or franchises theretofore granted by the Licensee within 60 days after
termination, and that, with respect to those franchises and sublicenses which
the Licensor does not pick up and assume, the Licensee shall retain residual
rights for the sole purpose of enabling the Licensee to carry out its
obligations under those particular existing franchises and sublicenses
granted by Licensee pursuant to the Agreement prior to such termination.

    19.    In addition, the Licensor may, by notice to the other party
forthwith, terminate this Agreement if:

(a)  Licensee shall fail to perform or observe any covenant or condition
     to be performed or observed by it hereunder and such failure shall
     not have been remedied within thirty days after notice thereof
     shall have been given, or

(b)  (i) Licensee shall admit in writing its inability to pay its debts
     as they mature, (ii) Licensee shall make a general assignment for
     the benefit of, or enter into an arrangement with, its creditors,
     (iii) a court having jurisdiction in the premises shall enter a
     decree or order for relief in respect of such other party, which
     affects its obligations to its creditors or the enforcement
     thereof, in an involuntary case under any applicable bankruptcy,
     insolvency or other similar law now or hereafter in effect, or
     appointing a receiver, liquidator, assignee, custodian, trustee,
     sequestrator (or similar official) of such other party or for any
     substantial part of its property, or ordering the winding-up or
     liquidation of its affairs and such decree or order shall remain
     unstayed and in effect for a period of 60 consecutive days, (iv)
     such other party shall commence a voluntary case under any
     applicable bankruptcy, insolvency or other similar law now or
     hereafter in effect, or shall consent to the entry of an order for
     relief, which affects its obligations to its creditors or the
     enforcement thereof, in an involuntary case under any such law, or
     shall consent to the appointment of or taking possession by a
     receiver, liquidator, assignee, trustee, custodian, sequestrator
     (or other similar official) of such other party or for any
     substantial part of its property, or shall make any general
     assignment for the benefit of creditors, or shall fail generally to
     pay its debts as they become due, or (v) such other party shall
     take any corporate action authorizing or ratifying or in direct

-7-

furtherance of any action specified in the foregoing clauses (i) through (iv).

20.  Effect of Termination

20.1.  Obligations of Licensee.  The Licensee covenants and agrees that, if this Agreement shall expire or for any reason be terminated, the Licensee will:

(a)  within two months thereafter pay to the Licensor all amounts payable to it by the Licensee hereunder which had accrued but were unpaid at the date of such expiration or termination.

(b)  forthwith return (without in any manner retaining any copy thereof) to the Licensor all documents supplied by or on behalf of the Licensor and all documents and other records derived therefrom (or from information supplied by or on behalf of the Licensor) then in the possession or control of the Licensee or any Affiliate disclosing or relating to any Know-how;

(c)  not make, and shall not permit any Affiliate to make, any further use whatsoever of any Brand or Trade Mark or other trade mark, trade dress or similar rights except that, during the six months following the termination of this Agreement by Licensee pursuant to Paragraph 6.2 hereof, the Licensee, its affiliates, franchisees, sublicensees and assignees may continue to manufacture and sell (but solely in accordance with the provisions of this Agreement) any Covered Products which the Licensee, its affiliates, franchisees, sublicensees and assignees, as the case may be, were manufacturing or selling on the date of such termination.

(d)  during the five years following such termination or expiration not make use of or disclose, and not permit any Affiliate to make use of or disclose, to any Person other than the Licensor, any Know-how.

21.  Assignability

Licensor may assign all of its rights or obligations under this Agreement to a wholly-owned subsidiary and may assign all of its rights or obligations under this Agreement to any other Person who purchases all or substantially all of its assets (or the assets of such wholly-owned subsidiary) or to any other Person in connection with a merger or consolidation of Licensor (or such wholly-owned subsidiary) and such other Person, provided that such other Person shall agree in writing to be bound by all of the terms and conditions as fully and to the same extent as if named as Licensor herein.

22.  Interest.  All overdue payments shall bear interest at the base rate of Marine Midland prime plus 2 from time to time.

-8-

23. _Parties Independent_. Nothing contained herein shall in any respect constitute the parties a partnership or constitute the Licensee an agent of the Licensor. In the event that Avi Zinger and Nacuhm Gendelman cease to control and be actively involved in the management of Licensee (and any Qualifying Subsidiary), this Agreement shall terminate 180 days after the date of such cessation, provided that if this event arises as a result of the death or incapacity of Avi Zinger or Nacuhm Gendelman , then this Agreement shall not terminate, so long as Licensee complies with the following provisions of this section. Licensee shall be obligated within a second 180 day period, unless said requirement is waived in writing by Licensor, to sell all of its rights and obligations under this Agreement to Licensor at a price to be mutually agreed or, failing such agreement, at a price determined by agreement of three appraisers, one of whom shall be selected by Licensee, one of whom shall be selected by Licensor and one of whom shall be selected by agreement of the first two appraisers or to sell all of its rights and obligations under this Agreement to a third party.

24.   _Arbitration_.   All disputes, claims and questions regarding the rights and obligations of Licensor and Licensee under the terms of this Agreement are subject to arbitration. Either party may make a demand for arbitration by filing such demand in writing with the other party within twenty (20) days after the dispute first arises. Thereafter, arbitration shall be conducted by three arbitrators under the rules of the American Arbitration Association.   All arbitration shall be conducted in New York City, New York.

25. _Additional Instruments_. Each of the parties shall from time to time, at the request of the other, execute, acknowledge , and deliver to the other party any and all further instruments that may be reasonably required to give full force and effect to the provisions of this Agreement.

26.   _The Entire Agreement_.   This Agreement constitutes the entire understanding of the parties and there are no representations, warranties, covenants, or undertakings other that those expressly set forth herein.

27. _Modification_. A modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality of this Agreement.

28.   _Waiver_.   The failure of either party to insist upon strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default of the same or similar nature.

29.   _Situs_.   The Agreement shall be construed in accordance with and governed by the laws of the State of Vermont.

30. _Partial Invalidity_. If any provisions of this Agreement is held to be invalid or unenforceable, all of the other provisions shall nevertheless continue in full force and effect.

-9-

31.   _Binding Effect_.   Except as otherwise stated herein, all of the provisions of this Agreement shall be binding upon the respective successors and assigns the parties.

32.   _Time of the Essence_. Time is of the essence in every particular, and particularly where the obligation to pay money is involved.

33.   _Attorneys Fees and Costs_.   In connection with any litigation arising out of this Agreement, the prevailing party shall be entitled to recover all costs incurred, including reasonable attorney's fees, including but not limited to costs and reasonable attorney's fees through and including all appellate levels.

34.   _Captions_. Captions contained in this Agreement are inserted only as a matter of convenience or for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement this _____ day of _____, 1987.

Witness:                              BEN & JERRY'S HOMEMADE, INC.

_____

_____              By_____

_____              QUALITY GUARD, INC.

_____              By_____

                                     By_____

                                        Avi Zinger

                                     By_____

                                        Nacuhm Gendelman

-10-

# EXHIBIT 2

# BEN & JERRY'S HOMEMADE, INC.

## AMENDED AND RESTATED AGREEMENT

## THE AMERICAN COMPANY OF ICE CREAM MANUFACTURING E.I. LIMITED

This AMENDED AND RESTATED AGREEMENT ("Agreement") is made and entered into as of June 25, 1998 between BEN & JERRY'S HOMEMADE, INC., a corporation with its principal place of business at 30 Community Drive, South Burlington, Vermont, USA and its wholly owned subsidiary BEN & JERRY'S HOMEMADE HOLDINGS, INC. (which for convenience purposes will be collectively referred to as "BEN & JERRY'S") on the one hand and THE AMERICAN COMPANY OF ICE CREAM MANUFACTURING E.I. LIMITED, a corporation with it principal place of business at 1 Hameisav Street, Yavne, 70600, Israel ("Licensee"), on the other hand.

## INTRODUCTION AND BACKGROUND

The purpose of this Agreement is to terminate the presently existing agreement dated December 20, 1987 (the "1987 Agreement") between the parties and to set forth the mutual obligations each party has to the other regarding LICENSEE's execution of the rights granted to it hereunder, all as set forth in this Agreement.

Several outstanding issues remain from the 1987 Agreement and the resolution of the same is an integral part of this Agreement. The promises of LICENSEE to pay certain monies due under the 1987 Agreement must be fulfilled as set forth below. Failure of LICENSEE to make the below payments on the dates indicated will not only cause the entire balance of the 1987 Agreement payments to become immediately due and payable but will also constitute a material breach of this Agreement and thus give BEN & JERRY'S the right to terminate this Agreement for cause.

Accordingly, execution of this Agreement by LICENSEE will constitute acceptance of the following terms and conditions regarding the 1987 Agreement:

1.      Payment of past due royalties due under the 1987 Agreement will be made as follows:

| $20,000 | due | December 15, 1998 |
| $20,000 | due | December 15, 1999 |
| $20,000 | due | December 15, 2000 |
| $23,000 | due | December 15, 2001 |

If any installment is not paid when due, then the whole of the unpaid balance shall be immediately due and payable along with interest of 1 1/2% per month on the unpaid

2

balance.

2.      Payment of past due invoices under the 1987 Agreement, as indicated in Exhibit A attached hereto, will be paid in full upon the signing of this Agreement.

3.      Simultaneously with the execution of this Agreement, BEN & JERRY'S and LICENSEE shall execute mutual releases which, among other things, will indemnify and hold either party, their affiliates respective officers, directors and employees harmless from and against any and all claims, losses, costs, expenses, liabilities and damages arising directly or indirectly from, as a result of, or in connection with the terms and obligations of any and all previously existing agreements and/or understandings, including the 1987 Agreement, between the parties.

RECITALS.

A.      This Agreement consists of three (3) components which are: (i) Manufacturing of the Proprietary Products (the manufacturing component), (ii) the establishment and operation of Retail Shops which sell at retail the Proprietary Products (the retail component), and (iii) the distribution of Proprietary Products through the Wholesale Distribution Channels (the wholesale component).  These terms of art are as defined herein.

B.      BEN & JERRY'S, as a result of the expenditure of time, skill, effort and money, has developed a unique Frozen Dessert Business which includes, among other things, the manufacturing ("Manufacturing") of frozen desserts such as ice cream, ice milk, frozen yogurt, sorbet, ice cream and/or sorbet cakes, smoothies,  novelties and the like (hereinafter collectively referred to as the "Proprietary Products") as well as the means by which Ben & Jerry's products including, but not limited to, the Proprietary Products, are distributed through certain wholesale distribution channels and through a distinctive system (the "System") relating to the establishment and operation of retail scoop shops (collectively "Retail Shops"), which are primarily engaged in the retail sale and distribution of Ben & Jerry products including the Proprietary Products, as well as Proprietary Gift Products (such as T-Shirts, hats, mugs, clothes and the like).  The Retail Shops also sell a  limited selection of complementary and compatible products, including non-proprietary gift products, approved by BEN & JERRY'S (the "Non-Proprietary Products").  For purposes of this Agreement, "Retail Shops" shall include any retail sale location, including, but not limited to stores, concessions, food court locations, vending carts (fixed or mobile), stands or counters (stand-alone or installed in the business of another retail operation; each electronic retail sale channel or electronically accessible computer location which offers Products for sale shall be deemed a separate Retail Shop.  For purposes of this Agreement, Proprietary Products and Proprietary Gift Products are sometimes collectively referred to as "Proprietary Products" and Proprietary Products and Non-Proprietary Products are sometimes

3

referred to, in the aggregate, as "Products".

C.     BEN & JERRY'S has developed and will continue to develop certain technology relative to the Manufacturing of Proprietary Products which it is willing to license to LICENSEE pursuant to the terms and conditions of this Agreement.

D.     BEN & JERRY'S manufactures the Proprietary Products in a protected manner using specifically formulated ingredients of the highest quality and  employs unique product formulations,  proprietary flavor combinations, unique methodology, and products purchased from local and/or special interest vendors--all of which may be changed, improved, and further developed by BEN & JERRY'S from time to time.

E.     The distinguishing characteristics of the System include distinctive exterior and interior design; decor; color schemes; fixtures and furnishings; standards and specifications for products, for equipment, for materials and for supplies; uniform standards, specifications and procedures for operations; procedures for inventory and management control; training and assistance; and marketing and promotional programs; all of which may be changed, improved, and further developed by BEN & JERRY'S.

F.     The distinguishing characteristics of the wholesale component of this Agreement include methods of transportation and delivery, trade dress for vehicles, distribution operational standards, equipment, standards of operation for the Wholesale Distribution Channels of distribution  and marketing and promotional programs, all of which may be changed, improved, and further developed by BEN & JERRY'S from time to time.

G.     The Manufacturing and Distribution (both the retail component and the wholesale component) of the Proprietary Products are operated under and identified by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin as are now designated and may hereafter be designated by BEN & JERRY'S in writing for use in connection with the aforementioned including the mark  "Ben & Jerry's" and other marks as are listed in Exhibit B hereto (the "Proprietary Marks").

H.     LICENSEE understands the importance of the high standards of BEN & JERRY'S, including but not limited to manufacturing, for quality and acknowledges that the Proprietary Products to be manufactured and distributed through the Wholesale Distribution Channels and the Product to be distributed through the Retail Shops by LICENSEE hereunder use Proprietary Marks and must conform to the BEN & JERRY'S General Standards, the ("Standards")  as outlined in Exhibit C, attached hereto and made a part hereof.

I.     Israel, as presently constituted, will be referred to as the "Territory".

4

J.     For purposes of this Agreement only, "Wholesale Distribution" and/or "Wholesale Distribution Channels" mean the distribution channels specifically defined as supermarkets, grocery stores, convenience stores, contract food service accounts, department stores, other food outlets, PROVIDED, HOWEVER, that it does NOT include Retail Shops.

K.     For purposes of this Agreement only, "Retail Shop(s)" means any retail sale location, including but not limited to free standing retail stores, concessions, food court locations, vending carts (fixed or mobile), stands, or counters (stand alone or installed in the business of another retail location).

L.     For purposes of this Agreement only, the manufacturing and the retail and the wholesale components are collectively referred to as the "Licensed Business".

M.     For purposes of this Agreement only, "Licensed Technology" shall mean the deliverables listed in Exhibit D hereto and any other documents, information, know-how and devices disclosed to LICENSEE by BEN & JERRY'S under this Agreement and the 1987 Agreement.

N.     For purposes of this Agreement only, "Affiliate(s) shall mean any person or entity that directly or indirectly controls another person or entity, or that is directly or indirectly controlled by, or that is under common control with, such other person or entity.

O.     Although the majority of the Proprietary Products will be manufactured by LICENSEE in Israel, the LICENSEE will be required to purchase certain finished Proprietary Products and certain ingredients from BEN & JERRY'S or from authorized vendors certified by BEN & JERRY'S.

P.     For purposes of this Agreement, "Technical Coordinators" shall mean the BEN & JERRY'S and LICENSEE'S employees responsible for (a) coordinating the transfer of the Licensed Technology between the parties and (b) acting as the contact point relative to the Licensed Technology.  Robert Aragona, or such person as BEN & JERRY'S may designate in the future, is the Technical Coordinator for BEN & JERRY'S and __Orit Toker__ Technical Coordinator for LICENSEE.

Q.     LICENSEE desires to acquire from BEN & JERRY'S the rights to: (i) manufacture the Proprietary Products (excluding the Proprietary Gift Products) in Israel, (ii) establish and operate Retail Shops, and (ii) sell Proprietary Products only in the Wholesale Distribution Channels of distribution for sale to accounts located in the Territory for re-sale in the Territory.

R.     BEN & JERRY'S is willing to grant such rights.

NOW, THEREFORE, in consideration of the premises and mutual covenants

5

contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follow:

1.    GRANT

1.1    Subject to the terms and conditions of this Agreement and to the continuing faithful performance by LICENSEE of its obligations hereunder, BEN & JERRY'S grants to LICENSEE four (4) separate non-exclusive, non-transferable and personal rights (without the right to sublicense unless BEN & JERRY'S previously agrees in writing), to: (i) to manufacture, under BEN & JERRY'S know-how and trade secrets contained in the Licensed Technology, and to package the Proprietary Products solely in the Territory,  (ii) to offer, sell and distribute Proprietary Products solely through the Wholesale Distribution Channels of distribution in the Territory, (iii) to construct, open, own and operate Retail Shops in the Territory and (iv) to use the Proprietary Marks which are registered for use in the Territory.  The right to distribute includes the right to market, sell, display, advertise and otherwise promote the Products.  LICENSEE agrees and understands that its right to sell and distribute Proprietary Gift Products is limited to selling the same through Retail Shops only and LICENSEE is acquiring no right to manufacture the Proprietary Gift Products or to distribute the same in any other channel of distribution.  Notwithstanding the fact that the licenses contained herein are granted on a non-exclusive basis BEN & JERRY'S agrees that; (i) it shall not grant any other person or entity the right to distribute Proprietary Products through the Wholesale Distribution Channels of distribution in the Territory during the Term of this Agreement and (ii) it shall not grant any other person or entity the right to open and operate Retail Scoop shops within the Territory and (iii) it shall refrain from conducting identical operations as described herein within the Territory all provided that LICENSEE is in full compliance will all the terms and conditions of this Agreement.

1.2    LICENSEE accepts such grant and licenses and agrees to exercise such rights  to Manufacture the Proprietary Products within the Territory and to distribute the same within the Territory and to construct, open, own and operate Retail Shops all in accordance with the terms and conditions of this Agreement. The LICENSEE will at all times faithfully, honestly, and diligently perform its obligations hereunder and will continuously exert its best efforts to promote and enhance the manufacture of the Proprietary Products and the sale and distribution of the same and the operating of Retail Shops within the Territory.

1.3    During the term of this Agreement, LICENSEE shall not, directly or indirectly, manufacture, distribute or sell Proprietary Products in the Territory nor establish or operate or license or sublicense any other person or entity to exercise any of the rights hereunder at any location within the Territory other than as set forth herein.

1.4    It is understood and agreed that BEN & JERRY'S, in its sole discretion, may sign agreements to establish retail and wholesale sales and distribution channels

6

with third parties in the countries of Cyprus, Greece and Turkey and may authorize LICENSEE to the be the designated manufacturer of certain approved BEN & JERRY'S frozen dessert products; however, LICENSEE will not be a direct party to any such agreements.  Unless BEN & JERRY'S expressly agrees, in writing, to the contrary, LICENSEE shall not export Proprietary Products outside of the Territory and LICENSEE is expressly prohibited from soliciting sales for the Proprietary Products outside the Territory without BEN & JERRY'S prior written approval.   LICENSEE agrees that it will not distribute any Proprietary Product to any party or in any manner dispose of any Proprietary Product under circumstances where LICENSEE knows, or in the exercise of prudent business judgment should know, that such activity ultimately will result in the exporting of the same outside of the Territory.

1.5.    LICENSEE acknowledges that the Manufacturing of the Proprietary Products and/or the distribution process for the same and/or the standards of operation for the Retail Shops may be supplemented, improved, and otherwise modified from time to time by BEN & JERRY'S; and LICENSEE agrees to comply with all reasonable requirements of BEN & JERRY'S in that regard, including offering and selling new or different Products or services as specified by BEN & JERRY'S.

1.6    LICENSEE agrees to refrain from: (i) manufacturing, directly or indirectly, any other frozen desserts at any manufacturing facility and (ii) selling, directly or indirectly, any other frozen desserts through any channel of distribution and (iii) opening any other scoop shop.

1.7    LICENSEE understands and agrees that no license or other right is granted herein, expressly or impliedly or by estoppel or otherwise, relative to any know-how, trade secrets, inventions, patents, copyrights or other intellectual property rights, except as expressly provided in Article 1 hereof.

2.    ADDITIONAL LIMITATIONS ON RIGHTS GRANTED

2.1    Nothing in this Agreement shall be construed as giving LICENSEE any right to, and LICENSEE agrees that it shall not, and shall not permit or assist any employee, officer, director, agent, contractor, parent, subsidiary, Affiliate, joint venturer or partner of LICENSEE (each an "Affiliate"), or any other party to, manufacture, modify, adapt any of the Proprietary Products (in whole or in part) or sell all or any part of any Proprietary Product, except as may be expressly and clearly permitted by this Agreement.  Without limiting the materiality of any other term of this Agreement, the failure of LICENSEE to comply with the provisions of this Section 2.1 shall be considered a material breach of this Agreement.

2.2    LICENSEE recognizes and acknowledges the vital importance to BEN & JERRY'S of the Proprietary Marks and other proprietary material BEN & JERRY'S owns and creates and the association of the "Ben & Jerry's" name with them.  In order to

prevent the denigration of the Proprietary Products and the value of their association with the "Ben & Jerry's" name, and in order to ensure the dedication of LICENSEE'S best efforts to preserve and maintain that value, LICENSEE agrees that, during the Term, LICENSEE will not manufacture, sell  or distribute any product embodying or displaying any artwork or other representation that is confusingly similar to the Proprietary Marks or other proprietary material of BEN & JERRY'S.

2.3     All rights not specifically and expressly granted by BEN & JERRY'S to LICENSEE are hereby reserved by BEN & JERRY'S.

3.     DEVELOPMENT OBLIGATION

3.1     LICENSEE accepts the obligation to develop the Licensed Business in the manufacturing, the retail, and the wholesale components thereof.  More specifically LICENSEE accepts its obligation to develop Retail  Shops within the Territory as agreed in the Development Schedule attached hereto as Exhibit E, focusing on areas which satisfy the criteria and demographics for the operation of similar successful franchise locations.  It is acknowledged that LICENSEE has opened and is operating those Retail Shops as set forth on Exhibit F.  LICENSEE will at all times, faithfully, honestly and diligently perform its obligations hereunder and will continuously exert its best efforts to promote and enhance the development and operation of all components of the Licensed Business in the Territory.

3.2     BEN & JERRY'S and LICENSEE may agree to reasonably extend the dates as reasonably required for compliance with there Development Obligations upon the happening of any Act of God or event of force majeure which materially interferes with the ability of LICENSEE to comply with the above schedule.  Nothing contained herein shall limit LICENSEE from establishing Shops or expanding wholesale distribution sooner than required pursuant to the Development Schedule.

4.     TERM AND RENEWAL

4.1_    This Agreement is effective upon the date first above written and, except as otherwise provided herein, shall expire seven (7) years from the date the hereof.

4.2     LICENSEE may renew the rights granted hereunder for one (1) additional consecutive term of seven (7) years if the following conditions are met prior to renewal:

4.2.1   LICENSEE shall give BEN & JERRY'S written notice of LICENSEE'S election to renew at least nine (9) months, but not more than twelve (12) months, prior to the end of the term of this Agreement; and

4.2.2   LICENSEE shall not have any past due monetary obligations or

8

other outstanding obligations to BEN & JERRY'S or its Affiliates; and

4.2.3   LICENSEE shall not be in default of any provision of this Agreement, or successor hereto, or any other agreement between LICENSEE and BEN & JERRY'S or its Affiliates or any lease or sublease for the premises of any Retail Shop ("Premises").   LICENSEE shall have substantially complied with all the terms and conditions of such agreements during the terms thereof; and

4.2.4   LICENSEE shall execute a general release, in a form prescribed by BEN & JERRY'S, of any and all claims against BEN & JERRY'S and its Affiliates, and their respective officers, directors, agents, and employees; and

4.2.5   LICENSEE shall present evidence, in a manner satisfactory to BEN & JERRY'S, that LICENSEE has the right to remain in possession of each manufacturing facility and each location used in the wholesale component of the Licensed Business and any open and operating Retail  Shop location  for the duration of the renewal term. Should some extraordinary circumstance occur which would render the approved location unavailable for the renewal period, BEN & JERRY'S agrees, in its sole discretion, to review an alternative Retail Shop location, assuming the location meets the then current Retail Shop site criteria;  and

4.2.6   LICENSEE shall make or provide for, in a manner satisfactory to BEN & JERRY'S, such renovation and modernization of the manufacturing facility(ies)and/or of any location used in the wholesale component of the Licensed Business,  and any open and operating Retail Shop, as BEN & JERRY'S may reasonably require, including installation of new equipment and renovation of existing fixtures, replacement of obsolete signage, furnishings and decor in order to accommodate  the then current technology relative to the manufacture of the Proprietary Products and the design and image of the then current Retail Scoop Shops;  and

4.2.7   LICENSEE and BEN & JERRY'S shall have agreed on  minimum royalty payments and the on-going royalty fees and on a Development Schedule to be effective for the renewal term.

4.2.8   LICENSEE shall comply with the then current BEN & JERRY'S qualification and training requirements for operators of Retail Shops outside of the United States;

4.2.9   Upon the signing of the renewal, LICENSEE shall pay BEN & JERRY'S a renewal fee in US dollars equal to 10% of the greater of: (i) 50% of LICENSEE'S net income for the last year of the original Term or (ii) 1.25% of LICENSEE'S gross turnover from all sources of income of LICENSEE for the last year of the original Term.

5.      MANUFACTURING

5.1     LICENSEE shall manufacture all Proprietary Products only at locations approved by BEN & JERRY'S in writing and prior to the commencement of manufacturing by LICENSEE. LICENSEE shall manufacture Proprietary Products only in the manner and under the conditions that are expressly authorized by BEN & JERRY'S and which are in full compliance with the Licensed Technology. LICENSEE shall construct and equip any manufacturing facility, in compliance with BEN & JERRY'S specifications, at LICENSEE'S own expense. LICENSEE shall obtain all licenses, permits and certifications required for the lawful construction and operation of each such location and shall certify in writing to BEN & JERRY'S that all such licenses, permits and certifications have been obtained.

5.2     LICENSEE covenants and agrees that it will manufacture the Proprietary Products primarily in its own facility(ies), in accordance with the specifications for the Proprietary Products as supplied by BEN & JERRY'S. Initially, LICENSEE will manufacture the Proprietary Products only at its facility located at Hameisav Street, Yavne, Israel. Such manufacture will be subject to the approval of BEN & JERRY'S for frozen dessert product and will meet the Quality Assurance requirements for such quality as prescribed by BEN & JERRY'S and its Quality Control Agent. LICENSEE shall be in full compliance with all applicable laws as well as applicable standards generally in use for the normal manufacture of frozen dessert products.

5.3     LICENSEE represents that it is a manufacturer qualified to produce frozen dessert products in general and has the ability to produce the Proprietary Products (with the use of the Licensed Technology) in sufficient quantity to meet the requirements of this Agreement and to gain a substantial market for the Proprietary Products in the category in which the same will be positioned. The LICENSEE confirms that it has invested in or presently maintains and will either maintain manufacturing facilities or contract for facilities to produce the Proprietary Products and LICENSEE will produce Proprietary Product of the highest quality in the frozen dessert products category, meeting Q.A. standards as specified by BEN & JERRY'S.

5.4     LICENSEE will not deviate in the formulation, labeling and packaging for the Proprietary Products.

5.5     In the event LICENSEE wishes to subcontract the manufacture of the Proprietary Products, LICENSEE must obtain the prior written consent of BEN & JERRY'S. BEN & JERRY'S, in its sole discretion, shall approve or disapprove any proposed subcontractor. BEN & JERRY'S may, in its sole discretion, approve or disapprove any agreements between LICENSEE and/or its subcontractors.

6.      QUALITY CONTROL

10

6.1    After BEN & JERRY'S has certified the LICENSEE'S facility(ies) ready for manufacturing of the Proprietary Products, then upon request from BEN & JERRY'S, but not less than once per month, LICENSEE shall deliver to BEN & JERRY'S or its designated representative, at LICENSEE'S expense, to a location prescribed by BEN & JERRY'S, samples of the finished Proprietary Products. LICENSEE will also submit monthly production, quality control and finished product manufacturing biological testing records for review. If at any time a Proprietary Product is, in the sole and exclusive judgement of BEN & JERRY'S, not manufactured in strict compliance with BEN & JERRY'S standards or as otherwise approved in writing by BEN & JERRY'S, BEN & JERRY'S shall notify LICENSEE to suspend the production and sale of such Proprietary Product until the same is brought by the LICENSEE, at its sole expense, into conformity with the specifications. BEN & JERRY'S will give LICENSEE written notice of any such non-compliance, which notice shall specify the details thereof. Within five (5) days after receipt of such notice, LICENSEE shall promptly correct any problem specified by BEN & JERRY'S therein. If such Proprietary Product, as corrected by LICENSEE still is not approved by BEN & JERRY'S or if LICENSEE fails to correct any such problem in the time provided here, the Proprietary Marks shall be promptly removed from such Proprietary Products, at the option of, and at no cost to BEN & JERRY'S and all such product shall be promptly destroyed. In addition, BEN & JERRY'S shall have the right to terminate this Agreement forthwith.

6.2    In order to carry out the purposes of this Agreement, but without relieving LICENSEE of its continuing obligation of maintaining proper conformity, BEN & JERRY'S retains the right, with or without notice, to inspect, during normal business hours,  the facilities utilized by LICENSEE and by suppliers to LICENSEE in connection with the manufacture, storage and distribution of Proprietary Products and to examine Proprietary Products in the process of manufacture and all documents and records related hereto.

6.3    LICENSEE agrees that each Proprietary Product manufactured and offered for sale by it shall be in conformity with the Quality Assurance ("Q.A.") standards and specifications set for the Proprietary Products by BEN & JERRY'S. The Proprietary Products shall be of a high quality which is at least equal to comparable other Super Premium ice cream products and to comparable products in the market of the same premium quality, and always in conformity with a standard sample approved by BEN & JERRY'S

7.    DISTRIBUTION

7.1    The Wholesale Distribution Channels of distribution, including Proprietary Product availability, Proprietary Product variety, and quantity of Proprietary Product are critical to the promotion of the Proprietary Products and to the protection of the Proprietary Marks within the Territory. LICENSEE shall use its best efforts to maximize the rights granted hereunder throughout the Territory, including but not limited to,

11

selling significant quantities of Proprietary Product and maintaining sufficient personnel to provide effective distribution of the same.

7.2    Upon execution of this Agreement, LICENSEE shall submit to BEN & JERRY'S the names of its presently existing and its intended wholesale customers for the sale of such approved Proprietary Products and such other relative information as BEN & JERRY'S may reasonably request.  LICENSEE shall submit to BEN & JERRY'S for BEN & JERRY'S approval any intended new wholesale customers, prior to making sales to any such customers.

7.3    LICENSEE will, in a manner satisfactory to BEN & JERRY'S, maintain an adequate sales force to actively and vigorously market, promote, distribute and sell the Products contemplated by this Agreement as provided herein.  LICENSEE'S obligations will include the maintenance of satisfactory marketing and distribution facilities.

7.4    LICENSEE will maintain a public relations department in connection with its marketing and sales undertakings and will continue to maintain such department during the term of this Agreement and utilize the same for the marketing of the Products.

7.5    LICENSEE shall be solely responsible for, and shall use its best efforts to provide and maintain, high-quality customer service and technical support in the Territory to all dealers, distributors and end-users with respect to all  Products.  Subject to LICENSEE having obtained BEN & JERRY'S prior written approval in connection with the form and content thereof, LICENSEE'S name and appropriate information for contacting LICENSEE with respect to customer service issues shall be prominently displayed on the packaging or label of each Product sold by LICENSEE.  For purposes of this Agreement, "customer service" means the resolution of customer complaint issues pertaining to the  Products in the following general categories: inventory processing, payment processing, order inquiries, product returns and replacements, and technical support.

7.6    LICENSEE and its staff shall be conversant with the Products and similar frozen dessert products in general and shall develop sufficient knowledge of the industry and of products competitive with the Products so as to be able to explain the Products in detail to distributors, dealers, retailers and end-users.  LICENSEE shall conduct or provide for any training of its personnel that may be necessary to impart such knowledge.

7.7    LICENSEE shall maintain a high-quality adequately staffed customer service department to address all customer service issues relating to  Products sold by LICENSEE.  All customer service issues shall be categorized by type of issue and problem resolution.  Problem resolution shall be guided by reasonable written customer service policies applied by LICENSEE uniformly throughout the Territory after

12

consultation with BEN & JERRY'S.

7.8     LICENSEE shall establish and maintain adequate telephone access within the Territory for answering questions from end-users and potential end-users concerning the sale and use of the Products sold by LICENSEE and for addressing other customer service issues.

7.9     LICENSEE shall promptly notify BEN & JERRY'S in writing of any claimed or suspected defect in a  Product no later than five (5) days after LICENSEE learns of the same, whether directly or through a distributor, dealer, retailer or an end-user.

7.10    LICENSEE shall notify BEN & JERRY'S in writing of the terms and conditions of the Wholesale Distribution Channels of the Licensed Business including food service accounts and Product distribution which LICENSEE conducts within the Territory.  Further, LICENSEE agrees that any food service account wishing to sell the Proprietary Products will meet BEN & JERRY'S standard criteria for cleanliness and standards of operation.

7.11    LICENSEE understands and agrees that if, when, and as it may want to use an arms-length  third party distributor, which would perform services for LICENSEE (which LICENSEE is obligated to perform), in the Wholesale Distribution Channel, LICENSEE must inform BEN & JERRY'S, before any negotiations with said third party distributor begin, of the LICENSEE'S strategy and tactics for said third party agreement. LICENSEE will keep BEN & JERRY'S informed of the progress and will not present BEN & JERRY'S with a "fait accomplit."   BEN & JERRY'S prior written approval of such agreement must be obtained prior to the signing of same and BEN & JERRY'S must be a signatory to any such third party distributor agreement.

8.     LICENSED TECHNOLOGY

8.1     BEN & JERRY'S shall provide and disclose to LICENSEE the Licensed Technology  with respect to the formulation and manufacture of its Proprietary Products. LICENSEE agrees to use its best efforts to protect the confidentiality of this information and use this Licensed Technology only as it relates to the formulation and manufacture of the Proprietary Products.

8.2     Following delivery of the Licensed Technology, BEN & JERRY'S will, at LICENSEE'S expense,  provide technical support and instruction concerning the Licensed Technology for not more then ten (10) days, for up to five (5) of LICENSEE'S employees, at BEN & JERRY'S facilities in Vermont, at a date that is mutually agreeable to the parties.  In addition, BEN & JERRY'S will provide up to ten (10) hours of telephone support per month concerning the Licensed Technology during the one (1) year period commencing on the date LICENSEE first receives the Licensed Technology, such support not to exceed one (1) hour in any day.

13

8.3    Any improvements made to the process of formulating or manufacturing the Proprietary Products, whether done by LICENSEE or another third party, will remain and be the sole property of BEN & JERRY'S.  LICENSEE will execute any and all documents which BEN & JERRY'S deems necessary in order to vest all right, title, and interest in and to the improvements in BEN & JERRY'S.

8.4    LICENSEE acknowledges that Licensed Technology (including but not limited to manufacturing methods, recipes and formulae now or hereafter used) received from BEN & JERRY'S constitute valuable trade secrets of BEN & JERRY'S and is revealed in confidence hereunder. LICENSEE agrees to, at a minimum, make such confidential information available only to those parties having a need-to-know and require the same parties to agree to the obligations of confidentiality.   LICENSEE agrees to notify BEN & JERRY'S prior to  any transfer of confidential information to any third party.  LICENSEE agrees that for a period of five (5) years from the termination of this Agreement, whether by default or expiration, to use the same care and discretion to protect the confidential information belonging to  BEN & JERRY'S

9.    RETAIL SHOP LOCATIONS

9.1 LICENSEE shall operate the Retail  Shops only at locations (the "Approved Location") approved by BEN & JERRY'S in writing prior to the opening of each Retail Shop. LICENSEE shall not relocate a Retail Shop without the prior written approval of BEN & JERRY'S.  Any approvals furnished by BEN & JERRY'S pursuant to this Section 9.1 or assistance in selecting a location, shall be at the sole discretion of BEN & JERRY'S, and are not, and shall not be, a guarantee or assurance by BEN & JERRY'S that the Retail Shop will be profitable or successful.

9.2 Upon the opening of each Retail Shop, BEN & JERRY'S and LICENSEE shall execute an amended Exhibit E to set out the Approved Location and include the effective date which shall be considered the effective date at which the term of the individual Retail Shop shall commence.

10.    DUTIES OF BEN & JERRY'S

10.1    BEN & JERRY'S shall make available to LICENSEE standard U.S. plans and specifications for the Manufacture of all Proprietary Products and for the retail and wholesale components of the Licensed Business.

10.2    At LICENSEE's sole expense, BEN & JERRY'S shall provide a total of two (2) inspections annually of any manufacturing or subcontracted manufacturing facility in which Proprietary Products are produced.  At LICENSEE'S sole expense, BEN & JERRY'S shall provide initial training for operation of a Retail shop as set forth in Article 14 of this Agreement.

14

10.3   At LICENSEE'S expense, BEN & JERRY'S shall provide such on-site pre-opening and opening supervision and assistance for each Retail Shop as BEN & JERRY'S deems advisable.

10.4   At LICENSEE's request and in BEN & JERRY'S sole discretion, BEN & JERRY'S may make available to LICENSEE, at BEN & JERRY'S expense, standard U.S. marketing plans and promotional materials as the same exist in English.

10.5   After LICENSEE's execution of this Agreement , BEN & JERRY'S shall provide LICENSEE, on loan and at BEN & JERRY'S expense, English-language copies of the BEN & JERRY'S Confidential Operating Manuals, including, without limitation, copies of BEN & JERRY'S Manufacturing Standards, Quality, Distribution and Product Handling Requirements (collectively, the "Manuals"), as described in Article 17.  All Manuals and translation thereof are the sole property of BEN & JERRY'S and are to be treated as confidential by LICENSEE.

10.6   BEN & JERRY'S shall provide to LICENSEE, from time to time, as BEN & JERRY'S deems appropriate and at BEN & JERRY'S's expense, advice and written materials concerning techniques of managing and operating the Manufacturing of the Proprietary Products, the distribution of the same through the Wholesale Distribution Channels and the operation of the Retail Shops, including required and suggested inventory and cost control methods, new developments and improvements in manufacturing techniques, new developments and improvements in products and marketing techniques, new developments and improvements in Wholesale Concept and service standards and new developments and improvements in the Retail Shop layout and design.

10.7   BEN & JERRY'S may conduct, at its expense and as it deems  advisable, inspections of the operation of LICENSEE'S facilities in excess of the two(2) annual inspection which are at the expense of LICENSEE.

10.8   To require the return or disposal of, as BEN & JERRY'S shall direct in its sole discretion, Products which BEN & JERRY'S reasonably believes to be adulterated, tainted, contaminated, spoiled, unsafe, hazardous, expired, or otherwise unfit to be used for its intended purpose. BEN & JERRY'S all at LICENSEE'S sole cost.

11.   PURCHASE AND SALE OF PRODUCTS

11.1   LICENSEE shall notify BEN & JERRY'S of any changing requirements for packaging and marking and the parties shall agree on the actions needed for such compliance.  In addition to purchasing finished Proprietary Products from BEN & JERRY'S (as the need arises), the LICENSEE shall not purchase any ingredients of any kind or nature, used in the manufacture of Proprietary Products, including Proprietary Gift Products, from any entity not approved in advance and in writing by

15

BEN & JERRY'S.

11.2   LICENSEE shall purchase all proprietary ingredients for all Proprietary Products from BEN & JERRY'S or from BEN & JERRY'S designees.

11.3   LICENSEE shall manufacture and/or buy and distribute (in both the wholesale and the retail concepts) its annual requirements of Proprietary Products pursuant to the projections in the Business Plan referred to in Section 20.2.

11.4   In the event that LICENSEE purchases finished Proprietary Products from BEN & JERRY'S, LICENSEE will purchase the same upon at least thirty (30) days notice to BEN & JERRY'S which will prepare the order for shipment after LICENSEE has opened an irrevocable commercial, at sight, letter of credit with terms to be defined by BEN & JERRY'S which shall be negotiable when said finished  Proprietary Products are shipped by BEN & JERRY'S to LICENSEE. All costs associated with said letter of credit are to be paid by LICENSEE..  LICENSEE agrees to accept full responsibility for the handling and transportation of orders for the Products from the BEN & JERRY'S's facilities in Vermont U.S.A. and/or in Europe and all expenses connected therewith shall be borne by the LICENSEE.

11.5   The purchase price of the Products  shall be in accordance with the BEN & JERRY'S International distributor (Ex-Factory) price list, as it shall be in effect from time to time.  Such purchases shall be paid by LICENSEE in accordance with Article 12 hereof. Title and all damage and risk of loss of all  Products so purchased shall pass from BEN & JERRY'S to LICENSEE upon BEN & JERRY'S delivery of the same to LICENSEE'S designated carrier.

11.6   The price of the Proprietary Ingredients shall be in accordance with BEN & JERRY'S price as outlined in Exhibit G, attached hereto and made a part hereof.

11.7.   With respect to Products manufactured and/or bought by LICENSEE from BEN & JERRY'S to be sold by LICENSEE in the Territory through the Wholesale Distribution Channels of distribution and/or Retail Shops, BEN & JERRY'S reserves the right:   __

11.7.1. To discontinue, in its sole discretion, the availability of particular Products from time to time;

11.7.2 To limit the offer and sale of any Product in such manner and for such period of time as BEN & JERRY'S may reasonably deem necessary to determine the marketability of a Product or the feasibility and desirability of offering a Product for sale under this Agreement; and

11.7.3 To require the return or disposal of, as BEN & JERRY'S shall direct

16

in its sole discretion, Products which BEN & JERRY'S reasonably believes to be adulterated, tainted, contaminated, spoiled, undated, hazardous, expired or otherwise unfit to be used for its intended purpose. BEN & JERRY'S shall reimburse LICENSEE for the cost of any such Products provided that the defect in such Products existed before the Products were delivered to LICENSEE'S designated carrier and further provided that such Products were not returned or disposed of as a result of an act or failure to act by LICENSEE or its shippers, transporters or carriers.

12.   FEES

12.1  Upon LICENSEE'S execution of this Agreement, the sum reflected in Exhibit A attached hereto and made a part hereof will be immediately paid by LICENSEE to BEN & JERRY'S. As part of the consideration hereof, LICENSEE will grant BEN & JERRY'S certain rights to own shares in the LICENSEE, all as set forth in separate documents which must be executed within fourteen (14) days of the signing of the Agreement by both parties; provided however, if these said rights agreements are not executed by both parties within said fourteen (14) days, then BEN & JERRY'S shall have the right to terminate this Agreement pursuant to Section 23.2 hereof.

12.2   For purposes of this Article 12, the following terms shall have the following definitions:

12.2.1 "WDC Net Sales" shall mean LICENSEE'S invoice price to the first non-affiliated party customers in the Territory minus actual returns only and regardless of sales discounts and/or collection in case of credit. Novelty Products only, in finished form, purchased by LICENSEE directly from BEN & JERRY'S for re-sale in the Territory will be royalty free. If LICENSEE uses a third party distributor as set forth in Section 7.11, then as part of a third party distributor agreement, it will be agreed that the royalty due to BEN & JERRY'S thereunder will be fixed by mutual consent.

12.2.2 "RS Gross Sales" shall mean all revenue from the sale of all Products, whether for cash or credit, of every kind and nature related to the operation of the Retail Shops regardless of collection in the case of credit.

12.2.3 "Export Net Sales" shall mean LICENSEE'S invoice price to the first non-affiliated party customer (including BEN & JERRY'S and/or its designee), which is located outside of the Territory and to whom LICENSEE sells Proprietary Products manufactured and distributed by LICENSEE under this Agreement (with BEN & JERRY'S prior written consent) minus returns only and regardless of collection in case of credit. Proprietary Products in finished form sold by LICENSEE to BEN & JERRY'S or any of its subsidiaries and/or affiliates will be royalty free; provided that the selling price of said Products paid by BEN & JERRY'S is not in excess of LICENSEE'S direct out of pocket costs plus 20%

17

12.2.4 "Total Royalty Paid" shall mean the sum of the royalty from WDC Net Sales plus the royalty from RS Gross Sales plus the royalty from the Export Net Sales.

12.2.5 Unless otherwise indicated, the dollar amounts referred to in Section 12.3 are NIS equivalents of United States Dollars.

The term"Sales" used in Sections 12.2.1 through and including 12.2.4 shall not include any sales taxes or other taxes collected from customers by LICENSEE and paid directly to the appropriate taxing authority. As to distributions where there is no separate charge for Proprietary Products (e.g., where sample products are provided to prospective customers or where LICENSEE uses Proprietary Products internally other than in connection with the manufacture, marketing as service thereof) or where there are transfers of Proprietary Products to individuals or companies that are subsidiaries or other affiliated entities of LICENSEE, the term "Sales", as used above, shall mean the average  sales price charged during the most recent fiscal quarter by LICENSEE for the applicable Proprietary Products or if there were no such sales of the Proprietary Products, then the average sales price charged by the LICENSEE during the most recent fiscal quarter for substantially similar Proprietary Products.

12.3    As additional consideration for the granting of this License, LICENSEE shall pay to BEN & JERRY'S the following cumulative Royalty Fees:

12.3.1 (i) 2.5% of the first $4,000,000 from the combined WDC Sales and the RS Gross Sales which are sold each calendar year;

(ii) 3.5% of the Sales between $4,000,000 and $5,500,000 from the combined WDC Sales and the RS Gross Sales which are sold each calendar year;

(iii) 5% of all Sales over $5,500,000 from the combined WDC Sales and the RS Gross Sales which are sold each calendar year.

(iv) Notwithstanding anything to the contrary contained in subsections (i) through (iii) of this Section 12.3.1, if in any calendar year of the Term hereof, the LICENSEE achieves Sales of $5,500,000 from the combined WDC Sales and the RS Gross Sales, then the royalty under this Section 12.3.1 will be a flat 5% of the combined WDC Sales and the RS Gross Sales regardless of the total for any subsequent year Sales; and

12.3.2 Six 6% Export Net Sales which are sold each calendar year.

12.4    Notwithstanding the amount of the Total Royalty Paid in any calendar year of this Agreement, LICENSEE guarantees that the Total Royalty Paid shall not be less than the following (the "Guaranteed Royalty Fees") for the calendar years indicated:

18

12.4.1 First year end the Guaranteed Royalty will be US$112,500.

12.4.2 For years two through and including seven, the Guaranteed Royalty will be the greater of $112,500 or 2.5% of the prior year's gross turnover income from all sources of LICENSEE.

LICENSEE agrees to pay BEN & JERRY'S the difference, if any, between the Total Royalty Paid for each calendar year and the corresponding Guaranteed Royalty within sixty (60) days of the calendar year end. The Guaranteed Royalty for each calendar year will be paid in advance on a quarterly basis: one-fourth (1/4) due each quarter and the same shall be paid on January 1, April 1, July 1, and October 1 of each calendar year with the first payment due January 1, 1998.

12.5   LICENSEE shall not pay to BEN & JERRY'S any Retail Shop opening fee for each and every Retail Shop owned and operated by LICENSEE under this Agreement. The fee for any approved PartnerShop opened within the Territory shall also be waived. If BEN & JERRY'S approves, as set forth herein, LICENSEE sub-licensing third parties to operate Retail Shops under this Agreement, then any and all fees received by LICENSEE from said sub-license will be split as agreed to by BEN & JERRY'S and LICENSEE but in no event shall BEN & JERRY'S split be less than $10,000.

12.6   Remittances to BEN & JERRY'S of all of the Royalties set forth in this Article 12 shall be paid (unless otherwise set forth herein) by the fifteenth (15th) day of each month following the end of a calendar quarter and shall be submitted to BEN & JERRY'S, together with any reports or statements required hereunder. Any contribution, payment, statement or report due to, but not actually received by, BEN & JERRY'S on the or before the prescribed date herein shall be overdue if not postmarked by such date or the next business day if the date specified is on a weekend or holiday recognized by the U.S. postal system. If any contribution or payment is overdue, LICENSEE shall pay BEN & JERRY'S immediately upon demand and in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies BEN & JERRY'S may have. LICENSEE shall not be entitled to set off any contributions or payments required to be made under this Article 12 against any monetary claim it may have against BEN & JERRY'S. All Total Royalty Paid payments and any Guaranteed Royalty payments will be made in US Dollars and will be as directed by BEN & JERRY'S.

12.7   All payments made to BEN & JERRY'S pursuant to this Article 12 shall be paid to BEN & JERRY'S in United States Dollars and will be wire-transferred, at LICENSEE's expense, to such bank account as BEN & JERRY'S shall designate from time to time. Computation of any amounts payable under this Agreement which require

19

12.9.3 LICENSEE shall provide BEN & JERRY'S w accounting of advertising and promotional expenditures by type c. ............., promotion.  BEN & JERRY'S will approve the annual spending plans pursuant to the Business Plan (Section 20.2).

12.9.4 All marketing and promotion by LICENSEE shall be in such media and of such type and format as set forth in this Agreement.

12.10  In the event that any government authority having jurisdiction in the Territory imposes restrictions on the transfer of United States Dollars to places outside of The Territory, or imposes any tax or other imposition which is required to be paid or born by BEN & JERRY'S, BEN & JERRY'S, in its sole discretion, shall have the option to: (i) with respect to restriction on the transfer of United States Dollars, require that LICENSEE deposit all payments required under this Agreement to a designated account in the name of BEN & JERRY'S in The Territory; or (ii) terminate this Agreement pursuant to the terms of Article 23.

13.    CONSTRUCTION AND OPENING OF RETAIL SHOPS

13.1    LICENSEE shall renovate or construct, and equip the Retail Shops at LICENSEE'S own expense.  LICENSEE shall obtain all permits and certifications required for the lawful construction and operation of each Retail Shop and shall certify in writing to BEN & JERRY'S reasonable satisfaction that all such permits and certifications have been obtained.

13.2    LICENSEE shall be responsible for obtaining all licenses, permits, zoning classifications and clearances which may be required by applicable laws, ordinances, or regulations, or which may be necessary or advisable owing to any restrictive covenants relating to the premises of any Retail Shop.

13.3    Except as otherwise provided herein, prior to opening for business of each Retail Shop, LICENSEE shall comply with all pre-opening requirements set forth in this Agreement, the Manuals and-or elsewhere in writing by BEN & JERRY'S.  LICENSEE also shall obtain written approval by BEN & JERRY'S prior to opening each Retail Shop.  BEN & JERRY'S, in its sole discretion, may conduct a pre or post inspection within fifteen (15) business days of the request by LICENSEE.  If the Retail Shop fails the inspection, LICENSEE shall reimburse BEN & JERRY'S for the travel expenses and room and board of representatives of BEN & JERRY'S for each inspection including the first.

13.4    LICENSEE shall submit the design and layout for each proposed Retail Shop to BEN & JERRY'S for approval prior to beginning construction.  Failure to obtain written approval, may in BEN & JERRY'S sole discretion, constitute default of this Agreement.

21

14.    TRAINING

14.1    LICENSEE'S operations Manager shall attend and complete, to the satisfaction of BEN & JERRY'S, the training ("Scoop U Training") for owners and managers offered by BEN & JERRY'S.  At the option of BEN & JERRY'S, and at LICENSEE'S expense, any persons subsequently employed by LICENSEE in the position of Manager shall also attend and complete, to the satisfaction of BEN & JERRY'S, Scoop U Training for Managers.  LICENSEE, Managers, and other employees of LICENSEE also shall attend such additional courses, seminars, and other training programs as BEN & JERRY'S may reasonably require from time to time.  Every five (5) years, the current Operations Manager must attend a refresher training program held at a designated Scoop U Training Facility.

14.2    All training programs shall be at such times as may be designated by BEN & JERRY'S.  Training programs shall be provided in Vermont, USA or such other locations as BEN & JERRY'S may designate.  LICENSEE shall be responsible for any and all other expenses incurred by LICENSEE'S trainees in connection with Scoop U Training, including, without limitation, such cost as transportation, lodging, meals and wages.

14.3    BEN & JERRY'S shall provide, at its expense, Manufacturing Standards and Procedures, Product Handling Procedures and Standards of Operation for Retail Shop operations, approved product list, ice cream sampling handbooks and vend cart manual any and all which may be updated from time to time.

15.    DUTIES OF LICENSEE

15.1    LICENSEE understands and acknowledges that every detail of each of the  three components of the Licensed Business,  as communicated by BEN & JERRY'S to LICENSEE in the Manuals, training, on-going consultation, and in this Agreement, is important to LICENSEE, BEN & JERRY'S, and other operators and distributors of BEN & JERRY'S  in order to develop and maintain quality manufacturing standards, high operating standards, to increase the demand for the Products sold, to protect the Wholesale Distribution Concept, including the food service component,  and to protect the reputation and goodwill of BEN & JERRY'S.

15.2    LICENSEE shall refrain from using or permitting the use of any of its manufacturing, distribution facilities or Retail Shops for any  purpose other than the conduct of the Licensed Business, without first obtaining the written consent of BEN & JERRY'S.

15.3    LICENSEE shall keep the Retail Shops open and in normal operation for such minimum hours and days as BEN & JERRY'S may specify.

22

15.4   To insure that the highest degree of quality and service is maintained, LICENSEE shall exercise the rights granted to it herein in strict conformity with such standards and specifications as BEN & JERRY'S may from time to time prescribe in the Manuals or otherwise in writing. LICENSEE shall refrain from deviating from such standards, specifications, and procedures without the prior written consent of BEN & JERRY'S. Accordingly, LICENSEE agrees to purchase and install, at LICENSEE'S expense, all equipment, supplies, signs, furnishings, fixtures, decor and materials as BEN & JERRY'S may reasonably direct from time to time in the Manuals or otherwise in writing; and to refrain from installing or permitting to be installed on or about the premises of any of its manufacturing facilities, distribution facilities and Retail Shops, without the prior written consent of BEN & JERRY'S, any equipment, supplies, signs, furnishings, fixtures, decor and materials not previously approved as meeting the standards and specifications of BEN & JERRY'S;

15.5   LICENSEE agrees not to install or permit to be installed in any Retail Shop any vending machine, game or coin operated device, unless specifically approved in writing, by BEN & JERRY'S.

15.6   LICENSEE agrees to maintain an adequate supply of required supplies, including required proprietary paper products as specified in the Operations Manuals and other writings.

15.7   LICENSEE acknowledges that: (i) the Proprietary Products, manufactured hereunder, and the Proprietary Products distributed, offered and sold under this Agreement are prepared from proprietary recipes developed by and, in some cases, exclusively for BEN & JERRY'S; (ii) the Proprietary Products are unique and their formula and manufacturing processes constitute trade secrets essential to the success of the BEN & JERRY'S business as a whole and to LICENSEE'S success hereunder; and (iii) LICENSEE has entered into this Agreement in order to, among other things, obtain the right to manufacture the Proprietary Products, to distribute, offer and sell the same through the Wholesale Distribution Channels and to operate Retail Shops. In order to protect the interest of BEN & JERRY'S in the Proprietary Products and to ensure the quality, uniformity, and distinctiveness of the same, LICENSEE agrees:

15.7.1  To purchase all the ingredients used in the Proprietary Products, including Proprietary Ingredients, solely from BEN & JERRY'S or from suppliers approved by BEN & JERRY'S.

15.7.2  To sell only the Products approved by BEN & JERRY'S and to sell all Proprietary Products which are offered by BEN & JERRY'S.

15.7.3  To handle and store the Products and the Proprietary Ingredients solely in the manner directed by BEN & JERRY'S in the Manuals or otherwise in writing; and

23

15.7.4  Not  to sell, offer for sale, or sample, and to destroy immediately in accordance with procedures set forth in the Manuals and other writings, any Proprietary Product or ingredients therefor which it knows, or should know through the exercise of reasonable care, to be adulterated, tainted, contaminated, spoiled, expired, unsafe, or otherwise unfit for human consumption.

15.8   All Products, including Non-Proprietary Products and Proprietary Gift Products, sold or offered for sale by LICENSEE shall meet the then current standards and specifications of BEN & JERRY'S, as established in the Manuals or otherwise in writing. BEN & JERRY'S may agree to allow LICENSEE to purchase any/ all Non-Proprietary Products or ingredients for the same solely from suppliers who,  (i) demonstrate to BEN & JERRY'S continuing reasonable satisfaction the ability to meet the standards and specifications of BEN & JERRY'S, (ii) possess adequate quality controls and capacity to supply LICENSEE's needs promptly and reliably, and (iii) previously have not been disapproved by BEN & JERRY'S.   BEN & JERRY'S may, from time to time, disapprove particular Non-Proprietary Products, ingredients, or suppliers, if BEN & JERRY'S determines, in its sole discretion, that the Non-Proprietary Products, ingredients or suppliers of these ingredients do not meet the quality standards of BEN & JERRY'S.  Upon receipt of written notice of such disapproval, LICENSEE shall cease to use any disapproved Non-Propriety Products or ingredients and/or cease to purchase from any disapproved supplier.  LICENSEE must obtain prior written approval to use Non-Proprietary Products and/or ingredients, by forwarding samples of such ingredients or products to BEN &JERRY"S or to an independent testing facility designated by BEN & JERRY'S.  A charge not to exceed the reasonable cost of evaluation and testing shall be paid by the LICENSEE.  BEN & JERRY"S will use reasonable efforts to ensure that test results will be communicated to the LICENSEE in a timely fashion.  As a function of the ongoing quality assurance, BEN & JERRY'S shall have the right, but not the obligation, to require that its representatives be permitted to inspect the facilities of the suppliers from whom Non-Proprietary Products or ingredients are purchased.  In order to protect the goodwill and reputation of BEN & JERRY'S  and to ensure the quality, uniformity, and distinctiveness of the Non-Proprietary Products or ingredients, LICENSEE agrees to handle and store the Non-Proprietary Products or ingredients solely in the manner directed by BEN & JERRY'S in the Manuals or otherwise in writing by BEN & JERRY'S.

15.9   LICENSEE shall maintain  a computer system and point-of-sale system that meets the specifications of BEN & JERRY'S, including such peripheral devices and equipment as BEN & JERRY'S may specify in the Manuals or otherwise in writing as reasonably necessary for the efficient management and operation of the rights granted hereunder and the transmission of data to and from BEN & JERRY'S. BEN & JERRY'S may, from time to time, specify in the Manuals or otherwise in writing the information that LICENSEE shall collect and maintain on the computer system installed at LICENSEE'S facilities, including Retail Shops and LICENSEE shall provide to BEN & JERRY'S such reports as it may reasonably request from the data so collected and

24

maintained. LICENSEE agrees to permit BEN & JERRY'S to access, by modem or other requested means, information from LICENSEE's computer system. LICENSEE must acquire software for the computer system from BEN & JERRY'S or, the functional equivalent from an approved vendor. At the request of BEN & JERRY'S, LICENSEE shall upgrade the computer system, point-of-sale system, and software to conform to the specifications of BEN & JERRY'S.

15.10   LICENSEE shall stock and maintain, for both the wholesale and the retail components, all types of approved Products in quantities sufficient to meet reasonably anticipated customer demand in the Territory.  At the time each additional Retail Shop opens, LICENSEE shall stock and display additional amounts of approved Products as prescribed in the Manuals or in other writings.

15.11  LICENSEE shall manufacture a sufficient amount of Proprietary Products and purchase a sufficient amount of the Products to meet the projections of the Business Plan as outlined in Section 20.2 of this Agreement.

15.12  LICENSEE shall permit BEN & JERRY'S and their agents to enter upon any of LICENSEE'S facilities at any time and from time to time during normal business hours for the purpose of conducting inspections of the facilities and the books, records and/or accounts of LICENSEE.  LICENSEE shall cooperate with representatives of BEN & JERRY'S  in such inspections by rendering such assistance as they may reasonably request; and, upon written notice from BEN & JERRY'S or its agents, and without limiting other rights of BEN & JERRY'S  under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. If LICENSEE fails an inspection and BEN & JERRY'S determines that a re-inspection is required, LICENSEE shall reimburse BEN & JERRY'S for the travel expenses and room and board of their representatives for subsequent inspections to ensure all deficiencies have been corrected.

15.13 LICENSEE shall ensure that all marketing and promotional materials, signs, decorations, paper goods (including disposable food containers, napkins, menu boards and all forms and stationery used in each component of the Licensed Business and other items specified by BEN & JERRY'S bear the Proprietary Marks in the form, color, location, and manner prescribed by BEN & JERRY'S and are maintained in good and clean condition.

15.14  LICENSEE shall maintain its manufacturing, wholesale distribution facilities and Retail Shop locations (including adjacent public areas) in a clean, orderly condition and in excellent repair; and, in connection therewith, LICENSEE shall, at its expense, make such repairs and replacements thereto (but no others without prior written consent of BEN & JERRY'S) as may be required for that purpose.

15.15  LICENSEE shall not implement any change to any of the three (3)

25

components of the Licensed Business without the prior written consent of BEN & JERRY'S. LICENSEE shall notify BEN & JERRY'S in writing of any change, amendment, or improvement in the Manuals which LICENSEE proposes to make, and shall provide to BEN & JERRY'S such information as BEN & JERRY'S requests regarding the proposed change. BEN & JERRY'S shall use reasonable efforts to respond to LICENSEE'S requests submitted under this Section 15.15 in a reasonable amount of time. Under no circumstances shall the approval or consent of BEN & JERRY'S to any request be deemed to have been granted to LICENSEE absent LICENSEE'S receipt of express written notice thereof from BEN & JERRY'S. LICENSEE acknowledges and agrees that BEN & JERRY'S shall have the right to incorporate the proposed change into the manufacturing of the Proprietary Products and/or distribution of the same and shall thereupon obtain all right, title, and interest therein without compensation to LICENSEE.

15.16  At the request of BEN & JERRY'S, but not more often than once every five (5) years, unless sooner required by LICENSEE'S lease, LICENSEE shall refurbish the Premises of each Retail Shop, at its expense, to conform to the store design, trade dress, color schemes and presentation of the Proprietary Marks in a manner consistent with the then current image for new Retail Shops located outside the United States. Such refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration and modifications to existing improvements.

15.17  LICENSEE shall comply with all terms of its leases or subleases, its financing agreements (if any), and all other agreements affecting the operation of the business and shall undertake best efforts to maintain a good and positive working relationship with its landlords and/or lessors; and shall not engage in any activity which may jeopardize LICENSEE'S right to remain in possession of, or to renew the lease or sublease for, the Premises of each Retail Shop.

15.18  LICENSEE shall meet and maintain the highest health or safety standards and ratings applicable to the manufacture of the Proprietary Products, wholesale distribution of the Proprietary Products and operation of the Retail Shop (s). LICENSEE shall furnish to BEN & JERRY'S, within twenty-four (24) hours after receipt thereof, a copy of any violation or citation which indicates LICENSEE'S failure to maintain such health or safety standards.

15.19  If LICENSEE learns that any retail outlet in LICENSEE'S Territory, which is not sold Proprietary Products by LICENSEE, is selling Proprietary Products, LICENSEE shall notify BEN & JERRY'S in writing within fourteen (14) days. Failure by LICENSEE to notify BEN & JERRY'S within fourteen (14) days shall constitute a waiver of any and all of LICENSEE'S rights against BEN & JERRY'S under this Agreement.

15.20  LICENSEE shall use its best efforts to integrate into its business a reasonable number (given the size of LICENSEE's operation) of socially  responsible

26

activities which are not inconsistent with, those activities and programs which BEN & JERRY'S conducts to implement its social mission described in the current BEN & JERRY'S annual report, memoranda to LICENSEE's, and other documents directed to LICENSEE.

15.21  LICENSEE shall comply, and shall use its best efforts to ensure that it and all  entities dealing through LICENSEE complies with all applicable, national, federal, regional, provincial, state or local laws and regulations in performing its duties hereunder and in any of its dealings with respect to the  Products (including without limitation any approvals necessary in connection with any advertising that may be approved by BEN & JERRY'S pursuant to this Agreement).  LICENSEE shall be solely responsible for obtaining any required governmental approval in the Territory for this Agreement, and LICENSEE represents and warrants that this Agreement is valid, binding and enforceable in accordance with its terms in the Territory, without any requirement of any approval, consent, license or permit from any government entity, agency or authority (other than such approval, consent, license or permit s has already been obtained by LICENSEE.

15.22  Each Retail Shop shall at all times be under the direct, on premises supervision of LICENSEE or a Manager appointed by the LICENSEE and approved of by BEN & JERRY'S ("Manager"), who has satisfactorily completed the Scoop U Training described in Section (check).  LICENSEE shall maintain a competent, conscientious, trained staff at each Retail Shop.  LICENSEE shall use its best efforts to ensure that all of its employees preserve good customer relations; render competent, prompt, courteous and knowledgeable service; and meet such minimum standards as BEN & JERRY'S may establish from time to time in the Manuals and other writings. LICENSEE and its employees shall handle all customer complaints, refunds, returns and other adjustments in a manner that will not detract from the name and goodwill of BEN & JERRY'S.  LICENSEE will use the system designed by BEN & JERRY'S for training employees, as communicated to LICENSEE by BEN & JERRY'S in the Manuals and in Scoop U Training, and by BEN & JERRY'S in continuing consultation. LICENSEE shall be solely responsible for all employment decision and functions of the LICENSEE'S business including those related to hiring, firing, wage and hour requirements, record keeping, supervision and discipline of employees.

15.23  At the request of BEN & JERRY'S, LICENSEE agrees to return obsolete signage (which is used in the Retail Shops) to a location prescribed by BEN & JERRY'S.  BEN & JERRY'S' agrees to pay to LICENSEE the depreciated value of any obsolete signage.

15.24  LICENSEE shall promptly notify BEN & JERRY'S in the event that LICENSEE knows or has reason to believe that any act or refrainment from acting required by or contemplated under this Agreement violates any law, rule or regulation (whether criminal or non-criminal) of the Territory or any political or governmental

27

subdivision thereof.  LICENSEE shall promptly notify BEN & JERRY'S in writing of any claim or proceeding involving any Product no later than ten (10) days after LICENSEE learns of such claim or proceeding.

15.25  LICENSEE agrees that it shall not act or omit to act in any way that would violate any of the export control laws or regulations of the U.S., and no party shall be required hereunder to act or omit to act in any way that it believes in good faith would violate any such law or regulation.

16.    PROPRIETARY MARKS

16.1   BEN & JERRY'S  represents, with respect to the Proprietary Marks, that BEN & JERRY'S has the right to use, and to license LICENSEE to use, the Proprietary Marks in connection with the rights granted herein within the Territory.

16.2    LICENSEE acknowledges that the rights granted to LICENSEE pursuant to this Agreement are granted only in connection with LICENSEE'S exercise of the rights granted pursuant Section 1.1, all as specifically provided for in the Agreement.

16.3    With respect to LICENSEE'S use of the Proprietary Marks, LICENSEE agrees to:

16.3.1 Use only the Proprietary Marks designated by BEN & JERRY'S, and to use them only in the manner authorized and permitted by BEN & JERRY'S;

16.3.2  Use the Proprietary Marks only for the Manufacture of the Proprietary Products, distribution of the same in the Territory and operation of the Retail Shops;

16.3.3 Manufacture the Proprietary Products, distribute the same and operate the Retail Shops only under the name "Ben & Jerry's," and use the Proprietary Marks without prefix or suffix, unless otherwise authorized or required by BEN & JERRY'S. LICENSEE shall not use the Proprietary Marks as part of its corporate or other legal name;

16.3.4 Identify itself as an authorized licensee of BEN & JERRY'S  in conjunction with any use of the Proprietary Marks in the manner required by BEN & JERRY'S, including on delivery equipment, invoices, order forms, receipts, and business stationery, as well as at such conspicuous locations on each manufacturing, distribution facility, Retail Shop and food service outlets as BEN & JERRY'S may designate in writing;

16.3.5 Not to use the Proprietary Marks to incur any obligation or

28

indebtedness on behalf of BEN & JERRY'S;

16.3.6 Execute any documents deemed necessary by BEN & JERRY'S to obtain protection for the Proprietary Marks, or to maintain their continued validity and enforceability, in the Territory; and

16.3.7 Promptly notify BEN & JERRY'S of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to the ownership by BEN & JERRY'S of, the right of BEN & JERRY'S to use and to license others to use, or LICENSEE'S right to use, the Proprietary Marks. LICENSEE acknowledges that BEN & JERRY'S has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. BEN & JERRY'S has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. In the event of any litigation relating to LICENSEE'S use of the Proprietary Marks, LICENSEE shall execute any and all documents and do such acts as may, in the opinion of BEN & JERRY'S, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of LICENSEE'S use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, BEN & JERRY'S agrees to reimburse LICENSEE for its out-of-pocket costs in doing such acts, and

16.3.8 Not to use any marks, names, logos or other promotional or marketing materials that are confusingly similar to, or colorable imitations of, the Proprietary Marks or any of them, or promotional or marketing materials that are or were used in connection with or bearing the Proprietary Marks.

16.4    LICENSEE expressly understands and acknowledges that:

16.4.1 BEN & JERRY'S is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them. Except as specifically and clearly granted herein, it is understood that BEN & JERRY'S is not granting to LICENSEE,  and LICENSEE does not acquire, by the operation of this Agreement or otherwise, any right to or interest in the name "BEN & JERRY'S" or any derivation of said name or any Proprietary Products.

16.4.2 LICENSEE agrees that BEN & JERRY'S may immediately terminate this Agreement pursuant to Section 23.2 if, during the term of this Agreement: (i) LICENSEE directly or indirectly contests the validity of, the ownership of BEN & JERRY'S of, or the right of BEN & JERRY'S to use and to license others to use, the Proprietary Marks or (ii) LICENSEE attempts to register in its own name any trademark and/or copyright associated with any portion of the rights granted hereunder.

16.4.3 LICENSEE'S use of the Proprietary Marks does not give

29

LICENSEE any ownership interest or other interest in or to the Proprietary Marks;

16.4.4 Any and all goodwill arising from LICENSEE'S use of the Proprietary Marks shall inure solely and exclusively to the benefit of BEN & JERRY'S, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with LICENSEE'S use of the Proprietary Marks;

16.4.5 Except as specified in Section 1.1, the license of the Proprietary Marks granted hereunder to LICENSEE is nonexclusive, and BEN & JERRY'S thus has and retains the rights, among others (a) to use the Proprietary Marks itself in connection with selling the Proprietary Products and (b) to grant other licenses for the Proprietary Marks. BEN & JERRY'S has the right to develop and establish other businesses using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to LICENSEE; and

16.4.6 BEN & JERRY'S reserves the right to add to the Proprietary Marks and to substitute different proprietary marks for use in identifying the Proprietary Products and the businesses operating thereunder at the sole discretion of BEN & JERRY ' S. LICENSEE shall make all such additions and substitutions, at its expense.

16.4.7 LICENSEE will be responsible, at its own sole expense and cost, to design, manufacture and place all point of purchase displays and advertising materials for promotion of the Products in the Territory.  All advertising, brochures, displays and other marketing materials or literature in any way relating to the Products and/or using the Proprietary Marks will be subject to the prior written approval of BEN & JERRY'S, both with respect to copy and mode of use, all as set forth in this Agreement.

17.   OPERATING MANUALS

17.1   In order to protect the reputation and goodwill of BEN & JERRY'S and to maintain high standards of Manufacturing, Wholesale Distribution Channels and the operation of Retail Shops, LICENSEE shall exercise the rights granted to it hereunder in strict accordance with the standards, methods, policies, and procedures specified in the English language Manuals which LICENSEE shall receive on loan from BEN & JERRY'S, for the term of this Agreement, after LICENSEE's execution of this Agreement.

17.2   LICENSEE shall treat the Manuals, any translation thereof, any other materials created for or approved for use in the manufacturing of the Proprietary Products and the operation of the Retail Shops and the information contained therein as confidential, and shall use best efforts to maintain such information as secret and confidential. Except as described in Section 17.3 LICENSEE shall not copy, duplicate,

30

record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

17.3   LICENSEE may obtain, at its sole expense, a local-language translation of the Manuals, and any operating and instructional materials BEN & JERRY'S provides to LICENSEE. If LICENSEE deems such translation necessary for the full and proper exercise of the rights granted herein within the Territory. Such translation shall be approved by BEN & JERRY'S prior to its use, and all translators shall execute such document or documents as BEN & JERRY'S may require to assign to BEN & JERRY'S any rights said translators may have in the translated materials. BEN & JERRY'S shall use its best efforts to review for approval all translations submitted to BEN & JERRY'S by LICENSEE within sixty (60) days of receipt of such translations by BEN & JERRY'S.

17.4   All copies of the Manuals, including any translations thereof, shall remain the sole property of BEN & JERRY'S and shall be kept in a secure place and returned to BEN & JERRY'S as provided herein.

17.5   BEN & JERRY'S may from time to time revise the contents of the Manuals. LICENSEE expressly agrees to comply with each such new or revised standard within a reasonable time period after receipt of written notice from BEN & JERRY'S of such change(s). LICENSEE may suggest changes to the Manuals as described in Section 15.15.

17.6   LICENSEE shall ensure that all copies of the Manuals, whether translations or originals, are kept current at all times. In the event of any dispute as to the contents of the Manuals, the terms of the master copies maintained at the home office of BEN & JERRY'S shall be controlling.

18.   CONFIDENTIAL INFORMATION

18.1   Each party to this Agreement shall use its best efforts, which shall not be less than the same amount of care such party takes to ensure its own confidential information is so maintained, to keep strictly confidential and to prevent the unauthorized use of all information received from the other party to this Agreement. Such Confidential Information shall include, without limitation, not only the Licensed Technology but also any information: (i) relating to the formulation of the Proprietary Products or the operation of the Retail Shops, or (ii) which, prior to or concurrent with its disclosure to the other party, is identified in writing as confidential; provided, however, that LICENSEE may use and disclose to others such Confidential Information received from BEN & JERRY'S as may be necessary in connection with the full and proper exercise of the rights granted hereunder. Neither party to this Agreement shall be bound by any confidentiality restrictions with respect to any information to the extent that such information:

31

18.1.1  Came into the lawful possession of the receiving party through sources other than the other party to this Agreement, and where the sources providing such information were under no direct or indirect confidentiality obligation to the other party to this Agreement with respect to such information; or

18.1.2  Became publicly available through no act or failure to act on the part of the receiving party.

18.1.3 The Manufacture of any Proprietary Product as well as the marketing, distribution, sale, and service by LICENSEE of the same, including the supporting documentation therefor, which inherently discloses the Confidential Information of BEN & JERRY'S shall not in itself be deemed publication, disclosure or dissemination of such Confidential Information for purposes of this Article 18; provided, however, that none of the documents containing Confidential Information transferred by BEN & JERRY'S to LICENSEE hereunder, or any portion thereof, may be used by LICENSEE as such supporting documentation without written consent by BEN & JERRY'S.

18.2    At BEN & JERRY'S's request, LICENSEE shall require its Owners, Managers, and any other personnel having access to any of BEN & JERRY'S confidential information, to execute covenants, in a form approved by BEN & JERRY'S, that such personnel will maintain the confidentiality of information they receive in connection with their employment by LICENSEE. Such covenants shall be in a form satisfactory to BEN & JERRY'S, including specific identification of BEN & JERRY'S  as a third-party beneficiary of such covenants with the independent right to enforce them.

19.    ACCOUNTING AND RECORDS

19.1    LICENSEE shall record all sales of all components of the Licensed Business on a computer-based, point-of-sale record keeping and control system designated by BEN & JERRY'S, or on any other equipment specified by BEN & JERRY'S in the Manuals or otherwise in writing.  LICENSEE shall prepare, and shall preserve for at least five (5) years from the dates of their preparation, complete and accurate books, records, and accounts, in accordance with generally accepted accounting principles and in the form and manner prescribed by BEN & JERRY'S from time to time in the Manuals or otherwise in writing. The reporting requirements of this Article 19 shall be in addition to, and not in lieu of, the electronic reporting required under Section 15.9.

19.2    All Gross Sales, sales tax, and charges collected on behalf of third parties shall be recorded by LICENSEE in accordance with the procedures prescribed in the Manuals, and on such point-of-sale recording keeping and control system as BEN & JERRY'S may specify pursuant to Article 15 of this Agreement.

19.3 · LICENSEE shall, at LICENSEE's expense, submit to BEN & JERRY'S in the form prescribed by BEN & JERRY'S, the following reports, financial statements, and other data:

19.3.1 No later than the fifteenth (15th) day of the months of January, April, July and October, a profit and loss statement (including but not limited to Profit & Loss Statements for each Retail Scoop Shop) reflecting all Gross Sales, during the preceding three calendar months, for all sales of the Products sold by LICENSEE, or the equivalent in the Territory, prepare profit and loss statements on an accrual basis, using generally accepted international accounting principles; and

19.3.2 Other forms, statements, reports, records, information, and data as BEN & JERRY'S may reasonably designate.

19.4 BEN & JERRY'S and its agents shall have the right at all reasonable times to examine and copy, at their expense, the books, records, accounts, and/or business tax returns of LICENSEE. BEN & JERRY'S shall also have the right, at any time, to have an independent audit made of the books of LICENSEE. If an audit reveals that any contributions or payments have been understated in any statement or report to BEN & JERRY'S, then LICENSEE shall immediately pay to BEN & JERRY'S the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less. If any audit discloses an understatement in any statement or report of three percent (3%) or more, LICENSEE shall, in addition to repayment of monies owed with interest, pay for any and all costs and expenses connected with such audit (including travel, lodging and wages expenses, and reasonable accounting and legal costs). The foregoing remedies shall be in addition to any other remedies BEN & JERRY'S may have.

20.    MARKETING AND PROMOTION

20.1 Recognizing the value of marketing and promotion, and the importance of the standardization of marketing and promotion programs to the furtherance of the goodwill and public image, LICENSEE and BEN & JERRY'S agree, for the term of this Agreement, including any proposed renewal thereof, in accordance with the following:

20.2 Upon the execution of this Agreement and prior to August in each following year, LICENSEE shall complete and provide to BEN & JERRY'S a business plan ("Business Plan") for the Territory for the next calendar year, which shall include proposed marketing activity, projected sales, LICENSEE'S plan to fulfill its social mission activity as set forth in Section 15.20 and such other matters as BEN & JERRY'S may reasonably prescribe. Failure to supply such Business Plan and/or failure to meet the goals of each such Business Plan, constitutes a material breach of this Agreement and the appropriate provisions of Article 23.

33

20.3   All marketing and promotion materials used by LICENSEE must strictly conform to the requirements of BEN & JERRY'S as set forth in the Manuals or otherwise in writing. As described , LICENSEE may petition BEN & JERRY'S in writing to change such requirements.

20.4   When LICENSEE advertises and/or markets any of the Products, LICENSEE shall ensure that its marketing and advertising efforts are in accordance with high quality and good taste and will be comparable to the highest quality marketing efforts in the Territory for competitive products.  LICENSEE shall bear all costs of its marketing and advertising of the Products hereunder.

20.5   At all time during the Term, LICENSEE shall provide BEN & JERRY'S with a **"Product Manager"** who shall be reasonable satisfactory to BEN & JERRY'S.  The Product Manager shall be a designated employee of LICENSEE who shall be available to BEN & JERRY'S on a reasonable basis during LICENSEE'S regular business hours. The Product Manager shall maintain continuous contact with such BEN & JERRY'S employee, as BEN & JERRY'S may from time to time designate, and shall be fully familiar with BEN & JERRY'S method of operation in general and with the Products in particular, and shall coordinate the performance by LICENSEE of its manufacturing, distribution, retail operations, marketing, promotional and product support obligations under this Agreement, and shall promptly respond to all of BEN & JERRY'S both oral and written requests.

20.6   LICENSEE shall (a) conduct business in a manner that reflects favorably at all times on the Products and the good name, goodwill and reputation of BEN & JERRY'S; (b) avoid deceptive, misleading or unethical practices that are or might be detrimental to BEN & JERRY'S, the Products or the public, including, but not limited to, disparagement of BEN & JERRY'S or the Products; (c) make no false or misleading representations with regard to BEN & JERRY'S or the Products; (d) not publish or employ or cooperate in the publication or employment of any misleading or deceptive advertising material; (e) make no representations, warranties or guaranties to anyone with respect to the specifications, features or capabilities of the Products that are inconsistent with any literature distributed by BEN & JERRY'S, including all warranties and disclaimers contained therein; and (f) not engage in illegal or deceptive trade practices such as bait and switch techniques or any other practices proscribed hereunder.

20.7   BEN & JERRY'S acknowledges that, subject to the terms and conditions of this Agreement, LICENSEE has the right to use the Proprietary Marks in or on catalogues and display, advertising and promotion materials (all such catalogues and display, advertising and promotional materials incorporating the Proprietary Marks referred to collectively herein as "Promotional Materials") for the Products; *provided, however,* that LICENSEE shall submit the Promotional Materials to BEN & JERRY'S for its written approval prior to any use thereof.  LICENSEE shall procure BEN & JERRY'S

34

approval of Promotional Materials in two steps: first, when LICENSEE has put the Promotional Materials in rough or story board format, and second, when LICENSEE has put the Promotional Materials in final form. In each case, LICENSEE shall provide BEN & JERRY'S with copies of the Promotional Materials both in English and in the language in which LICENSEE proposes to use such Promotional Materials. BEN & JERRY'S approval or disapproval shall lie in BEN & JERRY'S sole discretion, and the use of unapproved Promotional Materials is strictly prohibited. BEN & JERRY'S shall endeavor to provide its approvals or disapprovals hereunder reasonable promptly; *provided, however,* that all Promotional Materials not approved in writing by BEN & JERRY'S within ten (10) days of BEN & JERRY'S written receipt of LICENSEE'S request for approvals shall be deemed disapproved. Printed matter submitted to BEN & JERRY'S for approval hereunder shall be submitted with four (4) additional copies thereof. If BEN & JERRY'S provides LICENSEE with forms for use in the submission of Promotional Material approval requests, LICENSEE shall use the same.

20.8   Without limiting the foregoing, LICENSEE shall obtain the prior written approval of BEN & JERRY'S regarding any promotion relating to the Products and shall not, without BEN & JERRY'S prior written consent (which may be granted or withheld in BEN & JERRY'S sole discretion), sell or otherwise provide any Products for use in fund-raisers, sweepstakes or similar activities or provide Products for use as prizes, premiums or give-aways. All costs of all advertising and promotions shall be borne by LICENSEE. LICENSEE shall pay to BEN & JERRY'S all out of pocket costs of BEN & JERRY'S for the artwork and copy provided by BEN & JERRY'S.

20.9   LICENSEE shall not utilize the Promotional Materials or any part thereof in connection with any products or services other than the Products or solely to promote LICENSEE and, without limiting the materiality of any other term of this Agreement, such use shall be considered a material breach of this Agreement.

20.10   LICENSEE shall be solely responsible for ensuring that all campaign and marketing materials (including without limitation, any Promotional Materials) shall comply with all applicable laws and regulations. BEN & JERRY'S authorization of the use or manner of use of any proposed Promotional Materials hereunder shall not constitute an opinion as the legal appropriateness or adequacy of such use or manner of use and LICENSEE'S use of the same shall be its sole responsibility.

20.11 BEN & JERRY'S may, in its sole discretion and at its sole expense contribute Product and/or Proprietary Gift Products to be used for promotions.

21.   INSURANCE

21.1   LICENSEE shall procure, prior to the commencement of any operations under this Agreement, and shall maintain in full force and effect at all times during the term of this Agreement, at LICENSEE'S expense, an insurance policy or policies

protecting LICENSEE, and BEN & JERRY'S and their respective officers, directors, partners, agents, and employees against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the manufacture of the Proprietary Products, distribution of the Products, or the operation of Retail Shops, including, but not limited to, comprehensive general liability insurance, property and casualty insurance, statutory workers' compensation insurance, and product liability insurance. Such policy or policies shall be written by a responsible carrier or carriers acceptable to BEN & JERRY'S, shall name BEN & JERRY'S and their affiliates as additional insured, and shall provide at least the types and minimum amounts of coverage specified in the Manuals and other writings . If the type of insurance coverage typically obtained by businesses operating in The Territory that are similar to or the same as operation of the business differs from that described in the Manuals, LICENSEE may petition BEN & JERRY'S to deviate from the requirement that LICENSEE purchase of such insurance.

21.2   LICENSEE'S obligation to obtain and maintain the policy or policies in the amounts specified in the Manuals and other writings shall not be limited in any way by reason of any insurance which may be maintained by BEN & JERRY'S nor shall LICENSEE's performance of that obligation relieve it of liability under the indemnity provisions set forth in Article 28 of this Agreement.

21.3   Prior to the commencement of any operations under this Agreement, and thereafter on an annual basis, LICENSEE shall deliver to BEN & JERRY'S, certificates of insurance ("Certificates of Insurance") evidencing the proper types and minimum amounts of coverage for all components of the Business. LICENSEE also shall maintain Certificates of Insurance evidencing the proper types and minimum amounts of coverage and furnish a copy to BEN & JERRY'S. All Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given to BEN & JERRY'S in the event of material alteration to or cancellation of the coverages evidenced by such Certificates.

21.4   Should LICENSEE fail, for any reason, to procure or maintain the insurance required by this Agreement, as such requirements may be revised by BEN & JERRY'S in the Manuals or otherwise in writing, BEN & JERRY'S shall have the right and authority (but not the obligation) to procure such insurance and to charge same to LICENSEE, which charges, together with a reasonable fee for the expenses of BEN & JERRY'S in so acting, shall be payable by LICENSEE immediately upon notice. The foregoing remedies shall be in addition to any other remedies BEN & JERRY'S may have.

22.   TRANSFER OF INTEREST IN THE LICENSED BUSINESS

22.1   BEN & JERRY'S shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity,

36

provided that such assignee agrees to be bound by all of the provisions of this Agreement, and any designated assignee of BEN & JERRY'S shall become solely responsible for all obligations of BEN & JERRY'S under this Agreement from the date of assignment. LICENSEE shall execute such documents of acknowledgment of assignment, or otherwise, as BEN & JERRY'S shall request with respect to such assignment by BEN & JERRY'S.

22.2    LICENSEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to LICENSEE, and that BEN & JERRY'S has granted this license in reliance on the business skill, financial capacity, and personal character of LICENSEE's owners. Accordingly, LICENSEE shall not sell, assign, transfer, convey, pledge, encumber, merge, or give (collectively, "transfer") away any rights or obligations under this Agreement without notifying, and obtaining the prior written consent of, BEN & JERRY'S.   For the purposes of this Section 22.2, any change of control of LICENSEE shall constitute a transfer of LICENSEE's rights and obligations under this Agreement.

22.3    LICENSEE shall not grant a security interest in the rights granted by BEN & JERRY'S hereunder unless the secured party agrees that in the event of any default by LICENSEE under any documents related to the security interest, BEN & JERRY'S shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of LICENSEE, and, in the event BEN & JERRY'S exercises such option, any acceleration of indebtedness due to LICENSEE'S default shall be void.

22.4    The consent of BEN & JERRY'S to a transfer pursuant to this Article 22 shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be a waiver of the right of BEN & JERRY'S to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

22.5    Any Retail Shop which has not been refurbished pursuant to Section 4.2.6 within five (5) years of the proposed transfer, shall, in a manner satisfactory to BEN & JERRY'S, be refurbished, renovated, and/or reconstructed by transferee and the transferee shall expend such funds as BEN & JERRY'S requires in doing so, to conform to the general building design, trade dress, color schemes, and presentation of the Proprietary Marks to the image then current for new or the most recently remodeled Retail Shops within BEN & JERRY'S Retail System (including, without limitation, structural changes, remodeling, redecoration and modification to existing improvements).

22.6 The Transferee and/or the Transferee's Manager if transferee or an owner of transferee will not manage the Retail Shop (s) at the transferee's expense, must successfully complete the then current BEN & JERRY'S training programs for operators and managers upon such terms and conditions as BEN& JERRY'S reasonable may

37

require; and

22.7   The LICENSEE shall pay a transfer fee in an amount equal to one third (1/3) of the then current, initial International Licensee Fee being charged to a new operator or the Renewal Fee (Section 4.2.9) whichever is greater within the System at the time of the transfer.  In the case of a transfer to a business entity formed by LICENSEE for the convenience of ownership, however, no such transfer fee shall be required.

## 23.   DEFAULT AND TERMINATION

23.1   LICENSEE shall be in default under this Agreement, and all rights granted to LICENSEE herein shall automatically terminate without notice to LICENSEE, if LICENSEE shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by LICENSEE or such a petition is filed against and not opposed by LICENSEE; if LICENSEE is adjudicated bankrupt or insolvent; if a proceeding for the appointment of a receiver of LICENSEE or other custodian for LICENSEE'S business or assets is filed and consented to by LICENSEE; if a receiver or other custodian (permanent or temporary), or the local equivalent thereof, of LICENSEE'S assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any law of the Territory is instituted by or against LICENSEE; if a final judgment remains unsatisfied or of record for thirty (30) days or longer; if LICENSEE is dissolved; if execution is levied against LICENSEE'S business or property; if suit to foreclose any lien or mortgage against the equipment used for the manufacture of the Proprietary Products is instituted against LICENSEE and not dismissed within thirty (30) days; or if the real or personal property of the LICENSEE shall be sold after levy thereupon by any government official.

23.2   In addition to the events described in Article 12 and Section 16.4.2, upon the occurrence of any of the following events of default, BEN & JERRY'S may, at its option, terminate this Agreement and all rights granted hereunder, without affording LICENSEE any opportunity to cure the default, effective immediately upon the provision of notice to LICENSEE (in the manner provided under Article 29):

23.2.1 If LICENSEE acts, or fails to act, in any manner which is inconsistent with or contrary to the terms and conditions of the rights granted hereunder;

23.2.2 If LICENSEE or any of its owners is convicted of a serious crime, or any other crime or offense that BEN & JERRY'S believes is reasonably likely to have an adverse effect on the manufacture of the Proprietary Products and/or distribution of

the same or the operation of the Retail Shops, the Proprietary Marks, the goodwill associated therewith, or the interest of BEN & JERRY'S therein;

23.2.3 If a threat or danger to public health or safety results from LICENSEE'S manufacture of the Proprietary Products, distribution of the Products or operation of the Retail Shops;

23.2.4 If LICENSEE's action or inaction, at any time, results in the loss of the right, or forfeiture of the right, to do or transact business in The Territory;

23.2.5 If LICENSEE fails to maintain or observe any of the health and sanitation standards and procedures prescribed by BEN & JERRY'S in this Agreement or by BEN & JERRY'S in the Manuals, or otherwise in writing;

23.2.6 If LICENSEE purports to grant, license or sublicense any other person or entity to distribute the Proprietary Products or to establish a business similar to the Licensed Business in the Territory in violation of Section 1.3 or exports Proprietary Products or otherwise violates Section 1.4 or purports to make any transfer contrary to the terms of Article 22;

23.2.7 If LICENSEE knowingly maintains false books or records, or knowingly submits any false statements or reports to BEN & JERRY'S;

23.2.8 If, contrary to the terms of Article 17 or Article 18, LICENSEE discloses or divulges the contents of the Manuals or other confidential information provided to LICENSEE by BEN & JERRY'S;

23.2.9 If LICENSEE misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the Products or files for a mark, in its own name, which relates to any portion of the rights granted hereunder;

23.2.10 If LICENSEE exercises the rights granted hereunder in a manner that materially impairs the reputation or goodwill associated with the Proprietary Marks, Proprietary Products, or the rights of BEN & JERRY'S therein;

23.2.11 If LICENSEE, after curing a default pursuant to Section 23.3 or Section 23.4, commits the same default again.

23.2.12 LICENSEE shall not, without BEN & JERRY'S prior written approval, transfer shares of stock in LICENSEE'S company (The American Company of Ice Cream Manufacturing I.E. Limited) in any amount which would significantly change the percentage of stock owned by the stockholders as of the signature date of this License Agreement. In the event Avi Zinger ceases to control and be actively involved in the management of LICENSEE, this Agreement shall terminate.

39

23.3   Upon the occurrence of any of the following events of default, BEN & JERRY'S may, at its option, terminate this Agreement by giving written notice of termination (in the manner set forth under Section 29) stating the nature of the default to LICENSEE at least fourteen (14) days prior to the effective date of termination; provided, however, that LICENSEE may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of BEN & JERRY'S, and by promptly providing proof thereof to BEN & JERRY'S within the fourteen (14) day period. If any such default is not cured within the specified time, this Agreement shall terminate without further notice to LICENSEE, effective immediately upon the expiration of the fourteen (14) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder include the following illustrative events:

23.3.1 If LICENSEE fails, refuses, or neglects promptly to pay any monies owing to BEN & JERRY'S or its Affiliates when due; or

23.3.2 If LICENSEE refuses to permit BEN & JERRY'S or its representatives to inspect the facilities used to manufacture the Proprietary Products or distribution of the Products, or the Retail Shops, or the books, records, or accounts of LICENSEE upon demand or;

23.3.3 If LICENSEE fails, refuses, or neglects promptly to submit Certificates of Insurance to BEN & JERRY'S when due as required under Article 21.

23.4   Except as otherwise provided in Section 23.1 Section 23.2 and Section 23.3 of this Agreement, upon any other default by LICENSEE, BEN & JERRY'S may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 29) stating the nature of the default to LICENSEE at least thirty (30) days prior to the effective date of termination; provided, however, that LICENSEE may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of BEN & JERRY'S, and by promptly providing proof thereof to BEN & JERRY'S within the thirty (30) day period. If any such default is not cured within the specified time, this Agreement shall terminate without further notice to LICENSEE, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.

24.   OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement any and all rights granted hereunder to LICENSEE shall terminate, and:

24.1   LICENSEE shall immediately cease to manufacture the Proprietary Products and/or distribute the same or operate the Retail Shops, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or

former holder of the rights granted herein in connection with the promotion or operation of any other business.

24.2   LICENSEE shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the rights granted herein; the Proprietary Mark "Ben & Jerry's", and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the manufacture of the Proprietary Products and/or distribution of the Products or the operation of the Retail Shops or confusingly similar thereto.   In particular, LICENSEE shall cease to use all signs, marketing materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks. LICENSEE shall transfer and assign to  BEN & JERRY'S, at BEN & JERRY'S request, all Internet or electronic network domain names and/or addresses and any electronically assessable pages, advertising or other promotional and marketing material used in connection with the advertising, promotion or marketing of the Products or bearing the Proprietary Marks in form so that same may be used or accessed on any electronically assessable network.

24.3   LICENSEE shall take such action as may be necessary to cancel any assumed name registration or equivalent registration obtained by LICENSEE which contains the mark "Ben & Jerry's," or any other Proprietary Marks, and LICENSEE shall furnish BEN & JERRY'S with evidence satisfactory to BEN & JERRY'S of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

24.4   LICENSEE agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in the sole discretion of BEN & JERRY'S, is likely to cause confusion, mistake, or deception, or which, in the sole discretion of BEN & JERRY'S is likely to dilute the rights of BEN & JERRY'S in and to the Proprietary Marks. LICENSEE further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to BEN & JERRY'S, or the Proprietary Marks) which, in the sole discretion of BEN & JERRY'S, suggests or represents a present or former association or connection with BEN & JERRY'S, or the Proprietary Marks.

24.5   LICENSEE promptly shall pay all sums owing to BEN & JERRY'S and its affiliates. In the event of termination for any default of LICENSEE, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by BEN & JERRY'S as a result of the default and termination, which obligation shall give rise to and remain, until paid-in-full, a lien in favor of BEN & JERRY'S against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by LICENSEE at the time of default, and LICENSEE hereby acknowledges and agrees that LICENSEE at all times shall have executed and timely

41

filed all documents necessary in the Territory to give full effect to the terms of this Section 24.5.

24.6   LICENSEE immediately shall deliver to BEN & JERRY'S the Manuals, and all other records, correspondence, and instructions containing confidential information relating to the exercise of the rights granted herein (and any translations and/or copies thereof, regardless of whether same were made in violation of this Agreement), all of which are acknowledged to be the property of BEN & JERRY'S.

24.7   BEN & JERRY'S shall have the option, to be exercised within ten (10) business days after termination or expiration, to purchase from LICENSEE any or all of equipment, supplies and inventory related to the manufacture of the Proprietary Products and/or distribution of the Products, or the operation of the Retail Shops at fair market value. If the parties are unable to agree on fair market value within fifteen (15) days after termination or expiration, BEN & JERRY'S shall appoint a qualified appraiser, and the appraiser shall determine fair market value within ten (10) days after appointment. BEN & JERRY'S shall bear the costs of the appraiser. If BEN & JERRY'S elects to exercise this option to purchase, it shall have the right to set off all amounts due from LICENSEE, if any, against any expenses or payment of the purchase price upon exercise of its option.

24.8   BEN & JERRY'S may, on the occasion of termination of this Agreement, exercise its option to re-purchase any existing inventory at landed cost or market value, whichever is less.

24.9   LICENSEE and LICENSEE's owners shall comply with the covenants contained in this Agreement.

24.10  Neither BEN & JERRY'S nor LICENSEE, nor any owner of LICENSEE, shall make any public statement, to the media or otherwise, except to the extent that such is legally required, whether by virtue of disclosure laws applicable in The Territory or otherwise.

24.11  In the event of termination of this Agreement at the end of the term or any renewal term, or any sooner termination for any reason, BEN & JERRY'S will be freed and discharged, and LICENSEE hereby expressly releases and discharges BEN & JERRY'S of and from any and all obligations or liabilities whatsoever, arising hereunder or in connection with any manner or thing relating to, or in any manner connected with, the subject matter of this Agreement.  The foregoing right of termination and the additional right of non-renewal at the end of the stated term are absolute, and neither BEN & JERRY'S nor the LICENSEE will be liable to the other because of termination or non-renewal hereof (whether with or without cause) for compensation, reimbursement, or damages on account of the loss of prospective profits on anticipated sales, or on account of expenditures, investments, leases or commitments in connection with the

42

business or goodwill of BEN & JERRY'S or LICENSEE, or for any other reason whatsoever. Nothing herein is intended to relieve any party from any obligation to pay any unpaid balances for Products ordered or shipped hereunder prior to termination or expiration.

24.12  The termination of this Agreement will operate as a cancellation, as of the date thereof, of all orders that have not been prepared by BEN & JERRY'S for shipment, and thereafter BEN & JERRY'S will have no obligation with respect to orders so canceled.

25.    COVENANTS

25.1    LICENSEE acknowledges and agrees that the success of the rights granted hereunder is dependent upon the marketing, solicitation, and sale of the Products. To that end, LICENSEE shall use best efforts to: (1) manufacture Proprietary Products in the Territory, and (2) maximize the sale of the Proprietary Products in the Territory; and (3) promote the Wholesale Distribution thereof and (4) operate the Retail Shops in the manner prescribed in the Manuals and (5) implement recommendations from BEN & JERRY'S.

25.2    During the term of this Agreement, LICENSEE and its Affiliates shall not, directly or indirectly, except as otherwise approved in writing by BEN & JERRY'S:

25.2.1 divert or attempt to divert any present or prospective business or customer of any Proprietary Products to any competitor, by inducement or otherwise, or do or perform any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks; or

25.2.2 manufacture, market, distribute, or sell frozen dessert products which are competitive with the various BEN & JERRY'S Proprietary Products.

25.2.3. have any interest, directly or indirectly, as an owner, director, officer, employee, consultant, representative, agent, or in any other capacity, in any business that offers the same or similar products or services as those offered by the LICENSEE in the exercise of the rights granted hereunder; provided, however that this provision shall not apply to the operation by LICENSEE of any business pursuant to an other Agreement, with BEN & JERRY'S; or

25.2.4 employ or seek to employ any person who is at that time employed by BEN & JERRY'S, or by any other LICENSEE of BEN & JERRY'S, or otherwise encourage such person to leave his or her employment.

25.5    LICENSEE represents and warrants that (a) it has the right, power and authority to enter into an Agreement and perform its obligations under this Agreement;

43

(b) the making of this Agreement by LICENSEE does not violate any Agreement existing between LICENSEE and any other person or entity, and throughout the Term, LICENSEE shall not make any Agreement with any person or entity that is inconsistent with any of the provisions of this Agreement; (c) LICENSEE is, and at all times during the Term shall be, the holder of all consents necessary for LICENSEE to perform its obligations hereunder; (d) LICENSEE complies, and at all time during the Term shall comply, with all laws and regulations affecting the distribution of the Products, whether federal or state or local within the Territory; and (e) LICENSEE shall perform services in accordance with generally accepted professional practices; (f) LICENSEE is adequately financed to meet any financial obligation that LICENSEE may be required to incur under this Agreement.

26.    LICENSEE AS A BUSINESS ENTITY

26.1   LICENSEE shall comply with the following requirements:

    26.1.1 Copies of LICENSEE'S governing documents, and any amendments thereto, including those documents authorizing entry into this Agreement, shall be promptly furnished to BEN & JERRY'S.

    26.1.2  LICENSEE shall maintain a current list of all owners of record of LICENSEE, including, if applicable, owners of any class of voting securities or securities convertible into voting securities of LICENSEE, and periodically shall furnish such list to BEN & JERRY'S upon request.

27.    TAXES PERMITS AND INDEBTEDNESS

27.1   LICENSEE promptly shall pay when due all taxes levied or assessed, including unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by LICENSEE in the exercise of the rights granted hereunder. LICENSEE shall pay to BEN & JERRY'S an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on BEN & JERRY'S with respect to any payments to BEN & JERRY'S required under this Agreement, unless the tax is credited against income tax otherwise payable by BEN & JERRY'S.

27.2   In the event of any bona fide dispute as to LICENSEE'S liability for taxes assessed or other indebtedness, LICENSEE may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall LICENSEE permit a tax sale or seizure, or attachment by a creditor, to occur.

27.3   LICENSEE shall comply with all laws applicable to the manufacture of the Proprietary Products, the sale and distribution of the Products in the Territory and the operation of the Retail Shops within the Territory, and shall timely obtain any and all

permits, certificates, or licenses necessary for the full and proper operations of the same.

27.4    LICENSEE immediately shall notify BEN & JERRY'S in writing of the commencement of any action, suit, or proceeding, and of the issuance of any order, award, or decree of any court, agency, or other governmental instrumentality which adversely may affect the operation or financial condition of the LICENSEE.

28.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

28.1    LICENSEE is an independent contractor. BEN & JERRY'S and LICENSEE are completely separate entities and are not fiduciaries, partners, joint venturers, or agents of the other in any sense and neither shall have the power to bind the other. No act or assistance given by either party to the other pursuant to this Agreement shall be construed to alter the relationship.

28.2    During the term of this Agreement, LICENSEE shall hold itself out to the public as an independent contractor exercising the rights granted hereunder. LICENSEE agrees to take such action as may be necessary to do so, including exhibiting a notice of that fact in a conspicuous place at of each  manufacturing facilities, Wholesale Distribution Channel facilities and Retail Shops the content of which BEN & JERRY'S reserves the right to specify.

28.3    Nothing in this Agreement authorizes LICENSEE to make any contract, Agreement, warranty, or representation on the behalf of BEN & JERRY'S, or to incur any debt or other obligation in the name of BEN & JERRY'S; and BEN & JERRY'S shall not in any event assume liability for, or be deemed liable hereunder as a result of any such action; nor shall BEN & JERRY'S be liable by reason of any act or omission of LICENSEE in its exercise of the rights granted herein or for any claim or judgment arising therefrom against LICENSEE or BEN & JERRY'S. LICENSEE shall indemnify and hold BEN & JERRY'S, and its and its Affiliates' respective officers, directors, and employees  harmless from and against any and all claims, losses, costs, expenses, liabilities, and damages arising directly or indirectly from, as a result of, or in connection with LICENSEE's exercise of the rights granted hereunder, as well as the costs, including attorneys' fees, of the indemnified party in defending against them.

28.4    It is understood and agreed that LICENSEE shall not be liable for, and BEN & JERRY'S shall hold LICENSEE harmless from, any obligations, claims, demands, losses, costs, damages, suits, judgments, penalties, expenses, and liabilities of any kind or nature arising directly out of, or in connection with, this Agreement unless the same is caused by LICENSEE or anyone or entity acting on behalf of or for LICENSEE.

28.5    Except with respect to a failure under the terms of Section 15.17 and

45

except as provided in Section 28.4, under no circumstances shall either party to this Agreement be liable to the other party to this Agreement for lost profits or consequential damages. The indemnification obligation of BEN & JERRY'S under Section 28.4 shall be reduced by any insurance proceeds paid or which would have been payable under the insurance required to be maintained by Licensee under Article 21.

## 29.   GOVERNMENT APPROVALS: WAIVERS

29.1   LICENSEE shall obtain all approvals, consents, permits and licenses necessary to enter into, make enforceable the terms of, or to perform under, this Agreement from all government, fiscal, and/or other proper authorities which are required by the applicable laws and regulations of the Territory. In obtaining any such approval, consent, permit or license, BEN & JERRY'S shall assist LICENSEE, as requested, in responding to any inquiry in writing to any government or other proper authority. If, in connection with any government approval, a translation of this Agreement is required, LICENSEE shall have such translation(s) prepared at its sole cost and expense, and LICENSEE shall submit such translation(s) to BEN & JERRY'S for its written approval prior to submission of the translation(s) to any government authority. LICENSEE shall inform BEN & JERRY'S of the status of any,  application referred to in this Section 29.1, in a timely fashion.

29.2   BEN & JERRY'S makes no warranties or guarantees upon which LICENSEE may rely, and assumes no liability or obligation to LICENSEE, by providing any waiver, approval, consent, or suggestion to LICENSEE in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

## 30.   NOTICES

Any and all notices required or permitted under this Agreement shall be in writing, in the English language, and shall be personally delivered, or sent by any means that affords the sender evidence of delivery, or of rejected delivery (including, but not limited to, transmission by telecopier), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to LICENSEE:          The American Company of Ice Cream-
                              Manufacturing E.I.,LTD
                              1 Hameisav Street
                              Yavne, 70600, Israel
                              ATTENTION: Avi Zinger


Notices to BEN & JERRY'S:     Ben & Jerry's Homemade, Inc.
                              30 Community Drive, Suite 1

46

South Burlington, Vermont 05403
U.S.A.
Attention: Director
International Marketing and Sales

Any notice by a means that affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.

31.    SEVERABILITY AND CONSTRUCTION

31.1    If any provision of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable. The language of each provision of this Agreement shall be construed according to its fair meaning and not strictly against any party. If any change in the law has a material effect on the commercial basis or working of this Agreement, or if this Agreement, in whole or in part, is declared by any competent authority to be illegal, invalid, or otherwise unenforceable, the parties shall endeavor to negotiate, in good faith, amendments which as far as practicable give effect to the intentions as expressed herein. If in the reasonable opinion of either party the scope of such amendments following such negotiations, would destroy the commercial value of this Agreement to that party, such party may terminate this Agreement by giving written notice to the other party.

31.2    Any provision or covenant in this Agreement which expressly or by its nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination), shall survive such expiration or termination.

31.3    Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than LICENSEE and BEN & JERRY'S, and the officers, directors, shareholders, agents, and employees of BEN & JERRY'S, and such successors and assigns of BEN & JERRY'S as may be contemplated by Article 22, any rights or remedies under or by reason of this Agreement.

32.    APPLICABLE LAW

32.1    The laws of the State of Vermont, U.S.A. shall apply to any claim or controversy regarding the making, entering into, performance, or interpretation of this Agreement, without giving effect to any conflict-of-law rules of such jurisdiction. Except as otherwise provided herein, upon written demand of either party, any claim or controversy shall be submitted to arbitration pursuant to the then-prevailing American

47

Arbitration Association,  (the "Rules") before a single arbitrator chosen by the parties, but, if the parties cannot agree on an arbitrator, then the arbitrator shall be chosen as provided in the Rules.

32.2 ˙ The arbitration proceeding shall be held at an office of American Arbitration Association in the city of London, England or in such other city in as the parties may agree upon at the time arbitration is requested, and the parties hereby waive all questions of personal jurisdiction and venue for the purpose of carrying out this Article. The proceedings and all documents submitted in connection therewith shall be in the English language. The arbitrator's fee shall be borne equally by the parties. All other costs and expenses of the arbitration shall be borne as the arbitrator may determine. Subject to the provisions of Sections 28.3 and 28.4, the parties hereby agree that the arbitrator may make any award or awards or enter such orders, including an injunction or specific performance as may be deemed appropriate by the arbitrator, but shall have no authority to award punitive or exemplary damages.

32.3   BEN & JERRY'S and LICENSEE hereby waive any right to or claim of any punitive or exemplary damages, each against the other, and agree that, in the event of a dispute between them, each shall be limited to the recovery of actual damages sustained. Such award or awards shall be the sole and exclusive remedy between the parties hereto regarding any claims, counter-claims, issues, or accounting, presented to the arbitrator, except nothing herein shall be deemed to bar either party's right to obtain injunctive relief against conduct or threatened conduct that will cause it loss or damage. A decision of the arbitrator shall have no collateral estoppel effect with respect to any person or entity not a party to the arbitration proceeding. All awards shall be paid promptly in U.S. dollars, free of any tax, deduction, or offset, and any costs, fees, or taxes incident to enforcing the award shall, to the maximum extent permitted by law, be charged against the party resisting such enforcement. Judgment on the award may be entered by either party in any court of competent jurisdiction. The award shall include interest from the date of any damages incurred for breach or other violation of the contract, and from the date of the award until paid in full, at a rate to be fixed by the arbitrator, but in no event less than twelve percent (12 %), or the highest rate permitted by US law, whichever is less. Any arbitration proceeding shall be limited to controversies between BEN & JERRY'S and LICENSEE, and shall not be expanded to include any other parties.

32.4   Nothing contained in this Agreement shall bar BEN & JERRY'S right to seek injunctive relief without the posting of any bond or security to obtain the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to LICENSEE'S: (i) use of the Proprietary Marks; (ii) obligations upon termination or expiration of the Agreement; (iii) assignment or proposed assignment of the rights granted herein, this Agreement, or any ownership interest in LICENSEE; or (iv) actions covered by the provisions of Articles 13, 14 or 27(check these).  BEN & JERRY'S and LICENSEE may each seek injunctive relief to

prohibit any act or omission by the other, or the employees of the other, that constitutes a violation of any applicable law, or is dishonest or misleading to customers or to the public. BEN & JERRY'S also shall be able to seek injunctive relief to prohibit any act or omission by LICENSEE or its employees which may impair the goodwill associated with the Proprietary Marks. Any party to the arbitration to whom relief is granted pursuant to this Section 32.4 shall be entitled to collect from the other party all costs and reasonable attorneys' fees incurred in obtaining such relief.

33.    ACKNOWLEDGMENTS

LICENSEE acknowledges that it has conducted an independent investigation of the rights granted herein, and recognizes that the business contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of LICENSEE'S owners as independent business people. BEN & JERRY'S expressly disclaims the making of, and LICENSEE acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

34.    FORCE MAJEURE.

Neither party shall be deemed in default hereunder, nor shall it hold the other party responsible for, any cessation, interruption or delay in the performance of its obligations hereunder other than an obligation to pay money due hereunder (other than an obligation to pay money hereunder) due to causes beyond its reasonable control including, but not limited to: earthquake; flood; fire; storm or other natural disaster; epidemic; accident; explosion; casualty; act of God; lockout; strike; labor controversy or threat thereof; riot; insurrection; civil disturbance or commotion; boycott; disruption of the public markets; war or armed conflict (whether or not officially declared); sabotage; act of a public enemy; embargo; delay of a common carrier; the inability to obtain sufficient material, supplies, labor, transportation power or other essential commodity or service required in the conduct of its business; or any change in or the adoption of any law, ordinance, rule, regulation, order, judgment or decree; provided that the party relying upon this Article 34 (shall have given the other party written notice thereof promptly and, in any event, within five (5) days of discovery thereof and (b) shall take all steps reasonably necessary under the circumstances to mitigate the effects of the *force majeure* upon which such notice is based.

35.    NO THIRD PARTY BENEFICIARIES.

Nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

36.    CONSTRUCTION.

49

This Agreement has been negotiated by the parties hereto and by their respective advisers. This Agreement shall be fairly interpreted and construed in accordance with its terms and without strict interpretation or construction in favor of or against either party by reason of such party having drafted this Agreement or any portion of this Agreement.

This Agreement supersedes any prior Agreement between the parties and/or their Affiliates. This Agreement may be executed in counterparts and shall become effective as of the date executed by LICENSEE.

LICENSEE

THE AMERICAN COMPANY OF ICE CREAM MANUFACTURING E.I., LIMITED

BY:_____

TITLE:_____

DATE:_____

BEN & JERRY'S

BEN & JERRY'S HOMEMADE, INC.

BY: _____

TITLE: _____Frances Ratnke_____

DATE: _____6/25/98_____

BEN & JERRY'S HOMEMADE, HOLDINGS, INC.

By:_____

TITLE: _____President_____

DATE: _____6/25/98_____

50

# EXHIBIT 3

```
<DOCUMENT>
<TYPE>DEFM14A
<SEQUENCE>1
<FILENAME>defm14a.txt
<DESCRIPTION>DEF14A
<TEXT>

<PAGE>
-------------------------------------------------------------------------------
---
-------------------------------------------------------------------------------
---


                    SECURITIES AND EXCHANGE COMMISSION
                         WASHINGTON, D.C. 20549

                       SCHEDULE 14A INFORMATION
                            (RULE 14A-101)
              PROXY STATEMENT PURSUANT TO SECTION 14(A)
               OF THE SECURITIES EXCHANGE ACT OF 1934


<TABLE>
       <S>          <C>
       Filed by the Registrant /X/

       Filed by a Party other than the Registrant / /

       Check the appropriate box:
       / /        Preliminary Proxy Statement
       / /        Confidential, for Use of the Commission Only (as permitted
                  by Rule 14a-6(e)(2))
       /X/        Definitive Proxy Statement
       / /        Definitive Additional Materials
       / /        Soliciting Material Under Rule 14a-12

                      BEN & JERRY'S HOMEMADE, INC.
                 (Name of Registrant as Specified In Its Charter)

            (Name of Person(s) Filing Proxy Statement, if other than the
                                 Registrant)

</TABLE>

Payment of Filing Fee (Check the appropriate box):

<TABLE>
<S>         <C>  <C>
/ /         No fee required.
/ /         Fee computed on table below per Exchange Act Rules 14a-6(i)(1)
```

and 0-11.
(1)  Title of each class of securities to which transaction
     applies:
(2)  Aggregate number of securities to which transaction applies:
(3)  Per unit price or other underlying value of transaction
     computed pursuant to Exchange Act Rule 0-11 (set forth the
     amount on which the filing fee is calculated and state how
     it was determined):
(4)  Proposed maximum aggregate value of transaction:
(5)  Total fee paid:

/ /      Fee paid previously with preliminary materials.

/X/      Check box if any part of the fee is offset as provided by
         Exchange Act Rule 0-11(a)(2) and identify the filing for which
         the offsetting fee was paid previously. Identify the previous
         filing by registration statement number, or the form or schedule
         and the date of its filing.

         (1)  Amount Previously Paid:
                  $72,828
         (2)  Form, Schedule or Registration Statement No.:
              Schedule TO and Amendment No. 1 to Schedule 13D
         (3)  Filing Party:
              Vermont All Natural Expansion Company
              Conopco, Inc.
              Unilever N.V.
         (4)  Date Filed:
              April 18, 2000
</TABLE>


-------------------------------------------------------------------------------
---
-------------------------------------------------------------------------------
---
<PAGE>
                                [LOGO]

Ben & Jerry's Homemade, Inc.
30 Community Drive
South Burlington, Vermont 05403-6828


                                 July 5, 2000


Dear Shareholder:

    You are cordially invited to attend a Special Meeting of Shareholders,
which
will be held on August 3, 2000 at the Grand Hyatt New York, Park Avenue at

Grand
Central, New York, New York 10017 at 10:00 a.m., local time.

    As described in the enclosed Proxy Statement, at the Special Meeting you
will be asked to consider and vote upon the merger of Vermont All Natural
Expansion Company, a wholly-owned subsidiary of Conopco, Inc., an indirect
subsidiary of Unilever N.V. and Unilever PLC, with and into Ben & Jerry's
Homemade, Inc. (the "Company"), pursuant to an Agreement and Plan of Merger,
dated as of April 11, 2000, and as amended and restated as of July 5, 2000.
Upon
consummation of the merger, each outstanding share of Class A Common Stock
will
be converted into the right to receive $43.60 in cash, without interest, upon
surrender of certificates formerly representing such shares.

    The merger is the second and final step in the acquisition of the Company
by
Unilever. The first step was a tender offer by Vermont All Natural Expansion
Company for all of the outstanding shares of the Company's common stock at a
price of $43.60 per share. Vermont All Natural Expansion Company purchased
6,621,944 shares pursuant to the tender offer and now owns approximately 91%
of
the outstanding shares of the Company.

    The affirmative vote of holders of a majority of the shares of the
Company's
common stock outstanding and entitled to vote at the Special Meeting is
necessary to approve the Agreement and Plan of Merger. Vermont All Natural
Expansion Company owns a sufficient number of shares to assure approval of
the
Agreement and Plan of Merger at the Special Meeting and will vote all of its
shares in favor of the Agreement and Plan of Merger. As a result, the
affirmative vote of any other shareholder will not be required to approve the
Agreement and Plan of Merger.

    YOUR BOARD OF DIRECTORS HAS DETERMINED THAT THE TERMS OF THE MERGER ARE
FAIR
TO AND IN THE BEST INTERESTS OF BEN & JERRY'S SHAREHOLDERS. THE BOARD OF
DIRECTORS UNANIMOUSLY RECOMMENDS THAT BEN & JERRY'S SHAREHOLDERS VOTE "FOR"
APPROVAL OF THE MERGER AGREEMENT AND THE MERGER.

    Among the factors considered by the Board of Directors in evaluating the
merger was the opinion dated April 11, 2000 of Gordian Group, L.P., the
Company's financial advisor, which provides that as of such date, the cash
consideration to be received by the shareholders of the Company pursuant to
the
tender offer and the merger was fair from a financial point of view to such
shareholders. The written opinion of Gordian Group, L.P. is attached as Annex
D

to the enclosed Proxy Statement and should be read carefully and in its
entirety
by shareholders.

    On the following pages, you will find a Notice of the Special Meeting and
a
Proxy Statement, which provides you with detailed information concerning the
proposed merger. I urge you to read the enclosed materials carefully and
request
that you promptly complete and return the enclosed proxy. If you attend the
Special Meeting, you may vote in person even if you have previously returned
your proxy. Your vote is important regardless of the number of shares you
own.

                                Sincerely,

                                /s/ PERRY D. ODAK
                                Perry D. Odak
                                President and CEO


  THIS PROXY STATEMENT IS DATED JULY 5, 2000, AND IS BEING FIRST MAILED TO BEN
&
                JERRY'S SHAREHOLDERS ON OR ABOUT JULY 6, 2000.
<PAGE>
                                [LOGO]

Ben & Jerry's Homemade, Inc.
30 Community Drive
South Burlington, Vermont 05403-6828

                NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

To the Shareholders of Ben & Jerry's Homemade, Inc.:

    NOTICE IS HEREBY GIVEN that a Special Meeting of Shareholders of Ben &
Jerry's Homemade, Inc., (the "Company") will be held at the Grand Hyatt New
York, Park Avenue at Grand Central, New York, New York 10017, on August 3,
2000,
at 10:00 a.m., local time, for the following purposes:

    1.  To consider and vote upon a proposal to approve the Agreement and
Plan
of Merger, dated as of April 11, 2000, among Conopco, Inc, Vermont All
Natural
Expansion Company, a wholly-owned subsidiary of Conopco, and the Company (as
amended and restated as of July 5, 2000, the "Merger Agreement"). The Merger
Agreement provides, among other things, that in accordance with the relevant
provisions of the Vermont Business Corporation Act, Vermont All Natural
Expansion Company will be merged with and into the Company. Following the

In the License Agreement, Unilever has agreed to undertake activities
related to the "social mission" of the Company in connection with the
Unilever
Affiliates' activities under the Ben & Jerry's trademark, including, among
others, a commitment to purchase "fair trade" products to the extent
available
at commercially reasonable prices, a commitment to open scoop shops in the
Company's PartnerShop format in partnership with non-profit organizations, a
commitment to use unbleached paper to the extent available at commercially
reasonable prices and a commitment to purchase, if commercially feasible, a
portion of its ingredients from not-for-profit suppliers and suppliers from
economically disadvantaged groups and to provide assistance to such
suppliers.
The License Agreement provides that a material breach by Unilever of one of
the
covenants contained in the preceding sentence with respect to a country is
not
Material Default but will result in an increased royalty rate of 8% with
respect
to the region in which such country is located for so long as such breach is
uncured following a 90-day cure period. Upon a Material Default by Unilever
of
its duties under the social mission commitments contained in the first
sentence
of this paragraph, the royalty rate will be increased to 8% worldwide for so
long as such Material Default is uncured during a one-year cure period.
Following the expiration of such one-year cure period, the Company and
Holdings
may terminate the License Agreement if such Material Default is continuing.

The License Agreement also provides that the parties thereto will
negotiate
a mutually satisfactory master franchising agreement within 12 months of the
date of the License Agreement. SEE ANNEX B.

STOCK OPTION AGREEMENT

On April 11, 2000, the Company and Conopco entered into a Stock Option
Agreement (the "Stock Option Agreement"). Pursuant to the Stock Option
Agreement, the Company granted to Conopco an irrevocable option (the
"Option")
to purchase up to 1,219,986 shares of Class A Common Stock (equivalent to
19.9%
of the then-outstanding shares of Company Common Stock) at a purchase price
of
$43.60 per share. The Option is exercisable (in whole or in part) at any one
time either (i) after the expiration of the Offer and the acceptance of
shares

her shares of Company Common Stock pursuant to the Offer in order to serve on
the Surviving Corporation Board with respect to Ms. Henderson's failure to
tender shares of Company Common Stock owned by her.

OPERATIONS OF THE SURVIVING CORPORATION

    The parties have agreed in the Merger Agreement that the Surviving
Corporation will not initiate any material headcount reductions for two years
following the Effective Time and to maintain for at least five years its
corporate presence and substantial operations in Vermont. In addition, the
parties have agreed to continue the Company's liveable wage policy following
the
Effective Time and that a significant amount of the incentive-based
compensation
of members of the OCEO shall be based on the social performance of the
Surviving
Corporation.

SOCIAL MISSION

    The parties have agreed in the Merger Agreement that the Surviving
Corporation Board will have primary responsibility for preserving and
enhancing
the objectives of the historical social mission of the Company as they may
evolve from time to time consistent therewith (the "Social Mission
Priorities").
The Company and Conopco also have agreed that following the Effective Time,
they
will work together in good faith to develop a set of social metrics to
measure
the social performance of the Surviving Corporation. The parties also have
agreed that the Surviving Corporation will seek to have the rate of increase
of
such social metrics exceed the rate of increase of sales. The parties have
agreed in the Merger Agreement that the Surviving Corporation will establish
a
new product development unit responsible for special products to be headed by
Ben Cohen for so long as he is an employee of the Surviving Corporation.

    The parties have agreed in the Merger Agreement that the Surviving
Corporation will establish a social venture fund (the "Social Venture Fund")
to
be administered by a committee of the Surviving Corporation Board that shall
oversee the Social Venture Fund (the "Social Venture Committee"), to provide
venture financing to (i) vendors owned by women, minorities or indigenous
people, (ii) vendors which give priority to a social change mission, and
(iii) such other third-party entrepreneurial businesses within the scope of
the
Company's social mission priorities. The Surviving Corporation shall fund

# EXHIBIT 4

**Dr. Oded Tal, Certified Translator**

27 Black Maple Crescent, Kitchener, ON N2P 2W8, Canada
Phone: 226-338-8722
e-mail: odedtal.translations@gmail.com

## Certification of Translation - Hebrew to English

I, Oded Tal, residing at 27 Black Maple Crescent, in Kitchener, Ontario N2P 2W8 Canada, hereby attest that I am a translator certified by the Association of Translators and Interpreters of Ontario (ATIO) for Hebrew into English, that I have translated the attached document, and that to the best of my knowledge, ability, and belief this English document (Exhibit A) is a true translation of the attached Hebrew document (Exhibit B).

_Oded Tal_

Dr. Oded Tal, C.Tran. no. 2937

MAR 0 1 2022

Date

Certification credentials may be verified online at https://atio.on.ca/paupress/profile/4361/view/

1

[Emblem of the State of Israel]

**Israel Antitrust Authority**



Conditions for the merger between Ben & Jerry's Homemade, Inc. and Unilever N.V.

On May 30, 2000, approval was granted for the above-mentioned merger (hereinafter: "**the Merger Approval**"), subject to future determination of the merger conditions by the Antitrust Commissioner.

After further review of the effect of this merger on the competition in the relevant market, and due to the request made by the Parties to the merger to engage in an agreement to irrevocably[1] transfer the Concession to distribute Ben & Jerry's products in Israel to a third party that is not controlled by Unilever and/or Strauss Ice Creams, I have decided to set the following final conditions for the Merger Approval, instead of the conditions specified on May 30, 2000:

**Part A: Material conditions**

1. As of December 31, 2001, all Ben and Jerry's products in Israel shall be distributed by a person who is not related, directly or indirectly, to Unilever and/or Strauss Ice Creams (hereinafter: "the **Concession Holder**").

2. BJH and Unilever, who controls it, shall not reduce the Concession's scope and shall not worsen the Concession, its terms and the products that had been distributed under it before the announcement of the above-mentioned merger. Without detracting from the generality of the aforementioned, and notwithstanding any other provision of the agreement:

   2.1  The Concession Holder shall be allowed to set the prices of Ben & Jerry's products independently, and Unilever shall not determine, be a partner in or affect the prices of those products;

   2.2  The quantity and variety of Ben & Jerry's products that the Concession Holder will market shall not be reduced or limited compared to the quantity and variety of those products that had been marketed before the merger announcement was submitted, subject to the variety of BJH's products at any given time;

   2.3  Any new Ben & Jerry's product shall be available to the Concession Holder for marketing in Israel under the customary terms, subject to equal application of BJH's international marketing policy that applies to all the countries where its products are marketed;

   2.4  Any arrangement between the Concession Holder and BJH must not include any restriction that the Commissioner has not approved. Without detracting from the aforementioned –

---

[1] This means that should the concession expire for any reason, it shall not be transferred to Unilever, Strauss Ice Creams or any person related to them, without the Commissioner's approval.

256743/3721

any agreement between the Concession Holder and Unilever shall be submitted to the Commissioner for review and approval; for the avoidance of doubt, it is hereby clarified that the aforementioned also applies to any agreement between the Concession Holder and Strauss Ice Creams.

2.5  The Concession Holder may be involved in any other frozen desserts business.

3.  Until the date mentioned in Section 1 above, the conditions based on which the Antitrust Commissioner approved the merger between BJH and Unilever on May 30, 2000 shall remain in effect; nevertheless, during this period, Unilever and/or BJH may transfer money to the American company and/or its shareholders in order to liquidate it and transfer the Concession to a third party. As of the date specified in Section 1 above, and subject to the execution of the provisions of this Section, the May 30, 2000 conditions shall become null and void;

4.  There shall be a complete business separation between Unilever's operations in Israel, including its business with regard to Strauss Ice Creams, and the Concession Holder's business; without detracting from the generality of the aforementioned, Unilever and/or BJH shall have no right to determine for the Concession Holder the marketing terms of Ben & Jerry's products in Israel; Unilever shall have no say in the Concession Holder's decisions regarding the terms of engagement with retailers, the scope and timing of the engagement, and the opening of retail ice cream parlors, their locations and the prices of Ben & Jerry's products at these parlors. Unilever and BJH, including all their officers, shall not contact the Concession Holder directly or indirectly on such matters;

5.  BJH, Unilever and Strauss Ice Creams shall not engage in any activity that may interfere with the Concession Holder's activity in the frozen desserts industry in general, and in the distribution and marketing of Ben & Jerry's products in particular.

6.  Any transfer of the Concession to another person, or the appointment of another person as a concession holder, as well as any change in the control of a concession holder, must be approved in advance by the Commissioner;

7.  Should there be any doubt with regard to these conditions, applicability or interpretation – the Commissioner shall resolve it.

8.  These provisions do not detract from the provisions of the Antitrust Law.

**Part B: Definitions**

**"Person"** - including a corporation;

**"Related person"** – any person who controls a corporation, a corporation controlled by a person or a corporation, and any corporation controlled by any of them;

256743/3721

3

**"The Concession"** – A concession to distribute Ben & Jerry's products in Israel;

**"Strauss Ice Creams"** – Strauss Ice Creams Ltd. and any person related to it;

**"The American Company"** – The American Company for Ice Cream Manufacturing E.I. Ltd.;

**"Holding"** – directly or indirectly, without detracting from the generality of the aforementioned, shall be considered any person who holds directly, holds the holdings of any Related Person, the holdings of any corporation controlled by a Related Person, etc.;

**"The Commissioner"** – the Antitrust Commissioner;

**"Unilever"** – Unilever N.V. and any company that is controlled by it, controls it or is controlled by a persons who control it, individually or collectively;

**"Ben and Jerry's products"** – frozen desserts, including ice cream, frozen yoghurt, sorbet, cakes made of any of those, and any other frozen desserts that BJH has developed under the Ben & Jerry tradename that it owns.

**"Control"** – The ability to direct the operations of a corporation, directly or indirectly. Without detracting from the generality of the aforementioned: (1) A person controls a corporation if they hold more than half of the voting rights based on shares or their types at the corporation's AGM or an equivalent body, or of the right to nominate directors, and in a corporation that is not a company – the right to nominate similar officers of the corporation; (2) A person controls a corporation if they have the right to appoint its CEO; (3) A person controls a corporation if they hold more than thirty percent of the rights to the corporation, and no other person holds more than half of that amount; (4) A person controls a corporation if they are the beneficiary of a trust that controls its assets, except for holding units in a mutual fund that is subject to the Mutual Funds Law, 5754 – 1994; (5) A person controls a corporation if they have the power to prevent the corporation from making a material business decision, unless the source of this power is an agreement regarding the terms of a loan given by a banking corporation while conducting its normal business; a material business decision does not include a decision about issuing shares, selling or liquidating most of the corporation's assets, or a material change to the corporation's business.

**"BJH"** - Ben & Jerry"s Homemade, Inc. and any person related to it.



David Strum, Advocate
Antitrust Commissioner

Jerusalem, 1 Tevet 5762
          December 16, 2001

256743/3721



ﬡ



רשות ההגבלים העסקיים

## תנאים למיזוג בין Ben & Jerrys Homemade, Inc, לבין Unilever N.V.

ביום 30.5.00 ניתנה הסכמה למיזוג שבנדון (להלן : "**אישור המיזוג**"), בכפוף לקביעה מעותדת של תנאים למיזוג על ידי הממונה על ההגבלים העסקיים.

לאחר בחינה נוספת של השפעת המיזוג דן על על התחרות בשוק הרלבנטי וכן – לאור בקשת הצדדים למיזוג ולעסקה להתקשר בהסכם על-פי יועבר הזכיון להפצת מוצרי בן אנד ג'יריס בישראל באופן בלתי הדיר[1] לצד שלישי שאינו בשליטתם של יונילבר ו/או גלידת שטראוס, מצאתי לנכון לקבוע תנאים סופיים אלה לאישור המיזוג שבנדון, שיבואו במקומת התנאים מיום 30.5.00 :

### חלק א׳: תנאים מהותיים

1.   החל מיום 31.12.01 יופצו כל מוצרי בן אנד ג'יריס בישראל על ידי אדם שאיננו קשור, לא במישרין ולא בעקיפין, ליוניליבר ו/או לגלידת שטראוס – (להלן : "**בעל הזכיון**").

2.   BJH ויונילבר כבעלת השליטה בה לא יצמצמו את היקף הזכיון ולא ירעו את תנאיו ביחס לזכיון, תנאיו והמוצרים ששווקו על פיו, עובר להגשת הודעת המיזוג נשוא תנאים אלה. מבלי לגרוע מכלליות האמור ועל אף כל הוראה אחרת בהסכם:

2.1 בעל הזכיון יהא רשאי לקבוע את מחירי מוצרי בן אנד ג'יריס לבדו ובאופן עצמאי ויונילבר לא תקבע, לא תהא שותפה ולא תשפיע על מחירי המוצרים האלה.

2.2 כמות מוצרי בן אנד ג'יריס אשר ישווקו על ידי בעל הזכיון והמגוון שלהם לא יופחתו ולא ירעו בהשוואה לכמות ולמגוון ששווקו ממוצרים אלה קודם להגשת הודעת המיזוג, בכפוף למגוון המוצרים אותו תייצר BJH בכל עת;

2.3 כל מוצר חדש של בן אנד ג'יריס יהיה זמין לבעל הזכיון לשיווק בישראל בתנאים מקובלים, בכפוף ליישום שווה של מדיניות השיווק הבינלאומית של BJH החלה על כלל המדינות בהם משווקים מוצריה;

2.4 לא תהא בהסדר כלשהו בין בעל הזכיון ל- BJH כבילה אשר לא אושרה על ידי הממונה. מבלי לגרוע מן האמור - כל הסכם בין בעל הזכיון לבין יוניליבר יובא לעיון ואישור הממונה; ולמען הסר ספק בלבד מובהר בזה כי האמור יחול גם על כל הסכם בין בעל הזכיון לגלידת שטראוס.


Association of Translators and Interpreters of Ontario
Oded Tal
Certified Translator
atio
Oded Tal
2937

MAR 0 1 2022

---

[1] במובן זה שהזכיון, גם אם יפוג תוקפו מכל סיבה שהיא, לא יועבר לידי יונילבר, גלידות שטראוס, או כל אדם הקשור במי מאלה – ללא אישור הממונה.

רח׳ כנפי נשרים 22, ת.ד. 34281 ירושלים 91341   טלפון : 02-6556111   פקס : 02-6515330

jerusalem@antitrust.gov.il

256743 /3721

2

2.5 בעל הזיכיון לא יהיה מנוע מכל עיסוק אחר בתחום מוצרי הקינוח הקפואים ;

3. עד למועד האמור בסעיף 1 לעיל יעמדו בעינם התנאים בכפוף להם ניתנה הסכמת הממונה על ההגבלים העסקיים מיום 30.5.00 למיזוג שבין BJH לבין יוניליבר ; אף על פי כן, יוניליבר ו/או BJH תהיינה רשאיות במהלך תקופה זו להעביר כספים לחברה האמריקאית ו/או לבעלי המניות שלה לשם חיסולה והעברת הזכיון לצד ג׳. מן המועד האמור בסעיף 1 לעיל ואילך, ובכפוף לביצוע האמור בסעיף זה, יהיו בטלים התנאים מיום 30.5.00 ;

4. תישמר הפרדה ניהולית מלאה בין עסקי יוניליבר בישראל, לרבות עסקיה הנוגעים לגלידת שטראוס, לבין עסקי בעל הזכיון ; מבלי לגרוע מכלליות האמור לא תהיה ליוניליבר ו/או ל-BJH כל זכות לקבוע בעבור בעל הזכיון את תנאי השיווק של מוצרי בן אנד ג׳ריס בארץ ; ליוניליבר ול- BJH לא תהא כל נגיעה להחלטות בעל הזכיון בקשר לתנאי ההתקשרות עם קמעונאים, היקף ההתקשרות ומועדיה ובאשר להיקף פתיחתן של חנויות קמעונאיות לממכר גלידה, מיקומן והמחירים בהם ימכרו מוצרי בן אנד ג׳ריס בחנויות אלה. יוניליבר ו-BJH, לרבות כל נושא משרה בהן, לא יפנו בעניינים אלה, במישרין או בעקיפין, לבעל הזכיון ;

5. BJH, יוניליבר וגלידות שטראוס לא ינקטו בכל פעולה שיהיה בה כדי להפריע לפעילותו של בעל הזכיון בתחום הקינוחים הקפואים בכלל ובהפצה ושיווק של מוצרי בן אנד ג׳ריס בפרט ;

6. כל העברה של הזכיון לאדם אחר, או מינוי אדם אחר כבעל זכיון, וכן – כל שינוי בשליטה בבעל זכיון יהיו טעונים אישור הממונה מראש ;

7. התעורר ספק בנוגע לתנאים אלה, תחולתם או פירושם - יובא הספק להכרעת הממונה ;

8. אין באמור בתנאים אלה כדי לגרוע מהוראות חוק ההגבלים העסקיים.

<u>חלק ב׳: הגדרות</u>

״**אדם**״ - לרבות תאגיד ;

״**אדם קשור**״ – אדם השולט בתאגיד, תאגיד הנשלט על ידי אדם או תאגיד וכל תאגיד הנשלט בידי מי מהם ;

״**הזכיון**״ – זכיון להפיץ בתחומי ישראל את מוצרי בן אנד ג׳ריס ;

״**גלידת שטראוס**״ - גלידת שטראוס בע״מ וכל אדם הקשור בה ;

״**החברה האמריקאית**״ - החברה האמריקאית לייצור גלידות א. י. בע״מ ;

״**החזקה**״ - במישרין או בעקיפין ; מבלי לגרוע מכלליות האמור, יראו אדם כמי שמחזיק בעצמו, במישרין, בהחזקות כל אדם קשור, בהחזקות כל תאגיד שבשליטת אדם קשור, וכן הלאה ;

״**הממונה**״ - הממונה על הגבלים עסקיים ;



256743 /3721

3

"**יוניליבר**" - Unilever N.V. וכל חברה המצויה בשליטת החברה האמורה, השולטת בחברה האמורה או הנשלטת על ידי השולטים בחברה זו, לבד או ביחד עם אחרים;

"**מוצרי בן אנד ג'ריס**" - מוצרי קינוח קפואים ובהם גלידות, יוגורט קפוא, סורבט, עוגות העשויות מאחד מאלה וכל קינוח קפוא אחר אשר פיתחה BJH תחת השם המסחרי "בן אנד ג'ריס" אשר בבעלותה;

"**שליטה**" - היכולת לכוון, במישרין או בעקיפין, פעילותו של תאגיד. בלי לגרוע מכלליות האמור לעיל: (1) חזקה על אדם שהוא בעל שליטה בתאגיד אם הוא מחזיק ביותר ממחצית מהזכות להצביע מכוח המניות או סוג שלהן באסיפה כללית של חברה או בגוף מקביל לאסיפה כללית של תאגיד אחר, או מהזכות למנות דירקטורים ובתאגיד שאינו חברה - מהזכות למנות בעלי תפקידים דומים; (2) חזקה על אדם שהוא בעל שליטה בתאגיד אם הוא מחזיק בזכות למנות מנהל כללי באותו תאגיד; (3) חזקה על אדם שהוא בעל שליטה בתאגיד אם הוא מחזיק ביותר משלושים אחוזים מזכות בתאגיד, אם אין אדם אחר מחזיק יותר ממחצית מזכות כאמור; (4) חזקה כי אדם הנהנה באמונות מחזיק שליטה בנכסיה, למעט החזקה ביחידה בקרן נאמנות שחל עליה חוק השקעות משותפות בנאמנות, התשנ"ד - 1994; (5) חזקה על אדם שהוא בעל שליטה בתאגיד אם הוא מחזיק ביכולת למנוע קבלת החלטה עסקית מהותית של התאגיד, זולת אם מקור אותה יכולת בהסכם המסדיר תנאי הלוואה שנתן תאגיד בנקאי במהלך עסקיו הרגילים; לעניין זה, החלטה עסקית מהותית - למעט החלטה שעניינה הנפקת אמצעי שליטה בתאגיד, מכירה או חיסול של רוב עסקי התאגיד, או שינוי מהותי בעסקי התאגיד.

"**BJH**" - Ben & Jerry's Homemade, Inc. וכל אדם הקשור בה;

דרור שטרום, עו"ד

הממונה על ההגבלים העסקיים

ירושלים, א' טבת תשס"ב
16 בדצמבר 2001



# EXHIBIT 5

This document is being filed under seal

# EXHIBIT 6

# LICENSE AGREEMENT

This License Agreement ("**Agreement**") is made and entered into as of January ___, 2004 between Ben & Jerry's Homemade, Inc. ("**Homemade**"), a corporation with its principal place of business at 30 Community Drive, South Burlington, Vermont, USA, and Unilever N.V., a corporation with its principal place of business at Weena 455, Rotterdam, the Netherlands ("**Unilever**") ("**Ben & Jerry's**" shall mean one or other or both of Homemade and Unilever as the case may be) on the one hand and American Quality Products Ltd. ("**Licensee**"), a corporation with its principal place of business at 1 Hameisav Street, Yavne, 70600, Israel, on the other hand.

## Introduction and Background

The purpose of this Agreement is to replace the presently existing agreement dated June 25, 1998 (the "**1998 Agreement**") and its addendum dated February, 1999 (the "**1999 Addendum**") between Ben & Jerry's Franchising, Inc., on the one hand as the assignee of Homemade, Ben & Jerry's Homemade Holdings Inc. and The American Company For Ice Cream Manufacturing E.I. Ltd., on the other hand, which 1998 Agreement and 1999 Addendum are being terminated concurrently with the execution of this Agreement, and to set forth the mutual obligations and rights between Ben & Jerry's and the Licensee in the Territory (as defined hereunder), regarding Licensee's execution of the rights granted to it hereunder, all as set forth in this Agreement.

## Definitions

In this Agreement the following expressions shall have the meanings appearing alongside them, unless the context otherwise requires:

**ACIC** – means the American Company for Ice Cream Manufacturing E.I. Ltd.

**Affiliate** – means a person or entity that directly or indirectly controls another person or entity, or that is directly or indirectly controlled by, or is under common control with such other person or entity, or any employee, officer, director, agent, or shareholder of such person or entity. In particular, an Affiliate of Homemade or an Affiliate of Unilever shall also include Unilever N.V., Unilever PLC or any entity a

majority of the voting shares of which is owned directly or indirectly by Unilever N.V. or Unilever PLC or both of them together.

**Agreement** - means this license agreement.

**Appendix A** -- as referred to in Proprietary Marks.

**Appendix B** – as referred to in Quality Assurance

**Appendix C** – which defines the Wholesale Distribution Concept.

**Appendix D** – as referred to in Section 11.3 and as modified by Ben & Jerry's from time to time, in accordance with the general international marketing policy of Ben & Jerry's.

**Appendix E** – as referred to in Section 11.3 and as modified by Ben & Jerry's from time to time based on any changes in Ben & Jerry's actual costs.

**Ben & Jerry's** – as defined in the Preamble.

**Business Plan** - as defined in Section 20.2.

**Certificates of Insurance** - as defined in Section 21.3.

**Confidential Information** - as defined in Section 18.1

**Customer Service** - as defined in Section 8.2.

**Gross Turnover/Gross Sales** –means the gross invoiced amount for Products (as defined hereunder) sold by Licensee or any of its Affiliates to third party customers minus actual returns regardless of any discounts, allowances, collection or any taxes other than purchase tax and value added tax. For the purpose of this definition, a sale shall not be deemed to have occurred when Products are transferred or "sold" by Licensee to its Affiliates for resale, but only upon the resale by Licensee or any of its

2

Affiliates to a third party. Gross Turnover/Gross Sales shall also include any other income from any source relating to the Licensed Business or the Products, including, without limitation, any income from sub-licensing or franchising the Licensed Business or any part thereof.

**Initial Term** – as defined in Section 4.1.

**Licensee** - as defined in the Preamble.

**Licensed Business** – means the business of the Licensee regarding the Products only in accordance with the terms of the Agreement.

**Licensed Technology** – means any document, information, know-how and devices disclosed to Licensee by Ben & Jerry's under this Agreement or under any agreement with ACIC.

**Local Proprietary Products** – means the products to be manufactured by the Licensee in the Territory and sold under the Proprietary Marks.

**Managers** – means Retail Shop Managers and Product Managers.

**Manuals** – as defined in Section 10.5

**Marketing Budget** – as defined in Section 12.5.1.

**Net Income** – calculated in accordance with U.S. generally accepted accounting principles.

**Non-Proprietary Products** – means a limited selection of complementary and compatible products, including gift products, that do not bear the Proprietary Marks and are approved from time to time by Ben & Jerry's for sale at Retail Shops by Licensee.

3

**Outline of Terms** – means the agreement signed on December 18, 2001, between Ben & Jerry's Homemade, Inc. and Mr. Avi Zinger.

**Premises** - as defined in Section 4.2.3.

**Products** – means Proprietary Products together with Non-Proprietary Products.

**Product Manager** – as defined in Section 20.5.

**Promotional Materials** – as defined in Section 20.7.

**Proprietary Gift Products** – means T-Shirts, hats, mugs, clothes and the like using or associated with the Proprietary Marks.

**Proprietary Marks** – means certain trade names, service marks, trademarks, logos, emblems, domain names and indicia of origin used in connection with Ben & Jerry's products and Retail Shops as listed in **Appendix A**, and as modified by Ben & Jerry's from time to time.

**Proprietary Products** – the Local Proprietary Products together with products to be imported by the Licensee from Ben & Jerry's and distributed and sold in the Territory under the Proprietary Marks, and the Proprietary Gift Products.

**Quality Assurance** and Q.A. - as defined in Section 6.3; and as modified by Ben & Jerry's from time to time and as set out in **Appendix B**.

**Renewal Fee** - as defined in Section 4.2.7.

**Renewal Term** – as defined in Section 4.2.

**Retail Shops** – means any retail sales location, including but not limited to free standing retail stores, concessions, food court locations, vending carts (fixed or mobile), stands, or counters (stand alone or installed in the business of another retail

location), operating under the Proprietary Marks and Ben & Jerry's system of operating retail ice cream and frozen dessert shops.

**Retail Shop Manager** – as defined in Section 15.21.

**Rules** – as defined in Section 32.2.

**Scoop U Training** – as defined in Section 14.1.

**Term** – as defined in Section 4.1.

**Territory** – The State of Israel, including the "occupied territories" under sole Israeli control.

**The 1998 Agreement** – as defined in the Introduction and Background.

**The 1999 Addendum** – as defined in the Introduction and Background.

**Unilever** – as defined in the Preamble.

**Website** – as defined in Section 20.12.

**Wholesale Distribution/Wholesale Distribution Channel** – means the distribution channels specifically defined as supermarkets, grocery stores, convenience stores, contract food service accounts, department stores, other food outlets, provided however, that it does not include Retail Shops.

**Wholesale Distribution Concept** - as defined in Appendix C.

**NOW, THEREFORE,** the parties agree as follows:

1.    <u>Grant</u>

1.1    Subject to the terms and conditions of this Agreement and to the continued faithful performance by Licensee of its obligations hereunder, Ben & Jerry's

5

grants to Licensee an exclusive, non-transferable and personal license (other than the right to sublicense and franchise as provided hereunder in Section 1.3 and the right to subcontract the manufacture of the Local Proprietary Products as provided hereunder in Section 5.5) in the Territory (i) to manufacture solely in the Territory, under Ben & Jerry's know-how and trade secrets contained in the Licensed Technology, and to package the Local Proprietary Products solely in the Territory, (ii) to offer, sell and distribute Proprietary Products solely through the Wholesale Distribution Channels of distribution in the Territory, (iii) to construct, open, own and operate Retail Shops in the Territory through which the Proprietary Products are sold and (iv) to use the Proprietary Marks which are registered for use in the Territory in connection with the Licensee's rights under this Agreement. The right to distribute includes the right to market, sell, display, advertise and otherwise promote the Products. Licensee agrees and understands that its right to sell and distribute Proprietary Gift Products is limited to selling the same through Retail Shops only and Licensee is acquiring no right, without Ben & Jerry's prior written approval, to manufacture the Proprietary Gift Products or to distribute the same in any other channel of distribution. Ben & Jerry's agrees that, so long as this Agreement is in effect and has not been cancelled or otherwise terminated in accordance with the terms hereof: (i) it shall not grant any other person or entity the right to manufacture, package, or distribute Proprietary Products through the Wholesale Distribution Channels of distribution in the Territory during the Term of this Agreement, (ii) it shall not grant any other person or entity the right to open and operate Retail Shops within the Territory; and (iii) it shall refrain from conducting identical operations as described herein, or any such operations using the name "Ben & Jerry's", with respect to the Proprietary Products and Retail Shops within the Territory, in each case, provided that Licensee is in full compliance with all the terms and conditions of this Agreement.

1.2.   Licensee accepts such grant and licenses and agrees to such rights and obligations to manufacture the Local Proprietary Products within the Territory and to distribute the Proprietary Products within the Territory and to construct, open, own and operate Retail Shops all in accordance with the terms and

6

conditions of this Agreement.   The Licensee will at all times faithfully, honestly, and diligently perform its obligations hereunder and will continuously exert its best efforts to promote and enhance the Licensed Business.

1.3.   During the Term of this Agreement, Licensee shall not, directly or indirectly, manufacture, distribute or sell Proprietary Products or other products subject to this Agreement in the Territory nor establish or operate or license or sublicense any other person or entity to exercise any of the rights hereunder at any location within the Territory other than as set forth herein. Notwithstanding the foregoing, Licensee will have the right to sub-license or franchise, subject to obtaining Ben & Jerry's written consent, which consent shall not be unreasonably withheld or delayed, and provided that quality standards (including Quality Assurance) and all other requirements under this Agreement are assured.   Ben & Jerry's shall be entitled to veto any specific sublicensee or franchisee proposed by Licensee, if in the sole opinion of Ben & Jerry's such a sublicensee or franchisee, or any of their Affiliates, would have an adverse effect upon the Proprietary Marks or any related proprietary information.   In the event that Ben & Jerry's has approved a sublicensee or franchisee, then Licensee agrees that it shall cause such sublicensee or franchisee to comply with the terms and conditions of this Agreement as if they were a party hereto and shall be responsible to Ben & Jerry's for any breach by such sublicensee or franchisee of any such terms or conditions. Ben & Jerry's shall have the right to require that its representatives, or third parties on its behalf, be permitted to inspect the facilities of the sublicensee or franchisee and the Products distributed by them.   Ben & Jerry's further reserves the right, in its sole discretion, to determine and advise Licensee that any sublicensee or franchisee does not meet, or no longer meets, the standards of Ben & Jerry's.   Upon receipt of written notice of such determination and advice, Licensee shall promptly cease to conduct business with any disapproved sublicensee or franchisee.

1.4.   Licensee shall not export Proprietary Products outside of the Territory and Licensee is expressly prohibited from soliciting sales for the Proprietary

7

Products outside the Territory, except for the export of any Proprietary Products outside of the Territory to Unilever or a Unilever Affiliate upon the prior approval of an officer of Homemade, Vermont. Except as aforesaid, Licensee agrees that it will not distribute any Proprietary Products to any party or in any manner dispose of any Proprietary Product under circumstances where Licensee knows, or in the exercise of prudent business judgment should know, that such activity ultimately will result in the exporting of the same outside of the Territory.

1.5.    Licensee acknowledges that the manufacturing of the Local Proprietary Products and/or the distribution process for the Proprietary Products and/or the standards of operation for the Retail Shops may be supplemented, improved, and otherwise modified from time to time by Ben & Jerry's, and Licensee agrees to comply with all reasonable requirements of Ben & Jerry's in that regard.

1.6.    Licensee understands and agrees that no license or other right is granted herein, expressly or impliedly or by estoppel or otherwise, relative to any know-how, trade secrets, inventions, patents, copyrights or other intellectual property rights, except as expressly provided in Section 1 hereof.

2.    **Additional Limitations on Rights Granted**

2.1.    Nothing in this Agreement shall be construed as giving Licensee any right to, and Licensee agrees that it shall not, and shall not permit or assist any Affiliate or any other party to, manufacture, modify, adapt any of the Proprietary Products (in whole or in part) or sell all or any part of any Proprietary Products, except as may be expressly and clearly permitted by this Agreement. Without limiting the materiality of any other term of this Agreement, the failure of Licensee to comply with the provisions of this Section 2.1 shall be considered a material breach of this Agreement.

2.2.    Licensee recognizes and acknowledges the vital importance to Ben & Jerry's of the Proprietary Marks and other proprietary material which Ben & Jerry's owns and creates and the association of the Ben & Jerry's name with them. In

8

order to prevent the denigration of the Proprietary Products and the value of their association with the "Ben & Jerry's" name, and in order to ensure the dedication of Licensee's best efforts to preserve and maintain that value, Licensee agrees that, during the Term, Licensee will not manufacture, sell or distribute any product embodying or displaying any artwork or other representation that is confusingly similar to the Proprietary Marks or other proprietary material of Ben & Jerry's.

2.3.   All rights not specifically and expressly granted by Ben & Jerry's to Licensee are hereby reserved by Ben & Jerry's.

**3.**   **Development Obligation**

Licensee accepts the obligation to develop the Licensed Business.  Licensee will at all times, faithfully, honestly and diligently, perform its obligations hereunder and will continuously exert its best efforts to promote and enhance the development and operation of all components of the Licensed Business in the Territory.

**4.**   **Term and Renewal**

4.1.   The initial term of this Agreement is effective upon the date of the execution of the Outline of Terms (December 18, 2001), except as otherwise provided herein, and shall expire on June 24, 2005 (the "**Initial Term**").  Unless otherwise stated, "**Term**" shall refer to the Initial Term and the period of any renewal rights that Licensee exercises in accordance with Section 4.2.

4.2.   Licensee may renew the rights granted hereunder for one (1) additional consecutive term of seven (7) years (the "**Renewal Term**") if the following conditions are met prior to renewal:

4.2.1.   Licensee shall give Ben & Jerry's written notice of Licensee's election to renew at least nine (9) months, but not more than twelve (12) months, prior to the end of the Initial Term; and

9

4.2.2. Licensee shall not have any past due monetary obligations or other outstanding obligations to Ben & Jerry's or its Affiliates; and

4.2.3. Licensee shall not be in default of any material provision of this Agreement, or successor hereto, or any other agreement between Licensee and Ben & Jerry's or its Affiliates or any lease or sublease for the premises of any Retail Shop or other facility ("Premises"). Licensee shall have substantially complied with all the terms and conditions of such agreements during the terms thereof; and

4.2.4. Licensee shall execute a general release, in a form prescribed by Ben & Jerry's, of any and all claims against Ben & Jerry's and its Affiliates, and their respective present and former officers, directors, agents, and employees; and

4.2.5. Licensee shall make or provide for, in a manner satisfactory to Ben & Jerry's, such renovation and modernization of the manufacturing facility(ies) and/or of any location used in the wholesale component of the Licensed Business, and any open and operating Retail Shop, as Ben & Jerry's may reasonably require, including installation of new equipment and renovation of existing fixtures, replacement of obsolete signage, furnishings and décor in order to accommodate the then current technology relative to the manufacture of the Local Proprietary Products, the Wholesale Distribution of Products and the design and image of the then current Retail Shops; and

4.2.6. Licensee shall comply with the then current Ben & Jerry's qualification and training requirements for operators of Retail Shops outside of the U.S. so long as the said qualifications and requirements have actually substantially been enforced, to the extent required, by Ben & Jerry's, in the previous twelve (12) months, upon other Ben & Jerry's licensees outside of the U.S. and Canada; and

10

4.2.7.  Licensee shall pay Ben & Jerry's a renewal fee (the "Renewal Fee") in US dollars equal to 10% of the greater of: (i) 50% of Licensee's Net Income generated from the Products or other rights pursuant to this Agreement for the last year of the Initial Term or (ii) 1.25% of Licensee's Gross Turnover from all sources of income of Licensee generated from the Products or other rights pursuant to this Agreement for the last year of the Initial Term.  Payments shall be made in accordance with Section 12.

5.      **Manufacturing**

5.1.    Licensee shall manufacture Local Proprietary Products only in the manner and under the conditions that are expressly authorized by Ben & Jerry's and which are in full compliance with the Licensed Technology, and with the Manuals and with the terms hereof and with Quality Assurance standards and any other requirement of Ben & Jerry's and in compliance with all applicable law. Licensee shall construct and equip any manufacturing facility, in compliance with Ben & Jerry's specifications, at Licensee's own expense. Licensee shall obtain all licenses, permits and certifications required for the lawful construction and operation of each such location and shall certify in writing to Ben & Jerry's that all such licenses, permits and certifications have been obtained.

5.2.    Licensee covenants and agrees that it will manufacture the Local Proprietary Products, in accordance with the specifications for the Local Proprietary Products as supplied by Ben & Jerry's. Such manufacture will be subject to the approval of Ben & Jerry's for frozen dessert products and must meet the Quality Assurance requirements for such quality as prescribed by Ben & Jerry's and its quality control agent. Licensee shall be in full compliance with all applicable laws as well as applicable standards generally in use for the normal manufacture of frozen dessert products.

5.3.    Licensee represents that it is a manufacturer qualified to produce frozen dessert products in general and has the ability to produce the Local Proprietary Products (with the use of the Licensed Technology) in sufficient quantity to

11

meet the requirements of this Agreement and to gain a substantial market for the Local Proprietary Products in the category in which the same will be positioned. The Licensee confirms that it has invested in and presently maintains manufacturing facilities and will either continue to maintain manufacturing facilities or contract for manufacturing facilities in Israel to produce the Local Proprietary Products and Licensee will produce Local Proprietary Products of the highest quality in the frozen dessert products category, meeting Q.A. standards as specified by Ben & Jerry's.

5.4.   Licensee will not deviate in the formulation, labeling and packaging for the Proprietary Products without the prior written consent of Ben & Jerry's.

5.5.   In the event Licensee wishes to subcontract the manufacture of the Local Proprietary Products, Licensee must obtain the prior written consent of Ben & Jerry's. Ben & Jerry's will not unreasonably withhold or delay its consent provided that Quality Assurance requirements and all other requirements of this Agreement are assured. Ben & Jerry's shall be entitled to veto any specific subcontractor proposed by Licensee if in the sole opinion of Ben & Jerry's such a subcontractor or any Affiliate of such a subcontractor would have an adverse effect upon the Proprietary Marks or any related Confidential Information. In the event that Ben & Jerry's has approved a subcontractor then Licensee agrees that such approval shall not relieve Licensee of any of its obligations pursuant to this Agreement, and Licensee shall be responsible to Ben & Jerry's for any breach by such subcontractor of any of the terms or conditions of this Agreement. Ben & Jerry's shall have the right to require that its representatives, or third parties on its behalf, be permitted to inspect the manufacturer's facilities, and that samples from the products produced by the manufacturer or components used by the manufacturer be delivered for evaluation and testing either to Ben & Jerry's or to an independent testing facility designated by Ben & Jerry's. A charge not to exceed the reasonable cost of the evaluation and testing shall be paid by Licensee. Ben & Jerry's further reserves the right, in its sole discretion, to determine and advise Licensee that the manufacturer of the products supplied does not meet, or no longer meets, the standards of Ben & Jerry's. Upon receipt of written notice

of such determination and advice, Licensee shall immediately cease to conduct business with any disapproved manufacturer.

6.   **Quality Control**

6.1.   Upon request from Ben & Jerry's at any time, but not less than twice per year, Licensee shall deliver to Ben & Jerry's or its designated representative, at Licensee's expense, to a location prescribed by Ben & Jerry's, samples of the finished Local Proprietary Products. Licensee will also submit upon request from Ben & Jerry's at any time, but not less than twice a year, production, quality control and finished product manufacturing biological testing records for review. In addition, Licensee shall submit such testing records prior to the manufacture of any new Products. If at any time a Local Proprietary Product is, in the sole and exclusive judgment of Ben & Jerry's, not manufactured in strict compliance with Ben & Jerry's Quality Assurance standards or as otherwise approved in writing by Ben & Jerry's, Ben & Jerry's shall notify Licensee to suspend the production and sale of such Local Proprietary Product until the same is brought by the Licensee, at its sole expense, into conformity with all required specifications pursuant to this Agreement. Ben & Jerry's will give Licensee written notice of any such non-compliance, which notice shall specify the details thereof. Within five (5) days after receipt of such notice, Licensee shall promptly correct any problem specified by Ben & Jerry's therein. If such Local Proprietary Product, as corrected by Licensee, still is not approved by Ben & Jerry's, or if Licensee fails to correct any such problem in the time provided herein, the Proprietary Marks shall be promptly removed from such Local Proprietary Products, at the option of, and at no cost to Ben & Jerry's, and all such products shall be promptly destroyed and evidence of such destruction shall be provided to, Ben & Jerry's. In addition, Ben & Jerry's shall have the right to terminate this Agreement forthwith.

6.2.   In order to carry out the purposes of this Agreement, but without relieving Licensee of its continuing obligation of maintaining proper conformity, Ben & Jerry's retains the right, with or without notice, to inspect, during normal business hours, the facilities utilized by Licensee and by suppliers to Licensee in connection with the manufacture, storage and distribution of Proprietary

13

Products and to examine Proprietary Products in the process of manufacture and all documents and records related hereto.

6.3. Licensee agrees that each Local Proprietary Product manufactured and offered for sale by it shall be in conformity with the Quality Assurance ("**Quality Assurance**" or "**Q.A.**") standards and specifications set for the Proprietary Products by Ben & Jerry's. The Local Proprietary Products shall be of a high quality which is at least equal to comparable other super premium ice cream products and to comparable products in the market of the same premium quality, and always in conformity with a standard sample approved by Ben & Jerry's.

## 7. Distribution

7.1. The Wholesale Distribution Channels, including Proprietary Product availability, Proprietary Product variety, and quantity of Proprietary Product are critical to the promotion of the Proprietary Products and to the protection of the Proprietary Marks within the Territory. Licensee shall use its best efforts to maximize the rights granted hereunder throughout the Territory, including but not limited to, selling significant quantities of Proprietary Products and maintaining sufficient personnel to provide effective distribution of the same.

## 8. Public Relations and Customer Service

8.1. Licensee will maintain a public relations department in connection with its marketing and sales undertakings and will continue to maintain such department during the Term of this Agreement and utilize the same for marketing of the Products.

8.2. Licensee shall be solely responsible for, and shall use its best efforts to provide and maintain, high-quality customer service and technical support in the Territory to all customers (e.g. dealers, distributors and end-users) with respect to all Products. Subject to Licensee having obtained Ben & Jerry's prior written approval in connection with the form and content thereof,

Licensee's name and appropriate information for contacting Licensee with respect to customer service issues shall be prominently displayed on the packaging or label of each Product sold by Licensee. For purposes of this Agreement, **"Customer Service"** means the resolution of customer complaint issues pertaining to the Products in the following general categories: inventory processing, payment processing, order inquiries, product returns, defects and replacements and technical support.

8.3.  Licensee and its staff shall be conversant with the Products and similar frozen dessert products in general and shall develop sufficient knowledge of the industry and of products competitive with the Products so as to be able to explain the Products in detail to distributors, dealers, retailers and end-users. Licensee shall conduct or provide for any training of its personnel that may be necessary to impart such knowledge.

8.4.  Licensee shall maintain a high-quality adequately staffed Customer Service department to address all Customer Service issues relating to Products sold by Licensee. All Customer Service issues shall be categorized by type of issue and problem resolution. Problem resolution shall be guided by reasonable written Customer Service policies applied by Licensee uniformly throughout the Territory after consultation with Ben & Jerry's.

8.5.  Licensee shall establish and maintain adequate telephone access within the Territory for answering questions from end-users and potential end-users concerning the sale and use of the Products sold by Licensee and for addressing other Customer Service issues.

8.6   Licensee shall promptly notify Ben & Jerry's in writing of any claimed or suspected defect in a Product no later than five (5) business days after Licensee learns of the same, whether directly or through a distributor, dealer, retailer or an end-user.

8.7   Licensee agrees that any Wholesale Distribution Channel wishing to sell the Proprietary Products will meet Ben & Jerry's then standard criteria for

15

cleanliness and standards of operation as directed in the Manuals or otherwise in writing.

**9.**     **Licensed Technology**

9.1.    Licensee acknowledges that Ben & Jerry's has provided and disclosed to Licensee the Licensed Technology with respect to the formulation and manufacture of the Local Proprietary Products. Licensee agrees to use its best efforts to protect the confidentiality of this information and use this Licensed Technology only as it relates to the formulation and manufacture of the Local Proprietary Products.

9.2.    Any improvements (including additions, modifications, substitutions) made to the process of formulating or manufacturing the Proprietary Products, whether done by Licensee or another third party, will constitute part of the Licensed Technology and will remain and be the sole property of Ben & Jerry's. Licensee will execute any and all documents which Ben & Jerry's deems necessary in order to vest all right, title, and interest in and to the improvements in Ben & Jerry's.

9.3.    Licensee acknowledges that Licensed Technology (including but not limited to manufacturing methods, recipes and formulae now or hereafter used) received from Ben & Jerry's constitute valuable trade secrets of Ben & Jerry's and Confidential Information, and is revealed in confidence hereunder. Licensee agrees, at a minimum, to make such Confidential Information available only to those parties having a need-to-know and require the same parties to agree to the obligations of confidentiality and to sign a non-disclosure undertaking in the form provided by Ben & Jerry's. Licensee agrees to notify and obtain Ben & Jerry's prior written consent to any transfer of Confidential Information to any such party.

**10.**     **Duties of Ben & Jerry's**

10.1.    Ben & Jerry's shall make available to Licensee standard U.S. plans and specifications for the manufacture of the Local Proprietary Products and for the retail and wholesale components of the Licensed Business.

16

10.2.   At Licensee's sole expense, Ben & Jerry's shall provide initial training for operation of a Retail Shop as set forth in Section 14 of this Agreement, to the extent such training has not been previously provided.

10.3.   Upon request, and at Licensee's expense, Ben & Jerry's shall provide such on-site pre-opening and opening supervision and assistance for each Retail Shop as Ben & Jerry's deems advisable.

10.4.   At Licensee's request and in Ben & Jerry's sole discretion, Ben & Jerry's may make available to Licensee, at Ben & Jerry's expense, standard U.S. marketing plans and promotional materials as the same exist in English.

10.5.   After Licensee's execution of this Agreement, Ben & Jerry's shall provide Licensee, on loan and at Ben & Jerry's expense, English-language copies of the Ben & Jerry's Confidential Operating Manuals, including, without limitation, copies of Ben & Jerry's Manufacturing Standards, Quality, Distribution and Product Handling Requirements (collectively, the "Manuals"), as described in Section 17. All Manuals and translations thereof (as provided for in Section 17.3) are the sole property of Ben & Jerry's and are to be treated as confidential by Licensee. The Manuals may be set forth in several volumes, including such amendments thereto as Ben & Jerry's may publish from time to time. Additionally, Licensee acknowledges and agrees that Ben & Jerry's may provide a portion or all (including updates and amendments) of the Manuals, and other instructional information and materials in, or via, electronic media, including without limitation, through the use of computer disks, the internet or the Ben & Jerry's extranet.

10.6.   Ben & Jerry's shall provide to Licensee, from time to time, as Ben & Jerry's deems appropriate and at Ben & Jerry's expense, advice and written materials concerning techniques of managing and operating the manufacturing of the Local Proprietary Products, the distribution of the Proprietary Products through the Wholesale Distribution Channels and the operation of the Retail Shops, including suggested inventory and cost control methods, new

17

developments and improvements in manufacturing techniques, new developments and improvements in products and marketing techniques, new developments and improvements in wholesale concept and service standards and new developments and improvements in the Retail Shop layout and design.

## 11.     Purchase and Sale of Products

11.1.   Licensee shall notify Ben & Jerry's of any changed requirements for packaging and marking and the parties shall agree on the actions needed for such compliance, and until the parties agree on the actions to be taken by Licensee, Licensee shall refrain from preparing, purchasing or selling Products using such packaging and/or marketing. Notwithstanding the foregoing, Licensee shall be solely responsible for all such requirements, including any unique to Israel packaging requirements, and for all labeling or any other similar requirements. In addition to purchasing finished Proprietary Products from Ben & Jerry's (subject to availability and as the need arises), the Licensee shall not purchase any ingredients of any kind or nature, used in the manufacture of Local Proprietary Products, or any Proprietary Gift Products, from any entity unless such ingredients conform with all Quality Assurance requirements and all other requirements pursuant to Section 15.8.

11.2.   Licensee shall manufacture the Local Proprietary Products and/or buy and distribute (in both the wholesale and the retail concepts) its annual requirements of Proprietary Products pursuant to the projections in the Business Plan.

11.3.   In the event that Licensee purchases Proprietary Products from Ben & Jerry's, Licensee will purchase the same upon at least thirty (30) days' notice to Ben & Jerry's. During the initial three years, beginning from the date of the Outline of Terms, Ben & Jerry's will sell certain quantities and products as set out in Appendix D, to the Licensee on a cost basis, FOB Bellows Falls, V.T., U.S.A. The agreed initial cost prices are set out in Appendix E and will be adjusted from time to time based on any changes in Ben & Jerry's actual costs. Upon conclusion of the initial three years, the products will be sold by Ben & Jerry's

18

to the Licensee at prices to be determined by the Licensor and the Licensee based on arms-length negotiations. All sales shall be on a 90-day credit basis from date of FOB shipment. Licensee agrees to accept full responsibility for the handling and transportation of orders for the Proprietary Products from the Ben & Jerry's facilities in Vermont U.S.A. or such other Ben & Jerry's manufacturing facilities as may be designated by Ben & Jerry's, and all expenses connected therewith including, but not limited to, all freight, import costs and fees, taxes and duties, and any other applicable taxes, shall be borne by the Licensee.

11.4. Purchases shall be paid for by Licensee on a 90-Day credit from date of FOB shipment, and all other terms of Section 12 shall apply.

11.5. With respect to Local Proprietary Products manufactured and/or Proprietary Products purchased by Licensee from Ben & Jerry's to be sold by Licensee in the Territory through the Wholesale Distribution Channels of distribution and/or Retail Shops, Ben & Jerry's reserves the right:

11.5.1. To discontinue, in its sole discretion, the availability of particular Proprietary Products from time to time, to the extent consistent with Ben & Jerry's world wide policy (outside of the U.S. and Canada) with respect to licenses;

11.5.2. To limit the offer and sale of any new Proprietary Product in such manner and for such period of time as Ben & Jerry's may reasonably deem necessary to determine the marketability of a Proprietary Product or the feasibility and desirability of offering a Proprietary Product for sale under this Agreement, to the extent consistent with Ben & Jerry's world wide policy (outside of the U.S. and Canada) with respect to licenses; and

11.5.3. To require the return or proper disposal of, in accordance with all legal and regulatory requirements as Ben & Jerry's shall direct in its sole discretion, Proprietary Products which Ben & Jerry's reasonably

19.

believes to be adulterated, tainted, contaminated, spoiled, undated, hazardous, expired or otherwise unfit to be used for its intended purpose. Ben & Jerry's shall reimburse Licensee for the cost of any such Proprietary Products provided that the defect in such Proprietary Products existed before the Proprietary Products were delivered to Licensee's designated carrier and further provided that such Proprietary Products were not returned or disposed of as a result of an act or failure to act by Licensee or its shippers, transporters or carriers or any purchaser from Licensee.

## 12.    Payments

12.1    There shall be no royalties paid or due to Ben & Jerry's or Unilever with respect to any of Ben & Jerry's Products manufactured or sold in the territory by the Licensee or any of its Affiliates during the Initial Term. During the Renewal Term, Licensee shall pay Unilever an annual royalty fee equal to 3% of the Gross Turnover.

12.2    Remittances to Ben & Jerry's of all of the royalties set forth in this Section 12 shall be paid to Unilever N.V. or to any other Unilever Affiliate as instructed in writing by Ben & Jerry's by the fifteenth (15th) day of each month following the end of a calendar quarter (unless otherwise set forth herein) and shall be submitted to Unilever N.V., together with any reports or statements required hereunder. Any contribution, payment, statement or report due to, but not actually received by, Unilever on or before the prescribed date herein shall be overdue. If any contribution or payment is overdue, Licensee shall pay Unilever N.V. immediately upon demand, and in addition to the overdue amount, interest on such amount from the date it was due until paid at the rate of twelve percent (12%) per annum, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Ben & Jerry's may have. Licensee shall not be entitled to set off any contributions or payments required to be made under this Agreement against any monetary claim it may have against Ben & Jerry's. All payments will be made in U.S. Dollars and will be as directed by Ben & Jerry's.

20

12.3. All payments by Licensee to Ben & Jerry's (including any payments to Unilever) shall be made without any deduction for any taxes, except that Licensee shall deduct and pay to the appropriate taxing authorities, on behalf of Ben & Jerry's, any amount which Licensee is required to withhold under any laws of Israel on payments made by Licensee to Ben & Jerry's. Licensee shall transmit to Ben & Jerry's official receipts for payment on all taxes withheld. If Licensee fails to withhold or pay such taxes, it shall indemnify Ben & Jerry's for the full amount of such taxes and for any loss or liability occasioned by Licensee's failure to withhold as required by law, including, but not limited to, any penalties, interest, and expenses incurred by Ben & Jerry's. All other taxes imposed on payments by Licensee to Ben & Jerry's, including, but not limited to, value added taxes, consumption taxes, and salary taxes, which may be imposed now or in the future under the laws of the Territory or any taxing authority therein, shall be Licensee's sole responsibility, and Licensee shall transmit such taxes to the appropriate fiscal authorities. Such taxes shall not affect Licensee's obligation to make payments to Ben & Jerry's as required under this Agreement.

12.4 All payments made to Ben & Jerry's (including payment to Unilever) pursuant to this Section 12 shall be paid to in U.S. Dollars and will be wire-transferred, at Licensee's expense, to such bank account as Ben & Jerry's shall designate from time to time. Computation of any amounts payable under this Agreement which require conversion to U.S. Dollars shall be made at the electronic transfer selling rate for U.S. Dollars on the date of transfer at a bank in the Territory mutually agreed upon by Ben & Jerry's and Licensee, and if there is no such agreement then at First International Bank.

12.5. Recognizing the value of marketing and promotion, and the importance of standardization of marketing and promotion programs to the furtherance of the goodwill and public image of the Licensed Business, Licensee and Ben & Jerry's agree:

12.5.1 Each month during the Term of this Agreement, Licensee shall contribute to its own marketing budget (the "**Marketing Budget**") a

21

sum equal to not less than five (5) percent of Licensee's total sales from the sale of all Products through the Wholesale Distribution Channels and the Retail Shops for the preceding month. Licensee understands and acknowledges that such required expenditure is a minimum requirement only, and that Licensee may, and is encouraged to, expend additional funds for marketing and promotion. Licensee agrees to include the proposed expenditures for this fund in the annual Business Plan.

12.5.2 The Marketing Budget, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all marketing, advertising, public relations and/or promotional programs, and other activities including socially responsible activities. Licensee shall be responsible for the spending of the Marketing Budget in accordance with the provisions of this Agreement, but Licensee will keep Ben & Jerry's informed of any such spending. Based on performance, Ben & Jerry's reserves the right to approve the manner in which the Marketing Budget is spent to the extent necessary to ensure that there is no adverse effect upon the Proprietary Mark or the Quality Assurance of the Products.

12.6 In the event that any government authority having jurisdiction in the Territory imposes restrictions on the transfer of U.S. Dollars to places outside of the Territory, or imposes any tax or other imposition which is required to be paid or borne by Ben & Jerry's, Ben & Jerry's, in its sole discretion, shall have the option to: (i) with respect to restriction on the transfer of U.S. Dollars, require that Licensee deposit all payments required under this Agreement to a designated account in the name of Ben & Jerry's in the Territory; or (ii) terminate this Agreement pursuant to the terms of Section 23.2.

## 13.    Construction and Opening of Retail Shops

13.1.   Licensee shall renovate or construct, and equip, the Retail Shops at Licensee's own expense. Licensee shall obtain all permits and certifications required for the lawful construction and operation of each Retail Shop and shall certify in

22

writing to Ben & Jerry's reasonable satisfaction that all such permits and certifications have been obtained.

13.2.   Licensee shall be responsible for obtaining all licenses, permits, zoning classifications and clearances which may be required by applicable laws, ordinances, or regulations, or which may be necessary or advisable owing to any restrictive covenants relating to the premises of any Retail Shop.

13.3.   Except as otherwise provided herein, prior to opening for business of each Retail Shop, Licensee shall comply with all design and layout requirements and pre-opening requirements set forth in this Agreement, the Manuals and/or elsewhere in writing by Ben & Jerry's. Licensee also shall obtain written approval by Ben & Jerry's, a response to which should be provided by Ben & Jerry's without delay, prior to opening each Retail Shop. Ben & Jerry's, in its sole discretion, may conduct a pre or post opening inspection of any Retail Shop within fifteen (15) business days of the request by Licensee. If the Retail Shop fails the inspection, Licensee shall reimburse Ben & Jerry's for the travel expenses and room and board of representatives of Ben & Jerry's for each inspection including the first one.

13.4.   Licensee shall submit the design and layout for each proposed Retail Shop to Ben & Jerry's for approval prior to beginning construction, a response to which should be provided by Ben & Jerry's without delay.

## 14.   Training

14.1.   Licensee's Retail Shop Managers shall attend and complete, to the satisfaction of Ben & Jerry's, the training ("**Scoop U Training**") for owners and Retail Shop Managers offered by Ben & Jerry's. At the option of Ben & Jerry's, and at Licensee's expense, any persons subsequently employed by Licensee in the position of Retail Shop Manager shall also attend and complete, to the satisfaction of Ben & Jerry's, Scoop U Training for Retail Shop Managers. Licensee, Retail Shop Managers, and other employees of Licensee also shall attend such additional courses, seminars, and other training programs as Ben & Jerry's may reasonably require from time to time. Every five (5) years, the

23

current Retail Shop Managers must attend, to the extent requested by Ben & Jerry's, a refresher training program held at a designated Scoop U Training facility.

14.2.  All training programs shall be at such times as may be designated by Ben & Jerry's.  Training programs shall be provided in Vermont, USA or such other locations as Ben & Jerry's may designate.  Licensee shall be responsible for any and all other expenses incurred by Licensee's trainees in connection with Scoop U Training, including, without limitation, such costs as transportation, lodging, meals and wages.  Ben & Jerry's may authorize a qualified employee of the Licensee to provide such Scoop U Training, provided such employee completes a Ben & Jerry's training course, and thereafter remains up-to-date by completing any additional training as Ben & Jerry's may deem appropriate from time to time.  Ben & Jerry's may in its sole discretion at any time rescind such authorization.

14.3.  Ben & Jerry's shall provide, at its expense, manufacturing standards and procedures, product handling procedures and standards of operation for Retail Shop operations, approved product list, ice cream sampling handbooks and vend cart manual, whether in the Manuals or otherwise, any and all which may be updated from time to time.

**15.    Duties of Licensee**

15.1.  Licensee understands and acknowledges that every detail of each of the three (3) components of the Licensed Business, as communicated by Ben & Jerry's to Licensee in the Manuals, training, on-going consultation, and in this Agreement, is important to Licensee, Ben & Jerry's, and other operators and distributors of Ben & Jerry's in order to develop and maintain quality manufacturing standards, high operating standards, to increase the demand for the Products sold, to protect the Wholesale Distribution Concept, including the food service component, and to protect the reputation and goodwill of Ben & Jerry's.

24

15.2.   Licensee shall refrain from using or permitting the use of the Retail Shops for any purpose other than the conduct of the Licensed Business, without first obtaining the written consent of Ben & Jerry's.

15.3.   Licensee shall keep the Retail Shops open and in normal operation for such minimum hours and days as Ben & Jerry's may specify.

15.4.   To insure that the highest degree of quality and service is maintained, Licensee shall exercise the rights granted to it herein in strict conformity which such standards and specifications as Ben & Jerry's may from time to time prescribe in the Manuals or otherwise in writing. Licensee shall refrain from deviating from such standards, specifications, and procedures without the prior written consent of Ben & Jerry's. Accordingly, Licensee agrees to purchase and install, at Licensee's expense, all equipment, supplies, signs, furnishings, fixtures, décor and materials as Ben & Jerry's may reasonably direct from time to time in the Manuals or otherwise in writing, and to refrain from installing or permitting to be installed on or about the premises of any of its manufacturing facilities, distribution facilities and Retail Shops, without the prior written consent of Ben & Jerry's, any equipment, supplies, signs, furnishings, fixtures, décor and materials not previously approved as meeting the standards and specifications of Ben & Jerry's.

15.5.   Licensee agrees not to install or permit to be installed in any Retail Shop any vending machine, game or coin operated device, unless specifically previously approved in writing by Ben & Jerry's.

15.6.   Licensee agrees to maintain an adequate supply of required supplies, including required proprietary paper products as specified in the Manuals and other written Ben & Jerry's instructions.

15.7.   Licensee acknowledges that: (i) the Local Proprietary Products, manufactured hereunder, and the Proprietary Products distributed, offered and sold under this Agreement, are prepared from proprietary recipes developed by and, in some cases, exclusively for Ben & Jerry's; (ii) the Proprietary Products are

25

unique and their formulae and manufacturing processes constitute trade secrets essential to the success of the Ben & Jerry's business as a whole and to Licensee's success hereunder; and (iii) Licensee has entered into this Agreement in order to, among other things, obtain the right to manufacture the Local Proprietary Products, to distribute, offer and sell the Proprietary Products through the Wholesale Distribution Channels and to operate Retail Shops. In order to protect the interest of Ben & Jerry's in the Proprietary Products and to ensure the quality, uniformity, and distinctiveness of the same, Licensee agrees:

15.7.1 To handle and store the Products and their ingredients solely in the manner directed by Ben & Jerry's in the Manuals or otherwise in writing; and

15.7.2 Not to sell, offer for sale, or sample, and to destroy immediately in accordance with procedures set forth in the Manuals and other written Ben & Jerry's instructions, any Product or ingredients therefore which it knows, or should know through the exercise of reasonable care, to be adulterated, tainted, contaminated, spoiled, expired, unsafe, or otherwise unfit for human consumption.

15.8.   All Products sold or offered for sale by Licensee shall meet the then current standards and specifications of Ben & Jerry's, as established in the Manuals or otherwise in writing. Ben & Jerry's may agree to allow Licensee to purchase any or all ingredients for the same solely from suppliers who, (i) demonstrate to Ben & Jerry's continuing reasonable satisfaction the ability to meet the quality standards and specifications of Ben & Jerry's, (ii) possess adequate quality controls and capacity to supply Licensee's needs promptly and reliably, and (iii) previously have not been disapproved by Ben & Jerry's. Ben & Jerry's may, from time to time, disapprove ingredients or suppliers, if Ben & Jerry's determines, in its sole discretion, that the ingredients or suppliers of these ingredients do not meet the quality standards of Ben & Jerry's. Upon receipt of written notice of such disapproval, Licensee shall cease to use any disapproved ingredients and/or cease to purchase from any disapproved

26

supplier. Licensee must obtain prior written approval to use ingredients, by forwarding samples of such ingredients to Ben & Jerry's or to an independent testing facility designated by Ben & Jerry's. A charge not to exceed the reasonable cost of evaluation and testing shall be paid by the Licensee. Ben & Jerry's will use reasonable efforts to ensure that test results will be communicated to the Licensee in a timely fashion. As a function of the ongoing quality assurance, Ben & Jerry's shall have the right, but not the obligation, to require that its representatives be permitted to inspect the facilities of the suppliers from which ingredients are purchased.

15.9.   Licensee shall stock and maintain, for both the wholesale and the retail components, all types of Proprietary Products in quantities sufficient to meet reasonably anticipated customer demand in the Territory.

15.10.  Licensee shall manufacture a sufficient amount of Local Proprietary Products and purchase a sufficient amount of the Products to meet the projections of the Business Plan.

15.11.  Licensee shall permit Ben & Jerry's and their agents to enter upon any of Licensee's facilities at any time and from time to time during normal business hours for the purpose of conducting inspections of the facilities and the books, records and/or accounts of Licensee. Licensee shall cooperate with representatives of Ben & Jerry's in such inspections by rendering such assistance as they may reasonably request, and, upon written notice from Ben & Jerry's or its agents, and without limiting other rights of Ben & Jerry's under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. If Licensee fails an inspection and Ben & Jerry's determines that a re-inspection is required, Licensee shall reimburse Ben & Jerry's for the travel expenses and room and board of their representatives for subsequent inspections to ensure that all deficiencies have been corrected.

15.12.  Licensee shall ensure that all marketing and promotional materials, signs, decorations, paper goods (including disposable food containers, napkins, menu

27

boards and all forms of stationery) used in each component of the Licensed Business and other items specified by Ben & Jerry's bear the Proprietary Marks in the then current form, color, location, and manner prescribed from time to time by Ben & Jerry's and are maintained in good and clean condition.

15.13. Licensee shall maintain its manufacturing, wholesale distribution facilities and Retail Shop locations (including adjacent public areas) in a clean, orderly condition and in excellent repair, and, in connection therewith, Licensee shall, at its expense, make such repairs and replacements thereto (but no others without prior written consent of Ben & Jerry's) as may be required for that purpose.

15.14. Licensee shall not implement any change to any of the three (3) components of the Licensed Business without the prior written consent of Ben & Jerry's. Licensee shall notify Ben & Jerry's in writing of any change, amendment, or improvement in the Manuals which Licensee proposes to make, and shall provide to Ben & Jerry's such information as Ben & Jerry's requests regarding the proposed change. Ben & Jerry's shall use reasonable efforts to respond to Licensee's requests submitted under this Section 15.14 in a reasonable amount of time. Under no circumstances shall the approval or consent of Ben & Jerry's to any request be deemed to have been granted to Licensee absent Licensee's receipt of express written notice thereof from Ben & Jerry's. Licensee acknowledges and agrees that Ben & Jerry's shall have the right to incorporate the proposed change into the manufacturing of the Proprietary Products and/or distribution of the same and shall thereupon obtain all right, title, and interest therein without compensation to Licensee. Ben & Jerry's may, from time to time, on a reasonable basis, revoke its approval of a particular change or amendment. Upon receipt of written notice of such revocation, Licensee shall modify its activities in the manner prescribed by Ben & Jerry's.

15.15. At the request of Ben & Jerry's, but not more often than once every five (5) years, Licensee shall refurbish the Premises of each Retail Shop, at its expense, to conform to the store design, trade dress, color schemes and

presentation of the Proprietary Marks in a manner consistent with the then current image for new Retail Shops located outside the U.S. Such refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration and modifications to existing improvements.

15.16. Licensee shall comply with all terms of its leases or subleases, its financing agreements (if any), and all other agreements affecting the operation of the Licensed Business and shall undertake best efforts to maintain a good and positive working relationship with its landlords and/or lessors; and shall not engage in any activity which may jeopardize Licensee's right to remain in possession of, or to renew the lease or sublease for, the Premises of each Retail Shop.

15.17. Licensee shall meet and maintain the highest health and safety standards and ratings applicable to the manufacture of the Local Proprietary Products, wholesale distribution of the Proprietary Products and operation of the Retail Shops. Licensee shall furnish to Ben & Jerry's, within twenty-four (24) hours after receipt thereof, a copy of any violation or citation which indicates Licensee's failure to maintain such health or safety standards.

15.18. If Licensee learns that any retail outlet in Licensee's Territory is selling Proprietary Products which were not sold to such outlet by Licensee, Licensee shall notify Ben & Jerry's in writing within fourteen (14) days. Failure by Licensee to notify Ben & Jerry's within fourteen (14) days of Licensee's learning of the same shall constitute a default under this Agreement and a material waiver of any and all of Licensee's rights against Ben & Jerry's under this Agreement.

15.19. Licensee shall use its best efforts to integrate into its business a reasonable number (given the size of Licensee's operation) of socially responsible activities which are consistent with those activities and programs which Ben & Jerry's conducts to implement its social mission priorities.

15.20. Licensee shall comply, and shall use its best efforts to ensure that it and all entities dealing through Licensee comply with all applicable national, or local laws and regulations in performing its duties hereunder and in any of its dealings with respect to the Products (including without limitation any approvals necessary in connection with any advertising that may be approved by Ben & Jerry's pursuant to this Agreement). Licensee shall be solely responsible for obtaining any required governmental, regulatory or other approval in the Territory for this Agreement (except for the approval or approvals of the Controller of Restrictive Trade Practices which shall be the joint responsibility of Ben & Jerry's and the Licensee), and Licensee represents and warrants that this Agreement is valid, binding and enforceable in accordance with its terms in the Territory, without any requirement of any approval, consent, license or permit from any government entity, agency or authority (other than such approval, consent, license or permits as has already been obtained by Licensee, and the approval of the Controller of Restrictive Trade Practices as aforesaid).

15.21. Each Retail Shop shall at all times be under the direct, on premises supervision of Licensee or a manager appointed by the Licensee and approved of by Ben & Jerry's ("**Retail Shop Manager**"), who has satisfactorily completed the Scoop U Training. Licensee shall maintain a competent, conscientious, trained staff at each Retail Shop. Licensee shall use its best efforts to ensure that all of its employees preserve good customer relations, render competent, prompt, courteous and knowledgeable service, and meet such minimum standards as Ben & Jerry's may establish from time to time in the Manuals and other writings. Licensee and its employees shall handle all customer complaints, refunds, returns and other adjustments in a manner that will not detract from the name and goodwill of Ben & Jerry's. Licensee will use the system designed by Ben & Jerry's for training employees, as communicated to Licensee by Ben & Jerry's in the Manuals and in Scoop U Training, and by Ben & Jerry's in continuing consultation. Licensee shall be solely responsible for all employment decisions and functions of the Licensee's business including those related to hiring, firing, wage and hour requirements, record keeping, supervision and discipline of employees.

30

15.22. At the request of Ben & Jerry's, Licensee agrees to return obsolete signage (which is used in the Retail Shops) to a location prescribed by Ben & Jerry's. Upon receipt of such signage, Ben & Jerry's agrees to pay to Licensee the depreciated value of any obsolete signage.

15.23. Licensee shall promptly notify Ben & Jerry's in the event that Licensee knows or has reason to believe that any act or refrainment from acting required by or contemplated under this Agreement violates any law, rule or regulation (whether criminal or non-criminal) of the Territory or any political or governmental subdivision thereof. Licensee shall promptly notify Ben & Jerry's in writing of any claim or proceeding involving any Product no later than ten (10) days after Licensee learns of such claim or proceeding.

15.24. Licensee agrees that it shall not act or omit to act in any way that would violate any of the export control laws or regulations of the U.S., and no party shall be required hereunder to act or omit to act in any way that it believes in good faith would violate any such law or regulation.

## 16.    Proprietary Marks

16.1.   Ben & Jerry's represents, with respect to the Proprietary Marks, that Ben & Jerry's has the right to use, and to license Licensee to use, the Proprietary Marks in connection with the rights granted herein within the Territory. Notwithstanding the foregoing and without derogating from any of Ben & Jerry's rights pursuant to any law, Ben & Jerry's shall be entitled to assign any or all of the Proprietary Marks and any or all of its rights under this Agreement to any of its Affiliates. Accordingly, Licensee acknowledges that Ben & Jerry's is considering to assign such rights to Unilever Plc. and is entitled to do so.

16.2.   Licensee acknowledges that the rights granted to Licensee pursuant to this Agreement are granted only in connection with Licensee's exercise of the rights granted pursuant to Section 1.1., all as specifically provided for in the Agreement.

16.3.   With respect to Licensee's use of the Proprietary Marks, Licensee agrees to:

16.3.1  Use only the Proprietary Marks designated by Ben & Jerry's, and to use them only in the manner authorized and permitted by Ben & Jerry's;

16.3.2  Use the Proprietary Marks only for the manufacture of the Local Proprietary Products, distribution of the Proprietary Products in the Territory, operation of the Retail Shops, and the preparation and use of the Promotional Materials;

16.3.3  Manufacture the Local Proprietary Products, distribute the Proprietary Products and operate the Retail Shops only under the name "Ben & Jerry's," and use the Proprietary Marks without prefix or suffix, unless otherwise authorized or required by Ben & Jerry's.  Licensee shall not use the Proprietary Marks, the abbreviations "B&J" or "BJ", or any name that is now, or in the future, used for the Proprietary Products, or other products of Ben & Jerry's as part of its corporate or other legal name or any e-mail address, domain name, or other identification of Licensee or any component of the Licensed Business in any electronic medium, unless agreed to in advance, in writing, by Ben & Jerry's; Without derogating from the above, Licensee shall not combine as a unitary or composite mark any other trademark, name or symbol with any Proprietary Mark or use any other trademark, name or symbol on Product labels or Promotional Materials, except as may be required by law and/or approved in advance in writing by Ben & Jerry's.

16.3.4  Identify itself as an authorized licensee of Ben & Jerry's in conjunction with any use of the Proprietary Marks in the manner required by Ben & Jerry's, including equipment, invoices, order forms, receipts, and business stationery; as well as at such conspicuous locations on each manufacturing, distribution facility, Retail Shop and food service outlet as Ben & Jerry's may designate in writing;

16.3.5 Not to use the Proprietary Marks to incur any obligation or indebtedness on behalf of Ben & Jerry's;

16.3.6 Execute any documents deemed necessary by Ben & Jerry's to obtain protection for the Proprietary Marks, or to maintain their continued validity and enforceability, in the Territory;

16.3.7 Promptly notify Ben & Jerry's of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to the ownership by Ben & Jerry's of, the right of Ben & Jerry's to use and to license others to use, or Licensee's right to use, the Proprietary Marks. Licensee acknowledges that Ben & Jerry's has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. Ben & Jerry's has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. In the event of any litigation relating to Licensee's use of the Proprietary Marks, Licensee shall execute any and all documents and do such acts as may, in the opinion of Ben & Jerry's, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Licensee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, Ben & Jerry's agrees to reimburse Licensee for its out-of-pocket costs in doing such acts; and

16.3.8 Not to use any marks, names, logos or other promotional or marketing materials that are confusingly similar to, or are colorable imitations of, the Proprietary Marks or any of them, or Promotional Materials that are or were used in connection with or bearing the Proprietary Marks.

16.4. Licensee expressly understands and acknowledges that:

16.4.1 Ben & Jerry's is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them. Except as specifically and clearly granted herein, it is understood that Ben & Jerry's is not granting to Licensee, and Licensee does not acquire, by the operation of this Agreement or otherwise, any right to or interest in the name "Ben & Jerry's" or in any derivation of said name or any Proprietary Mark.

16.4.2 Licensee agrees that Ben & Jerry's may immediately terminate this Agreement pursuant to Section 23.2 if, during the Term of this Agreement: (i) Licensee directly or indirectly contests the validity of, the ownership of Ben & Jerry's of, or the right of Ben & Jerry's to use and to license others to use, the Proprietary Marks or (ii) Licensee attempts to register in its own name any of the Proprietary Marks or any variation thereof, or any trademark and/or copyright associated with any portion of the rights granted hereunder.

16.4.3 Licensee's use of the Proprietary Marks does not give Licensee any ownership interest or any other interest in or to the Proprietary Marks.

16.4.4 Any and all goodwill arising from Licensee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Ben & Jerry's, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Licensee's use of the Proprietary Marks.

16.4.5 Ben & Jerry's reserves the right to add to the Proprietary Marks and to substitute different proprietary marks for use in identifying the Proprietary Products and the businesses operating hereunder at the sole discretion of Ben & Jerry's, which different proprietary marks shall also be considered "Proprietary Marks" hereunder. Licensee shall make all such additions and substitutions, at its expense.

34

16.4.6 Licensee will be responsible, at its own sole expense and cost, to design, manufacture and place all Promotional Materials, including point of purchase displays and advertising materials for promotion of the Products in the Territory. All advertising, brochures, displays and other marketing materials or literature in any way relating to the Products and/or using the Proprietary Marks will be subject to the prior written approval of Ben & Jerry's as set forth in Section 20, both with respect to copy and mode of use, all as set forth in this Agreement.

## 17.   Operating Manuals

17.1.   In order to protect the reputation and goodwill of Ben & Jerry's and to maintain high standards of manufacturing, distribution through Wholesale Distribution Channels and the operation of Retail Shops, Licensee shall exercise the rights granted to it hereunder in strict accordance with the standards, methods, policies, and procedures specified in the English language Manuals which Licensee shall receive on loan from Ben & Jerry's, for the Term of this Agreement.

17.2.   Licensee shall treat the Manuals, any translation thereof, any other materials created for or approved for use in the manufacturing of the Proprietary Products and the operation of the Retail Shops and the information contained therein as confidential, and shall use best efforts to maintain such information as secret and in strict confidence. Except as described in Section 17.3, Licensee shall not copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

17.3.   Licensee may obtain, at its sole expense, a local-language translation of the Manuals, and any operating and instructional materials Ben & Jerry's provides to Licensee, if Licensee deems such translation necessary for the full and proper exercise of the rights granted herein within the Territory. Such translation shall be approved by Ben & Jerry's prior to its use, and all translators shall execute such document or documents as Ben & Jerry's may require to assign to Ben & Jerry's any rights said translators may have in the

35

translated materials. Ben & Jerry's shall use its best efforts to review for approval all translations submitted to Ben & Jerry's by Licensee within sixty (60) days of receipt of such translations by Ben & Jerry's.

17.4.    All copies of the Manuals, including any translations thereof, shall remain the sole property of Ben & Jerry's and shall be kept by the Licensee in a secure place and returned to Ben & Jerry's as provided herein.

17.5.    Ben & Jerry's may from time to time revise the contents of the Manuals. Licensee expressly agrees to comply with each such new or revised Manuals upon receipt of written notice from Ben & Jerry's of such change(s). Licensee may suggest changes to the Manuals as described in Section 15.14.

17.6.    Licensee shall ensure that all copies of the Manuals, whether translations or originals, are kept current at all times. In the event of any dispute as to the contents of the Manuals, the terms of the master copies maintained at the home office of Ben & Jerry's shall be controlling.

**18.    Confidential Information**

18.1.    Each party to this Agreement shall keep in strict confidence all information received from the other party to this Agreement. Such confidential information (the "**Confidential Information**") shall include, without limitation, not only the Licensed Technology and the Manuals but also any information: (i) relating to the formulation of the Proprietary Products or the operation of the Retail Shops, or (ii) which, prior to or concurrent with its disclosure to the other party, is identified in writing as confidential; provided, however, that Licensee may use and disclose to others such of the Confidential Information received from Ben & Jerry's as may be necessary in connection with the full and proper exercise of the rights granted hereunder. Neither party to this Agreement shall be bound by any confidentiality restrictions with respect to any information to the extent that such information:

18.1.1 Came into the lawful possession of the receiving party through sources other than the other party to this Agreement or any of their Affiliates,

and where the sources providing such information were under no direct or indirect confidentiality obligation to the other party to this Agreement with respect to such information; or

18.1.2  Became publicly available through no act or failure to act on the part of the receiving party.

18.2    The manufacture of any Proprietary Product as well as the marketing, distribution, sale, and service by Licensee of the same, including the supporting documentation therefore, which inherently discloses the Confidential Information of Ben & Jerry's, shall not in itself be deemed publication, disclosure or dissemination of such Confidential Information for purposes of this Section 18; provided, however, that none of the documents containing Confidential Information transferred by Ben & Jerry's to Licensee hereunder, or any portion thereof, may be used by Licensee as such supporting documentation without prior written consent by Ben & Jerry's.

18.3    Upon termination of this Agreement, whether by default or expiration, Licensee shall use the same care and discretion to protect the Confidential Information, and shall not in any way use or disclose the Confidential Information.

18.4.   At Ben & Jerry's request, Licensee shall require its shareholders, directors, Managers and any other personnel, agents, subcontractors or translators as permitted by Section 17.3 having access to any of Ben & Jerry's Confidential Information, to execute covenants, in a form approved by Ben & Jerry's, that such personnel will maintain the confidentiality of information they receive in connection with their employment or retention by Licensee.  Such covenants shall be in a form satisfactory to Ben & Jerry's, including specific identification of Ben & Jerry's as a third-party beneficiary of such covenants with the independent right to enforce them.

**19.    Accounting Records**

19.1.   Licensee shall record all sales of all components of the Licensed Business on a suitable computer-based, point-of-sale record keeping and control system. Licensee shall prepare, and shall preserve for at least five (5) years from the dates of their preparation, complete and accurate books, records, and accounts, in accordance with generally accepted accounting principles and in the form and manner prescribed by Ben & Jerry's from time to time in the Manuals or otherwise in writing.

19.2.   All Gross Sales, sales tax, and charges collected on behalf of third parties shall be recorded by Licensee in accordance with the procedures prescribed in the Manuals, and on such point-of-sale record keeping and control system as shall be agreed upon with Ben & Jerry's.

19.3.   Licensee shall, at Licensee's expense, submit to Ben & Jerry's in the form prescribed by Ben & Jerry's, the following reports, financial statements, and other data:

19.3.1 No later than the fifteenth (15th) day of the months of January and October, a profit and loss statement (including but not limited to profit and loss statements for each Retail Shop) reflecting all Gross Sales, during the preceding three calendar months, for all sales of the Products sold by Licensee, or the equivalent in the Territory, prepare profit and loss statements on an accrual basis using generally accepted accounting principles; and

19.3.2 Other forms, statements, reports, records, information, and data as Ben & Jerry's may reasonably designate with respect to the Licensed Business.

19.4.   Ben & Jerry's and its agents shall have the right at all reasonable times to examine and copy, at their expense, the books, records, accounts, and/or business tax returns of Licensee relating to the Licensed Business, including, but not limited to, those relating to any particular component of the Licensed

38

Business. Ben & Jerry's shall also have the right, at any time, to have an independent audit made of the books of Licensee relating to the Licensed Business. If an audit reveals that any contributions or payments have been understated in any statement or report to Ben & Jerry's, then Licensee shall immediately pay to Ben & Jerry's the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of twelve percent (12%) per annum, or the maximum rate permitted by law, whichever is less. If any audit discloses an understatement in any statement or report of three percent (3%) or more, Licensee shall, in addition to repayment of monies owed with interest, pay for any and all costs and expenses connected with such audit (including travel, lodging and wages expenses, and reasonable accounting and legal costs). The foregoing remedies shall be in addition to any other remedies Ben & Jerry's may have.

## 20.   **Marketing and Promotion**

20.1.   Recognizing the value of marketing and promotion, and the importance of the standardization of marketing and promotion programs to the furtherance of the goodwill and public image, Licensee and Ben & Jerry's agree, for the Term of this Agreement, in accordance with the following:

20.2.   Upon the execution of this Agreement and prior to October in each following year, Licensee shall complete and provide to Ben & Jerry's a business plan in a format to be provided by Ben & Jerry's ("**Business Plan**") for the Territory for the next calendar year, which shall include projected sales, projected purchases of Products from Ben & Jerry's, all material planned Promotional Materials, and Licensee's plan to fulfill its social mission activity as set forth in Section 15.19.

20.3.   All marketing and promotion materials used by Licensee must strictly conform to the requirements of Ben & Jerry's as set forth in the Manuals or otherwise in writing. As described in Section 15.14, Licensee may request Ben & Jerry's in writing to change such requirements.

39

20.4.   When Licensee advertises and/or markets any of the Products, Licensee shall ensure that its marketing and advertising efforts are in accordance with high quality and good taste and will be comparable to the highest quality marketing efforts in the Territory for competitive products. Licensee shall bear all costs of its marketing and advertising of the Products hereunder.

20.5.   At all times during the Term, Licensee shall employ a "**Product Manager**" who shall be reasonable satisfactory to Ben & Jerry's. The Product Manager shall be a designated employee of Licensee who shall be available to Ben & Jerry's on a reasonable basis during Licensee's regular business hours. The Product Manager shall maintain continuous contact with such Ben & Jerry's employee as Ben & Jerry's may from time to time designate, and shall be fully familiar with Ben & Jerry's methods of operation in general and with the Proprietary Products in particular, and shall coordinate the performance by Licensee of its manufacturing, distribution, retail operations, marketing, promotional and product support obligations under this Agreement, and shall promptly respond to all of Ben & Jerry's both oral and written requests.

20.6.   Licensee shall (a) conduct business in a manner that reflects favorably at all times on the Proprietary Products, the Retail Shops, the Proprietary Marks and the good name, goodwill and reputation of Ben & Jerry's; (b) avoid deceptive, misleading or unethical practices that are or might be detrimental to Ben & Jerry's, the Proprietary Products, the Retail Shops, the Proprietary Marks or the public, including, but not limited to, disparagement of Ben & Jerry's, the Products, the Retail Shops, or the Proprietary Marks; (c) make no false or misleading representations with regard to Ben & Jerry's, the Proprietary Products, the Retail Shops, or the Proprietary Marks; (d) not publish or employ or cooperate in the publication or employment of any misleading or deceptive advertising material; (e) make no representations, warranties or guaranties to anyone with respect to the specifications, features or capabilities of the Products that are inconsistent with any literature distributed by Ben & Jerry's, including all warranties and disclaimers contained therein; and (f) not engage in illegal or deceptive trade practices such as bait and switch techniques or any other practices proscribed hereunder.

40

20.7.   Ben & Jerry's acknowledges that, subject to the terms and conditions of this Agreement, Licensee has the right to use the Proprietary Marks in or on catalogues and display, advertising and promotional materials (all such catalogues and display, advertising and promotional materials incorporating of the Proprietary Marks referred to collectively herein as "**Promotional Materials**") for the Products; *provided however,* that Licensee shall submit the material Promotional Materials to Ben & Jerry's for its written approval prior to any use thereof. Licensee shall procure Ben & Jerry's approval of material Promotional Materials in two steps: first, when Licensee has put the Promotional Materials in rough or story board format, and second, when Licensee has put the Promotional Materials in final form. In each case, Licensee shall provide Ben & Jerry's with copies of the Promotional Materials both in English and in the language in which Licensee proposes to use such Promotional Materials. Approval or disapproval shall be at Ben & Jerry's sole discretion, and the use of unapproved Promotional Materials is strictly prohibited. Ben & Jerry's shall endeavor to provide its approvals or disapprovals hereunder reasonably promptly; *provided, however,* that all Promotional Materials not approved in writing by Ben & Jerry's within ten (10) days of Ben & Jerry's written receipt of Licensee's request for approvals shall be deemed disapproved. Printed matter submitted to Ben & Jerry's for approval hereunder shall be submitted with four (4) additional copies thereof. If Ben & Jerry's provides Licensee with forms for use in the submission of Promotional Material approval requests, Licensee shall use the same. Licensee acknowledges and agrees that any and all copyright and any other intellectual property rights in and to advertising and Promotional Materials developed by or on behalf of Licensee which bear the Proprietary Marks shall be the sole property of Ben & Jerry's, and Licensee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Ben & Jerry's to give effect to this provision, without any compensation to Licensee.

20.8.   Licensee shall not, without Ben & Jerry's prior written consent (which may be granted or withheld in Ben & Jerry's sole discretion), sell or otherwise provide

any Products for use in fundraisers, sweepstakes or similar activities. All costs of all advertising and promotions shall be borne by Licensee. Licensee shall pay to Ben & Jerry's all out of pocket costs of Ben & Jerry's for the artwork and copy provided by Ben & Jerry's.

20.9. Licensee shall not utilize the Promotional Materials or any part thereof in connection with any products or services other than the Products or solely to promote Licensee and, without limiting the materiality of any other term of this Agreement, such use shall be considered a material breach of this Agreement.

20.10. Licensee shall be solely responsible for ensuring that all campaign and marketing materials (including, without limitation, any Promotional Materials) shall comply with all applicable laws and regulations. Ben & Jerry's authorization of the use or manner of use of any proposed Promotional Materials hereunder shall not constitute an opinion as the legal appropriateness or adequacy of such use or manner of use and Licensee's use of the same shall be its sole responsibility.

20.11. Ben & Jerry's may, in its sole discretion and at its sole expense, contribute Proprietary Products (including Proprietary Gift Products) to be used for promotions.

20.12 Licensee specifically acknowledges and agrees that any Website (as defined below) shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Ben & Jerry's approval under the provisions of Section 20.7. As used in this Agreement, the term "Website" means an interactive electronic document, series of symbols, or otherwise, that is contained in a network of computers linked by communications software. The term Website includes, but is not limited to, Internet and World Wide Web home pages. In connection with any Website, Licensee agrees to the following:

42

20.12.1  If required by Ben & Jerry's, Licensee shall not establish a separate Website. Ben & Jerry's shall have the right, but not the obligation, to designate one or more web page(s) to describe Licensee and/or the Licensed Business, such web page(s) to be located within Ben & Jerry's Website;

20.12.2  If Ben & Jerry's gives written approval for Licensee to establish a separate Website, then each of the following provisions shall apply:

20.12.2.1 Before establishing the Website, Licensee shall submit to Ben & Jerry's, for Ben & Jerry's prior written approval, a sample of the proposed Website domain name, format, visible content (including, but not limited to, meta tags) in the form and manner Ben & Jerry's may reasonably require; and Licensee shall not use or modify such Website without Ben & Jerry's prior written approval as to such proposed use or modification.

20.12.2.2 In addition to any other applicable requirements, Licensee shall comply with Ben & Jerry's standards and specifications for Websites as prescribed by Ben & Jerry's from time to time in the Manuals or otherwise in writing.

20.12.2.3 If required by Ben & Jerry's, Licensee shall establish such hyperlinks to Ben & Jerry's Website and other Websites, as Ben & Jerry's may request in writing. Licensee shall not establish any hyperlinks to Ben & Jerry's Website or other Unilever Websites without obtaining Ben & Jerry's prior written approval.

20.12.3  Ben & Jerry's may revoke its approval at any time, in writing, and require that Licensee discontinue operation of a separate Website, upon which Licensee shall immediately discontinue use of such separate Website.

**21.    Insurance**

21.1.   Licensee shall procure, prior to the commencement of any operations under
this Agreement, and shall maintain in full force and effect at all times during
the term of this Agreement, at Licensee's expense, an insurance policy or
policies protecting Licensee, and Ben & Jerry's and their respective officers,
directors, partners, agents and employees against any demand or claim with
respect to personal injury, death or property damage, or any loss, liability, or
expenses whatsoever arising or occurring upon or in connection with the
manufacture of the Local Proprietary Products, distribution of the Products, or
the operation of Retail Shops, including, but not limited to, comprehensive
general liability insurance, property and casualty insurance, statutory workers'
compensation insurance, and product liability insurance.   Such policy or
policies shall be written by a responsible carrier or carriers acceptable to Ben
& Jerry's, shall name Ben & Jerry's and their Affiliates as additional insured
parties, and shall provide at least the types and minimum amounts of coverage
specified in the Manuals and other writings.  If the type of insurance coverage
typically obtained by businesses operating in the Territory that are similar to
or the same as operation of the business differs from that described in the
Manuals, Licensee may petition Ben & Jerry's to deviate from the requirement
that Licensee purchase such insurance.

21.2.   Licensee's obligation to obtain and maintain the policy or policies in the
amounts specified in the Manuals and other writings shall not be limited in
any way by reason of any insurance which may be maintained by Ben &
Jerry's, nor shall Licensee's performance of that obligation relieve it of
liability under the indemnity provisions set forth in Section 28 of this
Agreement.

21.3.   Prior to the commencement of any operations under this Agreement, and
thereafter on an annual basis, Licensee shall deliver to Ben & Jerry's,
certificates of insurance (**"Certificates of Insurance"**) evidencing the proper
types and minimum amounts of coverage for all components of the Licensed
Business.  Licensee also shall maintain Certificates of Insurance evidencing

44

the proper types and minimum amounts of coverage and furnish a copy to Ben & Jerry's. All Certificates of Insurance shall expressly provide that no less than thirty (30) days' prior written notice shall be given to Ben & Jerry's in the event of material alteration to or cancellation of the coverage's evidenced by Certificates of Insurance.

21.4.   Should Licensee fail, for any reason, to procure or maintain the insurance required by this Agreement, as such requirements may be revised by Ben & Jerry's in the Manuals or otherwise in writing, Ben & Jerry's shall have the right and authority (but not the obligation) to procure such insurance and to charge the cost of that insurance to Licensee, which charges, together with a reasonable fee for the expenses of Ben & Jerry's in so acting, shall be payable by Licensee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Ben & Jerry's may have.

## 22.   Transfer of Interest in the Licensed Business

22.1.   Ben & Jerry's shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, provided that such assignee agrees to be bound by all of the provisions of this Agreement, and any designated assignee of Ben & Jerry's shall become solely responsible for all obligations of Ben & Jerry's under this Agreement from the date of assignment. Licensee shall execute such documents of acknowledgement of assignment, or otherwise, which Ben & Jerry's shall request with respect to such assignment by Ben & Jerry's.

22.2.   Licensee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Licensee, and that Ben & Jerry's has granted this license in reliance on the business skill, financial capacity, and personal character of Licensee's shareholders. Accordingly, Licensee shall not sell, assign, transfer, convey, pledge, encumber, merge, or give (collectively, **"transfer"**) away any rights or obligations under this Agreement, or in all or substantially all of the assets of the Licensee, without notifying, and obtaining the prior written consent of, Ben & Jerry's. For the purposes of this Section

45

22.2, any direct or indirect change of control of Licensee shall constitute a transfer of Licensee's rights and obligations under this Agreement.

22.3. Licensee shall not grant a security interest in the rights granted by Ben & Jerry's hereunder unless the secured party agrees that in the event of any default by Licensee under any documents related to the security interest, Ben & Jerry's shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Licensee, and, in the event Ben & Jerry's exercises such option, any acceleration of indebtedness due to Licensee's default shall be void.

22.4. The consent of Ben & Jerry's to a transfer pursuant to this Section 22 shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be a waiver of the right of Ben & Jerry's to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

22.5 Ben & Jerry's may require, as a condition of its consent to a transfer pursuant to this Section 22, that the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Ben & Jerry's may request) enter into a written agreement, in a form satisfactory to Ben & Jerry's, assuming and agreeing to discharge all of Licensee's obligations under this Agreement for the remainder of the Term; and, if the transferee is other than an individual, Ben & Jerry's may request that such of the owners of a beneficial interest in the transferee as Ben & Jerry's may determine, provide a guarantee of the performance of all such obligations in writing in a form satisfactory to Ben & Jerry's.

22.6. Any Retail Shop which has not been refurbished pursuant to Section 4.2.5 or Section 15.15 within five (5) years prior to the proposed transfer, shall, in a manner satisfactory to Ben & Jerry's, be refurbished, renovated, and/or reconstructed by transferee and the transferee shall expend such funds as Ben & Jerry's requires in doing so, to conform to the general building design, trade dress, color schemes, and presentation of the Proprietary Marks to the image

then current for new or the most recently remodeled Retail Shops within Ben & Jerry's retail system (including, without limitation, structural changes, remodeling, redecoration and modification to existing improvements).

22.7.   The transferee and the transferee's managers will, at the transferee's expense, successfully complete the then current Ben & Jerry's training programs for operators and managers upon such terms and conditions as Ben & Jerry's reasonably may require.

22.8.   The Licensee shall pay Ben & Jerry's a transfer fee in the amount equal to three percent (3%) of the average annual fee for the prior three calendar years of the Gross Turnover, or the Renewal Fee, whichever is greater at the time of the transfer.   Payments shall be made in accordance with Section 12. However, in the case of a transfer to a business entity owned by Licensee or Licensee's current shareholder for the convenience of ownership or any other reason approved by Ben & Jerry's, no such transfer fee shall be required; provided that such transfer remains subject to Ben & Jerry's prior written consent pursuant to Section 22.2 above.

22.9   Licensee shall remain liable for all of the obligations to Ben & Jerry's in connection with the Licensed Business that arose prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Ben & Jerry's to evidence such liability.   Notwithstanding the foregoing, Licensee shall be permitted to allow Avi Zinger to bring a partner into the Licensed Business by issuing new shares in the Licensee or by Avi Zinger selling part of his existing shares in the Licensee, provided that Avi Zinger retains control of the Licensee and the Licensed Business and subject to all other provisions, of this Agreement.   Licensee shall provide Ben & Jerry's with ninety (90) days' prior written notice of any intended change in the shareholders of the Licensee.   Ben & Jerry's shall be entitled to veto any specific partner proposed by the Licensee, if in the sole opinion of Ben & Jerry's such a partner would have an adverse effect upon Proprietary Marks or any related Proprietary Information.

47

**23.    Default and Termination**

23.1.    Licensee shall be in default under this Agreement, and all rights granted to Licensee herein shall automatically terminate without notice to Licensee, if Licensee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Licensee or such a petition is filed against and not opposed by Licensee; if Licensee is adjudicated bankrupt or insolvent; if a proceeding for the appointment of a receiver of Licensee or other custodian for Licensee's business or assets is filed and consented to by Licensee; if a receiver or other custodian (permanent or temporary), or the local equivalent thereof, of Licensee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any law of the Territory is instituted by or against Licensee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer; if Licensee is dissolved; if execution is levied against Licensee's business or property; if suit to foreclose any lien or mortgage against the equipment used for the manufacture of the Local Proprietary Products is instituted against Licensee and not dismissed within thirty (30) days; or if the real or personal property of the Licensee shall be sold after levy thereupon by any government official.

23.2.    In addition to the events described elsewhere in this Agreement upon, or subsequent to, the occurrence of any of the following events of default, Ben & Jerry's may, at its option, terminate this Agreement and all rights granted hereunder, without affording Licensee any opportunity to cure the default, effective immediately upon the provision of notice to Licensee (in the manner provided under Section 30):

23.2.1   If Licensee acts, or fails to act, in any manner which is inconsistent with or contrary to the terms and conditions of the rights granted hereunder;

23.2.2   If Licensee or any of its owners is convicted of a serious crime, or any other crime or offense that Ben & Jerry's believes is reasonably likely

to have an adverse effect on the manufacture of the Local Proprietary Products and/or distribution of the Proprietary Products or the operation of the Retail Shops, the Proprietary Marks, the goodwill associated therewith, or the interest of Ben & Jerry's therein;

23.2.3 If a threat or damage to public health or safety results from Licensee's manufacture of the Local Proprietary Products, distribution of the Products or operation of the Retail Shops;

23.2.4 If Licensee's action or inaction, at any time, results in the loss of the right, or forfeiture of the right, to do or transact business in the Territory;

23.2.5 If Licensee fails to maintain or observe any of the health and sanitation standards and procedures prescribed by Ben & Jerry's in this Agreement or by Ben & Jerry's in the Quality Assurance Manuals, or otherwise in writing;

23.2.6 If Licensee permits or assists any Affiliate or any other party to act in breach of Section 2.1, or if Licensee purports to grant, license or sublicense any other person or entity to distribute the Proprietary Products without assuring quality standards and all other requirements in violation of Section 1.3, or if Licensee exports Proprietary Products except in accordance with, or otherwise violates, Section 1.4 or purports to make any transfer contrary to the terms of Section 22;

23.2.7 If Licensee knowingly maintains false books or records, or knowingly submits any false statements or reports to Ben & Jerry's;

23.2.8 If, contrary to the terms of Section 17 and Section 18, Licensee discloses, divulges or fails to protect the contents of the Manuals or other Confidential Information provided to Licensee by Ben & Jerry's;

49

23.2.9  If Licensee misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the Proprietary Products or files for a mark, in its own name, which relates to any portion of the rights granted hereunder;

23.2.10  If Licensee exercises the rights granted hereunder in a manner that materially impairs the reputation or goodwill associated with the Proprietary Marks, Proprietary Products, or the rights of Ben & Jerry's therein;

23.2.11  If Licensee, after curing a default pursuant to Sections 23.3 or 23.4, commits the same default again;

23.2.12  If any purported assignment or transfer is made to any third party without the prior written consent of Ben & Jerry's contrary to the terms of Section 22, or if Avi Zinger ceases to control or to be actively involved in the management of Licensee without the prior written consent of Ben & Jerry's.

23.3   Upon or subsequent to the occurrence of any of the following events of default, Ben & Jerry's may, at its option, terminate this Agreement by giving written notice of termination (in the manner set forth under Section 30) stating the nature of the default to Licensee at least fourteen (14) days prior to the effective date of termination; provided, however, that Licensee may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of Ben & Jerry's within the fourteen (14) day period. If any such default is not cured within the specified time, this Agreement shall terminate without further notice to Licensee, effective immediately upon the expiration of the fourteen (14) day period. Defaults which are susceptible of cure hereunder include the following illustrative events:

23.3.1  If Licensee fails, refuses, or neglects promptly to pay any monies owing to Ben & Jerry's or its Affiliates when due; or

50

23.3.2   If Licensee refuses to permit Ben & Jerry's or its representatives to inspect the facilities used to manufacture the Local Proprietary Products or distribution of the Products, or the Retail Shops, or the books, records, or accounts of the Licensed Business upon demand or;

23.3.3   If Licensee fails, refuses, or neglects promptly to submit Certificates of Insurance to Ben & Jerry's when due as required under Section 21.

23.3.4   If Licensee fails to provide Ben & Jerry's with a Business Plan or fails to meet the goals of each Business Plan as required under Section 20.2.

23.3.5   If Licensee utilizes the Promotional Materials in breach of Section 20.9.

23.3.6   If the independent board of Ben & Jerry's Homemade, Inc., determines, in its reasonable discretion, that the Licensee is violating, diluting or otherwise acting contrary to the integrity of the essential elements of the Ben & Jerry's brand name or to the social mission priorities established with respect to the business of Ben & Jerry's.

23.4    Except as otherwise provided in Section 23.1, Section 23.2 and Section 23.3 of this Agreement, upon any other default by Licensee, Ben & Jerry's may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 30) stating the nature of the default to Licensee at least thirty (30) days prior to the effective date of termination; provided, however, that Licensee may avoid termination by immediately initiating a remedy to cure such default, curing it to the satisfaction of Ben & Jerry's and by promptly providing proof thereof to Ben & Jerry's within the thirty (30) day period.  If any such default is not cured within the specified time, this Agreement shall terminate without further notice to Licensee, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require.

24.     **Obligations upon Termination or Expiration**

51

Upon termination or expiration of this Agreement any and all rights granted hereunder to Licensee shall terminate, and:

24.1   Licensee shall immediately cease to manufacture the Local Proprietary Products and/or distribute the Proprietary Products or operate the Retail Shops, and shall not thereafter, directly or indirectly, represent to the public or hold itself out (other than a modest and reasonable reference in a resume provided by Avi Zinger to a potential employer) as a present or former holder of the rights granted herein in connection with the promotion or operation of any other business.

24.2   Licensee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the rights granted herein; the Proprietary Mark "Ben & Jerry's", and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the manufacture of the Local Proprietary Products and/or distribution of the Proprietary Products or the operation of the Retail Shops or confusingly similar thereto. In particular, Licensee shall cease to use all signs, marketing materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks. Licensee shall promptly transfer and assign to Ben & Jerry's, at Ben & Jerry's' request, all internet or electronic network domain names and/or addresses and any electronically assessable pages, advertising or other Promotional Materials in form so that same may be used or accessed on any electronically assessable network.

24.3   Licensee shall take such action as may be necessary to cancel any assumed name registration or equivalent registration obtained by Licensee which contains the mark "Ben & Jerry's", or any other Proprietary Marks, and Licensee shall furnish Ben & Jerry's with evidence satisfactory to Ben & Jerry's of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

24.4   Licensee agrees, in the event that it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit,

52

copy, or colorable imitation of any of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in the sole discretion of Ben & Jerry's, is likely to cause confusion, mistake, or deception, or which, in the sole discretion of Ben & Jerry's, is likely to dilute the rights of Ben & Jerry's in and to the Proprietary Marks. Licensee further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to Ben & Jerry's, or the Proprietary Marks) which, in the sole discretion of Ben & Jerry's, suggests or represents a present or former association or connection with Ben & Jerry's, or the Proprietary Marks.

24.5    Licensee promptly shall pay all sums owing to Ben & Jerry's and its Affiliates. In the event of termination for any default of Licensee, such sums shall include all damages, costs, and expenses, including reasonable attorney's fees, incurred by Ben & Jerry's as a result of the default and termination, which obligation shall give rise to and remain, until paid in full, a lien in favor of Ben & Jerry's against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Licensee at the time of default, and Licensee hereby acknowledges and agrees that Licensee at all times shall have executed and timely filed all documents necessary in the Territory to give full effect to the terms of this Section 24.5.

24.6    Licensee immediately shall deliver to Ben & Jerry's the Manuals, and all other records, correspondence, and instructions containing Confidential Information relating to the exercise of the rights granted herein (and any translations and/or copies thereof, regardless of whether same were made in violation of this Agreement), all of which are acknowledged to be the property of Ben & Jerry's.

24.7    Ben & Jerry's shall have the option, to be exercised within thirty (30) business days after obtaining the approval of the Controller of Restrictive Trade Practices or obtaining an opinion from its legal advisors that such approval is not necessary, to purchase itself or to designate any other entity to purchase from Licensee any or all of the supplies and inventory related to the

53

manufacture of the Local Proprietary Products and/or distribution of the Products, or the operation of the Retail Shops at fair market value.  If the parties are unable to agree on fair market value within fifteen (15) days after termination or expiration, Ben & Jerry's shall appoint a qualified appraiser, such qualified appraiser to be subject to the approval of Licensee, such approval not to be unreasonably withheld, and the appraiser shall determine fair market value within ten (10) days after appointment.  Ben & Jerry's shall bear the costs of the appraiser.  If Ben & Jerry's elects to exercise this option to purchase, it shall have the right to set off all amounts due from Licensee, if any, against any expenses or payment of the purchase price upon exercise of its option.

24.8    Ben & Jerry's may, subsequent to the termination of this Agreement, exercise its option to repurchase all or any part of the Licensee's Proprietary Products at landed cost (if applicable) or then prevailing market value, whichever is less.

24.9    Licensee and Licensee's Affiliates shall comply with the covenants contained in this Agreement.

24.10   Neither Ben & Jerry's nor Licensee, nor any owner of Licensee, shall make any public statement, to the media or otherwise, except to the extent that such is legally required, whether by virtue of disclosure laws applicable in the Territory or otherwise.

24.11   In the event of termination or non-renewal of this Agreement at the end of the Initial Term or the Renewal Term, or any sooner termination for any reason, Ben & Jerry's will be freed and discharged, and Licensee hereby expressly releases and discharges Ben & Jerry's, of and from any and all obligations and liabilities whatsoever, arising hereunder or in connection with any manner or thing relating to, or in any manner connected with, the subject matter of this Agreement.  The foregoing right of termination and the additional right of non-renewal at the end of the stated terms are absolute (such right of non-renewal being subject only to the rights of the Licensee pursuant to Section

4.2 with respect to the Renewal Term), and neither Ben & Jerry's nor the Licensee will be liable to the other because of termination or non-renewal hereof (whether with or without cause) for compensation, reimbursement, or damages on account of the loss of prospective profits on anticipated sales, or on account of expenditures, investments, leases or commitments in connection with the business or goodwill of Ben & Jerry's or Licensee, or for any reason whatsoever. Nothing herein is intended to relieve any party from any obligation to pay any unpaid balances for Proprietary Products ordered or shipped hereunder prior to termination or expiration.

24.12   The termination of this Agreement will operate as a cancellation, as of the date thereof, of all orders that have not been prepared by Ben & Jerry's for shipment, and thereafter Ben & Jerry's will have no obligation with respect to orders so cancelled.

## 25.   Additional Covenants

25.1   Licensee acknowledges and agrees that the success of the rights granted hereunder is dependent upon the marketing, solicitation, and sale of the Products. To that end, Licensee shall use best efforts to (1) maximize the sale of the Proprietary Products in the Territory; and (2) promote the Wholesale Distribution thereof and (3) operate the Retail Shops in the manner prescribed in the Manuals and (4) implement recommendations from Ben & Jerry's.

25.2   During the Term of this Agreement, Licensee and its Affiliates shall not, directly or indirectly, except as otherwise approved in writing by Ben & Jerry's:

25.2.1 divert or attempt to divert any present or prospective business or customer of any Proprietary Products to any competitor, by inducement or otherwise, or do or perform any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks; or

55

25.2.2  employ or seek to employ any person who is at that time employed by Ben & Jerry's, or by any other Licensee of Ben & Jerry's, or otherwise encourage any such person to leave his or her employment.

25.5  Licensee represents and warrants that (a) it has the right, power and authority to enter into this Agreement and perform its obligations under this Agreement; (b) the making of this Agreement by Licensee does not violate any agreement existing between Licensee and any other person or entity, and throughout the Term, Licensee shall not make any agreement with any person or entity that is inconsistent with any of the provisions of this Agreement; (c) Licensee is, and at all times during the Term shall be, the holder of all consents necessary for Licensee to perform its obligations hereunder; (d) Licensee complies, and at all time during the Term of this Agreement shall be, the holder of all consents necessary for Licensee to perform its obligations hereunder;

25.6  Homemade undertakes that during the Term of this Agreement it will not employ or seek to employ any person who is at that time employed by the Licensee, or otherwise encourage any such person to leave his or her employment with the Licensee.

## 26.   License As A Business Entity

26.1.  Licensee shall comply with the following requirements:

26.1.1  Copies of Licensee's governing documents, and any amendments thereto, including those documents authorizing entry into this Agreement, shall be promptly furnished to Ben & Jerry's.

26.1.2  Licensee shall maintain a current list of all owners of record of Licensee, including, if applicable, owners of any class of voting securities or securities convertible into voting securities of Licensee, and periodically shall furnish such list to Ben & Jerry's upon request.

26.1.3  License shall not include in its name or that of any subsidiary or Affiliate the words "Ben & Jerry's" and to the extent that those words

56

appear in Licensee's name as of the date hereof they will be removed within fourteen (14) days.

27.   **Taxes Permits and Indebtedness**

27.1.   Licensee promptly shall pay when due all taxes levied or assessed, including unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Licensee in the exercise of the rights granted hereunder. Licensee shall pay to Ben & Jerry's an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Ben & Jerry's with respect to any payments to Ben & Jerry's required under this Agreement, unless the tax is credited against income tax otherwise payable by Ben & Jerry's.

27.2.   In the event of any bona fide dispute as to Licensee's liability for taxes assessed or other indebtedness, Licensee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Licensee permit a tax sale or seizure, or attachment by a creditor, to occur.

27.3.   Licensee shall comply with all laws applicable to the manufacture of the Local Proprietary Products, the sale and distribution of the Products in the Territory and the operation of the Retail Shops within the Territory, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper operations of the same.

27.4.   Licensee immediately shall notify Ben & Jerry's in writing of the commencement of any action, suit, or proceeding, and the issuance of any order, award, or decree of any court, agency, or other governmental instrumentality which may adversely affect the operation or financial condition of the Licensee.

28.   **Independent Contractor and Indemnification; Consents**

28.1.   Licensee is an independent contractor.   Ben & Jerry's and Licensee are completely separate entities and are not fiduciaries, partners, joint venturers, or agents of the other in any sense and neither shall have the power to bind the other.   No act or assistance given by either party to the other pursuant to his Agreement shall be construed to alter the relationship.

28.2.   During the Term of this Agreement, Licensee shall hold itself out to the public as an independent contractor exercising the rights granted hereunder. Licensee agrees to take such action as may be necessary to do so, including exhibiting a notice of that fact in a conspicuous place at of each of the manufacturing facilities, Wholesale Distribution Channel facilities and Retail Shops the content of which Ben & Jerry's reserves the right to specify.

28.3.   Nothing in this Agreement authorizes Licensee to make any contract, agreement, warranty, or representation on behalf of Ben & Jerry's, or to incur any debt or other obligation in the name of Ben & Jerry's, and Ben & Jerry's shall not in any event assume liability for, or be deemed liable hereunder as a result of any such action, nor shall Ben & Jerry's be liable by reason of any act or omission of Licensee in its exercise of the rights granted herein or for any claim or judgment arising therefrom against Licensee or Ben & Jerry's. Licensee shall indemnify and hold Ben & Jerry's and its Affiliates, their respective present and future officers, directors, employees and agents harmless from and against any and all claims, losses, costs, expenses, liabilities, and damages arising directly or indirectly from, as a result of, or in connection with, Licensee's exercise of the rights granted hereunder, as well as the costs, including attorney's fees, of the indemnified party in defending against them.  Notwithstanding the foregoing, Licensee shall only take action with respect to any claims upon consulting with Ben & Jerry's.

28.4.   Except with respect to a failure under the terms of Section 15.16, under no circumstances shall either party to this Agreement be liable to the other party to this Agreement for lost profits or consequential damages.

28.5    The parties hereto agree that whenever, pursuant to this Agreement, Licensee must obtain the approval or consent of Ben & Jerry's with respect to any matter, whether by petition, submission of materials or any other permitted or required request, such consent or approval is subject to Ben & Jerry's sole discretion, unless the Agreement specifically and expressly limits such discretion with respect to that particular approval or consent right.  In addition, in order to be deemed effective, such approval or consent must be in writing.

## 29.    Government Approvals: Waivers

29.1.   Licensee shall obtain all approvals, consents, permits and licenses necessary to enter into, make enforceable the terms of, or to perform under, this Agreement from all government, fiscal, and/or other proper authorities which are required by the applicable laws and regulations of the Territory.  In obtaining any such approval, consent, permit or license, Ben & Jerry's shall assist Licensee, as requested, in responding to any inquiry in writing to any government or other proper authority.    If, in connection with any government approval, a translation of this Agreement is required, Licensee shall have such translation prepared at its sole cost and expense, and Licensee shall submit such translation to Ben & Jerry's for its written approval prior to submission of the translation to any government authority.  Licensee shall inform Ben & Jerry's of the status of any application referred to in this Section 29.1, in a timely fashion.   In the event there exists a difference between any part of this Agreement and any translation hereof, the terms of this Agreement shall control.

29.2.   Ben & Jerry's makes no warranties or guarantees upon which Licensee may rely, and assumes no liability or obligation to Licensee, by providing any waiver, approval, consent, or suggestion to Licensee in connection with this Agreement, or by reason or any neglect, delay, or denial of any request therefor.

## 30.    Notices

30.1    Any and all notices required or permitted under this Agreement shall be in writing, in the English language, and shall be personally delivered, or sent by

59

any means that affords the sender evidence of delivery, or of rejected delivery (including, but not limited to, transmission by telecopier), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

| | |
|---|---|
| Notices to Licensee: | American Quality Products Ltd.<br>1 Hameisav Street<br>Yavne, 70600, Israel<br>Attention: Avi Zinger |
| With a copy to | Adv. Zvi Chowers<br>Glusman, Chowers, Broid & Co.<br>8 Shaul Hamelech Boulevard<br>Tel Aviv 64733<br>Facsimile: 972-3-693-8680 |
| Notices to Ben & Jerry's:1) | Ben & Jerry's Homemade, Inc.<br>30 Community Drive, Suite 1<br>South Burlington, Vermont 05403<br>U.S.A.<br>Facsimile:<br>Attention: Mr. Stuart M. Wiles<br>International Marketing and Sales<br>And |
| 2) | Unilever N.V.<br>Weena 455<br>Rotterdam, The Netherlands<br>Facsimile:<br>Attention: Mr. Stuart M. Wiles |
| With a copy to | Adv. Paul H. Baris<br>Yigal Arnon & Co.<br>1 Azrieli Center<br>Tel Aviv 67021<br>Facsimile: 972-3-608-7724 |

Any notice by a means that affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.

30.2   Without derogating from the above, with respect to all supply and other operational issues under this Agreement, other than those pertaining to the Proprietary Marks, the primary contact on behalf of Ben & Jerry's shall be

60

Homemade, and for all issues pertaining to the Proprietary Marks (e.g. renewals, infringements, etc.), the primary contact on behalf of Ben & Jerry's shall be Unilever.

## 31.    Severability and Construction

31.1.  If any provision of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable.  The language of each provision of this Agreement shall be construed according to its fair meaning and not strictly against any party.  If any change in the law, excluding any new order or change to any order issued by the Controller of Restrictive Trade Practices to the extent such new order or change are initiated by Ben & Jerry's or its Affiliates, has a material effect on the commercial basis or working of this Agreement, or if this Agreement, in whole or in part, is declared by any competent authority to be illegal, invalid, or otherwise unenforceable, the parties shall endeavor to negotiate, in good faith, amendments which as far as practicable give effect to the intentions as expressed herein.  If, in the reasonable opinion of either party, the scope of such amendments following such negotiations would destroy the commercial value of this Agreement to that party, such party may terminate this Agreement by giving prior reasonable written notice to the other party.

31.2.  Any provision or covenant in this Agreement which expressly or by it nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination), shall survive such expiration or termination.

31.3.  Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Licensee and Ben & Jerry's, and the officers, directors, shareholders, agents, and employees of Ben & Jerry's, and such successors and assigns of Ben & Jerry's as may be contemplated by Section 22, any rights or remedies under or by reason of this Agreement.

**32.   Applicable Law**

32.1   This Agreement and any disputes arising under or related thereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the laws of the State of New York, without reference to its conflicts of law principles.

32.2   Except as otherwise provided herein, upon written demand of either party, any claim or controversy concerning the subject matter hereof shall be submitted to arbitration pursuant to the then prevailing American Arbitration Association rules (the **"Rules"**) before a single arbitrator chosen by the parties, but if the parties cannot agree on an arbitrator, then the arbitrator shall be chosen as provided in the Rules.

32.3   The arbitration proceeding shall be held at an office of the American Arbitration Association in the City of New York, U.S.A. or in such other city as the parties may agree upon at the time arbitration is requested, and the parties hereby waive all questions of personal jurisdiction and venue for the purpose of carrying out this Section. The proceedings and all documents submitted in connection therewith shall be in the English language. The arbitrator's fee shall be borne equally by the parties. All other costs and expenses of the arbitration shall be borne as the arbitrator may determine. Subject to the provisions of Section 28.4, the parties hereby agree that the arbitrator may make any award or awards or enter such orders, including an injunction or specific performance as may be deemed appropriate by the arbitrator, but shall have no authority to award punitive or exemplary damages.

32.4.  Ben & Jerry's and Licensee hereby waive any right to or claim of any punitive or exemplary damages, each against the other, and agree that, in the event of a dispute between them each shall be limited to the recovery of actual damages sustained. Such award or awards shall be the sole and exclusive remedy between the parties hereto regarding any claims, counter-claims, issues, or accounting presented to the arbitrator, except nothing herein shall be deemed

to bar either party's right to obtain injunctive relief against conduct or threatened conduct that will cause it loss of damage. A decision of the arbitrator shall have no collateral estoppel effect with respect to any person or entity not a party to the arbitration proceeding. All awards shall be paid promptly in U.S. dollars, free of any tax, deduction, or offset, and any costs, fees, or taxes incident to enforcing the award shall, to the maximum extent permitted by law, be charged against the party resisting such enforcement. Judgment on the award may be entered by either party in any court of competent jurisdiction. The award shall include interest from the date of any damages incurred for breach or other violation of the contract, and from the date of the award until paid in full, at a rate to be fixed by the arbitrator, but in no event less than twelve percent (12%), or the highest rate permitted by applicable U.S. law, whichever is less. Any arbitration proceeding shall be limited to controversies between Ben & Jerry's and Licensee, and shall not be expanded to include any other parties.

32.5. Nothing contained in this Agreement shall bar Ben & Jerry's right to seek injunctive relief without the posting of any bond or security to obtain the entry of temporary and permanent injunctions and orders of specific performance enforcing the provision of this Agreement relating to Licensee's: (i) use of the Proprietary Marks; (ii) obligations upon termination or expiration of this Agreement; (iii) assignment or proposed assignment of the rights granted herein, this Agreement, or any ownership interest in Licensee; or (iv) actions covered by the provisions of Sections 13, 15, 16 or 27. Ben & Jerry's and Licensee may each seek injunctive relief to prohibit any act or omission by the other, or the directors, employees of the other, that constitutes a violation of any applicable law, or is dishonest or misleading to customers or to the public. Ben & Jerry's also shall be able to seek injunctive relief to prohibit any act or omission by Licensee or its directors or employees which may impair the goodwill associated with the Proprietary Marks. Any party to the arbitration to which relief is granted pursuant to this Section 32.5 shall be entitled to collect from the other party all costs and reasonable attorneys' fees incurred in obtaining such relief.

33.  **Acknowledgments**

Licensee acknowledges that it has conducted an independent investigation of the rights granted herein, and recognizes that the business contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Licensee's owner as an independent business person.  Ben & Jerry's expressly disclaims the making of, and Licensee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

34.  **Force Majeure**

Neither party shall be deemed in default hereunder, nor shall it hold the other party responsible for, any cessation, interruption or delay in the performance of its obligations hereunder other than an obligation to pay money due hereunder, due to causes beyond its reasonable control including, but not limited to: earthquake; flood; fire; storm or other natural disaster; epidemic; accident; explosion; casualty; acts of God; lockout; strike; labor controversy or threat thereof; riot; insurrection; civil disturbance or commotion; boycott; disruption of the public markets; war or armed conflict (whether or not officially declared); sabotage; act of a public enemy; embargo; delay of a common carrier; the inability to obtain sufficient material, supplies, labor, transportation power or other essential commodity or service required in the conduct of its business; or any change in or the adoption of any law, ordinance, rule, regulation, order, judgment, or decree; provided that the party relying upon this Section 34 shall (a) give the other party written notice thereof promptly and, in any event, within five (5) days of discovery thereof and (b) shall take all steps reasonably necessary under the circumstances to mitigate the effects of the *force majeure* upon which such notice is based.

35.  **No Third Party Beneficiaries**

Nothing in this Agreement is intended or shall be construed to give any person, other than the parties hereto, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

~~favor of or against either party by reason of such party having drafted this~~ Agreement or any portion of this Agreement.

This Agreement supersedes any prior Agreement between the parties and/or their Affiliates. To the extent any discrepancies exist between the terms of any provision of this Agreement and Section 20 of the Outline of Terms, the terms of this Agreement shall prevail. This Agreement may be executed in ~~counterparts and shall become effective as of the date executed by Licensee~~.


**BEN & JERRY'S HOMEMADE, INC.**

By: _Stuart M Wiles_

Title: _CFO_

Date: _Jan 8, 2004_


**UNILEVER N.V.**

By: _S. Dijkstra_        _E.J.M. Mulders_

Title: _Attorney B_        _Attorney A_

Date: _March 9, 2004_        _March 9, 2004_


**AMERICAN QUALITY PRODUCTS LTD.**

By: _AMERICAN QUALITY PRODUCTS LTD_

Title: _PRESIDENT_

Date: _JAN 10, 2004_

# EXHIBIT 7

    

30 community drive · south burlington, vt 05403 · tel: 802 846-1500 · www.benjerry.com

April 8, 2013

Mr. Mark Hage
Vermonters for a Just Peace in Palestine/Israel
26 Liberty Street
Montpelier, VT 05602

Dear Mark,

Thanks for your most recent letter. We recognize that there were scheduling issues that kept us from meeting in November and December last year, therefore we wanted to touch base around potentially connecting.

We also wanted to try to call out the elephant in the room, namely the fact that we face a fundamental challenge. While Vermonters for a Just Peace in Palestine/Israel (VTJP) and Ben & Jerry's have common ground in that we both aspire for peace in the Middle East, we are at fundamental odds over the most effective way that B&J can contribute. It makes for a challenging meeting when both groups start at such opposite ends of the spectrum. While we recognize that fact, we also feel that peace in the Middle East requires extraordinary efforts by all parties.

We felt before we met, it would be worth communicating a few of our basic disagreements with the way you've presented our situation.

Ben & Jerry's was honest and transparent with VTJP in our face-to-face meeting about our Licensee's business in Israel. In no way does Ben & Jerry's "profit" from anything in the contested territories. VTJP made a clear choice against constructive dialogue in launching its campaign against Ben & Jerry's with the false claim *"Ben & Jerry's is Profiting from Israel's Illegal Settlements and Occupation of Palestine."* We felt disappointed that VTJP was made aware of this fact and still decided to publish this headline to make PR gains for its campaign. We also shared with you that our Licensee works within the uncontested territories and that independent businesses distribute products outside of our Licensee's control, which serve both Palestinians and Israelis.

True to what we told VTJP, Ben & Jerry's Board of Directors and senior management team discussed Ben & Jerry's business in Israel and agreed to internal actions following that meeting. We've been conducting our own review of our Licensee's business in Israel. We also decided to create a fund to support the peace process in the Middle East through programs that promote peace through understanding. In effect we will invest 100% of our future royalty income in this program.

Ben & Jerry's Board Chair is personally involved in the peace process in the Middle East and visited our Licensee in Israel during a trip to the Middle East to gain better insights into the conflict there. From our BOD Chair's specific time in Israel and our ongoing communication with our Licensee, we believe that our Licensee in Israel operates his business in alignment with Ben & Jerry's Mission and Values.

ben & jerry's · peace, love, & ice cream · ben & jerry's · peace, love, & ice cream · ben & jerry's

We strongly feel that the presence of socially responsible businesses, that actively promote the peace process and provide employment and opportunity, are critical for achieving peace.

Our Board Chair, Jeff Furman, has asked to attend any potential meeting. He will be in Vermont on Thursday April 30th and would be available to meet in the afternoon in Burlington.  Please let me know if you are able to attend.

Respectfully,

Jostein Solheim,
CEO
Ben & Jerry's

# EXHIBIT 8



April 16, 2014

Dear Mr. Hage and VTJP Members,

We have sat at the table with you to discuss your concerns.  We have read your letters.  We understand your point of view.   We understand that there is an incredibly painful conflict in the Middle East.  We recognize that there are people who are suffering on both sides.

We have invested much time and effort to learn more.  We've had leadership and Board members visit the Middle East to experience, first hand, what's happening there.  We've had visitors here from both sides of the conflict to hear and understand their points of view on what's happening in the region.  We have been honest with you from the start of our discussions that the license agreement we have in Israel is not a profit generator, and any amount that we earn in royalties will be invested in programs that promote peace through constructive business activities in the region.

We've also taken a deeper look at everything our Licensee does in Israel.  How he runs his business and works to serve Ben & Jerry's Mission and Values.  We are confident that our Licensee in Israel is operating his business in a responsible and appropriate way.  We are working to build the constructive business relationships that can create positive outcomes such as sourcing Fairtrade-certified ingredients from local farmers.

During our visit we connected with farmers from the Canaan Fair Trade organization.  We were deeply moved by Canaan's commitment to working with small-holder farmers.  Through that interaction and others, we learned more about their everyday struggles and the importance of our sourcing relationships to help open up their access to and success in global markets.

Contemplating the complexities and the day-to-day realities, we had a discussion about what is the right thing for us to do at this time.  We are certain that supporting Canaan Fair Trade farmers and expanding their opportunities in the global marketplace is important, meaningful work.  It provides economic opportunity, gets their story out and encourages others to connect.  Their stories are powerful examples of human strength and resilience.

We believe we have taken unprecedented steps to understand what our role is in this instance.  We believe that the most powerful thing we can do is to use our business to open up constructive steps that create positive opportunities.  The farmers we met affirmed this to us.  We believe this is the most meaningful path for Ben & Jerry's at this time.

Sincerely,

*Rob Michalak*

Rob Michalak
Global Director of Social Mission
Ben & Jerry's

# EXHIBIT 9



**Vermonters for a Just Peace in Palestine/Israel**
c/o Peace and Justice Center, 60 Lake Street, 1C, Burlington, VT 05401
www.vtjp.org; email: vtjp@vtjp.org

### An Open Letter to the Franchise Owners of Ben & Jerry's Scoop Shops

### March 9, 2015

You are likely aware that there is an international campaign to stop the sale of ice cream made by Ben & Jerry's Israeli franchise and sold to venues in illegal, Jewish-only settlements in the occupied West Bank and East Jerusalem. The campaign was formally launched in 2013, and is organized and led by Vermonters for a Just Peace in Palestine/Israel (VTJP). It is supported by thousands of individuals and over 230 organizations worldwide.

VTJP has a special web page devoted to the campaign at www.vtjp.org/icecream, where we have documented the marketing and sale of Ben & Jerry's ice cream in Israeli settlements. We also describe there our efforts to persuade the company's management and Board of Directors to end this unethical business.

For the past two years, VTJP has also organized leafleting actions at scoop shops across the U.S. on Free Cone Day. Many people inspired by this action and other efforts have told us they have declared a personal boycott of Ben & Jerry's. VTJP is now endorsing and encouraging this tactic after four years of attempting, and failing, to persuade the company to change course.

VTJP is aware that supporting a boycott of Ben & Jerry's may inadvertently hurt your business. For this, we apologize. It is not our intent to undermine the franchises, but to compel the corporation to stop doing business as usual in the occupied territories. We believe, however, that you are well situated to play a key role in convincing Ben & Jerry's to abandon an increasingly unpopular policy.

The continued obstinacy of Ben & Jerry's management on the question of doing business in Israeli settlements is clearly inconsistent with the Company's Mission Statement to which you subscribe. We are appealing to you as an act of conscience and responsible business ethics to contact CEO Jostein Solheim and urge him to stop the sale of ice cream in Israeli settlements, and/or to close the Israeli franchise until Israel ends its illegal military occupation and settlement project.*

We hope you will join us in calling on Ben & Jerry's to act in a manner consistent with its Mission Statement.

Respectfully, on behalf of VTJP,

Ian Stokes

* Contact Jostein Solheim, CEO, at:
Ben & Jerry's
30 Community Drive
South Burlington, Vermont 05402-6828
Email: Jostein.Solheim@Unilever.com; Phone: 1-802-846-1500

# EXHIBIT 10

## FIRST AMENDMENT TO LICENSE AGREEMENT

THIS FIRST AMENDMENT TO LICENSE AGREEMENT ("**Amendment**") is made this 1st day of October, 2020 between **AMERICAN QUALITY PRODUCTS LTD.** ("Licensee"), on the one hand, and **BEN AND JERRY'S HOMEMADE, INC. AND UNILEVER N.V.** (collectively, "Ben and Jerry's"), on the other.

WHEREAS, Licensee and Ben and Jerry's are parties to that certain License Agreement dated January 2004 (the "**Agreement**"); and

WHEREAS, Licensee and Ben and Jerry's wish to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      **Recitals; Definitions.**   The foregoing recitals are true and correct and are incorporated herein as part of the agreement of the parties.  Any word or term with an initial capital letter as used herein shall have the meaning given to it in this Amendment or if not so defined herein shall have the meaning given to it in the Agreement.

2.      **Definitions**.  The definition of the term "Territory" is hereby amended and restated in its entirety as follows:

"Territory – The State of Israel."

3.      **Ratification**.  Except as hereinabove amended, all of the terms, covenants and conditions of the Agreement shall remain in full force and effect, are hereby ratified and confirmed.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

AMERICAN QUALITY PRODUCTS LTD.

By: _____

Name: AVI ZINGER

Title: LICENSEE

BEN AND JERRY'S HOMEMADE, INC.

By: _____

Name: Matthew McCarthy

Title: CEO

UNILEVER N.V.

By: _____

Name: Matt Close

Title: EVP

2

# EXHIBIT 11

    

30 community drive • south burlington, vt 05403 • tel: 802-846-1500 • www.benjerry.com

July 19, 2021

American Quality Products Ltd.
I Hameisav Street
Yavne, 70600, Israel
Attention:  Avi Zinger

Dear Avi:

This letter serves as Ben & Jerry's formal notification to American Quality Products Ltd. ("AQP") that Ben & Jerry's has decided it will let the License Agreement, dated January 2004, between AQP and Ben & Jerry's expire on December 31, 2022.

Ben & Jerry's continues to explore its options regarding future business opportunities in Israel.  In the meantime, our commitment to AQP and our business relationship remains a priority for Ben & Jerry's until the expiration of the License Agreement.

We understand you are disappointed with our decision.  Ben & Jerry's remains grateful to you and your team for all of your hard work and dedication to our brand and our business relationship.

Very truly yours,

Matthew McCarthy
CEO, Ben & Jerry's

ben & jerry's • peace, love, & ice cream • ben & jerry's • peace, love, & ice cream • ben & jerry's

# EXHIBIT 12

Case 2:22-cv-01154-KM-JBC Document 4-3 Filed 03/10/22 Page 174 of 182 PageID: 333



# Ben & Jerry's Will End Sales of Our Ice Cream in the Occupied Palestinian Territory

## July 19, 2021

We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT). We also hear and recognize the concerns shared with us by our fans and trusted partners.

We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year.

Although Ben & Jerry's will no longer be sold in the OPT, we will stay in Israel through a different arrangement. We will share an update on this as soon as we're ready.

## FAQs

### You say this isn't "consistent with your values." What do you mean?

### What do you consider to be the OPT?

### Why are you waiting until next year to remove your products from the OPT?

## Are you exiting Israel? Are you boycotting Israel? Is this part of the Boycott, Divestment, Sanctions (BDS) movement?

## Ben & Jerry's is being accused of antisemitism. What is your response?

## Where else in the world do you sell your ice cream?

Back To Top

## Connect with Us

How can we help you?

Select

## It's Like Dessert For Your Inbox

3/11/22, 12:35 PM
Ben & Jerry's Doubles Down on Our Ice Cream Fueled Opposition to Trump's Immigration Territory. Ben & Jerry's

Case 2:22-cv-01154-KM-JBC   Document 4-2   Filed 03/11/22   Page 176 of 182 PageID: 335

Sign Up For Our Email Newsletter & Get The Inside Scoop!

address@email.com                    SUBSCRIBE

   

# Also of Interest

2015 Social & Environmental Assessment Report

10 Ben & Jerry's Myths, Debunked (Or Confirmed)

Scoop Shops & Catering Near Me

Contact Us

Franchise

Press

Jobs

Terms of Use

Privacy Notice

Sitemap

Accessibility

▷ AdChoices–Do Not Sell

© 2021 Ben & Jerry's Homemade, Inc. This website is directed only to U.S. consumers for products and services of Ben & Jerry's Homemade, Inc. This website is not directed to consumers outside of the U.S.

# EXHIBIT 13

NO PLEDGE TO STAY IN ISRAEL IN BEN & JERRY'S BOARD STATEMENT

# Ben & Jerry's board in dispute with owners Unilever over remaining in Israel

As ice cream giant declares settlement boycott, Unilever vows brand will stay in Israel; but B&J chairman says this wasn't agreed on and owners had no authority to make promise

By **TOI STAFF**
20 July 2021, 2:08 am



In this file photo taken on May 19, 2021 Ben and Jerry's ice cream is stored in a cooler at an event where founders Jerry Greenfield and Ben Cohen gave away ice cream to bring attention to police reform at the US Supreme Court in Washington, DC. (Photo by Kevin Dietsch / GETTY IMAGES NORTH AMERICA / AFP)

A statement Monday by Ben & Jerry's that it will no longer distribute its products in the "Occupied Palestinian Territory" but will remain in Israel was released by the company's owner, Unilever, without consulting with the ice cream maker's board — which had intended to put out a different statement that made no mention of committing to continue doing business with the Jewish state, Ben & Jerry's chairman Anuradha Mittal told NBC News.

While many companies and countries have differentiated between Israel and its settlements in the West Bank, a complete boycott of Israel by a major Western company has been almost unheard-of in recent years.

Mittal said the board had been pushing for years to stop selling its products in settlements and intended to release a different statement from the one Unilever put out. NBC, which reviewed the intended statement, said it made no mention of remaining in Israel and focused on Ben & Jerry's commitment to social justice causes.

Mittal did not rule out the company doing business in Israel in the future with a different distributor but said such a decision would have to be agreed upon by the board and that Unilever had no right to make the commitment on behalf of Ben & Jerry's.

Mittal accused Unilever, the European consumer-product giant that bought Ben & Jerry's in 2000, of violating the purchase agreement that allowed the company to maintain control over its social mission, brand integrity and policies and implied that the decision to ignore the will of the board was racist and sexist.

**Get The Times of Israel's Daily Edition
by email and never miss our top stories**

Your email          GET IT

By signing up, you agree to the terms

"I am saddened by the deceit of it," Mittal told NBC News. "This is not about Israel; it is about the violation of the acquisition agreement that maintained the soul of the company," Mittal said. "I can't stop thinking that this is what happens when you have a board with all women and people of color who have been pushing to do the right thing."



"The statement released by Ben & Jerry's regarding its operation in Israel and the Occupied Palestinian Territory (the OPT) does not reflect the position of the independent board, nor was it approved by the independent board," said the board in a separate statement to NBC. "By taking a position and publishing a statement without the approval of the independent board on an issue directly related to Ben & Jerry's social mission and brand integrity, Unilever and its CEO at Ben & Jerry's are in violation of the spirit and the letter of the acquisition agreement."

Anuradha Mittal (Courtesy)

Mittal also said that the board had passed a resolution to end sales of Ben & Jerry's products in Israeli settlements last July, but that the company's CEO Matthew McCarthy, appointed by Unilever in 2018, "never operationalized it."

"They are trying to destroy the soul of the company," Mittal said. "We want this company to be led by values and not be dictated by the parent company."

Unilever, which has a very large presence in Israel, later released a separate statement expressing its commitment to its presence in Israel. It did not mention the dispute with the Ben & Jerry's board.

"The Israeli-Palestinian conflict is a very complex and sensitive situation. As a global company, Unilever's brands are available in more than 190 countries and in all of them, our priority is to serve consumers with essential products that contribute to their health, wellbeing and enjoyment," Unilever said. "We remain fully committed to our presence in Israel, where we have invested in our people, brands and business for several decades."



In this Thursday, March 15, 2018 file photo, the logo for Unilever appears above a trading post on the floor of the New York Stock Exchange. (AP Photo/Richard Drew, file)

"Ben & Jerry's was acquired by Unilever in 2000. As part of the acquisition agreement, we have always recognized the right of the brand and its independent Board to take decisions about its social mission. We also welcome the fact that

Ben & Jerry's will stay in Israel," Unilever said.

The original statement put out by Unilever on behalf of Ben & Jerry said: "We believe it is inconsistent with our values for Ben & Jerry's ice cream to be sold in the Occupied Palestinian Territory (OPT). We also hear and recognize the concerns shared with us by our fans and trusted partners."

"We have a longstanding partnership with our licensee, who manufactures Ben & Jerry's ice cream in Israel and distributes it in the region. We have been working to change this, and so we have informed our licensee that we will not renew the license agreement when it expires at the end of next year," it said.

However, the company said, it would continue to supply its ice cream inside Israel, albeit through a different distributor.

"Although Ben & Jerry's will no longer be sold in the OPT, we will stay in Israel through a different arrangement. We will share an update on this as soon as we're ready," the statement added.

Israel captured the West Bank from Jordan in the 1967 Six Day War, and today, more than 400,000 Israeli settlers live there. Most of the international community considers the settlements illegal and an impediment to the creation of an independent Palestinian state. Israel sees the territory as disputed and says the fate of the settlements must be resolved in peace negotiations with the Palestinians.

It was not immediately clear if the boycott also applied to East Jerusalem. Israel annexed East Jerusalem, including the Old City and its holy sites, and considers the whole city the undivided capital of the Jewish state. The Palestinians claim the eastern part as the capital of a future state, and the international community sees Israeli neighborhoods there as settlements, a designation Israel disputes.

Ben & Jerry's current Israel distributor condemned the ice cream company's decision to drop its licensing agreement.

3/11/22, 12:13 PM                    Ben & Jerry's board in dispute with owners Unilever over complete Israel pullout | The Times of Israel

Case 2:22-cv-01154-KM-JBC  Document 4-2  Filed 03/11/22  Page 181 of 182 PageID: 340



In this March 23, 2010 file photo ice cream moves along the production line at Ben & Jerry's Homemade Ice Cream, in Waterbury, Vt. (AP Photo/Toby Talbot, File)

"The decision is entirely unacceptable. Ben & Jerry's International decided not to renew their agreement with us in a year and a half, after we refused their demand to stop distribution throughout Israel," it said. "We urge the Israeli government and consumers — don't let them boycott Israel."

"Keep ice cream out of politics," it added.

The distributor, which has produced special flavors for Jewish holidays, such as haroset for Passover and Israeli election-themed flavors, urged Israelis to buy locally produced ice cream instead.

Prime Minister Naftali Bennett released a statement saying that the decision was a mistake.

"Ben & Jerry's decided to brand itself as anti-Israel ice cream," said Bennett. "This is a moral mistake and I believe it will turn out to be a business mistake as well."

"The boycott against Israel… reflects that they have totally lost their way. The boycott doesn't work and won't work and we will fight it with all our might," the prime minister added.

Foreign Minister Yair Lapid also condemned Ben & Jerry's' decision, calling it "a disgraceful capitulation to antisemitism, to BDS [the Boycott, Divestment and Sanctions movement against Israel], to all that is evil in the anti-Israeli and anti-Jewish discourse."

The foreign minister said he would ask the over 30 US states with anti-BDS laws to implement them against Ben & Jerry's in retaliation. The laws require states to divest from companies that boycott Israel.

"We won't be silent," he insisted.

Opposition leader Benjamin Netanyahu also weighed in. "Now we Israelis know which ice cream NOT to buy," he wrote on Twitter.

Ben & Jerry's statement did not explicitly identify the concerns that led to the decision, but last month, a group called Vermonters for Justice in Palestine called on the company to "end complicity in Israel's occupation and abuses of Palestinian human rights."

"How much longer will Ben & Jerry's permit its Israeli-manufactured ice cream to be sold in Jewish-only settlements while Palestinian land is being confiscated, Palestinian homes are being destroyed, and Palestinian families in neighborhoods like Sheik Jarrah are facing eviction to make way for Jewish settlers?" the organization's Ian Stokes said in a June 10 news release.

In a Monday statement, the organization said Ben & Jerry's actions did not go far enough.

"By maintaining a presence in Israel, Ben & Jerry's continues to be complicit in the killing, imprisonment and dispossession of Palestinian people and the flaunting of international law," said the Vermont group's Kathy Shapiro.



Ben & Jerrys 'Pecan Resist' ice-cream launched October 2018. (Ben & Jerrys)

Founded in Vermont in 1978, but currently owned by consumer goods conglomerate Unilever, Ben & Jerry's has not shied away from social causes. While many businesses tread lightly in politics for fear of alienating customers, the ice cream maker has taken the opposite approach, often espousing progressive causes.

Ben & Jerry's took a stand against what it called the Trump administration's regressive policies by rebranding one of its flavors Pecan Resist in 2018, ahead of midterm elections.

The company said Pecan Resist celebrated activists who were resisting oppression, harmful environmental practices and injustice. As part of the campaign, Ben & Jerry's said it was giving $25,000 each to four activist entities.

*The Associated Press contributed to this report.*